# United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 4.0.3 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:09–cv–04760
### *Internal Use Only*

Graczyk et al v. West Publishing Corp.

Assigned to: Honorable Robert W. Gettleman

Demand: $9,999,000

Case in other court:  10–01193

Cause: 28:1331 Federal Question

Date Filed: 08/04/2009

Date Terminated: 12/23/2009

Jury Demand: Plaintiff

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: Federal Question

**Plaintiff**

**Lisa M. Graczyk**

represented by **Ben Barnow**
Barnow and Associates, P.C.
One North LaSalle Street
Suite 4600
Chicago, IL 60602
(312) 621–2000
Email: b.barnow@barnowlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aron David Robinson**
Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, IL 60603
(312) 857–9050
Email: adroblaw@aol.com
*ATTORNEY TO BE NOTICED*

**Blake Anthony Strautins**
Barnow and Associates, P.C.
One North LaSalle Street
Suite 4600
Chicago, IL 60602
(312) 621–2000
Email: b.strautins@barnowlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Matthew M. Jorge**

represented by **Ben Barnow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aron David Robinson**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Blake Anthony Strautins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian Willingham**                    represented by  **Ben Barnow**
*individually and on behalf of all others*              (See above for address)
*similarly situated*                                    *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Aron David Robinson**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Blake Anthony Strautins**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**West Publishing Corp.**               represented by  **Diane Green–Kelly**
*a Minnesota corporation*                               Reed Smith LLP
                                                        10 South Wacker Drive
                                                        40th Floor
                                                        Chicago, IL 60606
                                                        (312) 207–1000
                                                        Email: dgreenkelly@reedsmith.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **David Zev Smith**
                                                        Reed Smith LLP
                                                        10 South Wacker Drive
                                                        40th Floor
                                                        Chicago, IL 60606
                                                        (312) 207–1000
                                                        Email: dzsmith@reedsmith.com
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Mark S. Melodia**
                                                        Reed Smith LLP
                                                        136 MainStreet
                                                        Suite 250
                                                        Princeton, NJ 08540
                                                        609 520 6015
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

**Paul J. Bond**
Reed Smith LLP
136 Main Street
Suite 250
Princeton, NJ 08540
609 520 6393
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/04/2009 | 1 | 6 | COMPLAINT filed by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham; Jury Demand. Filing fee $ 350, receipt number 07520000000003983529.(Barnow, Ben) (Entered: 08/04/2009) |
| 08/04/2009 | 2 | 16 | CIVIL Cover Sheet (Barnow, Ben) (Entered: 08/04/2009) |
| 08/04/2009 | 3 | 17 | ATTORNEY Appearance for Plaintiffs Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham by Ben Barnow (Barnow, Ben) (Entered: 08/04/2009) |
| 08/04/2009 | 4 | 18 | ATTORNEY Appearance for Plaintiffs Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham by Blake Anthony Strautins (Strautins, Blake) (Entered: 08/04/2009) |
| 08/04/2009 | 5 | 19 | ATTORNEY Appearance for Plaintiffs Lisa M. Graczyk, Matthew M. Jorge by Aron David Robinson (Robinson, Aron) (Entered: 08/04/2009) |
| 08/04/2009 | 6 | 20 | ATTORNEY Appearance for Plaintiff Brian Willingham by Aron David Robinson (Robinson, Aron) (Entered: 08/04/2009) |
| 08/05/2009 | | 21 | CASE ASSIGNED to the Honorable Robert W. Gettleman. Designated as Magistrate Judge the Honorable Nan R. Nolan. (li, ) (Entered: 08/05/2009) |
| 08/05/2009 | 7 | 22 | SUMMONS Issued as to Defendant West Publishing Corp. (ep, ) (Entered: 08/06/2009) |
| 08/20/2009 | 8 | 23 | SUMMONS Returned Executed by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham as to West Publishing Corp. on 8/12/2009, answer due 9/1/2009. (Strautins, Blake) (Entered: 08/20/2009) |
| 08/28/2009 | 9 | 25 | REQUEST for Clerk of Court to refund filing fee in the amount of 700.00, receipt no. 3983488; 3983515, regarding complaint 1 (Attachments: # 1 Exhibit)(Strautins, Blake) (Entered: 08/28/2009) |
| 09/30/2009 | 10 | 27 | ATTORNEY Appearance for Defendant West Publishing Corp. by David Zev Smith (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 11 | 28 | Corporate Disclosure Statement by West Publishing Corp. (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 12 | 31 | MOTION by Defendant West Publishing Corp. to dismiss *Plaintiffs' Complaint* (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 13 | 32 | MEMORANDUM by West Publishing Corp. in support of motion to dismiss 12 *Plaintiffs' Complaint* (Attachments: # 1 Exhibit Index A &B, # 2 Exhibit C part 1, # 3 Exhibit C part 2, # 4 Exhibit D, E, F, G)(Smith, David) (Entered: |

| | | | |
|---|---|---|---|
| | | | 09/30/2009) |
| 09/30/2009 | 14 | 191 | NOTICE of Motion by David Zev Smith for presentment of motion to dismiss 12 before Honorable Robert W. Gettleman on 10/7/2009 at 09:15 AM. (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 15 | 193 | ATTORNEY Appearance for Defendant West Publishing Corp. by Diane Green–Kelly (Green–Kelly, Diane) (Entered: 09/30/2009) |
| 10/08/2009 | 16 | 195 | MINUTE entry before the Honorable Robert W. Gettleman: Motion hearing held on 10/8/2009 regarding motion to dismiss 12 . Response is due by 10/29/2009. Reply is due by 11/6/2009. Status hearing set for 1/14/2010 at 9:00 a.m. Mailed notice (gds, ) (Entered: 10/09/2009) |
| 10/29/2009 | 17 | 196 | RESPONSE by Lisa M. Graczyk, Matthew M. Jorge, Brian Willinghamin Opposition to MOTION by Defendant West Publishing Corp. to dismiss *Plaintiffs' Complaint* 12 (Barnow, Ben) (Entered: 10/29/2009) |
| 11/03/2009 | 18 | 213 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000004245315. *on behalf of Defendant West Publishing Corporation* (Melodia, Mark) (Entered: 11/03/2009) |
| 11/03/2009 | 19 | 215 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000004245801. *on behalf of Defendant West Publishing Corporation* (Bond, Paul) (Entered: 11/03/2009) |
| 11/06/2009 | 20 | 217 | MOTION by Defendant West Publishing Corp. for extension of time to file response/reply as to motion to dismiss 12 *(Unopposed Motion for Extension of Time to File Reply Brief in Support of Its Motion to Dismiss)* (Smith, David) (Entered: 11/06/2009) |
| 11/06/2009 | 21 | 220 | NOTICE of Motion by David Zev Smith for presentment of motion for extension of time to file response/reply, motion for relief 20 before Honorable Robert W. Gettleman on 11/12/2009 at 09:15 AM. (Smith, David) (Entered: 11/06/2009) |
| 11/13/2009 | 22 | 222 | MEMORANDUM by West Publishing Corp. in support of motion to dismiss 12 *(Reply Memorandum of Law in Further Support of the Motion to Dismiss Plaintiffs' Complaint)* (Attachments: # 1 Exhibit Index and Exs. A to D)(Smith, David) (Entered: 11/13/2009) |
| 11/13/2009 | 23 | 295 | MINUTE entry before the Honorable Robert W. Gettleman: Motion for extension of time to 11/13/2009 to file reply regarding motion by defendant West Publishing Corp. to dismiss *Plaintiffs' Complaint* 12 20 is granted. Replies due by 11/13/2009. Telephone notice (gds, ) (Entered: 11/16/2009) |
| 12/04/2009 | 24 | 296 | REPORT of Rule 26(f) Planning Meeting (Strautins, Blake) (Entered: 12/04/2009) |
| 12/10/2009 | 25 | 306 | MINUTE entry before the Honorable Robert W. Gettleman: Motion 18 of Mark S. Melodia for leave to appear pro hac vice is granted. Motion 19 of Paul J. Bond for leave to appear pro hac vice is granted. Mailed notice (tc, ) (Entered: 12/11/2009) |
| 12/23/2009 | 26 | 307 | MEMORANDUM Opinion and Order. Signed by the Honorable Robert W. Gettleman on 12/23/2009. (ep, ) (Entered: 12/28/2009) |

| | | | |
|---|---|---|---|
| 12/23/2009 | <u>27</u> | 321 | MINUTE entry before Honorable Robert W. Gettleman: Memorandum opinion and order entered. Accordingly, defendant's motion <u>12</u> to dismiss the entire complaint is granted. Status hearing date of 1/14/2010 is stricken. Civil case terminated. (For further detail see separate order.) Mailed notice (ep, ) (Entered: 12/28/2009) |
| 01/22/2010 | 28 | 322 | PAYMENT by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham of Filing fee $ 455, receipt number 0752–4460505. (Barnow, Ben) (Entered: 01/22/2010) |
| 01/22/2010 | <u>29</u> | 324 | NOTICE of appeal by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham regarding orders <u>27</u> , <u>26</u> , Filing fee $ 455, receipt number 0752–4460505 (Barnow, Ben) Modified on 1/22/2010 (td, ). (Entered: 01/22/2010) |
| 01/22/2010 | <u>30</u> | 327 | DOCKETING Statement by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham regarding notice of appeal <u>29</u> (Barnow, Ben) (Entered: 01/22/2010) |
| 01/25/2010 | <u>31</u> | 331 | NOTICE of Appeal Due letter sent to counsel of record. (gej, ) (Entered: 01/25/2010) |
| 01/25/2010 | <u>32</u> | 332 | TRANSMITTED to the 7th Circuit the short record on notice of appeal <u>29</u> . Notified counsel (gej, ) (Entered: 01/25/2010) |
| 01/25/2010 | <u>33</u> | 361 | ACKNOWLEDGEMENT of receipt of short record on appeal regarding notice of appeal <u>29</u> ; USCA Case No. 10–1193. (ep, ) (Entered: 01/26/2010) |
| 02/05/2010 | <u>34</u> | 362 | SEVENTH CIRCUIT transcript information sheet by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham. (ep, ) (Entered: 02/09/2010) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **LISA M. GRACZYK, MATTHEW M. JORGE, and BRIAN WILLINGHAM** individually and on behalf of all others similarly situated, <br><br> **Plaintiffs,** <br><br>  v. <br><br> **WEST PUBLISHING CORP., a Minnesota corporation,** <br><br> **Defendant.** | **Case No:** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

NOW COME plaintiffs, Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, and hereby allege as follows:

## INTRODUCTION

1.     This class action arises out of improper and unlawful actions by defendant West Publishing Corp. ("Defendant"), who obtained, acquired, disclosed, sold, and/or disseminated Plaintiffs' and Class members' personal information for commercial purposes and profit, as prohibited by law.

2.     The members of the proposed Plaintiff Class are licensed drivers in the States of Alabama, Alaska, Colorado, Connecticut, Florida, Idaho, Illinois, Iowa, Kentucky, Louisiana, Main, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Dakota, Ohio, Tennessee, Texas, Utah, Wisconsin,

Wyoming and the District of Columbia (the "States").  The personal information pertaining to Plaintiffs and Class members was maintained by administrative agencies of the States.

3.      The acts of Defendant, as described more particularly below, were in violation of the law, specifically the Federal Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.* ("DPPA").

## PARTIES

4.      Plaintiff Lisa M. Graczyk is an individual residing in Cook County, Illinois, and is a licensed driver in the state of Illinois. Plaintiff Graczyk's name, address, VIN number, vehicle type, make, model, and body style of her car, and license plate number are in the motor vehicle record obtained, disclosed, and sold by Defendant.

5.      Plaintiff Matthew M. Jorge is an individual residing in Cook County, Illinois, and is a licensed driver in the state of Illinois.  Plaintiff Jorge's name, address, VIN number, vehicle type, make, model, and body style of his car, and license plate number are in the motor vehicle record obtained, disclosed, and sold by Defendant.

6.      Plaintiff Brian Willingham is an individual residing in Will County, Illinois, and is a licensed driver in the state of Illinois.  Plaintiff Willingham's name, address, VIN number, vehicle type, make, model, and body style of his car, and license plate number are in the motor vehicle record obtained, disclosed, and sold by Defendant.

7.      Defendant West Publishing Corp. is a Minnesota corporation with its headquarters in Eagan, Minnesota.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this action arises under statutes of the United States, specifically the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.* The DPPA specifically authorizes the Court to exercise jurisdiction.

2

The Court has supplemental jurisdiction over the claims set forth in Counts II and III pursuant to 28 U.S.C.A. §1367. Furthermore, the Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, includes more than 100 Class members, and is a class action in which at least one of the Class members is a citizen of a different state than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A). The Court also has personal jurisdiction over Defendant because it is authorized to do business and in fact do business in this state, and Defendant has sufficient minimum contacts with this state and otherwise intentionally avails itself of the markets in this state through the promotion, marketing, and sale of its products and services in this state, to render the exercise of jurisdiction by the Court permissible.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391.  A substantial part of the acts, events, or omissions giving rise to the claim occurred in this judicial district, as Defendant conducts substantial business in this District.  Additionally, Plaintiffs are residents of this judicial district.

## GENERAL ALLEGATIONS

10.     Defendant West Publishing Corp. is a corporation specializing in legal publishing, online information delivery, and various other legal information products.

11.     Defendant acquired a large database(s) of motor vehicle records, and the corresponding personal information for each such record, on information and belief directly from each of the States, or from entities who acquired it from the States, in violation of the DPPA.

3

12.     Upon information and belief, the information collected from the States was collected under the pretense that the information would be used only for the legitimate purposes outlined in 18 U.S.C. § 2725(3).

13.     The information database(s) acquired by Defendant from the States contained "personal information" and/or "highly restricted personal information" (as defined by the DPPA, 18 U.S.C. §§ 2721, *et seq*.), belonging to millions of licensed drivers.

14.     Defendant then made the unlawfully obtained information belonging to Plaintiffs and Class members available for search and sale on the Internet via websites controlled and operated by Defendant.

15.     The personal information of Plaintiffs and Class members was obtained and disseminated by Defendant for purposes not permitted under the DPPA.

16.     Plaintiffs have suffered have damages as a result of Defendant's conduct.

## CLASS ACTION ALLEGATIONS

17.     This action is properly brought as a class action pursuant to Fed. R. Civ. P. 23.  Plaintiffs bring this action on their own behalf and on the behalf of all others similarly situated, as representatives of the following class:

> All individuals who were licensed to drive in the States of Alabama, Alaska, Colorado, Connecticut, Florida, Idaho, Illinois, Iowa, Kentucky, Louisiana, Main, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Dakota, Ohio, Tennessee, Texas, Utah, Wisconsin, Wyoming and the District of Columbia, whose personal information, as defined by 18 U.S.C. § 2725(3), was obtained, disclosed, or sold by Defendant, or any agent, officer, employee, or contractor of Defendant (the "Class"). The Class excludes Defendant's directors, officers, parent corporations, subsidiaries, and affiliates.

18.     The members of the Class are identifiable from the information and records in the possession or control of Defendant and/or the various States identified in the Class definition and relevant agencies of those States.

19.    The Class members are so numerous that individual joinder of all members is impractical. This allegation is based upon information and belief that Defendant obtained and disclosed the personal information of millions of licensed drivers from the various States previously identified.

20.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual members of the Class, and, in fact, the wrongs suffered and remedies sought by Plaintiffs and the other members of the Class are premised upon an unlawful scheme participated in by Defendant.  The principal common issues include, but are not limited to, the following:

      a.  The nature and extent of Defendant's business model of obtaining and disclosing the personal information of the licensed drivers of the Class;

      b.  Whether the actions taken by Defendant in obtaining and disclosing the personal information of licensed drivers of the Class violated the DPPA;

      c.  Whether Defendant unlawfully obtained, disclosed, or sold personal information from the motor vehicle records of Plaintiffs and Class members, in violation of the DPPA;

      d.  Whether Defendant, in obtaining, disclosing, and selling the personal information of Plaintiffs and Class members for profit, violated the DPPA;

      e.  Whether Defendant should be enjoined from violating the DPPA in the future;

      f.  The nature and extent to which the personal information belonging to Plaintiff and Class members was unlawfully obtained, disclosed, or sold;

      g.  The nature and extent of Plaintiffs' and Class members' actual damages;

h. The nature and extent of all statutory penalties or damages for which
Defendant is liable to Plaintiffs and Class members; and

i.  Whether punitive damages are appropriate.

21.   Plaintiffs' claims are typical of those of the Class and are based on the same legal and
factual theories.

22.   Plaintiffs will fairly and adequately represent and protect the interests of the Class.
Plaintiffs have suffered damages in their own capacity from the practices complained of, in that
their personal information has been unlawfully obtained, disclosed, and sold for a profit, and are
ready, willing and able to serve as Class representatives.

23.   Plaintiffs' counsel are experienced in handling class actions and actions involving
unlawful commercial practices.  Neither Plaintiffs nor their counsel have any interest that might
cause them not to vigorously pursue this action.

24.   Certification of a class under Fed. R. Civ. P. 23 and is appropriate in that Plaintiffs and
Class members seek monetary damages, common questions predominate over any individual
questions, and a class action is superior for the fair and efficient adjudication of this controversy.

25.   A class action will cause an orderly and expeditious administration of Class members'
claims and economies of time, effort and expense will be fostered, and uniformity of decisions
will be ensured.  Individual Class members are unlikely to be aware of their rights and are not
likely to be in a position (either through experience or financially) to commence individual
litigation against Defendant.

26.   Alternatively, certification of a class is appropriate in that inconsistent or varying
adjudications with respect to individual members of the Class would establish incompatible
standards of conduct for Defendant, or adjudications with respect to individual members of the

Class as a practical matter would be dispositive of the interests of the other members who are not parties to the adjudications or would substantially impair or impede their ability to protect their interests.

27.     Defendant's conduct, as complained of herein, is generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

### (Violation of the DPPA)

28.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

29.     The DPPA, 18 U.S.C. § 2722(a), prohibits any organization or entity from knowingly obtaining or disclosing personal information contained in motor vehicle records for any purpose not specifically enumerated under § 2721(b) of the DPPA.

30.     The DPPA, 18 U.S.C. § 2722(b), prohibits any organization or entity from making any false representation to obtain any personal information from an individual's motor vehicle record.

31.     Defendant knowingly obtained, disclosed, and/or sold Plaintiffs' and Class members' personal information, as defined by the DPPA, for a use or uses not permitted under the statute.

32.     Upon information and belief, Defendant made false representations to the States to obtain Plaintiffs' and Class members' personal information, and at other times obtained Plaintiffs' and Class members' personal information from third parties.

33.     Plaintiffs and Class members have suffered damages, as alleged herein, and pursuant to 18 U.S.C. § 2724(b)(1), are entitled to actual damages, but not less than liquidated damages in the amount of $2,500 each.

## COUNT II

### (Unjust Enrichment)

34.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein, and allege this count in the alternative.

35.     As set forth herein, Defendant unlawfully obtained or acquired and then disclosed or sold personal information pertaining to Plaintiffs and Class members.

36.     Accordingly, Defendant has been unjustly enriched in that it received and retained the benefits of the proceeds from the sale of personal information that it would not have received but for its misconduct as alleged herein.

37.     Said benefits were unlawfully obtained to the detriment of Plaintiffs and Class members, whose personal information is of value to them as personal property.

38.     Allowing Defendant to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience.

39.     Plaintiffs and the Class are entitled to and hereby seek disgorgement and restitution of the benefits obtained by Defendant through its unlawful conduct.

## COUNT III

### (Injunctive Relief)

40.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

41.     Defendant knew, or should have known, that the actions set forth above violated the provisions of the DPPA.

42.     The wrongful conduct alleged in this Complaint occurs and continues to occur in the ordinary course of Defendant's business.

43.     Defendant should be enjoined and restrained from continuing to engage in such conduct,

or other conduct having similar purpose and effect, but specifically from obtaining, disclosing, or selling personal information pertaining to Plaintiffs and Class members in violation of the DPPA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray for judgment against Defendant as follows:

a)      For an order certifying that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(1)(a), (b)(2), and (b)(3), and appointing Plaintiffs and their counsel to represent the Class;

b)      For a declaration that Defendant's actions violated the Federal Driver's Privacy Protection Act;

c)      For all actual damages, statutory damages, penalties, and remedies available as a result of Defendant's violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class;

d)      For a declaration that Defendant, through its actions and misconduct as alleged herein, has been unjustly enriched, and an order that Defendant disgorge such unlawfully obtained gains and proceeds;

e)      For an order enjoining Defendant from obtaining, disclosing, or selling Plaintiffs' and Class members' personal information in violation of the DPPA;

f)      For an award to Plaintiffs and the Class of their costs and expenses of this litigation;

g)      For an award to Plaintiffs and the Class for their reasonable attorneys' fees; and

h)      For such other relief as the Court may deem just and reasonable.

Respectfully Submitted, Lisa M. Graczyk, Matthew
M. Jorge, and Brian Willingham, on behalf of
themselves and all others similarly situated,

By: _____

Ben Barnow
Blake A. Strautins
Barnow and Associates, P.C.
1 North LaSalle Street, Suite 4600
Chicago, IL 60602
(312) 621-2000
(312) 641-5504 Fax

*Attorneys for Plaintiffs*

Aron D. Robinson
The Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, IL 60603
(312) 857-9050

*Of Counsel:*

Ralph K. Phalen Atty. at Law
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 589-0753

Mitchell L. Burgess
Keith C. Lamb
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 471-1700

Don P. Saxton
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 471-1700

# CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated | West Publishing Corp. |

| (b) County of Residence of First Listed Plaintiff **Cook** | County of Residence of First Listed Defendant **Dakota, Minnesota** |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Barnow and Associates, P.C. One North LaSalle Street, Suite 4600 Chicago, IL 60602 | Unknown |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (excl. vet.)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Inj.

*PERSONAL INJURY*
- [ ] 362 Personal Injury— Med. Malpractice
- [ ] 365 Personal Injury — Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 445 ADA—Employment
- [ ] 446 ADA — Other
- [ ] 440 Other Civil Rights

**FORFEITURE/PENALTY**
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

**PRISONER PETITIONS**
- [ ] 510 Motions to Vacate Sentence Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 810 Selective Service
- [ ] 850 Security/Commodity/Exch.
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [X] 890 Other Statutory Actions

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

18 U.S.C. §§ 2721, et seq., Defendant violated the Driver's Privacy Protection Act

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ **>$5 million**

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## IX. This case

[X] is not a refiling of a previously dismissed action.

[ ] is a refiling of case number _____ , previously dismissed by Judge _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 8/4/09 | Ben Barnow |

**U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**
**ATTORNEY APPEARANCE FORM**

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

| | |
|---|---|
| In the Matter of | Case Number: 1:09-cv-4760 |

Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham,
individually and on behalf of all others similarly situated,
Plaintiffs,

v.

West Publishing Corp., Defendant

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated

| |
|---|
| NAME (Type or print)<br>Ben Barnow |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)<br>s/ Ben Barnow |
| FIRM<br>Barnow and Associates, P.C. |
| STREET ADDRESS<br>One North LaSalle Street, Suite 4600 |
| CITY/STATE/ZIP<br>Chicago, IL 60602 |

| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS)<br>0118265 | TELEPHONE NUMBER<br>(312) 621-2000 |
|---|---|

| | | |
|---|---|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES ✓ | NO ☐ |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES ☐ | NO ✓ |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES ☐ | NO ✓ |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES ✓ | NO ☐ |

IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.

RETAINED COUNSEL ☐     APPOINTED COUNSEL ☐

### U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
### ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

---

In the Matter of                                         Case Number: 1:09-cv-4760

Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham,
individually and on behalf of all others similarly situated,
Plaintiffs,
                              v.
West Publishing Corp., Defendant

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated

| | |
|---|---|
| NAME (Type or print) <br> Blake A. Strautins | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically) <br> s/ Blake A. Strautins | |
| FIRM <br> Barnow and Associates, P.C. | |
| STREET ADDRESS <br> One North LaSalle Street, Suite 4600 | |
| CITY/STATE/ZIP <br> Chicago, IL 60602 | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) <br> 6293892 | TELEPHONE NUMBER <br> (312) 621-2000 |

| | | |
|---|---|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES ☐ | NO ☑ |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES ☐ | NO ☑ |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES ☐ | NO ☑ |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES ☐ | NO ☑ |

IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.

RETAINED COUNSEL ☐          APPOINTED COUNSEL ☐

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
## ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

In the Matter of                                                   Case Number:

## AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

| |
|---|
| NAME (Type or print) |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically) <br>           s/ |
| FIRM |
| STREET ADDRESS |
| CITY/STATE/ZIP |

| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE  NUMBER |
|---|---|
| | |

| | | |
|---|---|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES | NO |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES | NO |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES | NO |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES | NO |

| |
|---|
| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS. <br><br> RETAINED COUNSEL            APPOINTED COUNSEL |

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
## ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

In the Matter of                                                            Case Number:

## AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

| | |
|---|---|
| NAME (Type or print) | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)<br>            s/ | |
| FIRM | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE  NUMBER |
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE?          YES          NO | |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE?          YES          NO | |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR?          YES          NO | |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY?   YES          NO | |
| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.<br><br>RETAINED COUNSEL          APPOINTED COUNSEL | |

**Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2**

**Notice of Electronic Filing**

The following transaction was entered on 8/5/2009 at 9:20 AM CDT and filed on 8/5/2009

| | |
|---|---|
| **Case Name:** | Graczyk et al |
| **Case Number:** | 1:09–cv–4760 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **CASE ASSIGNED to the Honorable Robert W. Gettleman. Designated as Magistrate Judge the Honorable Nan R. Nolan. (li, )**

**1:09–cv–4760 Notice has been electronically mailed to:**

Aron David Robinson    adroblaw@aol.com

Ben Barnow   b.barnow@barnowlaw.com, s.harris@barnowlaw.com

Blake Anthony Strautins    b.strautins@barnowlaw.com

**1:09–cv–4760 Notice has been delivered by other means to:**

### *United States District Court for the Northern District of Illinois*
Revised 03/11/2008

Case Number: _____    Assigned/Issued  By: _____

Judge Name: _____    Designated Magistrate Judge: _____

---

## FEE INFORMATION

***Amount Due:***  ☐ $350.00    ☐ $39.00    ☐ $5.00

☐ IFP    ☐ No Fee    ☐ Other _____

☐ $455.00

Number of Service Copies _____    Date: _____

*(For use by Fiscal Department Only)*

Amount Paid: _____    Receipt #: _____

Date Payment Rec'd: _____    Fiscal Clerk: _____

---

## ISSUANCES

☐ Summons                                    ☐ Alias Summons

☐ Third Party Summons                ☐ Lis Pendens

☐ Non Wage Garnishment Summons    ☐ Abstract of Judgment

☐ Wage-Deduction Garnishment Summons    _____

☐ Citation to Discover Assets          *(Victim, Against and $ Amount)*

☐ Writ _____    ☐ Other
         *(Type of Writ)*                          _____
                                                          *(Type of issuance)*

_____Original and _____ copies on _____ as to _____
                                              *(Date)*

_____

_____



## SANGAMON COUNTY SHERIFFS OFFICE
*"Keeping the Peace Since 1821"*

*NEIL M. WILLIAMSON*
#1 Sheriffs Plaza
Springfield, Illinois 62701

Administration - (217) 753-6855 -
Civil Process/Records - (217) 753-6846

Investigations - (217) 753-6840
Corrections - (217) 753-6886

I, __Robert R Meacham II #5019__ certify that I served this summons as follows:

☐  **Personal service** on an individual, by leaving a copy of the summons and complaint with the defendant personally

☐  **Abode service** on an individual, by leaving a copy of the summons and complaint with a member of the household thirteen (13) years or older, informing said person of the contents thereof, and also by sending a copy of the summons, in a sealed envelope, postage paid, to the individual listed in the summons.

☒  **Corporation service**, by leaving a copy of the summons and complaint with an agent or officer of the corporation listed in the summons.

☐  **Other service**, as described below.

Case Number ___1:09-CV-4760___

Name of defendant ___West Publishing Co___

Name of other person
Summons left with ___Rose Perkins___

Sex ( M /Ⓕ) Race ___B___ Approx. age ___35___

Date of Service __8-12__ /2009  Time __11:00__

Date of Mailing _____

Address at which paper was served: ___ On summons

___801 Stevenson Dr___

Service fees ___$30.00___   ( )N/C

**Neil Williamson, Sheriff of Sangamon County**

By, ___R Meacham #5019___, Civil Process Officer

IN PARTNERSHIP WITH THE COMMUNITY

09-6168

AO 440 (Rev. 05/00) Summons in a Civil Action

RECEIVED

AUG 0 5 2009

SHERIFF'S OFFICE
RECORD SECTION

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

Lisa M. Graczyk, Matthew M. Jorge, and
Brian Willingham, individually and on
behalf of all others similarly situated,
Plaintiffs,

V.

West Publishing Corp., Defendant.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:    1:09-cv-4760

ASSIGNED JUDGE:  HON. ROBERT W. GETTLEMAN

DESIGNATED
MAGISTRATE JUDGE:  HON. NAN R. NOLAN

TO: (Name and address of Defendant)

West Publishing Corp.
c/o Illinois Corporation Service
801 Aldai Stevenson Drive
Springfield, IL 62703

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Ben Barnow
Barnow and Associates, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602

an answer to the complaint which is herewith served upon you, _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**Michael W. Dobbins, Clerk**

-------------------------------
(By) DEPUTY CLERK

**August 5, 2009**
-------------------------------
Date

BARNOW AND ASSOCIATES

*a professional corporation*

ATTORNEYS AT LAW

BEN BARNOW *
SHARON HARRIS
ERICH P. SCHORK
BLAKE A. STRAUTINS

* *also admitted in New York*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

*Telephone: 312-621-2000*
*Facsimile: 312-641-5504*

August 28, 2009

***VIA Electronic Filing***

Michael W. Dobbins
Clerk of the Court
U.S. District Court for the Northern District of Illinois
Dirksen Federal Building
219 S. Dearborn
Chicago, Illinois 60604

Re:   *Graczyk, et al. v. West Publishing Corp.*
      Case No. 1:09-cv-4760

Dear Mr. Dobbins:

On August 4, 2009, the above-captioned civil case was opened. In the process of filing the Class Action Complaint, the electronic filing system listed the defendant, West Publishing Corp., as one of the parties filing the complaint. In attempting to correct the error before filing the complaint, two duplicate filing fees, in the amount of $350.00 each, were incurred, which were in addition to the $350.00 filing fee required for the filing of a new civil action. In sum, duplicate payments were made in the total amount of $700.00.

This letter serves as my request for a refund of $700.00 for the two duplicate payments erroneously made in the process of filing the complaint in this matter. The receipt numbers for the duplicate payments are 3983488 and 3983515. An email from Dorothy M. Keller-Flowers referencing these duplicate payments is attached hereto as Exhibit 1.

Please refund the credit card used in the transaction in the amount of $700.00. If you have any questions in this matter, do not hesitate to contact me. Thank you.

Very truly yours,

Blake A. Strautins

Attachment

**Blake A. Strautins**

| | |
|---|---|
| From: | Dorothy_Keller-Flowers@ilnd.uscourts.gov |
| Sent: | Thursday, August 20, 2009 3:41 PM |
| To: | b.strautins@barnowlaw.com |
| Subject: | Fw: Possible Duplicate Payments - 09cv4760 |

Dorothy M. Keller-Flowers
U.S. District Court
(312) 435-6085

----- Forwarded by Dorothy Keller-Flowers/ILND/07/USCOURTS on 08/20/2009 03:36 PM -----

**Dorothy Keller-Flowers/ILND/07/USCOURTS**

08/07/2009 12:42 PM

To Email: b.barnow@barnowlaw.com

cc Donna Carey/ILND/07/USCOURTS@USCOURTS, Donald
Sippel/ILND/07/USCOURTS@USCOURTS, Emilia
Garcia/ILND/07/USCOURTS@USCOURTS, Adam
Avalos/ILND/07/USCOURTS@USCOURTS, Ryan Edward
Murray/ILND/07/USCOURTS@USCOURTS, Sandra
Julun/ILND/07/USCOURTS@USCOURTS, Leticia
Pacheco/ILND/07/USCOURTS@USCOURTS

Subject Possible Duplicate Payments - 09cv4760

Dear Counselor:

Our Internet Payment Report reflects that on August 4, 2009 you made three payments of $350.00 through pay.gov.

Receipt nos. 3983488 and 3983515 :          For this receipt no. we never received a complaint.

Receipt no. 3983529 :                      For this receipt no. we received a complaint and it was assigned case no. 09cv4760.

If it was your intention to file two new cases, please call the Service Center at 312-435-5691, and someone will give you instructions on how to re-submit the complaint for receipt no. 3983488 and 3983515.

If it was not your intention to file two new cases, but paid twice by mistake, you can e-file a "Request for the Clerk of Court to Refund Filing Fee", which can be found under the "Other Documents" category.  Please e-file the request in case no.  09cv4760, include your receipt numbers in the request, and indicate which one is the duplicate payment.

In the future, if you don't see that the complaint you e-filed is in your case or you encounter difficulty in filing your documents, please call us before e-filing it again and someone from our office will walk you through the process of re-submitting your documents.

If you have any further questions, please feel free to call the Service Center at 312-435-5691.

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
## ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

| | |
|---|---|
| In the Matter of | Case Number:  1:09-cv-04760 |

Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham individually and on behalf of all others similarly situated v. West Publishing Corp.

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

(In the space below, enter the name of the party or parties being represented)

West Publishing Corp.

| |
|---|
| NAME (Type or print)<br>David Z. Smith |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)<br>      s/ *David Z. Smith* |
| FIRM  Reed Smith LLP |
| STREET ADDRESS  10 S. Wacker Drive, 40th Floor |
| CITY/STATE/ZIP  Chicago, Illinois 60606-7507 |

| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) 6256687 | TELEPHONE  NUMBER 312-207-1000 |
|---|---|

| |
|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? (Enter "Y" or "N") N |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? (Enter "Y" or "N") N |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? (Enter "Y" or "N") Y |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? (Enter "Y" or "N")  Y |
| IF THIS IS A CRIMINAL CASE, USE AN "X" TO DESCRIBE YOUR STATUS IN THIS CASE.<br><br> RETAINED COUNSEL                           APPOINTED COUNSEL |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

---

LISA M. GRACZYK, MATTHEW M.          :
JORGE, and BRIAN WILLINGHAM          :
Individually and on behalf of others :
similarly situated,                  :
                                     :       No.: 1:09-cv-04760
          Plaintiffs,                :
v.                                   :       Hon. Robert W. Gettleman
                                     :
WEST PUBLISHING CORP., a             :
Minnesota corporation,               :
                                     :
          Defendant.                 :

---

**DEFENDANT WEST PUBLISHING CORPORATION'S**
**CORPORATE DISCLOSURE STATEMENT**

Defendant West Publishing Corporation, by and through its undersigned attorneys, furnishes the following information in compliance with Federal Rule of Civil Procedure 7.1 and Local Rule 3.2:

1.     West Publishing Corporation, a non-public corporation, is a subsidiary of Thomson Reuters (Legal) Inc, a non-public corporation.  West Publishing Corporation is indirectly owned by Thomson Reuters Corporation, a publicly-held corporation, traded on the New York Stock Exchange and Toronto Stock Exchange.

2.     There are no intermediate parent corporations or subsidiaries of West Publishing Corporation or Thomson Reuters (Legal) Inc. that are publicly held, and no publicly held companies own 10% or more of West Publishing Corporation or Thomson Reuters (Legal) Inc. stock.

Dated: September 30, 2009                Respectfully submitted,

                                         WEST PUBLISHING CORPORATION
                                         *Defendant*

                                         By: /s/  David Z. Smith
                                                One of its attorneys

Mark S. Melodia (*pro hac vice* application
pending)
Paul Bond (*pro hac vice* application pending)
REED SMITH LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, N.J. 08540
(609) 987-0050

Diane Green-Kelly (ARDC # 6216868)
David Z. Smith (ARDC # 6256687)
REED SMITH LLP
10 South Wacker Drive
Chicago, IL  60606-7507
(312) 207 1000
(312) 207 6400 (fax)
dzsmith@reedsmith.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2009, I electronically filed the foregoing

**DEFENDANT WEST PUBLISHING CORPORATION'S CORPORATE DISCLOSURE**

**STATEMENT** with the Clerk of the Court using the CM/ECF system which sent notification of

such filing to the following:

BARNOW AND ASSOCIATES, P.C.
Ben Barnow
Blake Strautins
One North LaSalle Street, Suite 4600
Chicago, IL 60602
(312) 621-2000
*Attorneys for Plaintiff*

LAW OFFICE OF ARON D. ROBINSON
Aron David Robinson
19 South LaSalle Street
Suite 1200
Chicago , IL 60603
(312) 857-9050
*Attorneys for Plaintiff*

West Publishing Corp.,
A Minnesota Corporation

By: /s/ Diane Kelly-Green
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207 1000
(312) 207 6400 (fax)
*Attorneys for Defendants*

US_ACTIVE-102400111.1

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

LISA M. GRACZYK, MATTHEW M.　　: Case No.: 1:09-cv-04760 (RWG)
JORGE, and BRIAN WILLINGHAM　　:
Individually and on behalf of others　　:
similarly situated,　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiffs,　　:
v.　　:
　　　　　　　　　　　　　　　　　　:
WEST PUBLISHING CORP., a　　:
Minnesota corporation,　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　Defendant.　　:
_____ :

## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendant West Publishing Corporation ("West"), by its attorneys Reed Smith LLP, respectfully move to dismiss Plaintiffs' Complaint in its entirety, pursuant to Fed. R. Civ. P. Rules 12(b)(6) and 12(b)(1).  In support of its motion, West submits its Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Complaint.

　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　**REED SMITH LLP**
　　　　　　　　　　　　　　Reed Smith LLP
　　　　　　　　　　　　　　10 South Wacker Drive
　　　　　　　　　　　　　　Chicago, IL 60606
　　　　　　　　　　　　　　(312) 207-3875
　　　　　　　　　　　　　　Attorneys for Defendant
　　　　　　　　　　　　　　West Publishing Corp.,
　　　　　　　　　　　　　　A Minnesota Corporation

　　　　　　　　　　　　　　By:/s Diane Green-Kelly_____
　　　　　　　　　　　　　　 Diane Green-Kelly, Esq
Dated: September 30, 2009　　　　 David Z. Smith, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

LISA M. GRACZYK, MATTHEW M.              : Case No.: 1:09-cv-04760 (RWG)
JORGE, and BRIAN WILLINGHAM               :
Individually and on behalf of others      :
similarly situated,                       :
                                          :
                Plaintiffs,               :
v.                                        :
                                          :
WEST PUBLISHING CORP., a                  :
Minnesota corporation,                    :
                                          :
                Defendant.                :
_____          :

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
TO DISMISS PLAINTIFFS' COMPLAINT**

## I.    INTRODUCTION

### A.    Preliminary Statement

Defendant West Publishing Corporation ("West") moves under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) to dismiss in its entirety Plaintiffs' Complaint, which seeks billions of dollars in statutory damages for perceived violations of the federal Driver's Privacy Protection Act ("DPPA"), 18 U.S.C.A. §2721, *et seq*. This Court should grant West's motion because the Complaint fails to state a claim under the DPPA or under any other legal theory.

Merely parroting the language of the statute, Plaintiffs allege that West violated the DPPA when it "knowingly obtained, disclosed and/or sold [information] for a use or uses not permitted under the statute." Complaint, ¶ 31. Even taking those allegations as true (which the Court must do on a motion to dismiss), Plaintiffs' Complaint must fail. Plaintiffs are apparently asserting a theory of the DPPA under which a data aggregator, such as West, would be held liable for obtaining information from motor vehicle records and reselling that information to persons with permissible uses. Such a theory of the DPPA does violence to the statute's text and runs counter to Congress's demonstrated intent. Such a theory also flies in the face of the express interpretation of the DPPA by the Department of Justice, the entity charged with enforcing the statute. No published federal court decision, and no decision in the Courts of the Seventh Circuit, supports such a theory of the DPPA.

Plaintiffs' apparent interpretation of the DPPA would frustrate all of the uses of motor vehicle records explicitly authorized by Congress. National security, law enforcement, child welfare services, businesses trying to guard against identity theft, even lawyers trying to serve a summons or do investigation in advance of litigation, all would be deprived of the only practical way to quickly access such records, and would be left waiting on line at the Departments of

Motor Vehicles.  Moreover, companies like West, which only facilitate the lawful transfer of information, would be subject to catastrophic potential liability for statutory liquidated damages.

**B.      Background on the Driver's Privacy Protection Act**

The DPPA is the federal statute governing the sale and resale of certain information from motor vehicle records.  The DPPA was enacted to protect drivers from criminals (especially stalkers), abusive marketers, and others who would misuse drivers' information to intrude into their private lives.  However, the DPPA recognizes numerous "permissible uses" (fourteen (14) in total) for such information. 18 U.S.C.A. §2721(b).  Congress ensured that covered information could be purchased, sold, and resold for use in national security, law enforcement, the fight against identity theft, the service of process, investigation in anticipation of litigation, enforcement of judgments, research and statistical reports, insurance claims investigations, providing notice to owners of towed or impounded vehicles, and multiple other permitted uses. *See* 18 U.S.C.A. §2721(b)(1), (3)(A), (4), (5), (6), and (7).

The DPPA expressly permits "authorized recipients," like West, to engage in the "resale or redisclosure" of covered information for a permitted use.  18 U.S.C.A. §2721(c).  West's customers, which include law enforcement and other government agencies, legally must certify to such a use before purchasing covered information from West.  West is required by law to keep, for five (5) years, "records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request."  18 U.S.C.A. §2721(c).

- 2 -

A civil action can only be brought under the DPPA against a person who "knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted" under the DPPA.  18 U.S.C.A. §2724.[1]

## II.   LEGAL ANALYSIS

### A.   Merely Obtaining Information for Resale to Persons With Permissible Uses is Not a DPPA Violation

According to Plaintiffs' Complaint, West violated the DPPA because it obtained, disclosed and/or sold information for an impermissible purpose.  Complaint ¶ 31.  However, Plaintiffs do not specify any impermissible use to which the information allegedly was put, nor any improper disclosure made.  Rather, Plaintiffs appear to be recycling the theory of the DPPA advanced by plaintiffs in other (mostly unsuccessful) class actions brought against resellers and aggregators.  Under that theory, West allegedly cannot obtain driver's license information for ready use by law enforcement and other end-users unless West itself had some other, independent, permissible use for the same data.  In other words, being a reseller to or aggregator for persons with permissible uses, by itself, is insufficient to become an "authorized recipient" of covered information.   However, requiring a reseller to have an independent immediate permissible use for the information is a redundant requirement that does not appear anywhere in the statute.   Moreover, such a requirement would deprive persons with Congressionally-permitted uses of covered information of any effective means to obtain that information.

---

[1]  Plaintiffs allege that West "made false representations to the States" to acquire information about Plaintiffs and the putative class.  Complaint  ¶ 7 and ¶ 32.  That allegation, even if true (it is not), does nothing to advance Plaintiffs' private action.   The provision of the DPPA prohibiting use of false representations to obtain personal information does not create a private cause of action, but rather enforcement of such an action is left to the United States Department of Justice.   See, Miller v Image Data LLC, 91 Fed. Appx. 122, 127 (10th Cir. 2004)(unpublished)(finding no private right of action exists under DPPA for false representations).

There are two published federal court decisions directly on-point.  Both consider and reject Plaintiff's theory of the DPPA.  <u>Russell v. ChoicePoint Services, Inc</u>., 300 F. Supp. 2d 450 (E.D. La. 2004) ("<u>Russell I</u>") and <u>Russell v. Choicepoint Services, Inc</u>., 302 F. Supp. 2d 654 (E.D. La. 2004)("<u>Russell II</u>").  In <u>Russell I</u>, "[t]he Complaint allege[d] that defendant illegally obtained … highly personal information from the Louisiana Department of Motor Vehicles ('DMV') for the impermissible purpose of disclosure and distribution by resale."  300 F. Supp. 2d at 451.  The court dismissed the claim noting that if defendant is an "authorized recipient" of the information, then resale to a person with a permissible use is itself permitted.  <u>Id</u>. at 454.  The court thoroughly considered and rejected the contention that the defendant (ChoicePoint) could be held liable for "improperly obtaining" information, absent some allegation of an improper use.

The court held that "[t]he plain language of the DPPA permits entities like ChoicePoint to obtain drivers' personal information" just to "subsequently resell that information to third parties with a permissible use."  <u>Russell I</u>, 300 F. Supp. 2d at 455.  The court noted that the DPPA authorized resale by "authorized recipients," not by "authorized users".  <u>Id</u>. at 455.  This "indicates Congress' anticipation that entities such as ChoicePoint would obtain drivers' personal information," not for their own use, but "strictly to redistribute it to persons with permissible uses."  <u>Id</u>. at 456.  Citing to ordinary, dictionary definitions of the words, the court found that:

> "Recipient," as commonly defined in dictionaries, is not synonymous with "user".
> "Recipient" is generally defined as one that receives or a person who or thing
> which receives something. "User" means one that uses. One "receives" by taking
> or acquiring and "uses" by putting into service. Clearly, the two terms have
> separate meanings, as Congress knew well when it drafted the DPPA. Any
> interpretation of "authorized recipient" to mean "authorized user" runs afoul of
> the words' common definitions and, in effect, renders the term "recipient"
> meaningless under the DPPA.

Id. (quotation marks and citations omitted).

The court concluded that, "[i]f Congress had intended to require that the 'authorized recipient' of personal information also be a user of that information, it could have written the DPPA exceptions explicitly to that effect". Id. at 457.  Instead, "Congress was well aware of the economic value of DMV records and of the common state practice of selling drivers' personal information to private resellers," and intended it to continue under the DPPA.  Id. at 456.  The court dismissed the claim against ChoicePoint for alleged improper obtaining of information for resale under Rule 12(b)(6).

Russell II was a companion case to Russell I, brought against Reed Elsevier, Inc., another data aggregator and reseller which, like ChoicePoint, competes with West.  302 F. Supp. 2d at 654.  As in Russell I, the allegation was that the defendant had obtained, disclosed, and used covered information for the purpose of resale to persons with permissible uses.  In Russell II, the court granted Reed Elsevier's motion to dismiss under Rule 12(b)(1).

The court reaffirmed its prior analysis from Russell I – that there is no claim for improper use against a commercial reseller who resold the data to persons with permissible uses for it; and that a commercial reseller need not have any immediate, direct use of its own for covered information obtained for resale.  The court further dismissed plaintiffs' claims for improper disclosure, which did not identify anyone, other than plaintiffs' counsel, to whom the information was disclosed.  As such, plaintiffs' claims for improper disclosure were "conjectural, hypothetical, and tenuous at best," and properly dismissed.  Id. at 670.

Another DPPA putative class action, Taylor v. Acxiom Corporation, resulted in the same construction of the DPPA.  United States District Court for the Eastern District of Texas, 2:07-cv-0001, Exhibit A, Judgment.  In Taylor, plaintiffs had brought suit against more than 100

businesses which had obtained a database of covered information from the State of Texas.  The Taylor plaintiffs alleged that the defendants had either obtained the information having no immediate use for it ("non-sellers") or had obtained the information to resell to others, having themselves no permissible use ("resellers").  The court granted defendants' motions to dismiss under Rules 12(b)(6) and 12(b)(1).

As to non-sellers, the Taylor plaintiffs had asserted that "obtainment of the entire database was impermissible as Defendants did not immediately use the data[.]"  Id.  The court disagreed, finding that this "lack of immediate use" did not satisfy the standards of Rule 12(b)(6), as it did not constitute a "purpose not permitted under the Act".  Id. at 9.  "Moreover, the plain language of the DPPA does not require that a person 'immediately use' the data, nor has the statute been interpreted to imply such a requirement."  Id.

> The Taylor court, following Russell, also dismissed the claims against resellers:
>
> Plaintiffs allege that resellers are in violation of the DPPA because they obtained plaintiff's personal information solely for purposes of resale and were not themselves "users" of the information. Yet the statute clearly and unambiguously permits "[a]n authorized recipient of personal information…[to] resell or redisclose that information." 18 U.S.C.A. § 2721(c). The only limitation placed on 'authorized recipients' is that the information must be resold or redisclosed "only for a use permitted under section (b)." Id. The DPPA does not require an 'authorized recipient' to also be an 'authorized user'.

[Id. at 9.]

> Further, the court granted defendants' Rule 12(b)(1) motion:
>
> Plaintiffs have failed to allege or plead any facts showing that Defendants, neither Non-Sellers or Resellers, impermissibly obtained and/or used Plaintiffs' 'personal information.'  Thus, Plaintiffs have not shown that they have suffered an 'injury-in-fact.'  Further, they have not pled a causal connection between the alleged violations and the alleged harm, nor can they demonstrate redressability.

Id. at 13.  The court dismissed this case in its entirety.[2]

There is one federal court decision disagreeing with Russell I, Russell II, and Taylor. Roberts v. Source for Public Data, 2008 WL 5234675 (W.D. Mo. 2008), Exhibit B.  In Roberts, plaintiffs alleged that defendants offered highly restricted personal information about plaintiffs, including their Social Security Numbers, "for sale to the general public".  Id. at *2.[3]  The Roberts defendants moved to dismiss, arguing that the DPPA permitted resale to persons with permissible uses, and therefore impliedly authorized *obtainment* for the purpose of resale to persons with permissible uses.  The Roberts court denied this preliminary motion, rejecting the reasoning of Russell I, Russell II, and Taylor and asserting that an "authorized recipient" must also be an "authorized user".  Id. at *4.[4]

With due respect, Roberts was wrongly decided.  As set forth in Russell I, Russell II, and Taylor, the plain text of the statute, giving words their ordinary meanings, allows for companies to obtain covered information in bulk for later resale to persons with permissible uses.  The reasoning of the Roberts court threatens to halt the flow of covered information to persons with critical uses, such as law enforcement, and imposing catastrophic penalties on companies for acting as efficient market intermediaries.  Significantly, the Roberts court places the defendant resellers in that case at a competitive disadvantage, because they can no longer resell covered information in competition with the defendants in Russell I, Russell II, and Taylor.   West

---

[2] The Taylor decision is on appeal to the United States Court of Appeal for the Fifth Circuit. Docketed as No. 08-41083.

[3] "Highly restricted personal information" is a category of information given special protection under the DPPA, as to which fewer permissible uses exist.  18 U.S.C.A. § 2721(a)(2).

[4] Accord, Locate.Plus. Com, Inc. v. Iowa Dep't of Transp., 650 N.W.2d 609, 617-18 (Iowa 2002) (asserting that authorized recipient must itself be a user of information).

respectfully requests that this Court uphold the plain language of the statute that expressly permits an authorized recipient, such as West, to resell covered information to others for permissible uses, by dismissing Plaintiffs' Complaint in its entirety.

**B.     Legislative History of the DPPA Belies Plaintiffs' Theory**

Not only does the clear language in the DPPA support dismissal, but the legislative history of that statute confirms that it was the intent of Congress to permit obtainment for purposes of resale under the DPPA.

Congress passed the DPPA in 1994 as "primarily crime-fighting legislation". Margan v. Niles, 250 F. Supp. 2d 63, 69 n.4 (N.D.N.Y. 2003). . The sponsoring legislators made it perfectly clear that the DPPA was not intended to restrict "legitimate business and governmental needs" for information from motor vehicle records. 139 Cong. Rec. S15745-01, S15763 (Nov. 16, 1993) (statement of Senator Boxer), Exhibit C.   Rather, the intention of Congress was to strike "a critical balance between legitimate governmental and business needs for this information, and the fundamental right of our people to privacy and safety. Id.  The DPPA was only intended to deny access to information to a "narrow group of people that lack legitimate business" for obtaining it.   140 Cong. Rec., H2518-01, H2526 (Apr. 20, 1994) (statement of Representative Goss), Exhibit D.  "Careful consideration was given to the common uses [then] made of this information and great efforts were made to ensure that those uses were allowed under this bill". 1994 WL 212698 (Feb. 3, 1994) (statement of Representative Moran), Exhibit E.  More specifically, Representative Moran said the DPPA "would allow the DMVs to continue to sell DMV information *in bulk* as long as every driver in that state had been given the opportunity to restrict the sale of their name for marketing purposes". Id.  (emphasis added).

These statements are wholly inconsistent with Plaintiffs' theory of the DPPA, under which a commercial reseller would have to have its own, immediate, direct use for every piece of

- 8 -

covered information at the time it obtained the data from the DMV.  If Plaintiffs are right, law enforcement agencies (and every other person with a permissible use) would be required to go to the DMV each and every time they wanted to obtain covered information.  With no centralized databases of motor vehicle record information to turn to, vital interests --  from homeland security to the fight against organized crime to child welfare protection -- would suffer from delay and disorganization.  Plaintiffs' theory would not allow a commercial reseller like West to stand at the ready with a database of covered information for law enforcement's later use.  This would be contrary to the intent of Congress, as expressed by Senator Harkin, a chief sponsor of the legislation, who made clear that "with respect to law enforcement agencies [a DPPA provision allowing disclosure for use by any government agency in carrying out its functions] should be interpreted so as not to in any way restrict or hinder law enforcement and crime prevention strategies,"  139 Cong. Rec. S15962 (Nov. 17, 1993), Exhibit F.

Plaintiffs' theory of the DPPA manifestly *would* restrict and hinder not only law enforcement but every other permissible use of covered information.  The Court should reject Plaintiffs' theory and dismiss their Complaint.

## C.     The United States Department of Justice and the State of Illinois Have Rejected Plaintiffs' Theory

Violating the DPPA is not just a matter of civil law; the DPPA also imposes criminal penalties. The enforcing agency is the United States Department of Justice.   18 U.S.C.A. §2723(b).  As such, the interpretations and opinions of the Justice Department "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

In a private opinion letter, the Justice Department stated unequivocally that obtaining covered information for commercial resale to persons with permissible uses is not a violation of

the DPPA.  <u>Exhibit G</u>.  The Justice Department responded to a question from the Office of the Attorney General for the Commonwealth of Massachusetts.  "Specifically, you posed the question of whether the Massachusetts Registry of Motor Vehicles may release information to a commercial distributor who disseminates that information only to other authorized recipients or entities that use the information solely for authorized purposes."

The Justice Department concluded that, "[u]nder these circumstances, we believe that such releases are permissible under the statute."  The Justice Department noted that "several of the permissive release provisions in the statute regulate *only the ultimate use* of the personal information without specifying or restricting *who may obtain* the information in order to accomplish the authorized purpose."  (Emphases added).  "[T]he Massachusetts Registry of Motor Vehicles may release personal information to a distributor upon reasonably concluding that the information would be used for authorized purposes only.  Such a practice would be consistent with current Department of Justice enforcement policy recommendations to the Attorney General."  <u>Id</u>.  In short, what invokes the statute is "the ultimate use of the information," not the act of obtaining it to further a permissible use.

Moreover, states across the country routinely sell information to information resellers. Some states have gone so far as to enact laws and regulations that expressly permit commercial purchasers to buy covered information in bulk for resale to persons with permissible uses.  Those laws and regulations do not require the commercial purchasers to attest to any immediate, direct use of the information they themselves might have.  For example, the State of Illinois allows "commercial or business purchasers" to buy information "in bulk".  92 Ill. Adm. Code 1002.60. The purchasers have to sign an Access Agreement with the State, which "shall include disclosure of the commercial use … *or* disclosure of the permissible use of personal information, *if*

*applicable*." Id. (emphasis added).   Thus, the State of Illinois, like the Justice Department, expects commercial resellers to purchase information in bulk, generally for no immediate, direct use of their own.   The DPPA authorizes such sales anticipating later resale to persons with permissible uses.

**D.      Plaintiffs' Theory Contradicts Established Canons of Statutory Interpretation**

Factually, Plaintiffs allege nothing more than that West obtained and sold their information.   They do not deny that West's customers, the purchasers of that information, had legitimate, Congressionally-authorized uses.   Plaintiffs do not allege that anyone (let alone West) used Plaintiffs' information to stalk, harass, or improperly market to them, or for any other unlawful purposes.   Yet Plaintiffs, who have not been harmed in any way, seek to extract a penalty in the form of liquidated damages of $2,500 per class member and ranging into the billions of dollars under their theory of the DPPA.   The case law, text of the statute, Congressional intent, and interpretations of the Justice Department and State of Illinois all run directly counter to Plaintiffs' attempt to recover.   In addition, Plaintiffs' theory of the DPPA is contrary to multiple accepted canons of statutory interpretation.

First, courts "interpret statutes to avoid absurd results."   Treadway v. Gateway Chevrolet Oldsmobile Inc., 362 F.3d 971, 976 (2004).   Accord, FutureSource L.L.C. v. Reuters Ltd., 312 F.3d 281, 284-85 (7th Cir. 2002) (noting that "nonsensical interpretations" of statutes are disfavored because legislators are unlikely to pass statutes "that they believe will have absurd consequences"); 2A Sutherland Statutory Construction (7th ed.), § 46:7, Limits of Literalism (noting that to avoid absurd results, "the words of the statute will be construed to agree with the intention of the legislature").   Subjecting a company to potential billion-dollar liability when it merely helped accomplish the lawful use of information is an absurd result.

Second, "it is well settled that courts are obligated to interpret a statute in a manner which avoids potential constitutional infirmities." Northwest Hosp., Inc. v. Hosp. Serv. Corp., 687 F.2d 985 (7th Cir. 1982). "Indeed, where an otherwise acceptable construction of a statute would raise serious constitutional problems, we are required to construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Batanic v. I.N.S., 12 F.3d 662, 666 (7th Cir. 1993) (quotation marks and citation omitted).

Here, Plaintiffs' reading of the statute would subject data aggregators to billion dollar liabilities in liquidated damages solely for facilitating the lawful use of information. Such a construction of the DPPA would render the DPPA's liquidated damages provision violative of the Due Process Clause. See, e.g., BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) (finding award of $2,000,000 in punitive damages to be "grossly excessive" and a due process violation in light of low level of reprehensibility of conduct and small amount of actual harm). Accord, State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (U.S. 2003). To avoid such a constitutional violation, Plaintiffs' misreading of the DPPA is to be avoided.

Lastly, when a federal statute imposes criminal penalties, the rule of lenity applies. The DPPA unambiguously allows West to obtain information for resale to persons with permitted uses. But under the rule of lenity, unless the DPAA unambiguously *prohibits* such resale, Plaintiffs state no case. "The canon of strict construction of criminal statutes, or the rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it *only to conduct clearly covered*." United States v. Lanier, 520 U.S. 259, 266 (1997). Because the

DPPA does not clearly prohibit commercial resellers from obtaining covered information in bulk for later resale to persons with permissible uses, Plaintiffs state no case.[5]

**E.     Plaintiffs' Claims for Unjust Enrichment and Injunctive Relief Should Be Dismissed**

In addition to their DPPA claims, Plaintiffs have thrown in two additional counts, one for unjust enrichment and one for injunctive relief.  Neither is proper.  "Unjust enrichment is not a separate cause of action that, standing alone, will justify an action for recovery.  Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct."  Martis v. Grinnell Mut. Reinsurance Co., 388 Ill. App. 3d 1017, 1025 (2009) (citations omitted).  As demonstrated above, even if Plaintiffs' factual allegations were true, West has done nothing unlawful or improper.  Further, to state a claim for unjust enrichment, Plaintiffs would have to show that West received and retained a benefit *to Plaintiffs' detriment*.  See, e.g., HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131 Ill. 2d 145, 161 (1989).  Plaintiffs do not and cannot explain how they have suffered any detriment as a result of West reselling their information to persons with permissible uses.

Likewise, injunctive relief is a remedy and not a stand-alone cause of action.  Plaintiffs have not described any situation for which a remedy is required.  Therefore, the Court should dismiss Plaintiffs' claims for unjust enrichment and injunctive relief.

---

[5] On a related point, it is clear that prior to the passage of the DPPA, the common law of the States permitted the sale of motor vehicle records by DMVs to commercial aggregators for resale to persons with permissible uses. See, 1994 WL 212698 (Feb. 3, 1994)(statement of Representative Moran), Exhibit E. "In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." United States v. Texas, 507 U.S. 529, 534 (1993). The DPPA allows such obtainment for resale, and certainly does not "speak directly" in any way abolishing this common practice.

### III.   CONCLUSION

For all of the reasons stated above, this Complaint should be dismissed in its entirety. Plaintiffs' ask this Court to misread the DPPA to punish companies for lawfully obtaining and disclosing covered information to purchasers with permitted uses.  To misread the DPPA as imposing billion-dollar liability on a company engaged in that process would be to turn the purposes of the DPPA on its head, drying up the flow of information to persons with permissible uses, to the detriment of many lawful interests.  Respectfully, this Court should follow <u>Russell I</u>, <u>Russell II</u>, and <u>Taylor</u> and dismiss this Complaint in its entirety under Rules 12(b)(6) and 12(b)(1).

Respectfully submitted,

**REED SMITH LLP**
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-3875
Attorneys for Defendant
West Publishing Corp.,
A Minnesota Corporation

By:   _____s/ Diane Green-Kelly_____
        Diane Green-Kelly, Esq.

Dated: September 30, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA M. GRACZYK, MATTHEW M. JORGE, and BRIAN WILLINGHAM Individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WEST PUBLISHING CORP., a Minnesota corporation,<br><br>Defendant. | : Case No.: 1:09-cv-04760 (RWG)<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## INDEX OF EXHIBITS

A.    <u>Taylor v. Acxiom Corporation</u>, Judgment, No. 2:07-cv-0001 (E.D. Tex. Sep. 8, 2008).

B.    <u>Roberts v. Source for Public Data</u>, 2008 WL 5234675 (W.D. Mo. Dec. 12, 2008).

C.    139 Cong. Rec. S15745-01, S15763 (Nov. 16, 1993) (statement of Senator Boxer).

D.    140 Cong. Rec., H2518-01, H2526 (Apr. 20, 1994) (statement of Representative Goss).

E.    1994 WL 212698 (Feb. 3, 1994) (statement of Representative Moran).

F.    139 Cong. Rec. S15962 (Nov. 17, 1993) (statement of Senator Harkin).

G.    Department of Justice Opinion Letter to Peter Sacks, Massachusetts Office of the Attorney General, dated October 9, 1998.

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SHARON TAYLOR, ET AL.

CIVIL ACTION NO. 2:07cv0001 (LEAD)
C/W   2:07-0013, 2:07-0014, 2:07-0017,
2:07-0018, 2:07-0410

VERSUS

JUDGE DONALD E. WALTER

ACXIOM CORPORATION, ET AL.

## JUDGMENT

Before this Court is a Motion to Dismiss on Common Issues and Response to Plaintiffs'

Statement of Violations filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) on

behalf of American Driving Records, Inc., d/b/a First Advantage, a/k/a Agency Records, Inc.,

Southwestern Bell Telephone, L.P. d/b/a Southwestern Bell Telephone Company, a Texas Limited

Partnership, Safeway Inc., Academy, Ltd., Background Information Systems, Inc., HEB Grocery

Company, LP, RealPage, Inc., FedChex, L.L.C, LML Payment Systems Corporation, D.B.

Stringfellow, URAPI, The Hearst Corporation d/b/a Houston Chronicle, Texas Motor Transportation

Association, EmagineNet Technologies, Inc., Texas Farm Bureau Mutual Insurance Company,

Defensive Driving Online, Ltd., Household Drivers Report, Inc. d/b/a HDR, Inc., Spartan Insurance

Company, Insurance Technologies Corporation, ACS State & Local Solutions, Inc., Gila Corporation

d/b/a Municipal Services Bureau, Hawkeye Insurance Services, Reliant Energy, Inc., American

Student List, LLC, Source Data, Inc., Driver Training Associates, Inc. d/b/a TicketSchool.com, Jon

Latorella, d/b/a LocatePlus Holdings Corporation, American Electric Power Service Corporation,

Tenant Tracker, Inc., JI Specialty Services, Inc., Lee Farish Computer Services, Inc., National

Statistical Services Corporation, American Municipal Services, Ltd., Globe Life Accident and

Insurance Company, ADP Screening and Selection Services, Inc., Softech International, Inc., Talbot Group, Inc., Safety-USA Institute, LLC, Paradise Development, Inc. d/b/a Drivesafe Defensive Driving, Aristotle International, Inc., Defensive Driver Online, Ltd., Global 360 BGS, Inc., ABC Data, Inc. d/b/a Unicard Systems, Inc., Biometric Access Company, ContinuedEd.com d/b/a Idrivesafely.com, Zebec Data Systems, Inc., InfoNation, Inc., Allied Resident/Employee Screening Service, Inc., United Teacher Associates Insurance Company, Federated Retail Holdings, Inc., f/k/a The May Department Stores Company d/b/a Foley's, Cross-Sell, Inc., Industrial Foundation of America, PropertyInfo Corporation, Marshall Systems Technology, Inc., U.S. Interactive, Inc., Dallas Computer Information Systems, Realty Computer Solutions, Inc. d/b/a Real-Comp, Acxiom Risk Mitigation, Inc., Acxiom Corporation, TeleCheck Services, Inc., Carfax, Inc., and ISO Claims Service, Inc. d/b/a Insurance Information Exchange (hereinafter "Defendants").  For the reasons assigned herein, the Consolidated Motion to Dismiss is **GRANTED**.

I.   **Background**

In 2007, Plaintiffs filed six separate, but virtually identical, lawsuits in the Eastern District of Texas against more than 100 defendants alleging violations of the Driver's Privacy Protection Act ("DPPA").  The Defendants, though comprised of vastly different business organizations, can be broken into two distinct categories: (1) those who obtain information directly from the State of Texas for their own use ("Non-Sellers")[1], and (2) those who obtain information from the State of Texas

---

[1]Defendants referred to as "Non-Sellers" are:  Southwestern Bell Telephone, L.P. d/b/a Southwestern Bell Telephone Company, a Texas Limited Partnership, Safeway Inc., Academy, Ltd., HEB Grocery Company, LP, D.B. Stringfellow, The Hearst Corporation d/b/a Houston Chronicle, Texas Motor Transportation Association, Texas Farm Bureau Mutual Insurance Company, Defensive Drive Online, Ltd., Spartan Insurance Company, Insurance Technologies Corporation, ACS State & Local Solutions, Inc., Gila Corporation d/b/a Municipal Services Bureau, Hawkeye Insurance Services, Reliant Energy, Inc., Driver Training Associates, Inc. d/b/a

2

solely for the purpose of resale to others ("Resellers")[2]. Plaintiffs argue that the Non-Sellers are liable because although they may have a permissible use under the DPPA for obtaining some "personal information" from the Texas Department of Public Safety database, it is impermissible for them to obtain the entire database without immediate use of the data obtained. Plaintiffs argue that the Resellers are liable because resale is not a permissible purpose for obtainment under the DPPA.

## II.     Driver's Privacy Protection Act

In the late 1980s, Rebecca Schaeffer starred on the television show *My Sister Sam*. In 1989, Robert Bardo, an obsessed "fan," hired a private investigator to follow her. The investigator copied down her license plate number and obtained her home address from the State's Department of Motor Vehicles ("DMV"). When Bardo received her home address, he went to Schaeffer's home and murdered her. *See* 139 Cong. Rec. S15,765 (1993). Around the same time, another woman was

---

TicketSchool.com, American Electric Power Service Corporation, Tenant Tracker, Inc., JI Specialty Services, Inc., Lee Farish Computer Services, Inc., American Municipal Services, Ltd., Globe Life Accident and Insurance Company, Softech International, Inc., Safety-USA Institute, LLC, Paradise Development, Inc. d/b/a Drivesafe Defensive Driving, Defensive Driver Online, Ltd., Global 360 BGS, Inc., ABC Data, Inc. d/b/a Unicard Systems, Inc., ContinuedEd.com D/B/A Idrivesafely.com, United Teacher Associates Insurance Company, Federated Retail Holdings, Inc., f/k/a The May Department Stores Company d/b/a Foley's, Cross-Sell, Inc., Industrial Foundation of America, Marshall Systems Technology, Inc., U.S. Interactive, Inc., Carfax, Inc., and ISO Claims Service, Inc. d/b/a Insurance Information Exchange.

[2]Defendants referred to as "Resellers" are: American Driving Records, Inc., d/b/a First Advantage, a/k/a Agency Records, Inc., Background Information Systems, Inc., RealPage, Inc., FedChex, L.L.C, LML Payment Systems Corporation, URAPI, EmagineNet Technologies, Inc., Household Drivers Report, Inc. d/b/a HDR, Inc., American Student List, LLC, Source Data, Inc., Jon Latorella, d/b/a LocatePlus Holdings Corporation, National Statistical Services Corporation, ADP Screening and Selection Services, Inc., Talbot Group, Inc., Aristotle International, Inc., Biometric Access Company, Zebec Data Systems, Inc., InfoNation, Inc., Allied Resident/Employee Screening Service, Inc., PropertyInfo Corporation, Dallas Computer Information Systems, Realty Computer Solutions, Inc. d/b/a Real-Comp, Acxiom Risk Mitigation, Inc., Acxiom Corporation, and TeleCheck Services, Inc.

murdered in Tempe, Arizona, five women in California were sent threatening letters from a 31-year-old man, and several owners of expensive cars in Iowa were robbed by a gang of teenagers. Like Bardo, all of the other criminals obtained their victim's addresses from the State's Department of Motor Vehicles. *See* 139 Cong. Rec. S15,745–01 (1993). Following these incidents, public concern grew over the availability of personal information maintained by state motor vehicle departments.

Additionally, Congress was concerned with the practice by many states of selling personal information maintained by the DMV to businesses and marketers. Citizens were being flooded with junk mail and unwanted solicitations. *Reno v. Condon*, 520 U.S. 141, 143-144, 120 S.Ct. 666, 668 (2000); 183 ALR Fed. 37 § 2.

To address these concerns, Congress enacted the Driver's Privacy Protection Act of 1994 ("DPPA"), 18 U.S.C. §§ 2721–2725.[3] The DPPA generally makes it unlawful for the State DMV, and "any officer, employee, or contractor thereof" to "knowingly disclose or otherwise make available to any person or entity personal information...about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a)(1). The Act also prohibits a private actor from "knowingly obtain[ing], disclos[ing], or us[ing] personal information,

---

[3]*See Margan v. Niles*, 250 F. Supp. 2d 63, 68-69 (N.D.NY, 2003); 139 Cong. Rec. S15,754-01, S15,764-66 (1993) (statements of Sens. Robb, Biden, and Harken stating "[t]his amendment closes a loophole in the law that permits stalkers to obtain–on demand–private, person information about their potential victims" and discussing the following incidents where (1) anti-abortion activists obtained the personal information of an ob/gyn patient from DMV records and sent her threatening letters; and (2) a "fan" of a fashion model who obtained her address from the DMV, then went to her home and assaulted her); *see also* 139 Cong. Rec. S15,745–01 (1993) (statement of Senator Boxer discussing situations where (1) a 31-one-year old man copied the license plate number of five women in their early twenties, obtained their personal information from the DMV and sent them threatening letters; and (2) a gang of teenagers in Iowa copied the license plate numbers of expensive cars, obtained the home addresses of the owner's of those cars, and then robbed them).

4

from a motor vehicle record, for a purpose not permitted under [section 2721(b) of this title]." 18

U.S.C. § 2724(a).  "Personal information" is defined as "information that identifies an individual,

including an individual's photograph, social security number, driver identification number, name,

address (but not the 5-digit zip code), telephone number, and medical or disability information, but

does not include information on vehicular accidents, driving violations, and driver's status." 18

U.S.C. § 2725(3).

     While the DPPA generally prohibits a state from disclosing personal information, the statute

sets out a number of "permissible uses" for which personal information may be disclosed:

Permissible uses.—Personal information referred to in subsection (a) shall be disclosed for
use in connection with matters of motor vehicle or driver safety and theft, motor vehicle
emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring
of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner
records from the original owner records of motor vehicle manufacturers to carry out the
purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information
Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and
chapters 301, 305, and 321-331 of title 49, and, subject to subsection (a)(2), may be disclosed
as follows:
    (1) For use by any government agency, including any court or law enforcement agency,
in carrying out its functions, or any private person or entity acting on behalf of a Federal,
State, or local agency in carrying out its functions.
    (2) For use in connection with matters of motor vehicle or driver safety and theft; motor
vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance
monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research
activities, including survey research; and removal of non-owner records from the original
owner records of motor vehicle manufacturers.
    (3) For use in the normal course of business by a legitimate business or its agents,
employees, or contractors, but only--
        (A) to verify the accuracy of personal information submitted by the individual to the
business or its agents, employees, or contractors; and
        (B) if such information as so submitted is not correct or is no longer correct, to obtain
the correct information, but only for the purposes of preventing fraud by, pursuing legal
remedies against, or recovering on a debt or security interest against, the individual.
    (4) For use in connection with any civil, criminal, administrative, or arbitral proceeding
in any Federal, State, or local court or agency or before any self-regulatory body, including
the service of process, investigation in anticipation of litigation, and the execution or

5

enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

(7) For use in providing notice to the owners of towed or impounded vehicles.

(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

18 U.S.C. § 2721(b).

The DPPA also provides for resale or redisclosure of personal information obtained by

"authorized recipients:"

> Resale or redisclosure.--An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b) (11) or (12)). An authorized recipient under subsection (b)(11) may resell or redisclose personal information for any purpose. An authorized recipient under subsection (b)(12) may resell or redisclose personal information pursuant to subsection (b)(12). Any authorized recipient (except a recipient under subsection (b) (11)) that resells or rediscloses personal information covered by this chapter must keep for a period of 5 years records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request.

18 U.S.C. § 2721(c).

6

Persons who violate the DPPA may be subject to a criminal fine as well as civil liability for (1) actual damages, (2) punitive damages, (3) reasonable attorneys' fees and other litigation costs, and (4) preliminary and equitable relief. 18 U.S.C. §§ 2723(a), 2724(b).

### III.   Analysis

Defendants' Consolidated Motion to Dismiss presents a two-pronged argument for dismissal: (1) failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6), and (2) lack of standing pursuant to Rule 12(b)(1). Ordinarily, a Rule 12(b)(1) motion must be considered first when filed in conjunction with other Rule 12(b) motions. *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). This requirement prevents a court without subject matter jurisdiction from prematurely dismissing a case with prejudice. *Id.* However, in the instant matter, this Court will discuss Defendants' Rule 12(b)(6) argument before addressing standing because the Court's interpretation of the DPPA will determine the scope, if any, of plaintiffs' injuries-in-fact.

####     A.     *Rule 12(b)(6)*

Rule 12(b)(6) authorizes the dismissal of a complaint for "failure to state a claim upon which relief may be granted." Civ. P. 12(b)(6). While a complaint does not need detailed factual allegations, a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007). Federal Rule of Civil Procedure 8(a)(2) requires a "showing," not merely a blanket assertion, of entitlement to relief. *Id.* at n.3. The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (internal citations omitted).

*Non-Sellers.* Section 2724(a) of the DPPA sets forth three elements giving rise to liability:

7

(1) the defendant knowingly obtained, disclosed, or used personal information, (2) from a motor vehicle record, (3) for a purpose not permitted. With regard to the third element, Plaintiffs' bear the burden to prove that the personal information was not obtained, disclosed, or used for a purpose specifically enumerated in Section 2721(b). *See Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, and Stevens, P.A.*, 525 F.3d 1107, 1111-14 (11th Cir. 2008).

Plaintiffs allege that the Non-Sellers obtained their "personal information" for an impermissible purpose—"to save [themselves] time and/or money by not having to go back to the State of Texas each time [they] need additional information" and " to avoid the inconvenience of having to go to the State each time [they] need an additional customers' information." [Statement of Violations, No. 07-0001, Doc. 62]. Plaintiffs claim that any purpose Defendants had for obtaining their "'personal information' other than an immediately contemplated use of the information for one of the DPPA's authorized uses" constitutes a violation of the DPPA. *Id.* Defendants' choice to obtain the entire database, containing the personal information of over twenty million individuals, is the basis for Plaintiffs' improper obtainment claims. Plaintiffs' also allege that the continued use of the information obtained by Defendants' "is not an enumerated use and is contrary to [the DPPA's] provisions." *Id.* In other words, Plaintiffs do not allege that Defendants' have obtained or used their personal information for an impermissible purpose; rather, they argue only that obtainment of the entire database was impermissible as Defendants' did not immediately use the data.

This Court agrees with Defendants' that Plaintiffs factual allegations do not give rise to a plausible right to relief under the DPPA. *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007). The statute expressly provides that a private actor may be liable for civil damages only if

8

that person "knowingly obtains, discloses, or uses personal information, from a motor vehicle record, *for a purpose not permitted under this chapter.*" 18 U.S.C. § 2724(a) (emphasis supplied). Plaintiffs have failed to plead any facts alleging that Defendants obtained or used their information *for a purpose not permitted* under the Act. Plaintiffs' assertion that, because Defendants did not immediately use the data obtained, does not constitute an allegation of obtainment or use of "personal information" for an impermissible *purpose.*

Moreover, the plain language of the DPPA does not require that a person "immediately use" the data, nor has the statute been interpreted to imply such a requirement.[4] *See* 18 U.S.C. §§ 2721-2725. As such, this Court refuses to interpret the DPPA to impose such an illogical restriction on the use of data obtained for a permissible purpose.

*Resellers.* Plaintiffs allege that Resellers are in violation of the DPPA because they obtained plaintiffs' personal information solely for the purpose of resale and were not themselves "users" of the information. Yet, the statute clearly and unambiguously permits "[a]n authorized recipient of personal information...[to] resell or redisclose the information." 18 U.S.C. § 2721(c). The only limitation placed on "authorized recipients" is that the information may be resold or redisclosed "only for a use permitted under subsection (b)." *Id.* The DPPA does not require an "authorized recipient" to also be an "authorized user."[5]

─────────────────

[4]As Defendants' point out in their Consolidated Motion, the DPPA does not prohibit the nonuse of data obtained for a permissible purpose, immediate or otherwise. When a company obtains data for a permissible purpose, neither the DPPA nor the cases that interpret it impose a requirement that the data be put to use at any point in the future.

[5]*See Russell v. Choicepoint Serv., Inc.*, 300 F. Supp. 2d 450 (E.D.La, 2004) ("*Russell I*"); *Russell v. Choicepoint Serv., Inc.*, 302 F. Supp. 2d 654 (E.D.La, 2004) ("*Russell II*").

9.

Plaintiffs reliance on *Locate.Plus.Com*[6] is misplaced. In *Locate.Plus.Com,* the Iowa Supreme Court concluded that "[t]he statute does not permit disclosure to a nonuser, who only seeks information to redisclose it for use under a permitted purpose." *Id.* at 617. Yet the court reached this conclusion without providing a meaningful analysis of the DPPA's statutory language or its corresponding congressional intent.[7] In fact, the rationale of *Locate.Plus.Com* was expressly rejected in *Russell I* and *Russell II* after that court embarked on a thorough analysis of Section 2721(c) of the DPPA.[8]

By using the term "authorized recipients" instead of "authorized users" or "permissible" users," Congress anticipated that entities like defendant Resellers would obtain drivers' personal information from DMV's solely for the purpose of redistributing the information to persons with permissible uses. *See Russell I,* 300 F. Supp. 2d at 455-56; *Russell II,* 302 F. Supp. 2d at 654. As the district court in the *Russell* cases stated:

> Congress could have limited resale and redisclosure to "permissible users," keeping in line with 18 U.S.C. § 2721(b)'s theme of permissible use, but instead Congress employed the term "authorized recipient" in § 2721(c). This deliberate word choice reveals congressional intent to allow states and their DMVs to authorize persons and entities to receive drivers' information for resale. In enacting the DPPA, Congress intended to strike "a critical balance between legitimate governmental and business needs for this information, and the fundamental right of our people to privacy and safety." 139 Cong. Rec. S15,763 (1993). Congress was well aware of the economic value of DMV records and of the common state practice of selling drivers' personal

---

[6] *Locate.Plus.Com, Inc. v. Iowa Dept. Of Transp.,* 650 N.W.2d 609 (Iowa, 2002).

[7] In *Locate.Plus.Com,* the Court stated: "Redisclosure of the information is allowed only for a permitted purpose and can only occur if the information was initially disclosed by the state to an 'authorized recipient.'" The Court then concluded that "Worldwide must itself be an authorized user." However, the Court reached this conclusion without discussing the meaning of the term "authorized recipient" or Congress' intention in enacting Section 2721(c).

[8] *See Russell I,* 300 F. Supp. 2d 450; *Russell II,* 302 F. Supp. 2d 654.

information to private resellers. The inclusion of the term "authorized recipient" and the exclusion of any reference to "users" in DPPA § 2721(c) indicates an intent on behalf of Congress to delegate authorization to the states and thereby permit personal information resellers like [defendant] who are authorized by the state or its DMV to obtain drivers' personal information for the purpose of redistribution to persons with "permissible uses."

*Russell I* at 456-47; *Russell II* at 665.

The *Russell* court's interpretation of the term "authorized recipient" is further evidenced by the DPPA's requirement that any authorized recipient who resells or rediscloses personal information keep "records identifying each person or entity that receives information and the permitted use for which the information will be used and must make such records available to the motor vehicle department upon request." 18 U.S.C. § 2721(c).

Because the DPPA allows "authorized recipients" to obtain "personal information" solely for purposes of resale to third parties with permissible uses, Plaintiffs' may not maintain a DPPA claim against Resellers for improper obtainment under 18 U.S.C. § 2724(a) without alleging an accompanying impermissible use. *See Russell v. Choicepoint Serv., Inc.*, 300 F. Supp. 2d 450 (E.D.La, 2004) (hereinafter "*Russell I*"); *Russell v. Choicepoint Serv., Inc.*, 302 F. Supp. 2d 654 (E.D.La, 2004) (hereinafter "*Russell II*"); *see also Mechler v. Hodges*, 2005 WL 1406102, *7 (S.D.Ohio, 2005). The basis of Plaintiffs' claims against Resellers is improper obtainment alone. They have failed to allege any facts indicating an impermissible use of the "personal information" obtained by Resellers. As such, Plaintiff's factual allegations do not give rise to plausible right to relief under the DPPA. *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007).

**B.    *Rule 12(b)(1)***

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges

11

the subject matter jurisdiction of the court. Fed. R. Civ. P. 12(b)(1). In evaluating a Rule 12(b)(1) motion, the district court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of undisputed facts." *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). In the absence of subject matter jurisdiction, federal courts lack the power to adjudicate claims. *See Stockman v. Federal Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Plaintiffs, as the parties asserting jurisdiction in this matter, bear the burden to prove that jurisdiction does in fact exist. *Ramming*, 281 F.3d at 161.

In determining whether a federal district court has subject matter jurisdiction, the court must also consider whether the plaintiffs have standing. *See Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006). The Supreme Court has set out three elements that must be met to constitute the irreducible constitutional minimum of "standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992). First, the plaintiff must have suffered an "injury-in-fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of. In other words, the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* (internal quotations and citations omitted). Failure to establish any one of these three elements deprives the federal court of jurisdiction to hear the case. *Rivera v. Wyeth Ayerst Labs*, 283 F.3d 315, 319 (5th Cir. 2002).

Plaintiffs have failed to allege or plead any facts showing that Defendants, neither Non-

Sellers or Resellers, impermissibly obtained and/or used Plaintiffs' "personal information." Thus, Plaintiff's have not shown that they have suffered an "injury-in-fact." Further, they have not plead a causal connection between the alleged violations and the alleged harm, nor can they demonstrate redressability.

**Conclusion**

The DPPA does not require "immediate use" of personal information obtained from a State's Department of Motor Vehicles and Plaintiffs' have failed to allege an impermissible *purpose* for which the information was obtained by Non-Sellers. Plaintiffs have also failed to plausibly plead facts alleging that Resellers impermissibly used the data. Consequently, Plaintiffs have failed to state a claim upon which relief may be granted and, because they have not suffered an "injury-in-fact," lack standing to adjudicate their claim before this court.

For the reasons stated above, the Court will **GRANT** Defendants' Motion to Dismiss **WITH PREJUDICE** Pursuant to Rule 12(b)(6) and Rule 12(b)(1) and *sua sponte* **DISMISS WITH PREJUDICE** Plaintiffs' claims against all remaining Defendants in Nos. 07-0001, 07-0013, 07-0014, 07-0017, 07-0018, and 07-410.[9]

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 8th day of September, 2008.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE

---

[9]"It is well-established that the district court may dismiss a complaint a 12(b)(6) grounds *sua sponte*." *Bell v. Valdez*, 207 F.3d 657, n.1 (5th Cir. 2000); *First Gilbraltar Bank v. Smith*, 62 F.3d 133, 135 (5th Cir. 1995); *Guthrie v. Tifco Industries*, 941 F.2d 374, 379 (5th Cir. 1991).

# EXHIBITB

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 5234675 (W.D.Mo.)
**(Cite as: 2008 WL 5234675 (W.D.Mo.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
W.D. Missouri,
Central Division.
Emily ROBERTS, et al., Plaintiffs,
v.
The SOURCE FOR PUBLIC DATA, et al., Defendants.
**No. 08-4167-CV-C-NKL.**

Dec. 12, 2008.

West KeySummary
Records 326 ☜⇒31

326 Records
   326II Public Access
      326II(A) In General
         326k31 k. Regulations Limiting Access;
Offenses. <u>Most Cited Cases</u>
Missouri residents' allegations that an on-line retailer
knowingly obtained and disclosed their highly re-
stricted personal information from the Missouri De-
partment of Revenue for the purpose of selling it to
the general public, stated a claim for relief under the
Drivers Privacy Protection Act (DPPA). There was
no exception under the DPPA allowing business enti-
ties to obtain highly restricted personal information
for the purpose of re-selling it to others with permis-
sible uses, therefore, obtaining such information for
that purpose was not permitted. Moreover, the on-line
retailer was not an authorized recipient, their disclo-
sure to others was not permitted under the DPPA. <u>42
U.S.C.A. § 1983</u>.

<u>Don P. Saxton</u>, <u>Keith Christopher Lamb</u>, <u>Mitchell L.
Burgess</u>, Burgess & Lamb, PC, <u>Ralph K. Phalen</u>,
<u>Ralph K. Phalen</u>, Attorney at Law, Kansas City, MO,
<u>Timothy M. McDuffey</u>, Bergmanis & McDuffey,
Camdenton, MO, for Plaintiffs.

<u>John B. Boyd</u>, Brianne Niemann, Boyd & Kenter,
P.C., Kansas City, MO, <u>John E. Collins</u>, Burleson
Pate & Gibson, Dallas, TX, for Defendants.

**ORDER**

<u>NANETTE K. LAUGHREY</u>, District Judge.

**\*1** Plaintiffs Emily Roberts and Sarah E. Smith
("Plaintiffs") brought this putative class action
against Defendants The Source for Public Data, L.P.
("Public Data"), Shadowsoft, Inc. ("Shadowsoft"),
Omar Davis, Director of the Missouri Department of
Revenue ("Davis") and other unnamed individual
defendants who acted as agents of the Missouri De-
partment of Revenue. Plaintiffs claim violations of
the Drivers Privacy Protection Act ("DPPA"), <u>18
U.S.C. §§ 2721, et seq.</u>, <u>42 U.S.C. § 1983</u>, and the
Missouri Merchandising Practices Act. Plaintiffs'
claims against Defendants Public Data and Shadow-
soft (collectively, Defendants") stem from their al-
leged violations of Plaintiffs' statutory privacy rights
created by the DPPA. Pending before the Court is the
Defendants' Motion to Dismiss [Doc. # 21], and
Plaintiffs' Motion for leave to file Supplemental Au-
thority in Opposition to Defendants' Motions to Dis-
miss [Doc. # 33]. For the reasons stated herein, both
motions are denied.

**I. Background**<u>FN1</u>

> <u>FN1</u>. The Court treats the allegations in
> Plaintiffs' Complaint as true for purposes of
> the Defendants' motion to dismiss.

Plaintiffs allege that Shadowsoft acquired a large
database from the Missouri Department of Revenue
by falsely representing that this information was to be
used to verify the accuracy of information of indi-
viduals doing business with Shadowsoft. This data-
base contained information about Plaintiffs and puta-
tive class members, including their social security
numbers. Shadowsoft then transferred this database
to Public Data, who made the information, including
social security numbers, available for sale at its web-
site, www.publicdata.com. Public Data sold informa-
tion from the database Shadowsoft obtained from the
Department of Revenue, including social security
numbers.

Plaintiffs claim that the Defendants' actions listed

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5234675 (W.D.Mo.)
(Cite as: 2008 WL 5234675 (W.D.Mo.))

above were in violation of their and the putative class members' statutory privacy rights created in the DPPA, and that these actions further violated the Missouri Merchandising Practices Act and unjustly enriched the Defendants under Missouri law. The DPPA prohibits the knowing disclosure of "highly restricted personal information," defined to include social security numbers, without the express consent of the person to whom the information pertains, unless one of four statutory exceptions applies. 18 U.S.C. § 2721(a)(2). Plaintiffs argue that none of these exceptions were applicable to the Defendants' actions. Plaintiffs further claim the Defendants violated the DPPA by making false representations about their purposes in obtaining the database to the Missouri Department of Revenue in order to obtain the Plaintiffs' and putative class members information.[FN2]

## II. Discussion

In their motion, the Defendants argue that the allegations against them in Count II fail to state a claim upon which relief can be granted under the DPPA because, they argue, Plaintiffs have failed to allege that the Defendants acted with an impermissible purpose for obtaining their information under the DPPA. They further argue that Plaintiffs lack standing to bring a cause of action under the DPPA. Their motion does not discuss the Plaintiffs' claims under Missouri law for violation of the Missouri Merchandising Practices Act (Count IV) and for unjust enrichment (Count V).[FN2]

> FN2. In their suggestions in support, the Defendants do state, in a heading, that "Plaintiffs have no claim for 'false representation under the DPPA or the MPPA.' " This may be a reference to Plaintiffs' Count IV, for violation of the Missouri Merchandising Practices Act ("MMPA"), but even if so, the argument that follows contains no further references to the MMPA or the "MPPA," and there is no mention of either in the Defendants' reply suggestions. Finally, Plaintiffs' claim for unjust enrichment is nowhere mentioned in either party's briefs on this motion. Therefore, the Court treats this motion, as a motion to dismiss only Count II-Plaintiffs' claims brought under the DPPA-for failure to state a claim and lack of stand-

ing.

*2 On a motion to dismiss, the Court views the allegations in the Complaint in the light most favorable to Plaintiffs. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). The Court must accept "the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir.2005). A motion to dismiss for failure to state a claim must be granted if the Complaint does not contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

## A. Motion to Dismiss Count II for Failure to State a Claim

The Defendants first argue that Count II fails to state a claim under the DPPA because it fails to allege an essential element of a DPPA claim-that the Defendants obtained or disclosed the Plaintiffs' information for an impermissible purpose under the DPPA. The Defendants contend that under the DPPA, companies are not prohibited from re-selling and re-disclosing information to individuals who have a permissible use, and therefore the Plaintiffs' allegations-that the Defendants' purpose in obtaining and disclosing the information was to provide the information for sale to the general public-cannot support a DPPA claim. The Defendants' argument fails on a plain reading of the statute.

The DPPA makes it unlawful for a person to "knowingly ... obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b)" of the Act, and further states that "[a] person who knowingly obtains, discloses, or uses [such information] for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains[.]" [FN3] 18 U.S.C. § 2724(a).

> FN3. The DPPA defines "person" to include entities. 18 U.S.C. § 2725(2).

Section 2721(b) contains fourteen permissible purposes for obtaining, disclosing, or using the informa-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5234675 (W.D.Mo.)
**(Cite as: 2008 WL 5234675 (W.D.Mo.))**

tion-exceptions to the DPPA's general rule against obtaining or disclosing personal information from a motor vehicle record. 18 U.S.C. §§ 2721(a), 2721(b), 2722, and 2724. Section 2721(a)(2) states that "highly restricted personal information"-which under section 2725(4) includes social security numbers-may be disclosed only if the individual to whom the information applies consents to the disclosure, or if the disclosure is pursuant to "uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9)." 18 U.S.C. §§ 2721(a)(2), 2725(4). Those four subsections provide exceptions for obtaining or disclosing highly restricted personal information:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

....

(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

*3 ....

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, or underwriting.

....

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.

18 U.S.C. §§ 2721(b)(1), (4), (6), (9).

The Defendants suggest that the Plaintiffs' allegation that they obtained the Plaintiffs' highly restricted per-

sonal information for the purpose of sale to the general public is insufficient to state a claim under the DPPA. They do not argue that obtaining the information for this purpose is included in the four exceptions listed above, but rather contend that section 2721(c) of the DPPA allows for re-sale or redisclosure of personal information by a business entity, no matter the purpose for which that entity obtained the information, so long as the re-sale or redisclosure is to individuals who have a permissible purpose for obtaining the information under section 2721(b).

Section 2721(c) does *not* create an additional exception to the DPPA's general rule of non-disclosure; it simply provides that once an "authorized recipient" obtains the personal information, that person or entity may only re-sell or re-disclose that information if that resale or re-disclosure is also for a purpose permitted under section 2721(b). See 18 U.S.C. § § 2721(b) and (c). While the DPPA does not define "authorized recipient," it is clear from the context in section 2721(c) that an authorized recipient is one who has received the information pursuant to one of the 2721(b) exceptions. Section 2721(c) states, in full:

"(c) Resale or redisclosure.-An authorized recipient of personal information (*except a recipient under subsection (b)(11) or (12)* ) may resell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). *An authorized recipient under subsection (b)(11)* may resell or redisclose personal information for any purpose. *An authorized recipient under (b)(12)* may resell or redisclose personal information pursuant to subsection (b)(12). Any authorized recipient (*except a recipient under (b)(11)* ) that resells or rediscloses personal information covered by this chapter must keep for a period of 5 years records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request."

18 U.S.C. § 2721(c) (emphasis added). From the context of section 2721(c), and the references therein to recipients being authorized under particular section 2721(b) exceptions, it is clear that a recipient becomes authorized only by virtue of obtaining the information for a reason listed in section 2721(b).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5234675 (W.D.Mo.)
**(Cite as: 2008 WL 5234675 (W.D.Mo.))**

*4 Defendants cite to a district court decision from the Eastern District of Louisiana which basically holds that, because Congress used the phrase "authorized recipient," rather than "authorized user," in section 2721(c), Congress must have understood that some "authorized recipients" would be individuals or entities other than those who were authorized to use the information under an exception in section 2721(b). See Russell v. ChoicePoint Servs., Inc. et al., 300 F.Supp.2d 450, 455-461 (E.D.La.2004).

The Russell court's interpretation of section 2721(c) is inconsistent with the plain language of the DPPA, which makes it unlawful for business entities to "obtain ... personal information ... for any use not permitted under section 2721(b)[ .]" 18 U.S.C. § 2722. Section 2722's prohibition on *obtaining* information for any purpose other than one listed in section 2721(b) makes no sense if under section 2721(c) a business entity is allowed to *receive* personal information for the purpose of re-selling or re-disclosing it to others whose uses would fall under exceptions in section 2721(b)-a purpose for which there is no exception in section 2721(b). Congress could not have intended to prohibit *obtaining* personal information for a purpose not listed in section 2721(b) while at the same time authorizing the *receipt* of personal information by entities who wished to use the information in a way not contemplated by that section. The words *obtain* and *receive* both indicate that one has taken or acquired possession of some thing. BLACK'S LAW DICTIONARY 1078, 1268 (6th ed.1990); *Webster's II New College Dictionary* 756, 924-925 (Margery S. Berube *et al.* eds.1995). Thus, an "authorized recipient" is one authorized to receive (or obtain) something; one who is prohibited from obtaining something cannot also be an "authorized recipient" of it.

Congress could have included an additional exception in section 2721(b) to allow business entities to obtain highly restricted personal information for the purpose of re-selling or re-disclosing it to others with permissible uses; it did not do so. See Locate.Plus. Com, Inc. v. Iowa Dep't of Transp., 650 N.W.2d 609 (Iowa 2002). Because there is no such exception, obtaining personal information for this purpose is not permitted under the DPPA. Further, because section 2721(c) only allows "authorized recipients" to disclose highly restricted personal information for a

purpose permitted under section 2721(b), and because the Defendants are not "authorized recipients," their subsequent disclosure to others, no matter the reason, is not permitted under the DPPA. See 18 U.S.C. § 2721(c).

Plaintiffs allege in Count II that the Defendants knowingly obtained and disclosed their highly restricted personal information from the Missouri Department of Revenue for the purpose of selling it to the general public. That purpose is not among the four reasons entities may lawfully obtain or disclose such information under section 2721(b). Plaintiffs' Complaint therefore adequately states a claim for relief under the DPPA that the Defendants unlawfully obtained and disclosed Plaintiffs' highly restricted personal information.[FN4]

> FN4. The Defendants also argue that Count II fails to state a claim under the DPPA under a "false representation" theory, because while section 2724(a) creates a cause of action for knowingly obtaining, disclosing, or using personal information for a use not permitted under the DPPA, it does not create a cause of action for false representation, and section 2722(b)-the DPPA provision making the use of false representations in obtaining personal information unlawful-does not create a private right of action and its enforcement is left to the United States Department of Justice. Because Count II survives the Defendants' motion to dismiss under an unlawful obtainment or disclosure theory, it is unnecessary for the Court to address this alternative argument for dismissal.

**B. Motion to Dismiss Count II for Lack of Standing**

*5 Article III standing requires a plaintiff to have suffered an injury-in-fact that has a causal connection with the complained-of conduct that is likely to be redressed by a favorable decision. *Pucket v. Hot Springs Sch. Dist.*, 526 F.3d 1151, 1157 (8th Cir.2008) (citing *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir.2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The Defendants claim that Plaintiffs lack standing to bring their DPPA claim because their Complaint: (1) fails to "allege any spe-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5234675 (W.D.Mo.)
(Cite as: 2008 WL 5234675 (W.D.Mo.))

cific facts concerning their ... individual harm or damage; and (2) because Plaintiffs fail to plead any "improper use or obtainment [under the DPPA] ... Plaintiffs cannot establish the necessary causal connection, and in turn, cannot demonstrate redressability." (Sugg.Opp.14-15).

In their Complaint, Plaintiffs allege that the Defendants "knowingly obtained, acquired, and disclosed *the Plaintiffs'* ... highly restricted personal information, as defined by the DPPA, for a use not permitted under the statute-for sale to the general public-in violation of the DPPA[.]" (Compl.¶ 48) (emphasis added). The Complaint alleges that Shadowsoft acquired the information from the Missouri Department of Revenue, and that Public Data in turn acquired the information from Shadowsoft for this unpermitted purpose. (Compl.¶¶ 22, 24-25, 46-48). Plaintiffs have clearly alleged that they suffered an injury-in-fact caused by Defendant's violations of the DPPA. The DPPA is designed to protect personal information. *Parus v. Allstate Ins. Co.,* No. 05-C-0063-C, 2005 WL 2240955 (W.D.Wis. Sept.14, 2005) (citing 139 Cong. Rec. S15765 (1993)). It protects drivers' privacy by placing restrictions on the purposes for which personal information may be obtained, used, and disclosed. The Complaint's allegations that the Defendants unlawfully obtained Plaintiffs' highly restricted personal information, in violation of their privacy rights under the DPPA, suffice to establish injury-in-fact. Under the DPPA, "improperly obtaining [a] plaintiff's information [*is* ] an injury." *Id.* The Defendants' argument that Plaintiffs' allegations are insufficient to establish causation or redressability are based upon their argument-rejected above-that they did not obtain or disclose Plaintiffs' information unlawfully. The Court will not dismiss Plaintiffs' Complaint for lack of standing.

## II. Plaintiffs' Motion for Leave to File Supplemental Authority

Plaintiffs have moved the Court for leave to file supplemental authority in opposition to Defendants motions to dismiss [Doc. # 33]. It would be inappropriate for the Court to consider additional outside evidence on Defendants' motions to dismiss where Defendants introduced no outside evidence. Moreover, the documents Plaintiffs wish to file would have no bearing on the Court's resolution of the Defendants' motions to dismiss.

## III. Conclusion

*6 Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss [Doc. # 21] is DENIED; it is further

ORDERED that Plaintiffs Motion for Leave to File Supplemental Authority in Opposition to Defendants' Motions to Dismiss [Doc. # 33] is DENIED.

W.D.Mo.,2008.
Roberts v. Source for Public Data
Not Reported in F.Supp.2d, 2008 WL 5234675 (W.D.Mo.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT C

Westlaw.

139 Cong. Rec. S15745-01, 1993 WL 470986 (Cong.Rec.)

*1 Congressional Record --- Senate
Proceedings and Debates of the 103rd Congress, First Session
Tuesday, November 16, 1993

**\*S15745** VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1993

The Senate resumed the consideration of the bill.
The PRESIDING OFFICER.
Under the previous order, the Senate will now resume consideration of S. 1607, the crime bill.
The clerk will report.
The assistant legislative clerk read as follows:
A bill (S. 1607) to control and prevent crime.
Mr. BIDEN addressed the Chair.

The PRESIDING OFFICER.
The Senator from Delaware is recognized.
Mr. BIDEN.
Madam President, I believe under the unanimous-consent agreement, the next amendment that we are to take up is the amendment of the distinguished Senator from Texas, Senator HUTCHISON. While she is preparing to make her case, I have been trying to clear her amendment on our side. I may be able to save her a considerable amount of time. The last Democrat who had an objection to her amendment has now agreed that I can accept the amendment. I do not mean for her not to speak to it. But on our side, we will be prepared to accept the Hutchison amendment, once offered and explained by the distinguished Senator from Texas. I assume the Republican manager may accept it.
Mr. HATCH.
We are prepared to accept the amendment, as well, and are very pleased to do so.
Mr. BIDEN.
I will, at the appropriate time, after the Senator from Texas is finished, ask unanimous consent to vitiate the vote tomorrow on the Hutchison amendment as soon as she is **\*S15746** willing to have her amendment accepted.

AMENDMENT NO. 1158

Mrs. HUTCHISON.
Madam President, last year Congress prohibited the distribution of Pell grant funds to prison inmates who are under death sentences or serving sentences of life without parole. This was a step in the right direction, Mr. President, but during the past year those who are serving lesser sentences-for offenses like carjacking, armed robbery, rape, and arson-received as much as $200 million in Pell funds, courtesy of the American taxpayer.

This is not right. This is not fair to the more than 1 million eligible students who were denied Pell grants last year because there was not enough money in the program. It is not fair to the millions of parents who work and pay taxes, and then must scrape and save and often borrow to finance their children's educations.

My amendment is aimed at stretching every possible dollar for those young people who stay out of trouble, study hard, and deserve a chance to further their education, fair to working Americans who pay their taxes and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

do without in order that their children will have advantages they never had: a better education, more opportunities, a better future.

The American people are frustrated by a Federal Government and a Congress that cannot seem to get priorities straight. They are frustrated and angry by a Federal Government that sets rules that put convicts at the head of the line for college financial aid, crowding out law abiding citizens.

*2 One police officer whose daughter couldn't quality for a Pell grant summed up his frustration when he said recently, "Maybe I should take my badge off and rob a store."

I believe people who have made a mistake, who have been convicted of a crime and are serving time in jail, generally deserve a second chance. To provide that second chance, the Federal Government spends $100 million or so each year on prisoner education and training programs. State governments add to this total. This educational assistance money, however, is available only to prison inmates-to provide a second chance.

But the issue I raise is whether we will act to provide for a first, perhaps only, chance for 100,000 young people who qualify for Pell grants but who are denied educational assistance because there isn't enough money.

Congress created the Pell Grant Program in 1972, in order to help the children of poor and working class families have a chance to go to college. We have appropriated ever increasing sums of money for the program ever since, because higher education is an investment in our children's and our Nation's future. For recipients of Pell grants, 95 percent of whom come from families with annual incomes of less than $30,000, 70 percent below $15,000, financial aid is very often the difference between going to college and building a better future, and going to work in lower paying jobs.

For more than 10 years, however, Congress has looked the other way while increasingly large amounts of Pell grant money has been diverted from the students for whom it is intended, to imprisoned convicts.

As I said at the outset, this is not fair. It is not fair to taxpayers. It is not fair to law-abiding citizens. It is not fair to the victims of crime. But we can set things right. We only need to make a choice. And for me, it is an easy choice.

My amendment would put $200 million in the hands of more than 100,000 students and their parents, who have worked and studied and saved and scrimped for a chance at more schooling. They are my choice. I hope a majority of my colleagues also will choose to support them, to put at the head of the line, not the end, Americans who work and raise families and pay taxes.

Madam President, I would like to make an inquiry of the chairman. I would be happy not to make a talk. I do understand when you declare victory and go home. I would be happy to give back the time if the chairman would prefer that, or I would be happy to talk if the next Senator is not ready.

Mr. BIDEN.

The distinguished Senator from Texas has worked very hard on this amendment. If she would be willing to summarize her amendment it would facilitate. She is entitled to take the time to summarize her amendment.

The PRESIDING OFFICER.

The Senator from Texas.

Mrs. HUTCHISON.

Madam President, I certainly appreciate the Senator from Delaware accepting my amendment and certainly appreciate the Senator from Utah for all the work that he has done to make this possible.

*3 Let me just summarize my amendment and say that what we are going to be able to do, because of the acceptance of this, is reserve Pell grants, which are stipends, for children of low-income working families. Ninety-five percent of the grants for these children to be able to go to college come to parents of children in families that make under $30,000 a year. Seventy percent of those come from families that earn under $15,000 a year.

So this is a very important grant for these families to give their children the opportunity to go to college, many times something they could not do for themselves.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

What has happened is that because prisoners have zero income they have been able to step to the front of the line and push law-abiding citizens out of the way to get these grants for college educations. In fact, what this amendment will do is free up the $200 million that was going to prisoners to have their educations funded, and it will now go to the children of these low-income families for whom the Pell grants were originally intended.

Let me say that I think that prisoners who want to get an education deserve a second chance, and, in fact, the Federal Government does put up almost $100 million to do that, and, States do supplement that program. I am very much a supporter of that.

But these are a different type of grant. They are educational grants. They are for the children of low-income families, and many of these families have to borrow to send their children to school anyway, but these Pell grants give them that extra boost. It may be $1,500 or $2,000 a year, depending on the family.

So this is going to give 100,000 young people, Madam President, the opportunity to have that first chance, that chance that may make the difference in their lives.

I thank the Senator from Delaware and the Senator from Utah for accepting this amendment and giving these kids a chance.

Thank you, Madam President.

I yield the floor.

The PRESIDING OFFICER.

The Senator from Delaware.

Mr. BIDEN.

Madam President, let me again compliment the Senator from Texas and thank her for doing what a number of those of us who are more senior around here have not learned to do, and that is be gracious enough, as she always is, when she prevails to yield back her time. I wish everyone could take a lesson from her, and I thank her for her consideration as it relates to the time.

Madam President, I ask a unanimous consent that the unanimous consent agreement that calls for us acting on the Hutchison amendment tomorrow morning be vitiated, not the whole request, only the amendment.

The PRESIDING OFFICER.

Without objection, it is so ordered.

Mr. BIDEN.

Madam President, I urge adoption of the amendment.

Mr. HATCH.

The amendment is acceptable and I urge its adoption.

The PRESIDING OFFICER.

Do Senators yield back their time?

Mr. BIDEN.

We yield back all our time, Madam President.

The PRESIDING OFFICER.

*4 The question is on agreeing to the amendment.

The amendment (No. 1158) was agreed to.

Mr. BIDEN.

Mr. President, I move to reconsider the vote.

Mr. HATCH.

I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER.

The Senator from Utah.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. HATCH.

As I understand it we are going to move to the Boxer amendment at this time. So I ask unanimous consent that--

The PRESIDING OFFICER.

It is difficult to hear the Senator from Utah. Order, please.

*S15747 Mr. HATCH.

Madam President, I was concerned about the Senator from New York. I did not think he was here. He is next up on the amendment train.

Mr. BIDEN.

Madam President, what is the business before the Senate?

The PRESIDING OFFICER.

The crime bill.

Mr. BIDEN.

Madam President, let me be more specific.

The PRESIDING OFFICER.

The amendment of the Senator from New York is the next amendment.

Mr. BIDEN.

Madam President, let me ask my friend from New York if he would consider yielding for the following purpose: In order for us to accommodate an immediate need of the Senator from North Carolina, we allowed the Senator from North Carolina, who had an amendment that was the Helms-Graham amendment on prison caps, we allow the Senator from North Carolina to make his plea for his amendment earlier this evening and move ahead of the line.

I would respectfully suggest that since the Senator from Florida is a cosponsor of that amendment and he is only going to speak, as I understand, roughly 5 minutes on that amendment, that we allow the Senator from Florida to take 5 minutes and then the Senator from Delaware will not use the 15 minutes to respond but 5 minutes to respond. So we will be delaying the Senator from New York a total of 10 minutes, but it seems to me a more orderly way to do it.

Mr. D'AMATO.

I certainly have no objection.

Mr. BIDEN.

I ask unanimous consent that we move back to the Helms-Graham amendment and, as I understand, the Senator from Florida is going to seek to use 5 minutes of 15 minutes he has on another amendment to make his case. Is that correct?

Mr. GRAHAM.

Madam President, it had been my intention at the appropriate time to offer another amendment, No. 8 on the list of amendments to be offered. I can defer that and speak on both of those items at that time or I can speak on the prison caps amendment at this time, whichever would be preferable.

Mr. BIDEN.

If the Senator would be willing to speak on the prison caps amendment now and then we will go back to the regular order of how the UC suggests we take up amendments, that would be I think the most orderly way if he would be willing.

The PRESIDING OFFICER.

Without objection, the Senator from Florida is recognized for 5 minutes.

AMENDMENT NO. 1159

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. HELMS.

I call up the amendment and ask it be stated.

The PRESIDING OFFICER.

*5 Under the previous order, the Senator from North Carolina has 5 minutes on the amendment.

Mr. HELMS.

Do you not wish to state the amendment?

The PRESIDING OFFICER.

The clerk will report the amendment for the information of Senators.

The assistant legislative clerk read as follows:

The Senator from North Carolina <Mr. HELMS>, for himself, Mr. GRAMM, and Mr. GRAHAM, proposes an amendment numbered 1159.

Mr. HELMS.

Madam President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER.

Without objection, it is so ordered.

Mr. HELMS.

Madam President, I ask unanimous consent the following Senators be added as original cosponsors of the amendment, in addition to Mr. GRAMM of Texas, Mr. GRAHAM of Florida and myself, add these Senators: Senators MACK, FAIRCLOTH, DOLE, THURMOND, HATCH, KASSEBAUM, BURNS, MCCAIN, MC-CONNELL, and STEVENS.

The PRESIDING OFFICER.

Without objection, it is so ordered.

Mr. GRAHAM.

Madam President, I would speak briefly on the amendment that has been offered by the Senator from North Carolina, and the Senator from Texas, and myself relative to the Federal role in establishing the maximum population in local jails and State prisons.

The Federal Government's involvement in this is a function of the eighth amendment to the Constitution which prohibits cruel and unusual punishment.

Our amendment is simple and straightforward. It says that the Federal courts enforcing that provision shall establish those standards that assure that the constitutional prohibition against cruel and unusual punishment is not violated but that the court shall not exceed that standard.

There has been great concern that the pattern of Federal court orders relative to prison construction and operation and population have been setting higher and higher standards that have gone far beyond those necessary to assure that the constitutional standard of cruel and unusual is not violated.

The effect of this has been to reduce the ability of States to provide housing for those persons who are committed to local jails or State correctional facilities for incarceration.

The effect of that limitation has been that many States, including my own, have had to turn serious offenders out onto the streets in order to open a bed space for a person who is being admitted into that institution.

In our State of Florida, it is estimated that less than 50 percent of the time that should have been served based on court order is in fact being served because of the necessity to move people through the system in order to stay consistent with court ordered limitations and to create space for those persons who have been ordered into the system.

I believe, Madam President, that one of the things that we ought to be doing as we, the Federal Congress, debate a Federal crime bill is to be sensitive to the fact that has been reiterated time and time again during this debate. That is that the vast majority of responsibility in America's criminal justice system rests with local com-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

munities and the States. The Federal role is a relatively narrow one.

*6 One of the things the Federal Government can do is to avoid imposing excessive mandates on States and local communities which inhibit their ability to carry out responsible programs.

Madam President, I do not believe that local communities and States are in the position or are inclined to conduct their correctional facilities in inhumane, barbarous ways. They have a sense of responsibility to their communities. They understand that most of the people who are once incarcerated are eventually going to return to their communities and that effective programs inside the correction institutions can be some of the most determinative steps in what will happen to those people once they are released from prison.

What I object to is the Federal Government using the eighth amendment to impose standards that are even higher than the standards which the Federal Government uses in its own penal institutions. I believe that that is Federal Government run amuck, where it is imposing a standard that results in a turnstile type of justice. Things like the use of double bunking in prisons, things like the use of the kinds of less expensive corrections facilities, such as the Senator from Ohio was demonstrating during the debate last week. Those are the types of innovative activities that ought to be allowed and should not be, but, in fact, are, in many instances, prohibited because of overzealous Federal court orders.

So I strongly urge the adoption of this amendment which will in fact strike an immediate blow to the States' ability to provide housing for those persons who are violent and should, for the period of the sentence imposed by the court, be separated from society and society protected from them. Hopefully, something positive will happen while they are incarcerated. At least while they are incarcerated they will not be inflicting their violence on law-abiding citizens.

I urge the adoption of this amendment.

The PRESIDING OFFICER.

The Senator from Delaware.

Mr. BIDEN.

Madam President, I yield myself 5 of the 15 minutes I have in opposition.

I do oppose this amendment. I understand the desire and instincts of my friend from Florida and, I might add, the Senators probably from 31 other States who are under some form of court order, or most of them, or many of them, if not all of them, Federal court order for prisoner overcrowding.

The Senator is correct that generally we leave this to localities to determine.*S15748  But one thing, since the adoption of the incorporation doctrine about 65, 70 years ago, roughly the one thing we have not left to the States or local communities is interpreting the eighth amendment.  That is a matter for the Federal courts to make a judgment on.

The fact of the matter is that the amendment of the Senators from North Carolina and Florida I believe, is, at least arguably, and I think in fact is, an unconstitutional encroachment on the separation of powers as a matter of policy.

*7 The Senators' amendment does three things:

First, it eliminates the use of class action lawsuits to resolve claims that prison overcrowding violates the eighth amendment prohibition on cruel and unusual punishment.

Second, it limits the remedies that a Federal court may impose for prison overcrowding that violates the Constitution.

And, third, it requires the courts to reopen orders remedying violations of the eighth amendment every 2 years if the defendant prison system-which has been previously found in violation of the Constitution-requests reopening of the case.

I might add, we have debated on a number of other occasions, as I know the Senator from Florida, and the former Governor of Florida and Harvard Law School graduate and accomplished lawyer knows, we have de-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

bated these court-stripping amendments a number of times. Fortunately, in my view, we have never stripped the court of jurisdiction over such a fundamental, basic constitutional question as what remedy should flow from a finding of a violation of a constitutional amendment, in this case the eighth amendment.

We attempt to remedy the very things the Senator is concerned about legitimately, and that is the fact that violent criminals are let out of jail because the Federal court concludes that there is a cruel and unusual situation within the jail because of the overcrowding. But we have attempted to remedy that without running the risk of violating the Constitution.

That is why we have accepted, through the urging and the leadership of the Senator from Florida, about close to 3 billion dollars' worth of amendments in this bill to deal with prison overcrowding.

And so, I believe, although it is more expensive to do it by paying for additional prison spaces, it is the wise, constitutional, and humane way.

And I am going to sound like I am being facetious, but I am not, in what I am about to say.

The Senator indicated that he believes that localities are not inclined and do not engage in and are not desirous of engaging in cruel and unusual treatment of prisoners. I am prepared to accept as a matter of fact the assertion made by my friend from Florida. As of this moment, today, let me stipulate that there is no city, State, or county prison system in the Nation that, in fact, imposes cruel and unusual punishment upon its prisoners due to overcrowding. I will stipulate to that for now.

But I am sure the Senator from Florida would stipulate with me there have been many States that have done just that in the past. The prison system in the State of Florida in the distant past was nothing to be proud of. It was outrageous. The prison system in the State of Delaware was outrageous. The prison system in the State of Mississippi and a number of other States-I could name almost all 50 States.

So the one place we found that there is not much of a constituency to argue against cruel and unusual treatment is in a prison system. Not many folks out there rally behind them. And understandably, because these folks are in prison because they have done something bad.

*8 Quite frankly, the only last refuge-and I realize they say the last refuge of scoundrels is-well, the way the Constitution was written is, even scoundrels have refuge within the Constitution. Prisoners are scoundrels. They have refuge within the eighth amendment of the Constitution of the United States.

I think this is an unnecessary encroachment upon the jurisdiction of the Federal courts. To be more blunt about it, I think it can be remedied another way. The way to remedy it is the right way. Do not tamper with the Constitution and court stripping.

Although, if the Senator had the time, he would point out to me-and I will do it in the interest of fairness-that there are constitutional scholars who would argue that arguably what he is suggesting is constitutional. I think the preponderance of the weight of the authority is the opposite direction.

But there is no need to chance it. There is no need to deal with it. We correct it in the $22 billion crime bill by providing a means by which we keep prison systems-State, local, and Federal-straight and not succumbing to what prison systems have succumbed to in our past history by being the agents for cruel and unusual treatment of prisoners within the system.

I doubt whether Americans today would conclude that someone who had not committed a violent offense or even a violent offense should be put in a cement cell with no mattress and no facilities and no heat and so on. None do that, now, I might add, that I am aware of.

But, if our prison system were able to do that, went ahead and did that, and the Federal court were stripped of the jurisdiction of making a judgment whether or not that is a systemic violation of the law by the prison system, I suspect we would all say they should be able to look at that and make that judgment-not on a case-by-case basis of each prisoner.

Madam President, I oppose the amendment offered by the senior Senator from North Carolina, both because I

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

believe it may be an unconstitutional encroachment on the separation of powers and as a matter of policy.

The Senator's amendment does three things:

First, it eliminates the use of class action lawsuits to resolve claims that prison overcrowding violates the eighth amendment prohibition on cruel and unusual punishment;

Second, it limits the remedies that a Federal court may impose for prison overcrowding that violates the Constitution; and

Third, it requires the courts to reopen orders remedying violations of the eighth amendment every 2 years if the defendant prison system-which has been previously found in violation of the Constitution-requests reopening of the case.

Let me state at the outset why I believe the Senator's amendment may be unconstitutional. This amendment restricts authority of the Federal courts to interpret a part of the Constitution and limits the courts' remedial powers. In my view, the amendment is constitutionally infirm in each respect.

*9 The Senator's amendment states:

A Federal court shall not hold prison or jail crowding unconstitutional * * * except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate.

What that really means is that courts presiding over class action lawsuits would not be permitted to hold that prison overcrowding violates the Constitution unless the court made particularized findings of cruel and unusual punishment respecting an individual plaintiff.

If we adopted this amendment, we would be stating in effect that the Federal courts-which, since the landmark case of Marbury versus Madison, have been considered the final arbiters of what the Constitution requires-may not make determinations of what is or is not constitutional with respect to eighth amendment litigation over prison crowding.

That is because the amendment effectively prevents a court from making a finding of system-wide constitutional violation or from remedying that constitutional infirmity-even if the court believes that is the correct result.

In so doing, this amendment flies in the face of our national history and understanding of the court's role in the constitutional system.

Moreover, this amendment does more than merely tell the courts they may not fashion a specific remedy for a constitutional violation; it further seeks to define the limits of the law under the Constitution.

It says that a Federal court may not hold that certain prison conditions violate the Constitution unless the claim is brought by an individual plaintiff-*S15749 even where other aspects of a case are properly before the court.

If a class of plaintiffs demonstrates pervasive unlawful prison conditions, this amendment says that the Federal courts may not find those conditions unlawful, and, therefore, may not fashion a remedy for the constitutional infirmity.

In addition, this amendment-in my view, unconstitutionally-restricts the ability of the Federal courts to remedy cruel and unusual punishment resulting from prison overcrowding.

Congress has never granted a Federal court subject matter jurisdiction over a particular class of claims and then stripped away the court's jurisdiction to fashion a particular remedy-although such legislation has been introduced over the years.

Therefore, the Supreme Court has never ruled on the question of whether Congress improperly intrudes on the judicial power by restricting the Federal courts' ability to fashion appropriate remedies for constitutional wrongs.

Constitutional scholars are not unanimous in the view that such a restriction would violate the Constitution, although several scholars whose opinion I respect believe such a law would, in fact, be unconstitutional.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Because of this uncertainty, I am not prepared to support an amendment that would make such novel changes in the relationship between Congress and the courts without a thorough airing of the potential constitutional problems. I submit that 30 minutes of debate on the Senate floor is not an appropriate airing of these issues.

**\*10** There is another possibility. Perhaps the Senator's amendment does not purport to dictate to the Federal courts how they should and should not interpret the Constitution in this area.

The amendment provides that a court may not hold that certain conditions violate the Constitution unless an individual plaintiff proves that cruel and unusual punishment results from the condition of overcrowding.

That is already required under the law. Under the Federal Rules of Civil Procedure, rule 23, class action lawsuits are authorized. But class actions require a representative, or named, plaintiff who must prove the case on behalf of the entire class.

In the prison context, a named plaintiff would prove that a particular prison condition violated the Constitution. Of course, that showing would require that the plaintiff demonstrate injury to himself as an individual.

Thus, every class action lawsuit would already satisfy the requirements of the Senator's amendment, and, thereby, permit courts to make findings under the Constitution. That is because, in every class action, an individual plaintiff must make the showing required by the amendment.

If this is the intent of the amendment, it is entirely consistent with existing law and would, therefore, have no effect. I cannot believe, however, that the Senator from North Carolina would offer an amendment having no effect.

Therefore, I am compelled to construe his amendment as a limitation on the powers of the Federal courts to find and remedy violations of the Constitution.

Because I believe such a statute would violate the delicate separation of powers in our Federal Government, I oppose the Senator's amendment and urge my colleagues to do likewise.

Let me add that I oppose the Senator's amendment for an independent reason: The Supreme Court has already restricted the lower courts' ability to hold that prison overcrowding violates the eighth amendment.

I am aware of no case in which prison overcrowding, without more, has been held to violate the eighth amendment. Supreme Court precedents dictate that overcrowding must be combined with other problems such as unsanitary conditions, lack of medical treatment, or inadequate air filtration to support a finding of an eighth amendment violation.

Moreover, as a matter of policy, I believe it would be inappropriate to eliminate the use of class action litigation in this area of the law. If adopted, this amendment would create inefficiency in the judicial system.

Under this amendment, prison overcrowding claims would each have to be brought individually, imposing substantial burdens on scarce judicial resources.

I reiterate, I think the concern stated by the Senator from Florida is absolutely, totally legitimate. I think his remedy, that is, denying the Federal court the right to use a remedy when a eighth amendment violation is found, is the wrong way to remedy the problem. The right way to remedy the problem is what he did in the first instance in this bill. The Senator from Florida was one of the leaders in making sure that this bill provided for additional space to take nonviolent offenders out and put them in boot camps, provide space for nonviolent offenders in those boot camps. Whether it was his intention or not, that goes a long way to remedying the problem relating to overcrowding.

**\*11** But ultimately the eighth amendment is the domain of the Federal court system to determine whether or not it has been violated. There is an argument, "Deny the remedy, you deny the right." This denies a remedy that I think, arguably, would render it deficient constitutionally.

So at the appropriate time when all time has been yielded back, I am going to move to table the amendment, ask for the yeas and nays, which, as I understand it under our unanimous consent agreement, means not that that vote would take place tonight but it would take place tomorrow morning in the appropriate order. But I will wait

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

until time is yielded back.

Mr. HELMS.

Madam President, there is nothing complicated or difficult to understand about this amendment and its purpose. All over America, innocent citizens are being murdered, raped, robbed, beaten, sometimes all of the above. These crimes are being committed by violent felons who have been turned loose on society by Federal judges, set free after the criminals have served only a fraction of their prison terms they received for previous acts of violence.

Most Members of the Senate can relate to the shocking stories involving their own States, but let me speak for North Carolina where Gov. Jim Hunt is doing his best to cope with this awesome problem. Last year in North Carolina alone, more than 26,000 prisoners were given early releases from prisons. These 26,000 included 88 felons convicted of murder and 37 rapists. The father of basketball star Michael Jordan, Mr. President, was killed by one such felon who had been given an early release.

This amendment proposes to set a standard for the Federal courts precisely as the Congress did in the Religious Freedom Restoration Act, which President Clinton today signed into law.

Under the pending amendment, some prisoners may have to do with a few square feet less cell space, but that is far better than to continue to turn loose violent felons to kill or rape innocent citizens or, as happened in Charlotte last month, shooting in cold blood two fine young Charlotte police officers.

Madam President, here is the point: Those young police officers and others whose lives have been snuffed out by violent felons returned to the streets by Federal courts, these victims each will occupy a 6-foot hole in the ground for eternity because of violent criminals having been set free because prison cells were not quite large enough to suit some Federal judge.

For a change, let us think about the rights of victims of violent crimes, and this amendment will do exactly that.

I thank the Chair.

Madam President, I ask unanimous consent that it be in order for me to ask for the yeas and nays on my amendment.

The PRESIDING OFFICER.

Without objection, it is so ordered.

Mr. HELMS.

I ask for the yeas and nays.

The PRESIDING OFFICER.

Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

Mr. HELMS.

*12 I yield the floor.

Mr. BIDEN.

I yield back the remainder of my time.

Madam President, is all time yielded back on the Helms-Graham amendment? I do not think there was any time remaining.

The PRESIDING OFFICER.

All time has been yielded back.

*S15750 Mr. BIDEN.

Madam President, I move to table the Helms-Graham amendment.

I ask for the yeas and nays.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The PRESIDING OFFICER.
Is there a sufficient second?
There is a sufficient second.
The yeas and nays were ordered.
The PRESIDING OFFICER.
The vote will occur tomorrow after the disposition of the Levin amendment.

AMENDMENT NO. 1199

(Purpose: To amend the Controlled Substances Act to provide the death penalty for engaging in a continuing criminal drug enterprise involving a large quantity of drugs)

Mr. D'AMATO.
Madam President, I send an amendment to the desk and ask for its immediate consideration
The PRESIDING OFFICER.
The clerk will report.
The assistant legislative clerk read as follows:
The Senator from New York <Mr. D'AMATO>, for himself and Mr. HATCH, proposes an amendment numbered 1199.
Mr. D'AMATO.
Madam President, I ask unanimous consent that reading of the amendment be dispensed with.
The PRESIDING OFFICER.
Without objection, it is so ordered.
The amendment is as follows:
On page 30, after line 6, insert the following sections, (b) and (c):
"(b) a defendant who has been found guilty of-
"(1) an offense referred to in section 408(c)(1) of the Controlled Substances Act (21 U.S.C. 848(c)(1)), committed as part of a continuing criminal enterprise offense under the conditions described in subsection (b) of that section which involved not less than twice the quantity of controlled substance described in subsection (b)(2)(A) or twice the gross receipts described in subsection (b)(2)(B);
"(2) an offense referred to in section 408(c)(1) of the Controlled Substances Act (21 U.S.C. 848(c)(1)), committed as part of a continuing criminal enterprise offense under that section, where the defendant is a principal administrator, organizer, or leader of such an enterprise, and the defendant, in order to obstruct the investigation or prosecution of the enterprise or an offense involved in the enterprise, attempts to kill or knowingly directs, advises, authorizes, or assists another to attempt to kill any public officer, juror, witness, or members of the family or household of such a person;
"(3) an offense constituting a felony violation of the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.), where the defendant, intending to cause death or acting with reckless disregard for human life, engages in such a violation, and the death of another person results in the course of the violation or from the use of the controlled substance involved in the violation;
*13 shall be sentenced to death if, after consideration of the factors set forth in section 3592, including the aggravating factors set forth at (c) below, in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, except that no person may be sentenced to death who was less than 18 years of age at the time of the offense.
"(c) AGGRAVATING FACTORS FOR DRUG OFFENSE DEATH PENALTY.-In determining whether a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sentence of death is justified for an offense described in section (b) above, the jury, or if there is no jury, the court, shall consider each of the following aggravating factors and determine which, if any, exist:

"(1) PREVIOUS CONVICTION OF OFFENSE FOR WHICH A SENTENCE OF DEATH OR LIFE IMPRIS-ONMENT WAS AUTHORIZED.-The defendant has previously been convicted of another Federal or State of-fense resulting in the death of a person, for which a sentence of life imprisonment or death was authorized by statute.

"(2) PREVIOUS CONVICTION OF OTHER SERIOUS OFFENSES.-The defendant has previously been con-victed of two or more Federal or State offenses, each punishable by a term of imprisonment of more than one year, committed on different occasions, involving the importation, manufacture, or distribution of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) or the infliction of, or at-tempted infliction of, serious bodily injury or death upon another person.

"(3) PREVIOUS SERIOUS DRUG FELONY CONVICTION.-The defendant has previously been convicted of another Federal or State offense involving the manufacture, distribution, importation, or possession of a con-trolled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which a sen-tence of five or more years of imprisonment was authorized by statute.

"(4) USE OF FIREARM.-In committing the offense, or in furtherance of a continuing criminal enterprise of which the offense was a part, the defendant used a firearm or knowingly directed, advised, authorized, or as-sisted another to use a firearm to threaten, intimidate, assault, or injure a person.

"(5) DISTRIBUTION TO PERSONS UNDER 21.-The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 418 of the Controlled Substances Act (21 U.S.C. 859) which was committed directly by the defendant.

"(6) DISTRIBUTION NEAR SCHOOLS.-The offense, or a continuing criminal enterprise of which the of-fense was a part, involved conduct proscribed by section 419 of the Controlled Substances Act (21 U.S.C. 860) which was committed directly by the defendant.

"(7) USING MINORS IN TRAFFICKING.-The offense, or a continuing criminal enterprise of which the of-fense was a part, involved conduct proscribed by section 420 of the Controlled Substances Act (21 U.S.C. 861) which was committed directly by the defendant.

"(8) LETHAL ADULTERANT.-The offense involved the importation, manufacture, or distribution of a con-trolled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), mixed with a po-tentially lethal adulterant, and the defendant was aware of the presence of the adulterant. The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

Mr. D'AMATO.

*14 Madam President, I do not intend to spend a long time explaining this amendment. Indeed, we have con-sidered it, or an amendment very similar to it, back in 1989; again in 1990; again in 1991. What it does is provide for the death penalty for major drug dealers. Major drug kingpins are killing and maiming Americans. What our amendment does is provide for the death penalty for major drug dealers or traffickers, whether there is a murder or not.

Make no mistake about it, as defined pursuant to this section of the law, anyone who deals with the quantities that we set forth, which are 600 times over that which is required to bring about a felony, will be contributing to the death of scores and scores of Americans.

In order for that death penalty to be applicable, that person has to be involved in the sale or distribution of 132 pounds of heroin in a year. If you are involved in the sale or distribution and you had that rank and are selling 132 pounds of heroin-and that is the minimum-you are responsible for the deaths of untold numbers of people either directly or indirectly, whether through HIV, or whether the heroin addict shoots up and overdoses, or the heroin addict who unfortunately, to support his habit, uses that gun that we speak about and kills an innocent

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

bystander or robs that variety store at night and shoots down someone or was involved in a battle over turf and kills an innocent child. And 660 pounds of cocaine must be involved in order for this to meet the threshold; 13 pounds of PCP, 66 tons of marijuana, or 7 pounds of crack.

· We talk about crack addiction. We talk about the crack-addicted babies who are born into addiction. I have to tell you something, the death penalty is too good for those who bring this situation about.

The major trafficker would also be defined as one whose enterprise has gross receipts of $20 million or more. Again, if you are dealing in that kind of drugs in those quantities, certainly you have been responsible for the death of people.

Our amendment also provides for the death penalty for the drug kingpin who engages in an attempted murder of a person with the purpose of obstructing justice, a principal leader who directs others to attempt to kill any public official, juror, witness, or member of such a person's family or household in order to obstruct the investigation or prosecution of the enterprise or an offense involved in that enterprise.

How often have we heard, unfortunately, in our urban centers today, the drug hits that are put out, the contracts that are put out by the drug kingpins. This amendment also provides for the death penalty for those members of the drug kingpin's organization that dispense, supply, or sell the stated amount of substance that directly causes the death of a person.

Drugs are one of the leading causes of crime today. I believe this amendment can make a difference. There have been some questions as relates to just how many people would be involved. According to a Justice Department study of this amendment, it is estimated that there are 50 to 75 offenders annually who will violate the drug kingpin category as it relates to the amounts-50 to 75. It is estimated that there would be 200 drug offenders satisfying the criteria of members of a continual criminal*S15751 enterprise who engage in attempted murder to obstruct justice; a principal leader who directs others to kill. This comes from the Justice Department in their study. We are now saying there are at least 200 to 250 people annually who the Justice Department understands would fit this category. Let me suggest that when we talk about how many homicides come about as a result of the drug kingpins ordering assassination of other people, we are talking about 1,350.

*15 I know Senator HATCH will speak to some of the underlying arguments. It has been said that this may be unconstitutional because there is not a death directly attributable as it covers certain of these sections. The United States has provided death penalties for cases where there is not a death actually attributable because we understand, for example in areas of espionage, that while you may not prove a direct correlation, there is that danger to the community, to the Nation. There are those people who are not killing great numbers of people through drug trafficking, but it seems to me they certainly are in an indirect way, and in a very direct way are killing our neighborhoods, our communities, and our youngsters.

Madam President, I ask unanimous consent Senator DOMENICI and my colleague from Virginia, Senator WARNER, be added as cosponsors.

The PRESIDING OFFICER.

Without objection, it is so ordered.

Mr. D'AMATO.

Madam President, I ask for the yeas and nays.

Mr. BIDEN.

Has all time been yielded back?

The PRESIDING OFFICER.

All time has not been yielded back.

Mr. BIDEN.

I thank you.

Mr. D'AMATO.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Madam President, I ask for the yeas and nays.

The PRESIDING OFFICER.

Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

Mr. D'AMATO.

Madam President, I do not know whether or not Senator HATCH-I believe he is going to speak to the amendment for several minutes.

I have concluded my remarks.

Mr. WARNER.

Madam President, if the Senator will allow me just about a minute and a half.

The PRESIDING OFFICER.

Does the Senator from New York yield?

Mr. D'AMATO.

Yes, I do.

The PRESIDING OFFICER.

The Senator from Virginia is recognized.

Mr. WARNER.

I thank the Chair.

Mr. WARNER.

Madam President, I spent a good deal of the recess period this summer and well into the fall taking a series of unusual trips, in the sense that I went down into my State and visited with every single Federal judge in his or her chambers.

I found it to be a very rewarding experience. I do not wish to compliment myself, but several of the old-time judges who had been there some time said they have no recollection of a U.S. Senator doing this before. I urge other colleagues to do it because you have to go down and sit in the front lines of those judges' chambers and in their courtrooms and let them recount to you the experiences they have each and every day in the implementation of our Federal criminal statutes.

Time and time again, the subject which has been addressed by the distinguished colleague from New York, Mr. D'AMATO, was raised on the need to get to those individuals who have primary responsibility for so much of this drug trafficking.

The members of the judiciary are concerned about the gofers, as they are called, the young people who are roped into these nets, lured into the nets. The Senator from Virginia has included in this bill legislation, as has the Senator from Wisconsin, and others, to stop the transfer to these gofers of handguns as part remuneration for their participation in this lowly drug trafficking. All too often, the gofers are caught and they have not the faintest idea about the implication of the kingpin. I think this statute begins to focus the proper attention on the need to get to the kingpins, as well as the gofers, but get to the kingpins and hold them accountable in a way that I feel will be a deterrent for participation in such activities.

**\*16** I compliment my colleague from New York. I compliment the distinguished ranking member of the Judiciary Committee, Mr. HATCH.

I yield the floor.

The PRESIDING OFFICER (Mr. MATHEWS).

Who yields time?

Mr. BIDEN addressed the Chair.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The PRESIDING OFFICER.
The Senator from Delaware.
Mr. BIDEN.

Mr. President, I am very sympathetic and empathetic with the effort of the Senator from New York. As a matter of fact, it was in 1988 the first drug kingpin law was passed. I wrote that law. It is now law, on the books; a drug kingpin death penalty law that is on the books, different than this. There is one on the books now.

To be honest with you, when I first wrote the law and I sought the help of constitutional scholarship available, I wanted to extend it to do exactly what the Senator from New York is doing. But after consulting with liberal and conservative constitutional scholars and Federal judges, the overwhelming consensus was that under the present rulings of the Supreme Court, unless there is an intent directly related to and able to trace the cause of death to the action of a drug kingpin, a death penalty would, in fact, in that circumstance be viewed as unconstitutional.

The Senator pointed out, I think he used the figure 1,300 assassinations ordered. All of those are covered now by the present law. In the Biden drug kingpin law that is now law, any drug kingpin who, in fact, directly orders and/or commits a murder by either standing there and administering an overdose of a drug and/or in a drug war, shooting, killing, or ordering the assassination of someone else, they are able to receive the death penalty under Federal law now.

The big difference with the proposal of the Senator from New York is, a drug kingpin who, in fact, does not directly, immediately identify the subject of the murder and his actions would still be covered. The theory being-I cannot improve on the explanation-but the theory being that any reasonable person would have to know that they are engaged in the business of running a criminal enterprise the size that is required to be a drug kingpin and/or distributing the tens, if not hundreds of pounds of potentially lethal controlled substances; that it is reasonable to assume someone will die as a consequence of that.

So the nexus the Senator from New York finds under the Constitution to make it constitutional to put someone to death for an action is that any-my words not his-any reasonable person would have to know that death would result. The analogy I made in 1988, but I could not get the consensus of the constitutional scholars, was anyone who takes out a loaded gun and indiscriminately, but nonetheless, fires into a crowd of individuals without the intent to kill anyone or anyone in particular, they should have reasonably known that death would likely result, ergo, when death results, they should be able to be held accountable for that by whatever penalty was on the books.

*17 The same theory is proffered here. I think, unfortunately, it is a bit of a constitutional stretch. So I have in the past not moved to extend the present drug kingpin law to include what the Senator would argue are the reasonably anticipated deaths that would follow, as opposed to specifically intended damage done-death-that follows from an order of an assassination, for example.

So because I am still not convinced of its constitutionality, I will tomorrow at the appropriate time move to table the amendment. But I must say, of all the amendments being offered tonight-and my staff is not real crazy about me acknowledging this-my knowledge, my instinct about whether or not this is constitutional is that at least it is an even shot it is constitutional. My advice from people who are much more learned in the Constitution, notwithstanding I have the dubious distinction of being an adjunct professor of constitutional law in a law school these days, I know that does not qualify me as a constitutional expert. So I am going to continue, until I can make the case more strongly, to yield to the majority body of opinion among constitutional scholars that this is unconstitutional. That is why I will move to table it.

But quite frankly, I must acknowledge that I think it is a close call. Some of the other things that are up here from my perspective that I am arguing*S15752 against I do not even think are close calls. This one I acknowledge is a close call. But I have made it a practice for this Senator, when I have been in doubt about the constitu-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

tionality of an action of the Senate, I have voted against that action when I have been in doubt, because I have erred on the side of not stretching the limits of the Constitution, notwithstanding it is perfectly within our rights as a body to decide we believe it is constitutional and then leave it to the courts to resolve in debate. It has been my practice for 21 years not to proceed that way, although I am in no way criticizing those who would otherwise proceed.

This is what you call tabling with faint praise. I think it is a close call. It would be more appropriate for someone who felt very strongly about it being unconstitutional to make the case. But I do think, on balance, it is probably unconstitutional. Therefore, I will move to table it tomorrow.

I am prepared-I see the Senator is on his feet-when he finishes his comments, when he yields back time, to yield back the remainder of my time as well.

I compliment the Senator. Believe me, emotionally, politically and close to substantively, I find it very hard to move to table this, but I will for the reasons I have stated.

Mr. D'AMATO addressed the Chair.

The PRESIDING OFFICER.
The Senator from New York.
Mr. D'AMATO.

Mr. President, I certainly appreciate Chairman BIDEN's feelings. I want to thank him for the graciousness of his remarks. I understand where he is coming from. We had this discussion in the past. Indeed, we worked together to develop the drug kingpin bill back in 1988.

**\*18** I am not going to repeat the arguments. We know them. I think that the area of contention is one that reasonable people can disagree and, indeed, it may take the Supreme Court to set down a standard and to rule on this case as to whether or not we have the ability to say that if you traffic in such large amounts of drugs that you risk the death penalty being imposed. I think that we send them a case or an opportunity of a case and we send a message out that says we are serious and will do everything possible to deter those who are engaged in this kind of activity because certainly they are sapping the strength and vitality and it does result in the death of so many. Whether or not we can prove directly and whether that cause and effect must be of necessity proof of the kind of directness that some might contend, I think that is a matter for the courts to decide.   So I thank the distinguished chairman.

Mr. BIDEN.

Before the Senator yields back his time, because I do not want to see him be put in a spot where he has no time left, if the Senator will yield to me just a moment on my time.

The PRESIDING OFFICER.
Will the Senator yield?
Mr. D'AMATO.
Certainly.
Mr. BIDEN.

Mr. President, if we had a more flexible unanimous-consent agreement, what I would have done at this point, but I did not attempt to get an agreement because I respect the Senator's position-and quite frankly, because I respect the Senator has the votes on this, I have no doubt that a proposal that I entertain amending this amendment with, which would be minimum mandatory life in prison, no probation, no parole, is constitutional. I do not oppose the death penalty. The underlying Biden bill to which we are attaching all these things has 47 death penalties in it. I support the death penalty.

But I think the proper way to go here, so that we do not run the risk of it being ruled unconstitutional, would be to have minimum mandatory life imprisonment, no probation, no parole for a drug kingpin where you are not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

able to directly show the action taken by the kingpin resulted in the specific death of a specific person. I have no doubt that is constitutional, and I would prefer-and I am not asking the Senator to amend his amendment. I know he cannot do that this way.

But if in fact this passes and becomes law, it is declared unconstitutional, then I would invite the Senator to join me in taking the exact same language he has and changing the penalty to minimum mandatory life in prison, no probation, no parole, which means if you are sentenced you are there for the rest of your natural life, no matter what happens, unless you can be proven innocent at a later date as a consequence of evidence that was not available at the trial.

That is how strongly I feel about it. I just think constitutionally we are on very thin ice, and I would rather not skate on that ice.

So when the Senator from New York is prepared to yield back his time, I will yield back what remaining time I have.

Mr. HATCH.

**19** Mr. President, will the Senator yield a few minutes to me?

Mr. D'AMATO.

I will be happy to yield.

The PRESIDING OFFICER.

The Senator from Utah.

Mr. HATCH.

Mr. President, I agree with the Senator from New York. I think this is a good amendment. I think it is a constitutional amendment.

The activities of drug kingpins pose perhaps the gravest risk that we face today to our health and well-being, both as individuals and as a nation. In my home State of Utah, the spread of drugs and its attendant violence is a growing problem. Death by violence and disease, destruction of minds and bodies, follow in the wake of these unseen crime barons.

Mr. President, the time has come that we punish these evil purveyors of death and destruction as they deserve to be punished, and no longer let them hide behind the hired guns who pull the triggers for them. This was the position of the prior Republican administration. The Clinton administration, however, has retreated from this position in the crime war, apparently on the view that the death penalty is unconstitutional as applied to these major drug dealers. As I will explain in a few minutes, the case for the constitutionality of this provision is very, very strong. Significantly, an amendment on the side of the American people and the victims of drug kingpins would support this provision and defend it in the Court. The drug kingpins will have high-priced lawyers-legal hired guns-arguing for them. That the Clinton administration feels it has to take the side of drug kingpins in this matter is a disturbing development.

In 1988, Congress passed legislation to provide the death penalty for murders by drug kingpins and for drug-related murders of law enforcement officers. By passing this important legislation as part of the Anti-Drug Abuse Act of 1988, Congress acknowledged that capital punishment is a needed and proper weapon in our Nation's effort to fight the drug war. This action on the part of the 100th Congress was a valuable first step.

However, we did not go far enough. Drug kingpins are currently not subject to the Federal death penalty where they themselves are not directly involved in committing murder. But their nefarious traffic in drugs causes untold deaths and, even if they are not directly involved, untold murderous violence attendant on drug trafficking. The death penalty for these drug kingpins contained in the Dole-Hatch Neighborhood Security Act (S. 1356) sends a signal that our Nation is prepared to punish appropriately those who cause so many deaths-major drug kingpins. These drug kingpins are responsible for untold deaths and are, in a real sense, responsible for many drug-related murders which occur on our streets every day.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

S. 1356, the Dole-Hatch crime bill, provides that major drug traffickers-organizers, leaders, or administrators of continuing criminal enterprises-may be subject to the death penalty if the enterprise traffics in twice the amount of drugs which would qualify them for mandatory life imprisonment; that is, 300 kilograms of cocaine; 60 kilograms of heroin; or 70,000 kilograms of marijuana, or if the enterprise makes $20 million or more in gross receipts during any 12-month period. Additionally, kingpins who, in order to obstruct justice, attempt to kill any public officer, juror, witness, or member of the family or household of such person shall be eligible for the death penalty.

**\*20** S. 1356 also limits the application of the death penalty in these cases by requiring the jury to find that at least one or more additional aggravating factors exist and that such aggravating factor outweighs mitigating factors, if any are found. Specifically, the defendant**\*S15753** must have: a previous conviction or offense for which a sentence of death or life imprisonment was authorized; or two or more prior felony convictions; or a previous felony drug conviction; or used a firearm; or sold drugs to persons under 21 years of age, near a school, or used minors in selling drugs; or mixed the drugs with a lethal adulterant.

The imposition of the death penalty is constitutional for drug kingpins-even for those who do not themselves pull the trigger and in those cases where no death can be directly attributed to them. Opponents of this legislation will claim that it is unconstitutional to execute an individual where death has not resulted or where no particular death can be attributed to an individual kingpin. Mr. President, such critics are wrong for two reasons. First, Anglo-American law has a long tradition of imposing the ultimate sanction against those who pose an extremely grave risk to society, even where no death directly results. A few examples are treason, certain types of espionage, and airliner hijacking.

Second, because of the enormous magnitude of the public harm drug trafficking and related violence causes, applying the death penalty to these cases is wholly consistent with the proportionality requirement of eighth amendment's cruel and unusual punishment clause.

The eighth amendment's rule of proportionality requires that the severity of punishment be proportionate to: First, the gravity of the injury caused by the offense; and second, the moral culpability, or blameworthiness, of the offender. <See, Tison v. Arizona, 481 U.S. 137, 148-49 (1987); Coker v. Georgia, 433 U.S. 584, 598 (1977); Gregg v. Georgia, 428 U.S. 153, 173 (1976).> The death penalty for certain cases of large scale drug trafficking meets this burden.

As stated by former Assistant Attorney General Ed Dennis at a Senate Judiciary Committee hearing in 1989 on the death penalty, "Not since the dawn of the nuclear age, have we faced a threat more pernicious, more dangerous to the security and welfare of the Nation than the current crisis involving the large-scale importation and sale of narcotics." The cost of drug abuse to America in terms of lost lives, lost productivity, crime, and health care services is immeasurable.

In addition to the pernicious effects on the individual who takes illegal drugs, drugs relate to crime in at least three ways: First, a drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; second, a drug user may commit crime in order to obtain money to buy drugs; and third, a violent crime may occur as part of the drug business or culture. <See Goldstein, Drugs and Violent Crime, in Pathways to Criminal Violence 16, 24-36 (N. Weiner, M. Wolfgang eds., 1989).> Studies bear out these possibilities, and demonstrate a direct nexus between illegal drugs and crimes of violence. <See generally id., at 16-48.>

**\*21** The connection between crime and drugs is unquestionable. For example, 57 percent of a national sample of males arrested in 1989 for homicide tested postive for illegal drugs. <National Institute of Justice, 1989 Drug Use Forecasting Annual Report 9 (June 1990).> The comparable statistics for assault, robbery, and weapons arrests were 55, 73 and 63 percent, respectively. <Ibid.>

In New York City, in 1988, 90 percent of all male arrestees tested positive for drug use. During the last ad-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ministration, the budget requests for drug related funding increased to $12.7 billion-a $6.1 billion-93 percent-over four years. A National Institute on Drug Abuse and Drug Abuse Warning Network, DAWN, study found that between the second quarter of 1990 and the third quarter of 1991, the number of cocaine overdoses increased dramatically from below 20,000 per quarter to over 28,000. This was cited in The President's Drug Strategy, Has it Worked?, Senate Judiciary Committee Study, Sept. 1992, p. xxi. During this same period, heroin overdoses increased. Senator BIDEN estimates that there are 6 million hard-core drug addicts. The DAWN and Emergency Room surveys show that hard-core use has become increasingly concentrated in inner-city and monthly neighborhoods. These figures reflect that the importation, manufacture, and abuse of illicit narcotics is indeed one of the greatest problems affecting the health, welfare, and security of our Nation.

Opponents of capital punishment may argue that Coker v. Georgia, 433 U.S. 584 (1976), applies to this legislation. In Coker, a plurality of the Supreme Court, ruled that the death penalty for rape is forbidden by the eighth amendment as cruel and unusual since it was grossly disproportionate and excessive punishment. The Court defined punishment as excessive if it: First, makes no reasonable contribution to acceptable goals to punishment and hence has nothing more than the purposeless and needless imposition of pain and suffering; or second, is grossly disproportionate to the severity of the crime. In determining proportionality, the Court in Coker noted society's failure to re-endorse legislatively the death penalty for rape in response to Furman v. Georgia, 408 U.S. 238 (1972). Prior to Furman 18 States authorized the death penalty for rape. Afterwards only three States attempted to provide the death penalty for rape.

Significantly, the Coker plurality opinion stated that "the rapist, as such, does not take human life." In a real sense, a drug kingpin does take human life and causes untold violence, and the American people know it. Moreover, the enactment of this law by Congress, by representatives from among all the States, would signify the broad national consensus that was lacking in Coker.

That is why the amendment by the distinguished Senator from New York is so important. And I hope our colleagues will vote overwhelmingly for this amendment because it sends a message that there is a broad national consensus, something that the justices did not find in the case of rape defined in the Coker case.

*22 In Tison v. Arizona, 481 U.S. 137 (1987), the Supreme Court found that reckless indifference to the value of human life may be every bit as shocking to the moral sense as any specific intent to kill. The Court held " that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment. * * * <481 U.S. at 157-58.> A specific intent to kill is not required in imposing a death sentence on an individual. The class of drug kingpins covered by S. 1356 do act with reckless disregard for human life and should be subject to the death penalty.

I agree with the Senator from New York.

Large scale drug traffickers threaten millions of people. They engage in this destructive behavior purely for pecuniary gain. The Supreme Court in Gregg versus Georgia determined that the issue of whether the defendant acted for pecuniary gain is a factor to be considered relevant in determining blameworthiness and the appropriate punishment. These cases support the argument that the death penalty is constitutional for major drug traffickers, even when they do not directly cause a death themselves.

Although the Supreme Court has not directly addressed this issue, in the context of upholding a sentence of life without parole for drug possession, a majority of the Court has recently expressed the opinion that the evils associated with drugs warranted the legislative imposition of "the second most severe penalty permitted by law." <Harmelin v. Michigan, 111 S. Ct. 2680 (1991) (opinion of Scalia, J., 2702) (opinion of Kennedy, J., 2705).> Harmelin, the defendant, was sentenced to life without parole for mere possession of 650 grams of cocaine. A plurality of the Court explained that possession, use, and distribution of illegal drugs represents "one of the greatest problems affecting the health and welfare of our population." Treasury Employees v. Von Raab, 489

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S. 656, 668 (1989). Petitioner's suggestion that his crime was nonviolent and victimless * * * is false to the point of absurdity. To the contrary, petitioner's crime threatened to cause grave harm to society. Id. at 2705-06 (opinion of Kennedy, J.).

Mr. President, the death penalty is wholly proportional to the enormous danger drug kingpins pose to our society. As Justice Powell noted in Rummel versus Estelle, "A professional seller of addictive drugs may inflict*S15754 greater bodily harm upon members of society than the person who commits a single assault." Rummel, 445 U.S. 263, 296, n. 12 (1980) (Powell, J., dissenting). I agree with Judge Gee of the fifth circuit that whereas most killers have a descreet and limited number of victims, drug kingpins are a cancer killing people across our entire country.

Writing for an en banc court, Judge Gee said that:

Except in rare cases, the murderer's red hand falls on one victim only, however grim the blow; but the foul hand of the drug dealer blights life after life and, like the vampire of fable, creates others in its owner's evil image-others who create others still, across our land and down our generations sparing not even the unborn. Terebonne v. Butler, 848 F.2d 500, 504 (5th Cir. 1988), cert. denied, 109 S. Ct. 1140 (1989).

*23 The link between the activities of large-scale drug enterprises and death is unquestionable. Rates of drug related murder continue to rise in cities across our Nation. Reports of bystander deaths due to drug related gun fights and drive-by shootings continue to climb. Intravenous drug use is a major source of HIV infections. Congress can and should broaden the category of offenses for which the death penalty can be applied to include those individuals who pose the greatest threat to our Nation's health and safety-drug kingpins.

I do strongly support the amendment of the distinguished Senator from New York.

Mr. D'AMATO addressed the Chair.

The PRESIDING OFFICER.

Who yields time?

The Senator from New York.

Mr. D'AMATO.

Mr. President, I very simply thank my ranking member, Senator HATCH, for making these observations on the constitutional basis.

I also ask unanimous consent that Senator DECONCINI be added as an original cosponsor.

The PRESIDING OFFICER.

Without objection, it is so ordered.

The Chair would note that the time of the Senator from New York has expired.

The Senator from Delaware.

Mr. BIDEN.

Mr. President, one of the reasons why I think the amendment of the Senator from New York is arguably constitutional is that one of the things I teach in law school is the eighth amendment, and I think that the analogy to Tison v. Arizona is much more analogous and more controlling than the counter-arguments.

As I said I have, I have doubt about the wisdom of the body of constitutional scholarship to suggest that the principle stated in Tison would not in fact render his amendment constitutional as opposed to unconstitutional. But I am nonetheless going to engage in the futile exercise of attempting to table it tomorrow, knowing full well what the outcome is likely to be.

Mr. President, I also understand the Senator from New York is attempting to accommodate the unanimous consent agreement which was not to alter the death penalty procedures in the underlying bill has sent to the desk an amendment that may in fact not be in order. Because he acted in good faith, I wish to make sure that we get the proper unanimous-consent language which I will proffer in a moment to make his amendment in order under

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the existing unanimous consent agreement.

I do that now. I ask unanimous consent that the D'Amato amendment be in order notwithstanding the fact it amends the language already amended.

The PRESIDING OFFICER.

Is there objection? The Chair hears none, and it is so ordered.

Mr. BIDEN.

If the Senator from New York is, I am prepared to yield back the remainder of the time.

Mr. D'AMATO.

I believe our time has expired.

Mr. President, if I might state, I would like to thank again our distinguished chairman for his graciousness and his courtesy in dealing with this matter.

The PRESIDING OFFICER.

All time having been yielded back, the question is on the amendment. The vote will occur in sequence tomorrow morning.

Mr. HATCH.

*24 Are the yeas and nays ordered?

The PRESIDING OFFICER.

The yeas and nays have been ordered.

Mr. BIDEN.

Mr. President, for the information of our   colleagues, I will tell them that the vote that will be in order tomorrow, I will move to table tomorrow at the appropriate time.

The PRESIDING OFFICER.

The Senator has indicated he plans to offer that motion.

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER.

The Senator from Utah.

Mr. HATCH.

Mr. President, I ask unanimous consent for the yeas and nays to be ordered on the Smith amendment No. 1160.

The PRESIDING OFFICER.

Is there a sufficient second? There is a sufficient second.

The yeas and nays were ordered.

Mr. HATCH.

And that we place that in the appropriate order of the votes.

The PRESIDING OFFICER.

Is there objection? Hearing none, it will be placed following the D'Amato amendment.

Mr. HATCH.

Mr. KEMPTHORNE and I were permitted under the unanimous consent agreement to offer an amendment at this time. However, we have worked out our differences on the community policing title. For this reason, Senator KEMPTHORNE and I-as I understand it, we have worked it out-will not offer that.

Mr. BIDEN.

I believe that is correct, that has been worked out.

If the Senator will withhold for just a moment, I will check with my staff to see if that has been cleared.

Mr. GRAHAM addressed the Chair.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The PRESIDING OFFICER.

The Senator from Florida.

Mr. GRAHAM.

Will the Senator from Utah yield for a question?

Mr. HATCH.

I am happy to.

Mr. GRAHAM.

Would the Senator indicate what has been the alteration again on the amendment?

Mr. HATCH.

As I understand it, the Kempthorne amendment, the funding percentage, was not acceptable to the majority side of the floor. We had to work it out.

Mr. GRAHAM.

As I understand, the underlying formula currently in the bill provides for 0.5 percent to be allocated to each State, and the balance to be allocated to States on a competitive basis. The effect of the original amendment was an increase in the State set-aside of 0.75 percent. I wonder if the Senator will indicate what is the alteration?

Mr. HATCH.

The balance as I understand was 0.5 percent and it now goes up to 0.8 percent.

Mr. GRAHAM.

I thought the original amendment was to raise it from 0.5 to 0.75.

Mr. HATCH.

It may have been. I think we are now at 0.8.

Mr. GRAHAM.

That means that 0.8 percent is allocated to every State and the balance is on a competitive basis.

Mr. HATCH.

That is correct. That is my understanding.

Mr. GRAHAM.

That means as between the underlying formula and this amendment there will be an additional three-tenths of 1 percent allocated to each State.

Mr. HATCH.

That is my understanding.

Mr. GRAHAM.

That will be 15 percent. What is the rationale of tabling 15 percent which otherwise would be distributed on a competitive basis and allocating it per State?

Mr. HATCH.

**\*25** The rationale is really that the House has a very low level, around 0.25, and this gives us some flexibility in working on it.

Mr. GRAHAM.

We are already twice the House in the underlying bill, 0.5.

Mr. HATCH.

That is right. But it gives us some ability to work with them. I have a feeling it will be worked out with a reasonable percentage.

Mr. GRAHAM.

Frankly, Mr. President, at some point I would like to make some comments on the general movement that is occurring here in the formulas. That is the part of this bill that has not gotten much discussion. But I am concerned that this is a widening gap between the purpose of allocating these funds-that is, to fight crime-and how

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the money in fact is being allocated.

If you take 15 percent of the money beyond what is currently in the law and apparently we will now be some 30 to 40 percent above what the House level is in terms of allocation to individual States without having any competition or demonstration of need for the community policing dollar, we are going to be substantially diluting the capacity of that centerpiece program to have an impact that it is purported *S15755 to have in terms of dealing with our most serious crime issue in our most serious sites afflicted by crime.

Mr. HATCH.

If I could answer the Senator, we are trying to make sure that each State gets some allocation, especially some of the smaller States and some of the more rural States. But this is 15 percent of the $18.9 billion that is provided in grants by the attorney general to the various States. There is no question that what we are trying to do is handle this in the best way we can across the whole 50 States.

Mr. GRAHAM.

Could the Senator provide for us before we take final action on this, some analysis based on reported crimes or other indicators of criminal activity, and dollars that would be allocated for community policing under the bill as reported by the committee, and under the amendment that is now being considered?

Mr. HATCH.

I am not sure we can provide that kind of analysis. All I can say is that this is something that has been agreed upon. It is an effort to protect all States. It is an effort to be able to negotiate with the House, and it makes a lot of sense in our eyes. Frankly, we are trying to get these matters resolved. This we think is the appropriate way to do it.

But I do not know that I can put my hands on those kind of statistics at this particular time or even by tomorrow. But we will try to do so between now and the time that we meet with the House in conference, should there be a conference on this matter.

The PRESIDING OFFICER.

The Senator from Florida.

Mr. GRAHAM.

Mr. President, has the Senator from Utah yielded?

Mr. HATCH.

Yes. I do. I yield the floor.

Mr. GRAHAM.

What is the matter before the Senate at this time?

The PRESIDING OFFICER.

Under the agreed order the Kempthorne-Hatch amendment is the next amendment in order to be offered.

Mr. HATCH.

*26 As I understand the distinguished Senator from Delaware is checking his side to make sure that what we have agreed to has been agreed to. Otherwise, we will have to have a vote on the amendment.

Mr. GRAHAM.

Mr. President, if I could while we are waiting, I would like to make a few comments not about this specific amendment because it appears to be an amendment in flux and therefore we do not have the statistics. I hope we will have the statistical impact.

But I have been concerned about a general drift in this bill, and that is a drift toward allocating money in a way that seems to be towering to where the problem is.

As an example, in the juvenile drug trafficking and gang prevention grants, one of the grants in this legislation, there are 17 States which had last year 71.1 percent of the crime in the country. They have 68.9 percent of the juvenile population. Under the formula that is currently in the bill, they would get 50.8 percent of the Federal

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

money. The remaining three States and the District of Columbia, which have 28.9 percent of the total crime, 31.1 percent of the population, would get 49.2 percent of the Federal money. There seems to be a mismatch as between where the people and the crime is, and where we are directing the resources.

To put this in more specific context, and admittedly somewhat of a parochial context, unfortunately, I am sad to say that my State of Florida last year had the dubious distinction of leading the Nation in its crime index. The crime index is the number of crimes per 100,000 people in the population. Florida had 8,358 of those crimes. California had 6,679. Texas had 7,057. There are relatively high rates of crime in those three big States. We picked three other States which had a relatively low rate of crime-Wyoming with 4,575; Idaho had 3,996; North Dakota, one of the safest States in the Nation, 2,903.

If we have a formula distributing money to assist States in dealing with their juvenile drug trafficking and gang activities, you would think you would want to relay the resources from the Federal level to where the problem was. Is that in fact what our formula has done?

We have distributed to Florida for each crime 77 cents. We have distributed to North Dakota for each crime $4.77 cents. California got 62 cents per crime. It has been the State which probably, particularly in terms of gang-related violence, has been one of the most high profile and a driving force behind this legislation. In contrast, Wyoming gets $5.44 cents.

I am concerned that this is not peculiar to the juvenile drug trafficking and gang-prevention grants, but is a recurring theme. And we have arrived at another chapter of that theme with the proposal that in the area of community policing dollars, which are by far the largest pool of funds that will actually put people out on the streets to deal with both preventing crime and effectively investigating and making arrests for crimes that have been committed, that we are now, in a relatively casual manner, about to take 15 percent of the money that otherwise would have been distributed by some standard and distribute it to each of the 50 States on an equal-share basis.

*27 There may be a rationale in that, but I do not think that it is very persuasive to say that the only rationale is that the House is at 0.25, the Senate now is at 0.5, and the Senate needs to be at 0.8, so there will be the maximum difference between the Senate and House when they go to conference. That is not a compelling policy rationale for what we are about to do. I think that at least the Senate ought to know what are the similar statistics relative to community policing in terms of incidents of criminality and how funds will be allocated in order to deal with that criminality. I hope that at some point, before we complete action on this bill, we will have this type of an analysis of all of the formulas.

I am going to be using, for the purposes of an amendment that I will be offering later this evening, a letter from the Governor of Texas, Ms. Ann Richards, who, after discussing the amendment I am going to be offering, goes on to raise her concern relative to the formulas in this legislation. Mr. President, I will read and offer for the RECORD a letter from Governor Richards, dated November 9, 1993, to the Honorable JOSEPH R. BIDEN, chairman of the Judiciary Committee of the U.S. Senate, in which Governor Richards States:

I am particularly concerned with the formulas that are being considered in crime legislation to allocate funds to States. These formulas, as currently written, do not allow for equity in the distribution of funds. For example, under the current formula for substance abuse, treatment funds, in State prisons, Texas will receive $114 per inmate, while States with smaller prison populations will receive over $200 per inmate, with the greatest allocation $852 per inmate going to North Dakota. This disparity in funding will further the States' reliance on Federal Government assistance in the future.

I suggest that this is an important policy issue. It goes to the credibility of our utilization of scarce Federal dollars in order to impact on a nationwide problem, which is crime, a problem that is distributed disparately among the States. North Dakota ought to take great pride in the fact that it has such a relatively low incidence of crime. But our distribution of the funds for substance abuse treatment in State prisons would indicate that the relatively few people that commit crimes in North Dakota are excessively drug addicted, because we are going to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

be spending approximately seven times more money to treat the prisoner in North Dakota than we do the prisoner in Texas.

There may be some rationale that the prisoner in North Dakota requires that much more substance abuse treatment than the prisoner in Texas, but that is not an obvious or intuitive conclusion one would reach. I think at least the Senate ought to have a basis for the rationale that led to the discrepancy in the distribution under the juvenile drug trafficking and gang prevention grants and now the funds Governor Richards discusses for substance abuse treatment in State prisons and the proposed amendment relative to community policing.

*28 I yield the floor.

The PRESIDING OFFICER.

Who yields time?

Mr. HEFLIN addressed the Chair.


The PRESIDING OFFICER.

The Senator from Alabama.

Mr. HEFLIN.

Mr. President, since there is a lull and they are waiting on another Senator to come to the floor, I would like to speak briefly on an unrelated subject in morning business.

*S15756 Mr. BIDEN.

Mr. President, I ask the Senator to withhold. We have people who have amendments on the bill who are here. What is the next order of business?

Mr. HATCH.

Senator GRAHAM's amendment.

Mr. GRAHAM.

Are we still on the Kempthorne-Hatch amendment?

Mr. BIDEN.

The Kempthorne amendment has not been offered, but I can tell the Senator that it is the intention of the managers to accept that amendment in the managers' package.

Mr. GRAHAM.

Mr. President, will the chairman of the committee yield for a question?

Mr. BIDEN.

Surely.

Mr. GRAHAM.

If we are going to accept it, could we have some statement of the rationale why we are proposing to move from what is currently in the bill, which is one-half of 1 percent of the funds going to each State up to now what will be eight-tenths of 1 percent, which is more than the original amendment which was offered at 0.75? The effect of that is going to be, for instance-to give an example of what this formula at the 0.75 level is-and I would like to know what the number is at 0.8-but as I understand the basic formula, it is that after the minimum allocation is distributed, then the balance of the money is distributed on an arrest-based allocation, the number of arrests per State; is that correct?

Mr. HATCH.

That is not correct. If I could just answer the Senator. I acknowledge what my colleague from Florida is saying. Let me just compare it to my State of Utah. Gang violence is on the rise. Drug trafficking is on the rise. It is becoming a drug transshipment State. While the rate of crime has decreased in cities like New York, Los Angeles, and the District of Columbia, the violent crime rate increased 3.7 percent last year. Utah had 6,673 drug-related arrests, and 20 percent of those were juveniles. Although Utah's population is three times greater

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

than the District of Columbia, Utah has less police officers. We have 2,979 versus 5,212 in the District of Columbia.

The point I am making is that statistics do not make a lot of difference here. We are concerned about some of these smaller States being overrun, and we are concerned about making sure they have enough money and enough of these police officers to be able to stop this crime.

That is one reason that we went up to 0.8, in addition to the fact that we want to be able to make it clear to the House that we feel this has to be done.

So, I do not think the Senator's State is going to be harmed at all. We have taken that into consideration in the grants process and in the whole raft of other provisions in this bill. But there are small States like mine, just to use my State which I know more about, that clearly are having serious problems, and we are trying to solve those problems.

The PRESIDING OFFICER.

*29 The Senator from Delaware.

Mr. BIDEN.

Mr. President, I say to my friend from Florida I am not crazy about this. Let me begin by saying that. Let me tell you how it came about as far as the original Kempthorne amendment would be reduced from the ability to apply under a certain set of circumstances from populations of 150,000 down to 100,000.

The end result of that original Kempthorne amendment would have been that 70 percent of the people who live in areas of 100,000 or above population centers would be competing for only 40 percent of the money, which I think is outrageous, notwithstanding I come from a rural State. The largest city in my State has 88,000 people. The next largest city has about 30,000 people. So I do not come from a State with large population centers. But I think it would be totally inequitable.

My concern was very bluntly that might pass. So, the Senator from Utah came along with a proposal that had two purposes-to move from a minimum formulation of 0.5 percent per State to 0.8 percent for two very basic reasons.

One, to get rid of the other Kempthorne amendment. He might not characterize it that way, but that is the way I characterize it.

And, two, to strengthen our negotiating position in the House when we got to the House. The House Members have a different view than we have as Senators representing entire States.

So those are the two purposes.

I believe that moving from 0.5 minimum allocation to 0.8 minimum allocation, notwithstanding that I come from the fifth smallest State in the Union in actual population, it was not motivated by that. It was motivated by the desire to make sure that the intention of the underlying Biden bill was not thwarted by having 70 percent of the population compete for 40 percent of the dollars. That is how we got to this point. That is why the Senator from Delaware is prepared to yield to the suggestion of the Senator from Utah to accept this amendment.

Mr. HEFLIN.

Mr. President, who has the floor?

The PRESIDING OFFICER.

The Senator from Alabama has the floor.

Mr. HEFLIN.

I just wanted to get that straight.

The Senator asked me if I would withhold, and then we would get into another situation. I will be glad to withhold. What is the next amendment after Kempthorne?

Mr. BIDEN.

Mr. President, a parliamentary inquiry.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The PRESIDING OFFICER.

The Senator will state it.

Mr. BIDEN.

What amendment is in order?

The PRESIDING OFFICER.

The next amendment is the Kempthorne-Hatch amendment.

Mr. HEFLIN.

What is after that if that has been accepted?

The PRESIDING OFFICER.

The Graham amendment is in order after the Kempthorne amendment.

Mr. HEFLIN.

I yield the floor.

Mr. BIDEN.

Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER.

The Senator will state it.

Mr. BIDEN.

Is the Kempthorne-Hatch amendment one of the amendments that is contained in the unanimous-consent order for which there is going to be, unless otherwise arranged, a vote on that amendment if the yeas and nays are asked for on the amendment.

The PRESIDING OFFICER.

**\*30** The Chair will state that if the amendment is offered and the yeas and nays are requested it will be in order to vote tomorrow.

Mr. BIDEN.

Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER.

The Senator will state it.

Mr. BIDEN.

If the amendment is not offered, it is not before the Senate; is that correct?

The PRESIDING OFFICER.

The Senator is correct. If the amendment is not offered, it is not before the Senate.

Mr. BIDEN.

And the Kempthorne-Hatch amendment has not been offered; is that correct?

The PRESIDING OFFICER.

The Senator is correct.

Mr. BIDEN.

I ask for the regular order, that we move to the next item on the agenda if that is in order.

The PRESIDING OFFICER.

If that be true, that amendment will no longer be in order.

Mr. BIDEN.

All right. That is fine by me.

The PRESIDING OFFICER.

Without objection, we will move to the next amendment.

The Senator from Florida is recognized.

Mr. GRAHAM.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Thank you, Mr. President.

AMENDMENT NO. 1200

(Purpose: To make certain amendments relating to criminal aliens)

Mr. GRAHAM.
Mr. President, I send an amendment to the desk.
The PRESIDING OFFICER.
The clerk will report the amendment.
The legislative clerk read as follows:
The Senator from Florida <Mr. GRAHAM> for himself, Mr. D'AMATO, and Mr. MACK, proposes an amendment numbered 1200.
Mr. GRAHAM.
Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.
The PRESIDING OFFICER.
Without objection, it is so ordered.
The amendment is as follows:
At the appropriate place insert the following:

Subtitle -Criminal Aliens

SECTION . TRANSFER OF CERTAIN ALIEN CRIMINALS TO FEDERAL FACILITIES.

(a) DEFINITION.-In this section, "criminal alien who has been convicted of a felony and is incarcerated in a State or local correctional facility" means an alien who-
(1)(A) is in the United States in violation of the Immigration laws; or
*S15757 (B) is deportable or excludable under the provisions of the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et. seq.); and
(2) has been convicted of a felony under State or local law and incarcerated in a correctional facility of the State or a subdivision of the State.
(b) FEDERAL CUSTODY.-Subject to the availability of appropriations, at the request of a State or political subdivision of a State, the Attorney General may-
(1)(A) take custody of a criminal alien who has been convicted of a felony and is incarcerated in a State or local correctional facility; and
(B) provide for the imprisonment of the criminal alien in a Federal prison in accordance with the sentence of the State court; or
(2) enter into a contractual arrangement with the State or local government to compensate the State or local government for incarcerating alien criminals for the duration of their sentences.
Mr. GRAHAM.
*31 Mr. President, I thank the Senator from Delaware for allowing me the time to offer this amendment to the crime bill and Senators D'AMATO and MACK for their support on its behalf.
This amendment would authorize the Attorney General to take Federal custody of and imprison criminal aliens or to provide payment to State or local correctional facilities for criminal aliens. The legislation is very similar to the provision in the Immigration Reform and Control Act of 1986 that allowed for reimbursement to states of incarcerated aliens and Marielito Cubans. This amendment would, subject to appropriations, also allow

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

reimbursement to localities.

While discussions of responsibility, federalism and unfunded mandates may not be as enthralling as many of the other amendments we have voted on in the last week, it is critical for the Federal Government to appropriately bear its responsibility and help improve its partnership with State and local governments to address the issue of crime as a partner and not a shifter of costs. This amendment would be an important signal and substantive help to State and local government in that effort.

Immigration policy is the sole responsibility of the Federal Government. However, while its strengths with respect to diversity are shared by the Nation, its costs in terms of impact of social, health and educational services are borne primarily by just a few States and localities.

## FEDERAL RESPONSIBILITY

On January 31, 1993, the Governors of the States of Florida, California, Texas, New York and Illinois wrote President Clinton, just days after his inauguration, requesting that the Federal Government renew its partnership with States on the issue of immigration by honoring its responsibility and commitment to States for the unreimbursed costs associated with legalization, health and education programs and for prisons.

"This partnership," wrote the governors, "has broken down * * * because the Federal Government has failed to honor its commitment to provide reimbursement to which the States are entitled. States cannot be expected to pay the costs of policies which are fundamentally the responsibility of the Federal Government." They are right.

With respect to prison costs, they estimated the costs of incarcerating illegal alien felons in their State prisons at $524.2 million. This should be an expense borne by the Federal Government and we should be responsible and not continue to pass that buck on to them.

## PRESENT LEGISLATION

Why? There has been a great deal of state bashing for their inability to keep prisoners behind bars and much questioning of their commitment to law and order. The Federal Government, despite lacking a national police force and being responsible for only a small percentage of arrests nationwide, seem to want to argue that we can do it better and will rush in to take over.

## STATE SUPPORT FOR AMENDMENT

Governors and mayors across our Nation are probably quite cynical with a great deal of this debate on the crime bill. They can point to the Federal Government's inept attempts to control our nation's borders and the impact it has had on their communities. Texas Governor Ann Richards has written a letter to Senator Biden on criminal aliens. She writes, "* * * the Texas prison system houses some 2,000 criminal aliens who illegally crossed the United States border with Mexico permitted by weak efforts of the Federal Government to control its border. Certainly the States should not be expected to assume that responsibility abdicated by the Federal Government, although we do."

*32 New York Governor Mario Cuomo adds, "It is the responsibility of the Federal Government to prevent illegal immigration. When the Federal Government fails at this task, the ensuing costs remain a Federal responsibility. In particular, the financial burden of incarcerating illegal alien felons have been borne exclusively by States, straining our criminal justice budgets and prison systems." Governor Cuomo estimates that 2,600 criminal aliens are housed in New York State prisons.

## REGIONAL PRISONS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

What has been the Federal Government's response? Aspects of the crime bill, unfortunately, have it all wrong. Despite the hard and good work put into this legislation by my colleagues, the provision relating to regional prisons concern me a great deal.

According to the Florida Department of Corrections, violent offenders have served less than 50 percent of their time on average in Florida this year. We must do something about that within our State and in the nation immediately.

In response, the Senate is preparing to pass in this bill a provision that would establish 10 regional prisons, after over 4 years of waiting, to which States can transfer prisoners, including criminal aliens, only if they meet sentencing guidelines and have served at least 85 percent of their time.

We have it backward. Rather than bearing our burden and responsibility for criminal aliens immediately and putting our own house in order by adequately controlling our Nation's borders, we promise to take a few small steps to bear our responsibility by taking some criminal aliens but only after at least 4 years and only when we feel the States are doing precisely what the Federal Government determines what it thinks they should so.

In Florida's circumstance, they would get a lot further along the road toward keeping prisoners behind bars and off the streets if the Federal Government would take responsibility for its criminal aliens in the State's prison system-approximately 6 to 7 percent of the prison population. More importantly, this could happen rather quickly and not 4 to 5 years from Now.

In fact, State and local government could potentially see some relief within the next year if the Congress would pass this amendment.

Consequently, this legislation is supported by the National Conference of State Legislators, the National Association of Counties and many of our Nation's Governors, mayors, State corrections officials and law enforcement personnel.

I urge its support and passage.

Mr. HATCH.

Mr. President, will the Senator yield?

Mr. GRAHAM.

I yield.

Mr. HATCH.

We have looked at the Senator's amendment. I am prepared to take the amendment on this side. I believe the distinguished Senator from Delaware would take it.

Mr. BIDEN.

Mr. President, the Senator from Florida knows I was prepared to take his amendment awhile ago. I am glad to see we have agreement on it, and I congratulate the Senator on the passage of his amendment momentarily and I thank him for if he is inclined to yielding back the time and we are ready to move on.

Mr. GRAHAM.

*33 Mr. President, I appreciate the generous consideration of the managers of this legislation.

I ask unanimous consent to print in the RECORD letters from the Governor of Texas, the Governor of New York, the National Conference of State legislators, the attorney general of Florida, and a letter jointly signed by the Governors of California, New York, Florida, Texas, and Illinois to the President of the United States all in support of the concept of this amendment.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

STATE OF TEXAS,

Austin, TX, November 9, 1993.

Hon. JOSEPH R. BIDEN,

Chairman, Judiciary Committee, U.S. Senate, Washington, DC.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

DEAR SENATOR BIDEN: You are undoubtedly better informed than I about what all other *S15758 states are doing but you are wrong about this Governor and the state of Texas.

Last week, the Texas taxpayers voted to pass a bond issue that provides an additional $1 billion for prison construction. Last session, Texas legislators appropriated $93 million of state funds for the largest incarcerated substance abuse treatment initiative in the nation. All of these funds are in addition to the $1 billion bond issue for increased prisons construction that the Texas taxpayers passed two years ago.

Texas elected officials and taxpayers alike have assumed responsibility for the crime problem in this state and are requesting assistance from the federal government for a problem that is often beyond our control. For example, the Texas state prison system houses some 2,000 criminal aliens who illegally crossed the United States border with Mexico permitted by weak efforts of the federal government to control its border. Certainly the states should not be expected to assume that responsibility abdicated by the federal government, although we do.

I am particularly concerned with the formulas that are being considered in crime legislation to allocate funds to states. These formulas, as currently written, do not allow for equity in the distribution of funds. For example, under the current formula for substance abuse treatment funds in state prisons, Texas will receive $114 per inmate while states with smaller prison populations will receive over $200 per inmate with the greatest allocation of $852 per inmate going to North Dakota. This disparity in funding will only further states' reliance on the federal government for assistance in the future.

Senator Bob Graham will be introducing an amendment to the Violent Crime Control and law Enforcement Act of 1993 that would allocate funds to states based on a formula that better represents the ratio of crime across the nation.

I urge you to consider these changes to the formulas in the crime legislation currently being considered.

If I may be of any assistance, please do not hesitate to contact me.

Sincerely,

ANN W. RICHARDS,

Governor.

----

STATE OF NEW YORK,

Albany, NY, November 16, 1993.

*34 Hon. BOB GRAHAM,

SH-524, Washington, DC.

DEAR SENATOR GRAHAM: I strongly support your amendment to the Violent Crime Control and Law Enforcement Act of 1993 to offset the fiscal impact of illegal alien criminals on state and local governments. Such assistance is sorely needed in New York and other states that are bearing the tremendous costs of incarcerating these aliens.

It is the responsibility of the federal government to prevent illegal immigration. When the federal government fails at this task, the ensuing costs remain a federal responsibility. In particular, the financial burdens of incarcerating illegal alien felons have been borne exclusively by states, straining our criminal justice budgets and prison systems.

The Congress recognized this responsibility when it enacted Section 501 of the Immigration Reform and Control Act of 1986: "Subject to the amounts provided in advance in appropriations Acts, the Attorney General shall reimburse a State for costs incurred by the State for the imprisonment of any undocumented alien . . . who is convicted of a felony by such state."

Unfortunately, for states such as New York, Texas, Illinois, California, and Florida that are disproportionately

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

affected by this problem, no funds have ever been appropriated to fulfill the mandate of Section 501.

State prisons are presently facing unprecedented challenges posed by the rapid rise in their criminal alien populations. New York, for example, is now housing an estimated 2,600 individuals who entered the U.S. illegally and then committed some other crime for which they were convicted and incarcerated. Because it costs an average of $24,000 a year to house an inmate, New York is paying approximately $63 million annually in incarceration costs, not including the related costs of added prison construction and an overburdened judicial system.

The cost to state governments nationwide of incarcerating illegal alien criminals is close to a billion dollars annually.

Like many of my fellow governors, I believe it is patently unfair to impose this hardship on states when the problem is not one of their own making.

Federal immigration policy governs entry into this country, and often the initial destination of immigrants. In addition, the federal government is ultimately responsible for the flow of illegal immigrants as well. New York State and others are proud to serve as gateways for the nation, but we cannot shoulder the resultant burdens alone. The costs of undocumented alien felons are of particular concern, especially as they drain precious state resources from other crime-fighting efforts and beneficial programs for our residents.

I believe that your amendment to the 1993 crime bill helps to address the negative impacts of undocumented aliens on our communities. Although this amendment is "subject to the availability of appropriations," and does not guarantee funding to states for housing these prisoners, it is a step in the right direction by affirming that the responsibility for incarcerating illegal alien criminals belongs to the federal government.

**\*35** I am grateful for your leadership on this important issue. I look forward to working with you and others in the future to restore an equitable balance of responsibilities between the federal government and the states with regard to illegal alien criminals.

Sincerely,
MARIO M. CUOMO,
Governor.

----

NATIONAL CONFERENCE OF
STATE LEGISLATURES,
Washington, DC, November 4, 1993.

DEAR SENATOR: I am on behalf of the National Conference of State Legislatures to register our concerns about sections of S. 1607, "The Violent Control and Law Enforcement Act of 1993."

The purported purpose of habeas corpus reform is to streamline litigation. It is ironic that Section 310 is added as an enforcement mechanism subjecting states to suits in Federal court for failure to abide by new standards set by Congress with respect to the appointment of counsel. The abrogation of sovereign immunity should not be approached lightly. There has been no consideration of the potential harm to states by this section. We strongly object to using the threat of lawsuit to accomplish these congressional goals.

With respect to provisions relating to background checks for child care providers, Title VIII, we are most concerned that sufficient funds be authorized and appropriated in order for states to adequately meet the mandates of the act for disposition and automation. It is also important that states retain the flexibility to determine how the background checks may be used. Title VIII makes participation voluntary, but the restrictions binding participants may have the unintended consequence of limiting state participation in the program. We concur in the need for improving criminal history records, but see it as only a small part of providing a safer environment in day care settings. If the federal government has a different opinion about the priority for spending to improve

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the records, then it must undertake the primary responsibility for funding.

Because the states have no responsibility for the control of federal immigration policy, NCSL opposes all federal attempts to shift the cost of resettling newcomers to state budgets. NCSL supports an amendment to be offered by Senator Graham respecting criminal aliens because it requires the federal government to take responsibility for the fiscal consequences of its immigration policy-here, the cost of imprisoning undocumented alien felons. NCSL further opposes efforts to curtail federal funding for mandated programs for newcomers. States should not be solely responsible for the fiscal impact of court-driven mandates such as education for undocumented alien children.

Finally, I must reiterate NCSL's strong opposition to Senator Biden's amendment for a so-called "police officers' bill of rights," a provision that would federalize noncriminal police disciplinary procedures. This amendment would remove from localities issues related to personnel administration and implicitly community relations. I can think of no other issue that is so intensely local or beyond Washington's competence.

**\*36** Sincerely,
WILLIAM T. POUND,
Executive Director, NCSL

----

STATE OF FLORIDA,
November 15, 1993.
Hon. BOB GRAHAM,
U.S. Senate, Washington, DC.

DEAR SENATOR GRAHAM: I was very pleased to receive a copy of the amendments to crime bills that are on the Senate floor and you have agreed to sponsor.

Your amendment to Senate Bill 1607 which allows for the transfer of convicted aliens to federal custody is long overdue. Illegal aliens who commit crimes should be the responsibility of federal authorities and not the responsibility of over-burdened state governments. The amendments that you and others have proposed for prison overcrowding suits is another long overdue reform. States have been periodically victimized by federal judges who have been much too indulgent with prison overcrowding complaints. Congress should set forth very clearly that the eighth amendment standard is what is enforceable by federal courts and no more.

Therefore, I am happy to land our strong support to your efforts this week on the crime bills.

Sincerely,
ROBERT A. BUTTERWORTH,
Attorney General.

----

JANUARY 31, 1993.
The PRESIDENT,
The White House,
Washington, DC.

DEAR MR. PRESIDENT: The United States was founded by immigrants seeking a better life for themselves and their families. America continues to offer a home to immigrants, as well as a safe harbor for those refugees fleeing oppression and persecution. If the federal government wishes to sustain a humanitarian foreign policy which fosters immigration and refugee admissions, then it must allocate the financial resources required to support this population once it has arrived.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Some immigrants and refugees have special needs which require government assistance in order to facilitate rapid assimilation. *S15759 In setting immigration and refugee policy, the federal government has acknowledged these needs by mandating that both documented and undocumented immigrants be provided with medical, education, and other services. The federal government has formed a partnership with the states to deliver these services to the immigrant population. In forming this partnership the federal government recognized its responsibility to reimburse states for the costs of providing these federally mandated services.

This partnership has broken down, however, because the federal government has failed to honor its commitment to provide the reimbursement to which the states are entitled. States cannot be expected to pay the costs of policies which are fundamentally the responsibility of the federal government. This especially is the case at a time when so many states are struggling with long-term budget problems and are being forced to reassess state programs and expenditures.

We look to your Administration and the Congress to renew the federal-state immigration partnership-one that recognizes the financial strain imposed by federal mandates which are unaccompanied by fair compensation. Several steps should be taken to achieve this objective;

*37 (1) The federal government must take immediate action to provide all reimbursement owed to the states for the provision of services to documented and undocumented immigrants and refugees.

(2) The federal government must recognize that its decisions to admit immigrants and refugees is strictly a federal one and therefore carries with it a firm federal commitment to provide full reimbursement to the states for services provided to the immigrant and refugee population.

(3) The federal government must work with the states to develop in effective federal mass immigration emergency plan.

We look forward to working with you to meet these objectives and to renewing the federal-state relationship in this vital policy area.

Sincerely,
PETE WILSON,
Governor of California.
MARIO M. CUOMO,
Governor of New York.
LAWTON CHILES,
Governor of Florida.
ANN W. RICHARDS,
Governor of Texas.
JIM EDGAR,
Governor of Illinois.
The PRESIDING OFFICER.
Does the Senator urge adoption of the amendment.
Mr. GRAHAM.
I do.
Mr. BIDEN.
I second that.
The PRESIDING OFFICER.
The question is on agreeing to the amendment.
The amendment (No. 1200) was agreed to.
Mr. BIDEN.
Mr. President, I move to reconsider the vote.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. HATCH.

I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. HEFLIN.

Mr. President, am I next?

The PRESIDING OFFICER.

The Senator is correct.

Mrs. BOXER.

Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER.

The Senator will state it.

Mrs. BOXER.

It is my understanding we had unanimous consent that we go down the order of amendments. As the Senator knows, I have been here since the very beginning and I am wondering if we can just stick with the order that was agreed to so I can dispose of this amendment as was requested in the unanimous-consent agreement.

The PRESIDING OFFICER.

The Senator from Delaware.

Mr. BIDEN.

Mr. President, I think unfortunately for the Senator, my friend from California, we are going in order and the next amendment in order in the Heflin amendment on funding for State judges and prosecutors.

Mrs. BOXER.

I say to the chairman I will happily await my turn.

Mr. BIDEN.

I truly do admire the patience and loyalty of my friend from California. She is the only one who has stayed here the entire time that we have been discussing this. I am flattered. Only my sister, mother, and father would be willing to do that. I thank her for her willingness to do it as well.

Let me say, as I understand it, the order in which the remaining amendments will be considered will be Heflin, Kerry of Massachusetts, and I believe there is a strong possibility that we may accept that, although I am not certain, and then the Boxer amendment.

I can say, Mr. President, that the managers are going to accept the Kerry amendment. So after Heflin, we will go to the Boxer amendment, with a brief interlude of accepting the Kerry amendment, and then we will go to the Levin amendment, which was a 1-hour time for debate, which I sincerely hope we will not use.

**\*38** I yield the floor.

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER.

The Senator from Utah.

Mr. HATCH.

Mr. President, as I understand it, the Heflin amendment is pending.

The PRESIDING OFFICER.

It has not been offered.

Mr. HATCH.

Well, when it is offered, it will be pending.

As I understand it, the distinguished Senator from Alabama is offering an amendment to try to solve the problem that will naturally arise when 100,000 new police are placed in the field that will create millions of cases. He wants to make sure that State courts will be able to handle those cases, so he would like some money to go to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the State courts. But, as I understand his amendment, it is subject to appropriations, not to exceed a half billion dollars.

Mr. HEFLIN.

Over 5 years.

Mr. HATCH.

Over 5 years. So you are not really asking for a half a billion dollars, just subject to whatever the Appropriations Committee decides to give you in the appropriations process, not to exceed one-half billion dollars.

Mr. BIDEN.

Mr. President, I do not like this amendment. I love my friend from Alabama. I do not like this amendment.

I am so tired of paying for the States on things that they should be paying for.

I must tell you how strongly I feel. The rationale for this amendment is that we are doing what the States have asked us to do, and that is provide them 100,000 new cops; and we are doing what the States have asked us to do, providing them $6 billion in new money for State prisons; and we are doing what they asked us to do, and then the reward is, because we have done what they have asked us to do, they now are entitled for us to pay for additional State prosecutors and judges because we have given them more cops to arrest more State violators-not Federal violators, State violators-and now they say, but now, because of what you have done to us, giving us what we have asked for, we demand more money to hire more State judges.

I will accept the amendment. I think it is ridiculous, but I will accept it in a sincere hope that we do not ever have to pass it.

Mr. HEFLIN.

I did not have any State people ask me for it. You have a situation where 100,000 new cops are created. If they make two arrests a day, that is 50 million new cases on a yearly basis, 5 days a week, 52 weeks a year.

Mr. HATCH.

Will the Senator yield?

Mr. HEFLIN.

Yes.

Mr. HATCH.

I do not feel quite the same way as the distinguished chairman does.

I have to say, I do not think that the Federal Government can afford a half billion dollars, if that is what really is appropriated. But it has to be appropriated and the Senator from Alabama will have to make his case to the appropriators. If the appropriators decide that they could do it, I am prepared to accept it. I am prepared to accept the amendment. I think it is an intelligent amendment. I think it is a thoughtful one.

There is no question the distinguished Senator from Alabama is one of the most distinguished judges-justice, in fact-to ever serve in this body. He has been the chief justice of the Alabama Supreme Court and naturally is concerned about these matters.

*39 So I am prepared to accept the amendment, if the Senator is willing to put his statement in the Record.

Mr. HEFLIN.

I would like to have some legislative history behind it.

Mr. HATCH.

Well, your statement will make that legislative history, plus the fact we are going to accept your amendment.

Mr. BIDEN.

Mr. President, if the Senator will yield, it is now an even clearer picture to me. Not only is the Senator from Alabama all that the Senator from Utah said, he is probably the most effective Senator in the body for his State. He gets more into Alabama *S15760 than could fit into the entire State of Delaware. I admire the way he takes care of his State. I admire the fact that he is such an effective advocate for his State. All of our States should

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

have someone as successful, although we might be bankrupt if we were all as successful as he is in helping his State and his constituency.

He says this will add 50 million new cases. There are only 14 million arrests made in all of America now with 600,000 police. We add one-sixth more and I will argue that maybe we will have one-sixth more arrests. Right now, there are 14 million arrests made with 600,000 cops. How we get, God bless us, from 14 million with 600,000 copies to 50 million with 700,000 cops is beyond me.

But I have known two things in my dealings with the Senator from Alabama. One, he almost always wins and, two, his State almost always gets the better of anything he tries to do.

And so, since this is on an authorization and I will have a chance to fight it out on an appropriations front, I am prepared to accept it, because there are some good aspects of the amendment.

But the principle of the Federal Government getting the money to pay for State court judges I think is going a little far.

But, like I said, I know if the Senator will put his statement in the RECORD, I will accept it. If he does not put it in the RECORD, I will debate it, although I know the effectiveness of the former chief justice on matters like this. Sometimes when you debate with him on things that affect the State of Alabama, you would think he was still the chief justice, because he is able to rule as autocratically as he did then. His State always seems to win when he is making the case for them. But I will yield if he will yield, and I will accept if he will cease.

The PRESIDING OFFICER.

The Senator from Alabama.

Mr. HEFLIN.

I appreciate the kind remarks, but I think the Senator is really misplacing it. He is talking about the Senator from Delaware on what he acquires for his State, rather than myself.

AMENDMENT NO. 1201

(Purpose: To authorize Federal assistance to ease the increased burdens on State court systems resulting from enactment of this act)

Mr. HEFLIN.

Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER.

The clerk will report.

The legislative clerk read as follows:

*40 The Senator from Alabama <Mr. HEFLIN> proposes an amendment numbered 1201.

Mr. HATCH.

Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER.

Without objection it is so ordered.

The amendment is as follows:

At the appropriate place insert the following:

SEC. . FEDERAL ASSISTANCE TO EASE THE INCREASED BURDENS ON STATE COURT SYSTEMS RESULTING FROM ENACTMENT OF THIS ACT.

(a) IN GENERAL.-The Attorney General, acting through the Director of the Bureau of Justice Assistance (the Director), shall, subject to the availability of appropriation, make grants for States and units of local government

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to pay the costs of providing increased resources for courts, prosecutors, public defenders, and other criminal justice participants as necessary to meet the increased demands for judicial activities resulting from the provisions of this Act and amendments made by this Act.

(b) APPLICATIONS.-In carrying out this section, the Director is authorized to make grants to, or enter into contracts with public or private agencies, institutions, or organizations or individuals to carry out any purpose specified in this section. The Director shall have final authority over all funds awarded under this section.

(c) RECORDS.-Each recipient that receives a grant under this section shall keep such records as the Director may require to facilitate an effective audit.

(d) AUTHORIZATION OF APPROPRIATIONS.-

(1) IN GENERAL.-There is authorized to be appropriated to carry out this section $100,000,000 for each of fiscal years 1994, 1995, 1996, 1997, and 1998, to remain available for obligation until expended.

(2) USE OF TRUST FUND.-Funds authorized to be appropriated under paragraph (1) may be appropriated from the trust fund established by section 1321C.

Mr. HEFLIN.

Mr. President, I have offered an amendment that creates a grant program through which the Department of Justice may award State and local governments funds to assist in effectively handling the increased judicial activities which will result from enactment of this bill.

Given the vote by this Senate last week to increase by 100,000 the number of police officers on the street, coupled with a dramatic increase in the amount of prison space available to those convicted, my amendment will make grants available to participants in the justice system. I fully support the authorization of new police officers as well as new prisons, but I believe the entire crime bill will be greatly enhanced by the adoption of my amendment. The post-arrest, preconviction aspect of the fight against crime should not be overlooked.

It is a matter of fact that 100,000 new police officers and new prisons will result in more arrests. Consequently, prosecutors, public defenders, State and local court systems, along with every other facet of the due process afforded those charged with a crime, should have adequate resources to properly dispose of these new cases.

*41 Mr. President, if you conservatively assume that these 100,000 new police officers arrest one person per day while working a 5 day work-week, 50 weeks per year, then our criminal justice system will have to handle 25 million new cases. In reality, if each new officer arrests five people per shift, the already over-burdened court system will have an additional 125 million cases in need of disposition. More cops on the streets is a great idea, but we must follow effectively through. I believe it is prudent to ensure that once the arrest takes place, proper adjudication follows as quickly as possible.

We have all heard stories of violent criminals being returned to the streets because the criminal justice system lacks the necessary resources to operate effectively. If my amendment is not agreed to, the Senate will be passing a huge unfunded Federal mandate with devastating consequences for State and local judicial systems. There is no doubt many more violent criminals will be arrested, but without more resources, many of these defendants will simply be free on bond, possibly committing more violent offenses, or else be in jail for long periods of time awaiting trial.

Mr. President, the current crime bill is structured like an hour glass. It is very large at the top with the addition of 100,000 new police officers. The measure is also well rounded at the bottom with the creation of many new prisons and boot camps. Yet, there is a dire need to expand the middle. Given that only a limited number of defendants can proceed through the judicial system at one time, this amendment can only strengthen the existing crime bill.

I urge its immediate adoption.

Mr. HATCH.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

I ask that the amendment be agreed to.

The PRESIDING OFFICER.

The question is on agreeing to the amendment of the Senator from Alabama.

The amendment (No. 1201) was agreed to.

Mr. HEFLIN.

Mr. President, I move to reconsider the vote by which the amendment was agreed to.

Mr. HATCH.

I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. WARNER.

Mr. President, I believe that the order that was agreed on by the managers is that the Senator from California would proceed. I have joined her as a principal cosponsors, so I yield the floor.

The PRESIDING OFFICER.

The Senator will suspend for one moment.

I believe that the regular order calls for the amendment by the Senator from Massachusetts, Mr. KERRY.

Mr. BIDEN.

Mr. President, parliamentary inquiry. Is my distinguished friend from California the next order of business?

The PRESIDING OFFICER.

According to the unanimous-consent agreement, the amendment of the Senator from Massachusetts is the next amendment.

Mr. BIDEN.

Mr. President, I was about to inform the Senate that we are prepared to accept the Senator's amendment, as long as he does not talk about it. And if he has come to talk about it, then we will reconsider accepting the amendment.

The PRESIDING OFFICER.

**\*42** The Senator from Massachusetts.

**\*S15761** Mr. KERRY.

That is the best deal I have ever been offered, so I yield the floor.

Mr. HATCH.

We are happy on this side to accept the amendment.

Mr. BIDEN.

Why does the Senator not send the amendment to the desk? We will accept it right now.

AMENDMENT NO. 1202

(Purpose: To provide an additional authorization of $150,000,000 for fiscal year 1996 for the police corps)

Mr. KERRY.

Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER.

The clerk will report.

The legislative clerk read as follows:

The Senator from Massachusetts <Mr. KERRY> proposes an amendment numbered 1202.

Mr. KERRY.

Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The amendment is as follows:

At page 249, line 6 of the bill delete "each of fiscal years 1995 and 1996;" and insert the following: "fiscal year 1995 and $250,000,000 for fiscal year 1996;".

Mr. KERRY.

Mr. President, I was intending to send an amendment tonight to the desk concerning the police corps, and to ask for its consideration under Order No. 260, and call for the yeas and nays under that order, as set forth in the Unanimous Consent agreement entered into tonight. But I have just been informed that my amendment will be accepted by unanimous consent. I am grateful for the support the amendment concerning the police corps has received from my colleagues on both sides of the aisle.

Let me briefly summarize the substance of the amendment that has been accepted.

This crime bill authorizes a police corps program at the level of $100 million for 1995, $100 million for 1996, and such sums as are necessary for future years. This is the same level for this program as we started with at the beginning of this process. It is inadequate for the program. The inadequacy was acknowledged from the beginning by many.

This amendment changes the crime bill to increase the authorized level for the police corps from $100 million in the second year of the program, 1996, to $250 million, subject to the decisions of the appropriators. The increase would permit an immediate increase in 1996 from 5,000 Americans graduating from the police corps to serve in police departments around the country to 10,000. The amendment would simultaneously allow an increase from 5,000 to 10,000 in the number of students receiving scholarship assistance and preparing to serve after graduation.

As conceived, a fully funded national police corps could ultimately put as many as 80,000 additional officers into local police departments. The police corps is modeled after the ROTC program, which awards college scholarships in exchange for a commitment of military service.

In the police corps program, students who accepted police corp scholarships would be obligated to spend four years working, for pay, in their local police departments. The students would benefit. The police departments would benefit. And law-abiding citizens would benefit.

*43 As the New York Times editorialized last August:

At a time when there is bipartisan agreement on the need to put more cops on the beat, such a promising plan for adding to community policing strength surely deserves a much more ambitious launch. Beyond offering localities a well-educated pool of recruits-many of them minorities, which are still greatly underrepresented on many urban police forces-the Police Corps would also save money. Departments would pay Police Corps officers standard entry pay, but would be spared the costly pension and fringe benefits they pay their regular officers.

But even that is probably not as important as the less tangible value of engaging the energy and ideas of young citizens not traditionally involved in law enforcement. While many law enforcement officials support the idea, some police chiefs would prefer to stick with the kind of recruits they're used to. But by now it's also clear that the old way of doing things isn't working very well, especially in urban areas. The Senate Republican leader, BOB DOLE, says he favors spending $250 million over the next three years on the Police Corps, with a bigger buildup in the future. That's far more than President Clinton requests, though still less than what's desirable. But money is tight, and it's hard to say where the additional funds might come from. Mr. DOLE to his credit seems willing to help Mr. Clinton and Senate Democrats find it.

It is the credit of many Senators, including Senators BIDEN and HATCH, Senator SASSER, Senator DOLE, the minority leader, Senator SPECTER, Senator MITCHELL, the majority leader, Senator KENNEDY, Senator HEFLIN, Senator SIMON, and Senator FEINSTEIN, among others, that the police corps concept is finally on the road to becoming a reality. I thank my colleagues for their support of this amendment.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. BIDEN.

I urge adoption of the amendment.

The PRESIDING OFFICER.

If there be no further debate, the question is on agreeing to the amendment.

The amendment (No. 1202) was agreed to.

Mr. BIDEN.

Mr. President, I move to reconsider the vote.

Mr. KERRY.

I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. BIDEN.

I congratulate the Senator and thank him for his cooperation.

Now I believe our patient and capable colleague from California is next.

Mr. KERRY.

I just want to ask the Senator from Delaware if he thinks that was the most eloquent statement I ever made.

Mr. BIDEN.

It was not, because I have heard the Senator from Massachusetts speak. If I could speak from prepared remarks as well as he can extemporaneously, I probably would not be chairman of this committee now but be able to be chairman of the Foreign Relations Committee because I would have been able to talk Senator PELL into taking the Education Committee forcing Senator KENNEDY back to the Judiciary Committee.

I yield the floor.

The PRESIDING OFFICER.

*44 The question occurs on the amendment of the Senator from California.

AMENDMENT NO. 1203

(Purpose: To add a title to the bill relating to driver's privacy)

Mrs. BOXER.

Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER.

The clerk will report.

The legislative clerk read as follows:

The Senator from California <Mrs. BOXER>, for herself, Mr. WARNER, Mr. DECONCINI, Mrs. FEINSTEIN, Mr. WOFFORD, Ms. MOSELEY-BRAUN, Mr. METZENBAUM, Mr. DODD, Mr. CONRAD, Mrs. MURRAY, Mr. SIMON, Mr. REID, Mr. BUMPERS, Mr. ROBB, Mr. HARKIN, Ms. MIKULSKI, Mr. FEINGOLD, Mr. DASCHLE, Mr. INOUYE, Mr. AKAKA, Mr. CAMPBELL, Mr. PELL, Mr. KENNEDY, Mr. KERREY, Mr. BRYAN, Mr. RIEGLE, Mr. BINGAMAN, and Mr. EXON, proposes an amendment numbered 1203.

Mrs. BOXER.

Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER.

Without objection, it is so ordered.

The amendment is as follows:

At the appropriate place, insert the following title:

TITLE -DRIVER'S **PRIVACY PROTECTION** ACT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

SEC. . SHORT TITLE; PURPOSE.

(a) SHORT TITLE.-This title may be cited as the "Driver's **Privacy Protection** Act of 1993".

(b) PURPOSE.-The purpose of this title is to protect the personal privacy and safety of licensed drivers consistent with the legitimate needs of business and government.

SEC. . AMENDMENT TO TITLE 18, UNITED STATES CODE.

Title 18 of the United States Code is amended by inserting immediately after chapter 121, the following new chapter:

### "CHAPTER 122-PROHIBITION ON RELEASE OF CERTAIN PERSONAL INFORMATION

"Sec. 2720. Prohibition on release and use of certain personal information by States, organizations and persons.
"Sec. 2721. Definitions.
"Sec. 2722. Penalties.
"Sec. 2723. Effect on State and local laws.

"s2720. Prohibition on release and use of certain personal information by States, organizations and persons

"(a) IN GENERAL.-(1) Except as provided in paragraph (2), no department of motor vehicles of any State, or any officer or employee thereof, shall disclose or otherwise make available to any person or organization personal information about any individual obtained by the department in connection with a motor vehicle operator's permit, motor vehicle title, identification care, or motor vehicle*S15762 registration (issued by the department to that individual) unless such disclosure is authorized by the individual.

"(2) A department of motor vehicles of a State, or officer or employee thereof, may disclose or otherwise make available personal information referred to in paragraph (1) for any of the following routine uses:

"(A) For the use of any Federal, State or local court in carrying out its functions.

"(B) For the use of any Federal, State or local agency in carrying out its functions, including a law enforcement agency.

"(C) For the use in connection with matters of automobile safety, driver safety, and manufacturers of motor vehicles issuing notification for purposes of any recall or product alteration.

*45 "(D) For the use in any civil criminal proceeding in any Federal, State, or local court, if the case involves a motor vehicle, or if the request is pursuant to an order of a court of competent jurisdiction.

"(E) For use in research activities, if such information will not be used to contact the individual and the individual is not identified or associated with the requested personal information.

"(F) For use in marketing activities if-

"(i) the motor vehicle department has provided the individual with regard to whom the information is requested with the opportunity, in a clear and conspicuous manner, to prohibit a disclosure of such information for marketing activities;

"(ii) the information will be used, rented, or sold solely for a permissible use under this chapter, including marketing activities; and

"(iii) any person obtaining such information from a motor vehicle department for marketing purposes keeps complete records identifying any person to whom, and the permissible purpose for which, they sell or rent the information and provides such records to the motor vehicle department upon request.

"(G) For use by any insurer or insurance support organization, or their employees, agents, and contractors, in connection with claims investigation activities and antifraud activities.

"(H) For use by any organization, or its agent, in connection with a business transaction, when the purpose is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to verify the accuracy of personal information submitted to that business or agent by the person to whom such information pertains, or, if the information submitted is not accurate, to obtain correct information for the purpose of pursing remedies against a person who presented a check or similar item that was not honored.

"(I) For use by any organization, if such organization certifies, upon penalty of perjury, that it has obtained a statement from the person to whom the information pertains authorizing the disclosure of such information under this chapter.

"(J) For use by an employer or the agent of an employer to obtain or verify information relating to a holder of a commercial driver's license that is required under the Commercial Motor Vehicle Safety Act of 1986 (49 U.S.C. App. 2701 et seq.).

"(b) UNLAWFUL CONDUCT BY ANY PERSON OR ORGANIZATION.-No person or organization shall-

"(1) use any personal information, about an individual referred to in subsection (a), obtained from a motor vehicle department of any State, or any officer or employee thereof, or other person for any purpose other than the purpose for which such personal information was initially disclosed or otherwise made available by the department of motor vehicles of the affected State, or any officer or employee thereof, or other person, unless authorized by that individual; or

"(2) make any false representation to obtain personal information, about an individual referred to in subsection (a), from a department of motor vehicles of any State, or officer or employee thereof, or from any other person.

*46 "s2721. Definitions

"As used in this chapter:

"(1) The term 'personal information' is information that identifies an individual, including an individual's photograph, driver's identification number, name, address, telephone number, social security number, and medical and disability information. Such term does not include information on vehicular accidents, driving violations, and driver's status.

"(2) The term 'person' means any individual.

"(3) The term 'State' means each of the several States, District of Columbia, Commonwealth of Puerto Rico, Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

"(4) The term 'organization' means any person other than an individual, including but not limited to, a corporation, association, institution, a car rental agency, employer, and insurers, insurance support organization, and their employees, agents, or contractors. Such term does not include a Federal, State or local agency or entity thereof.

"s2722. Penalties

"(a) WILLFUL VIOLATIONS.-

"(1) Any person who willfully violates this chapter shall be fined under this title, or imprisoned for a period not exceeding 12 months, or both.

"(2) Any organization who willfully violates this chapter shall be fined under this title.

"(b) VIOLATIONS BY STATE DEPARTMENT OF MOTOR VEHICLES.-Any State department of motor vehicles which willfully violates this chapter shall be subject to a civil penalty imposed by the Attorney General in the amount of $5,000. Each day of continued noncompliance shall constitute a separate violation.

"s2723. Effect on State and local laws

"The provisions of this chapter shall supersede only those provisions of law of any State or local government which would require or permit the disclosure or use of personal information which is otherwise prohibited by this chapter.".

SEC. . EFFECTIVE DATE.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The amendments made by this title shall take effect upon the expiration of the 270-day period following the date of its enactment.

Mrs. BOXER.

Mr. President, today I join the Senator from Virginia <Mr. WARNER> and 26 other cosponsors, to offer an amendment to protect the privacy of all Americans.

In California, actress Rebecca Schaeffer was brutally murdered in the doorway of her Los Angeles apartment by a man who had obtained her home address from my State's DMV.

In Iowa, a gang of teenagers copied down the license plate numbers of expensive cars, obtained the home addresses of the owners from the Department of Transportation, and then robbed them at night.

In Tempe, AZ, a woman was murdered by a man who had obtained her home address from that State's DMV.

And, in California, a 31-year-old man copied down the license plate numbers of five women in their early twenties, obtained their home address from the DMV and then sent them threatening letters at home. I want to briefly read from two of those letters.

I'm lonely and so I thought of you. I'll give you one week to respond or I will come looking for you.

*47 Another one read:

I looked for you though all I knew about you was your license plate. Now I know more and yet nothing. I know you're a Libra, but I don't know what it's like to smell your hair while I'm kissing your neck and holding you in my arms.

When they apprehended him, they found in his possession a book entitled "You Can Find Anyone" which spelled out how to do just that using someone's license plate.

In 34 States, someone can walk into a State Motor Vehicle Department with your license plate number and a few dollars and walk out with your name and home address. Think about this. You might have an unlisted phone number and address. But, someone can find your name or see your car, go to the DMV and obtain the very personal information that you may have taken painful steps to restrict.

Mr. President, the American people think that this is wrong. In a recent Lou Harris survey, 80 percent of the people were uncomfortable with one person obtaining this type of information about another.

Can we afford to wait until every State has their own tragedy? That is not the way to legislate. Our Representatives are elected to lead, to think ahead and-at every turn-to find ways to protect the people they represent. In many States, police officers, public figures and other victims of these privacy abuses have been allowed to request that the DMV keep their home addresses confidential. Of course, these people deserve **privacy** and **protection**. But, so do all of our people.

Mr. HATCH.

Will the Senator yield?

Mrs. BOXER.

I will be delighted to yield.

Mr. HATCH.

Mr. President, I appreciate my colleague from California's effort to control the disclosure of State department of motor vehicle <DMV> information. We need to comprehensively review the means by which government agencies disclose personal information to the public.

Stalking is a problem which is beginning to receive the attention of legislators at both the State and Federal level. I too share the concerns of my colleagues. Last Congress, I supported legislation authored by Senator COHEN which directed the Department of Justice to develop model anti-stalking legislation for the States. As well, I coauthored the Violence Against Women Act which provides $1.89 billion to fight violence perpetrated against women. The Senate passed this measure as an amendment to the crime bill. As well, I coauthored the Chafee-Hatch amendment to the crime bill which adds another category of offenders-stalkers-*S15763 to the list of per-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sons banned from purchasing firearms.

I believe the crime bill already does much to combat stalking. I commend my colleague for wanting to do more. However, concerns have been raised by the National Governors Association, the American Association of Motor Vehicle Administrators, the American Society of Newspaper Editors, and the Newspaper Association of America. These organizations raise legitimate points:

The bill from which this amendment is taken was introduced less than 1 month ago and there has not been an adequate amount of time to assess its impact and cost;

**48** It places unfunded mandates on the States which may result in the States prohibiting all uses of DMV information for any purpose, including legitimate business and press purposes;

It subjects the DMV's to civil penalties for wrongful disclosure of drivers license information; and

While I support the goals of the Boxer amendment, I believe it warrants careful and studious review.

We are prepared to take the Senator's amendment but I do have to add this caveat. We are prepared to take the amendment on both sides but I have had a number of people very, very concerned about it. I would like to take it under the condition that we work on it together and see if we can perfect it somewhat between now and conference. Because I have received letters, for instance, this one from the Society of Professional Journalists, Utah Headliners Chapter, which I ask unanimous consent be printed in the RECORD at this point.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

SOCIETY OF PROFESSIONAL JOURNALISTS, UTAH HEADLINERS CHAPTER,

Salt Lake City, UT, November 16, 1993.

Hon. ORRIN G. HATCH,

Committee on the Judiciary, U.S. Senate Washington, DC.

DEAR SENATOR HATCH; the Utah Headliners Chapter of the Society of Professional Journalists has learned that there may be a vote on proposed amendments to the Crime Bill this afternoon. Among those amendments to be considered is the Boxer/Moran Driver's **Privacy Protection** Act of 1993. Our organization is concerned and strongly opposed to the incorporation of the measure into the Crime Bill without appropriate public hearings.

Our organization represents journalists throughout Utah and has been active in protecting the public's access to government proceedings and records. Nationally, the Society is the nation's oldest and largest journalism organization.

While we are sympathetic to the concerns about privacy connected with the proposed legislation, we believe there may be other approaches to the problem that would ensure the public's right to know while protecting against abuse of these records. For example, government could enact tough stalking laws rather than closing off records because of isolated violence associated with information gained from public records.

Consider the valuable ways journalists use driver and motor vehicle records to further the public interest. News organizations have discovered pilots, bus drivers and police officers who have DUI convictions but were still operating vehicles. In New Mexico, a series a articles based on these records, helped change the state's DUI laws and the court system's leniency with DUI convictions. Other stories have shown how dealers illegally rebuilt and resold automobile wrecks. Any Utah journalist could provide you with a list of ways reporters use these records in the public's behalf.

We also believe that this issue is better addressed on a state-by-state basis. For example, government officials, journalists and citizens recently spent five years debating Utah's new Government Records Access and Management Act. The act provides for balancing tests between the public interest and the interests of privacy. This is a much more reasonable approach than the wholesale closure of public documents. We are concerned that the Boxer/Moran legislation could be only the beginning of an unbalanced closure of records that creates double standards.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*49** We ask for a full debate on these issues. There is a great deal of experience in Utah's government, legal and media community regarding these issues. We would be happy to use our resources to give you and your staff further information regarding this bill.

Best regards,

JOEL CAMPBELL,

for the Utah Headliners Chapter

Board of Directors.

Mr. HATCH.

They are expressing a great deal of concern about the amendment of the distinguished Senator. I understand what the distinguished Senator from California is trying to do. I will personally work with her to try to make sure we can accomplish what she wants while still giving consideration to these professional journalists and others who feel her amendment might be damaging to the information-gathering process.

Mr. WARNER.

Mr. President, will the Senator yield?

Mr. HATCH.

I will be delighted to.

Mr. WARNER.

This is a joint effort on behalf of the Senators from California and Virginia, and so I hope my colleague will address us jointly in terms of this somewhat unusual procedure. I urge the distinguished Senator from California be permitted to complete her opening remarks and the Senator from Virginia can provide his remarks and then we should discuss with the managers such procedures as they think appropriate to work on this amendment. Because it is my clear understanding the amendment was accepted and this is the first knowledge I had there was some contingency to that acceptance.

Mr. HATCH.

If I can just remark, I apologize to the distinguished Senator from Virginia. In my zeal to accept the amendment, I failed to mention that this is the Boxer and Warner amendment and we feel very deeply about that.

Frankly, what we are trying to do is finish the bill tonight. I think the distinguished Senator from California has made an eloquent statement on this matter thus far. I will be happy to listen to the rest of it, but I think if we are willing to accept the amendment, if the Senators can summarize their statements, it would help.

Mr. WARNER.

Mr. President, if the Senator will yield, we will be happy to do that. But I must tell you, I express great admiration for the Senator from California, for her diligence and months of hard work, together with her staff member, Laura Schiller, working with my staff member, George Cartagena. A lot of hard work has been put into this. I was absolutely astonished that this situation existed across the United States.

I urge the managers of the bill to provide the distinguished Senator from California a few more minutes and I will be happy to curtail my remarks to just a bare few minutes response.

The PRESIDING OFFICER (Mr. GRAHAM).

The Senator from California.

Mrs. BOXER.

If I may ask, is the time currently my time?

The PRESIDING OFFICER.

The Senator from California controls 10 minutes 57 seconds.

Mrs. BOXER.

I would say to my friends it would be my intention to finish my remarks in less than 5 minutes and yield the remainder of the time to my distinguished coauthor, the Senator from Virginia, Senator WARNER, and I would

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

like to proceed.

*50 I am very pleased that this amendment will be accepted. It has been 7 months of work. In 5 minutes I think I can complete my remarks. I thank the Senator from Virginia for his tremendous courtesy and assistance in this effort.

With this amendment we have an opportunity to protect the privacy and safety of all Americans-not just the VIP's with special clout.

This area is clearly within Congress' authority to regulate. First, this is a fundamental issue of privacy. The Supreme Court has found that people have a right to be safe in their homes, that they have a right not to have the Government make public their personal data and that Congress can use it's powers-section 5 of the 14th amendment-provide remedies for violations to constitutional rights.

What's more, with mail, cars, and harassment involved, this issue clearly has an impact on interstate commerce. As such-under article 1, section 8-this area is well within Congress' authority to regulate. We all understand that interstate commerce is severely threatened when mail is used, when people are scared to drive in their cars, when their civil rights are violated, and when they live in fear of being harassed and stalked.

The amendment that I am offering today strikes a critical balance between the legitimate governmental and business needs for this information, and the fundamental right of our people to privacy and safety. Under this amendment, personal information is defined as including a driver's name, address, phone number, and social security*S15764 number. It does not include information on a driver's accidents, violations or status. Let me repeat that. Nothing in this bill will stop the press, insurance companies, employers, or anyone else from obtaining information about an individual's driving record.

This amendment allows access for all governmental agencies, courts, and law enforcement personnel. It allows full access for all automobile and driver safety purposes, including manufacturers of motor vehicles conducting a recall for any purpose. It sets up fair standards for insurance companies, employers, banks, researchers, and other organizations who routinely use this information. And, that is why we have the support from so many organizations, including the American Insurance Association, a trade organization representing more than 250 major insurance companies.

Currently, most States sell personal information to direct marketers. Our bill does not stop this. It simply says that if a State chooses to sell this information to marketers, they need to give people the opportunity to opt out and say no. This policy is fair. It is consistent with the Direct Marketing Association's own ethical guidelines and with the recommendations of the landmark 1977 Privacy Commission Report.

This amendment sets up clear guidelines and fair penalties. Under this amendment, only those people and individuals who willfully violate this chapter are subject to penalties. Under this amendment, aggrieved individuals and groups do not have a cause of action and cannot file suit. And, under this amendment, States are not liable for criminal penalties.

*51 If you want to own or operate a car, you must register with the DMV. This amendment simply gives people more control over the disclosure of their personal information, especially for those reasons that are totally incompatible with the purpose for which the information was collected. States are free to be more restrictive with this information. This bill simply takes a national problem and gives the States broad latitude and 9 months to enact a national solution.

Mr. President, we have more than 20 business, consumer, police, physician and victims groups who have given their support to this amendment, from the Fraternal Order of Police, to the Consumer Federation of America, to the American Medical Association.

Finally, I want to again thank Senator WARNER for his strong support on this legislation, and Congressman MORAN, of Virginia, for his leadership on this issue; and my constituent from Los Angeles, Joyce Shorr, who brought this critical problem to my attention; again, the many groups that have endorsed the legislation, our 27

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

cosponsors.

Finally, I would like to address a couple remarks to the chairman of the Judiciary Committee, who I do not see on the floor right now but I want to pay tribute to him because he knows that I am new in the United States Senate. He knows how much this particular piece of legislation meant to me. Even when it looked like it was going to be controversial, he encouraged me to continue, to line up the votes and the support. We did it, and I am extremely pleased that the Senator from Virginia and I tonight will have our amendment agreed to. Of course, we will work to see that it survives the conference in a way that meets the very clear objectives: We want to protect the privacy and the safety of the people of America, and I think we will achieve that.

At this time, I yield the remainder of my time to the good Senator from Virginia, Senator WARNER.

The PRESIDING OFFICER.

The Senator from Virginia has 6 minutes 56 seconds.

Mr. WARNER.

Mr. President, I thank my distinguished colleague and friend, the Senator from California. I have to confess that the Senator from California and I came to the body with a somewhat different approach and philosophy. I thought to myself when I discovered this piece of legislation, largely through her efforts and the efforts of my distinguished colleague from Virginia, Congressman MORAN, who pioneered this legislation in the Congress for some several years, I thought the likelihood of a Boxer-Warner bill was impossible. But here we are. Impossible things do happen.

I thank my colleague for her kind remarks and for the opportunity for me and my staff to work as diligently as we could to perfect this piece of legislation.

Mr. President, I was absolutely astonished to learn that in some 30-plus States and, indeed, my own State, which has a provision that gives some restriction but people who demonstrate good reason can acquire this information. It applies to auto titles, to car registrations, to driver's licenses, auto tags-all this is open. There is a war in this country to fight for privacy. People are now fighting, and this is coming to their assistance to provide the privacy, which I and many others thought existed.

*52 I had no idea when I went into my State to get licensed that all this information that I provided was going to be made public. Those in public life expect much of our factual data to be public but, indeed, others who are not in public life have a need to protect their privacy, and particularly women.

I shall not go into the specifics. My distinguished colleague from California cited some actual cases, but this legislation is to protect a wide range of individuals, protect them from the State agencies often for a price, a profit to the State, to release lists. Not only will the agency give out individual names and sponsors will call with an inquiry, but they give out the whole list, everybody in the State, if you want to buy it. It is somewhat expensive but you can get it. This legislation provides that, henceforth-the State is given 270 days within which to implement it-henceforth, individuals who go in to register cars, acquire permits, so forth, can clearly indicate their lack of willingness, their desire not to have that information released to marketers primarily. There are specific exceptions of course for law enforcement individuals and other areas where proven experience shows that this information should flow. But in those instances we have to presume it is somewhat protected.

The Boxer-Warner bill incorporates both the intent of the 1974 Privacy Act, which deals with the collection of personal information by Federal agencies as well as the recommendations of the landmark 1977 **Privacy Protection** Study Commission report. Registering with the DMV is mandatory. The Boxer bill will provide individuals with knowledge of and control over the disclosure of their personal information for uses unrelated to the purpose(s) for which it was collected.

Mr. President, the legislation will also:

Provide unlimited access for courts, law enforcement, governmental agencies, insurance companies involved in claims investigation and antifraud activities, and for other driver and automobile safety purposes;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Allow businesses to verify information provided by the licensee and to access personal information as long as the individual has waived his or her right to confidentiality. These businesses can enter into contracts with the DMV's to facilitate this process;

Not prohibit the disclosure of information on vehicular accidents or driving violations;

Provide access to this information for marketing purposes if the licensees have been given the opportunity to prohibit such disclosure. This policy is consistent with the Privacy Commission report and with the ethical guidelines of the Direct Marketing Association;

Allow States to enact tougher restrictions and gives them room to craft their own specific responses to the regulations;

Allow the DMV's to price their sale of services to fully recover any initial costs associated with implementing this legislation-most DMV's already sell this information, and costs for implementing the additional security provisions are estimated to be negligible; and

*53 Only penalize the States when the Attorney General has found that a State's failure to comply with these regulations was willful.

This is a superb piece of legislation badly needed to protect individuals in their fight to retain privacy.

I thank the Chair and I thank my colleague.

*S15765 Several Senators addressed the Chair.

The PRESIDING OFFICER.

The Senator from Utah.

Mr. HATCH.

Mr. President, we are prepared to accept the amendment.

Mrs. BOXER.

I am very pleased. I have no further remarks.

I understand the Senator from Virginia, Senator ROBB, has come over to lend support. I would appreciate a moment or two. How much time remains?

The PRESIDING OFFICER.

The Senator from California controls 3 minutes 7 seconds.

The PRESIDING OFFICER.

The Senator from Virginia is recognized with 2 minutes 45 seconds remaining.

Mr. ROBB.

Mr. President, I am very pleased to join my senior colleague and the Senator from California in cosponsoring this amendment.

The right to privacy, without which the Americans are not secure in their own homes, is seriously threatened. It is easy for anyone anywhere to access information as personal as your address and phone number, even if they are not listed in the telephone directory. Even your Social Security number is available, and the chief agent giving out this kind of information is the very government that is supposed to protect its citizens.

Many Americans are infuriated and, more importantly, they are vulnerable to these violations of privacy which happen in 34 States in this country every day, my own included.

Recently, a woman in Virginia was shocked to discover black balloons and antiabortion literature on her doorstep days after she had visited a health clinic that performs abortions. Apparently, someone used her license plate number to track down personal information which was used to stalk her.

In another case in Georgia, an obsessive fan obtained the home address of a fashion model from the State Department of Motor Vehicles and assaulted her in front of her apartment.

These are but two examples of how simple it is to submit a driver's license number, pay a nominal fee to the DMV and receive a person's name and address. This is no mere loophole in a system, it is a visible gap that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

needs to be plugged.

Luckily, we have the opportunity to close that hole by the amendment offered by the Senator from California and my distinguished senior colleague, Senator WARNER. This amendment would place safeguards on the privacy of the driver and vehicle owners by prohibiting release of personal information to anyone without a specific business-related or government-related reason for obtaining the information.

While this bill alone will not stop people from stalking, it will inhibit States from unknowingly aiding and abetting this type of crime. Easy access to personal information makes every driver in this Nation vulnerable and infringes on their right to privacy. Government's duty is to keep citizens safe and it should not, therefore, be contributing to insecurity.

*54 I hope that our colleagues will help to restrict easy, unlimited access to personal information by supporting this amendment.

I commend the Senator from California, my senior colleague and our colleague in the House for offering it.

I yield the floor.

Mr. WARNER.

Mr. President, I ask unanimous consent I may proceed for another minute-and-a-half.

The PRESIDING OFFICER.

Without objection, it is so ordered. The Senator from Virginia is recognized for 90 seconds.

Mr. WARNER.

Mr. President, I pose a question to my distinguished colleague. In his former capacity as a very distinguished Governor of the Commonwealth of Virginia, it is very interesting, listening to his remarks, that this was a situation that apparently was not recognized by the Governors as being so compelling as it is today during the period when he was Governor.

I wonder if the Senator might have a recollection of how the history of the need of this legislation has evolved in the intervening years since he was Governor of the Commonwealth of Virginia.

Mr. ROBB.

Mr. President, I can respond to my senior colleague by telling him, indeed, this is a problem, like many others, that has simply evolved. In recent years, it has become increasingly evident that this information was accessible and it was being used for purposes that were certainly not intended by the framers of the actual legislation that permitted its release.

This legislation is simply designed to close an important loophole that at this point restricts the privacy that I think most of our citizens believe they have but in some cases subjects them to stalking, abuse or other improper utilization of information which simply should not be in their hands.

Mr. WARNER.

Mr. President, I thank my distinguished colleague. I think this is a very important part of the legislative history that we are making tonight. It has been a relatively short period of time that the urgency for such legislation as this be adopted by the Congress. It is my fervent hope and wish that it will be.

The PRESIDING OFFICER.

Who yields time?

The Senator from Delaware.

Mr. BIDEN.

Mr. President, I rise to not only support but compliment my friend from California. She came early on with this amendment when it did not look like anybody was likely to support it at all. And because she always cooperates, she indicated she did not want to get in the way of the passage of the bill she supports, but she felt strongly about it.

One of the things I am learning is that she is a freshman Senator, but she is no freshman like I have ever seen.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

She has walked into this place with significant experience in the House and is frighteningly effective. I compliment her on her pushing this amendment along. It is a very important amendment. I for one would like to compliment her and the Senator from Virginia for their calling this concern and need to the attention of the Senate and the people of the country. I think it is a good amendment.

*55 I support the amendment of the Senator from California. This amendment would make it unlawful for States to disseminate personal information about any person or organization simply because the person seeking the information can recite a driver's or motor vehicle license number.

Too often we read, or hear on television, stories about women who suffer serious injury or death after being stalked by estranged and violent husbands and boyfriends. Stalking is a crime of terror and fear, plaguing thousands of Americans every year.

By protecting the privacy of addresses and telephone numbers-which would otherwise be available at the mere mention of a license plate or driver's license number-the amendment is another weapon against this violence.

This amendment closes a loophole in the law that permits stalkers to obtain-on demand-private, personal information about their potential victims.

Under the law in over 30 States, it is permissible to give out to any person the name, telephone number, and address of any other person if a drivers' license or vehicle plate number is provided to a State agency.

Thus, potential criminals are able to obtain private, personal information about their victims simply by making a request. These open-record policies in many States are open invitations to would-be stalkers.

In my view, this amendment makes common sense. Americans do not believe they should relinquish their legitimate expectations of privacy simply by obtaining drivers' licenses or registering their cars. Yet the laws of some States do just that by routinely providing this identifying information to all    who request it.

The States should not provide the mechanism for the terror that can be unleashed through the indiscriminate release of this kind of information. Some restrictions on the dissemination of private information such as an address or telephone number are reasonable and appropriate.

This amendment is narrowly tailored in that it carefully preserves the right of States to disseminate this private information for legitimate purposes such as law enforcement, automobile safety activities, and insurance investigations.

I applaud the Senator from California for her work in this regard. She provides a reasoned and measured approach to the protection of private information and the placement of yet another roadblock in the way of would-be criminals.

*S15766 When time is yielded back, I am prepared to accept the amendment and again congratulate the sponsors for their persistence and insight into this problem

The PRESIDING OFFICER.

Is there further debate?

Mr. HARKIN.

Mr. President, I rise in strong support of this amendment, which will ensure that the private information that drivers provide to their State licensing authorities will not be improperly disclosed to violate those drivers right to **privacy**. The Drivers **Privacy Protection** Act, of which I am an original cosponsor, strikes a fair balance between reasonable interests of the State and the public in this information, and the rights of private citizens to be left alone.

*56 I became aware of this issue through the plight of one of my constituents, Karen Stewart. Karen was a patient of Dr. Herbert Remer, a physician who specializes in obstetrics and gynecological care in the Des Moines area. Because Dr. Remer performs abortions, his clinic has been the site of repeated protests by those who oppose women's right to choose.

But Karen was going to Dr. Remer to save her pregnancy, not to terminate it. She was experiencing complica-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

tions, and went to Dr. Remer for treatment. Unfortunately, a few days after the visit, Karen suffered a miscarriage.

And then she received the letter. Extremists from Operation Rescue sent a venomous letter apparently intended to traumatize Dr. Remer's patients. The letter spoke of "God's curses for the shedding of innocent blood," and "the guilt of having killed one's own child." They got her name and address from department of transportation records, after they spotted her car parked near Dr. Remer's clinic.

This is one example of the potential for abuse of these public records, but it is far from the only one. According to the Des Moines Register of October 10, 1992, a gang of teens used State records to help them carry out their crimes. They would find cars with expensive stereos in parking lots and on the streets, take down their license numbers, and find the owners' home address through DOT records.

Most tragically, these records are used by stalkers to track down their victims. Rebecca Shaeffer, a promising young actress from California, was brutally murdered by an obsessed fan. That fan obtained her address from department of motor vehicles records through a private investigator.

I strongly believe that this legislation will provide important **protection** to every American's **privacy**. I want to congratulate Senator BOXER on her amendment, which is a well-balanced proposal that strongly protects privacy, yet accommodates a variety of important interests. I urge its adoption.

Mr. WARNER.

Mr. President, I wish to join with my distinguished colleague from California in thanking the managers of this bill. It has been a somewhat difficult task to work it through, and that has been successfully done tonight with the cooperation of the managers and their excellent staffs.

So at this point in time I believe the Senator from California would urge adoption of the amendment.

Mrs. BOXER.

I urge adoption of the amendment.

The PRESIDING OFFICER.

The Senator from California has urged adoption of the amendment. Is there further debate? If not, the question is on agreeing to the amendment.

The amendment (No. 1203) was agreed to.

Mr. WARNER.

Mr. President, I move to reconsider the vote.

Mrs. BOXER.

I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER.

The Senator from Michigan under the unanimous-consent agreement is authorized to offer an amendment upon which there will be 1 hour of debate.

AMENDMENT NO. 1204

(Purpose: To provide for imposition of the penalty of life imprisonment without the possibility of release rather than imposition of the death penalty)

Mr. LEVIN.

*57 Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER.

The clerk will report the amendment.

The assistant legislative clerk read as follows:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ı

The Senator from Michigan <Mr. LEVIN>, for himself, Mr. SIMON, Mr. HATFIELD, Mr. DURENBERGER, and Mr. PELL, proposes an amendment numbered 1204:

At the end of the bill add the following:

SEC.. MANDATORY LIFE IMPRISONMENT WITHOUT POSSIBILITY OF RELEASE.

In lieu of any amendment made by this Act or any other provision of this Act that authorizes the imposition of a sentence of death, such amendment or provision shall authorize the imposition of a sentence of mandatory life imprisonment without the possibility of release.

Mr. LEVIN.

Mr. President, this amendment is introduced on behalf of Senators SIMON, HATFIELD, DURENBERGER, PELL, and myself. It would replace the death penalty in this legislation with a sentence of mandatory life imprisonment without the possibility of release.

I doubt that my position comes as a surprise to anybody who has watched the Senate year after year consider legislation to impose the death penalty.

For me, the bottom line is that the history of the death penalty is filled with examples in which innocent people have been executed or almost executed.

I cannot support a means of punishment with the finality of the death penalty when our judicial system cannot avoid making errors and mistakes. We are human. Our system of justice reflects our own fallibility as human beings.

My colleagues have seen me in the past hold up case after case after case in which people have been sentenced to death only later to be found innocent and released. Since this last debate in the Senate, the staff of the House Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee has issued a report entitled "Innocence in the Death Penalty: Assessing the Danger of Mistaken Executions."

This report briefly and concisely describes 48 cases in the past 20 years where a convicted person has been released from death row either because their innocence was proven or because there was a reasonable doubt that was raised as to their guilt. This report also examines some of the reasons why innocent people were convicted and sentenced to death. Those factors included prejudice, inadequate counsel, initial misconduct, and pressure to prosecute.

Mr. President, I ask unanimous consent at this time that the 48 cases that were identified by the Judiciary Subcommittee of the House be inserted in the RECORD in full.

There being no objection, the information was ordered to be printed in the RECORD, as follows:

RECENT CASES INVOLVING INNOCENT PERSONS SENTENCED TO DEATH

The most conclusive evidence that innocent people are condemned to death under modern death sentencing procedures comes from the surprisingly large number of people whose convictions have been overturned and who have been freed from death row. Four former death row inmates have been released from prison just this year after their innocence became apparent: Kirk Bloodsworth, Federico Macias, Walter McMillian, and Gregory Wilhoit.

*58 At least 48 people have been released from prison after serving time on death row since 1973 with significant evidence of their innocence. [1] In 43 of these cases, the defendant was subsequently acquitted, pardoned, or charges were dropped. In three of the cases, a compromise was reached and the defendants were immediately released upon pleading to a lesser offense. In the remaining two cases, one defendant was released when the parole board became convinced of his innocence, and the other was acquitted at a retrial of the capital charge but convicted of lesser related charges. These five cases are indicated with an asterisk (*).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

1973: David Keaton, Florida; conviction 1971. Sentenced to death for murdering an off-duty deputy sheriff during a robbery. Charges were dropped and Keaton was released after the actual killer was convicted.

1975: Wilber Lee, Florida; conviction 1963; Freddie Pitts, Florida; conviction: 1963. Lee and Pitts were convicted of a double murder and sentenced to death. They were released when they received a full pardon from Governor Askew because of their innocence. Another man had confessed to the killings.

1976: Thomas Gladish, New Mexico; conviction: 1974; Richard Greer, New Mexico; conviction: 1974; Ronald Keine, New Mexico; conviction: 1974; Clarence Smith, New Mexico; conviction: 1974. The four were convicted *S15767 of murder, kidnaping, sodomy, and rape and were sentenced to death. They were released after a drifter admitted to the killings and a newspaper investigation uncovered lies by the prosecution's star witness.

1977: Delbert Tibbs, Florida; conviction: 1974. Sentenced to death for the rape of a sixteen-year-old and the murder of her companion. The conviction was overturned by the Florida Supreme Court because the verdict was not supported by the weight of the evidence. Tibbs' former prosecutor said that the original investigation had been tainted from the beginning.

1978: Earl Charles, Georgia; conviction: 1975. Convicted on two counts of murder and sentenced to death. Charles was released when evidence was found that substantiated his alibi. After an investigation, the district attorney announced that he would not retry the case. Charles won a substantial settlement from city officials for misconduct in the original investigation.

Jonathan Treadway, Arizona; conviction: 1975. Convicted of sodomy and first degree murder of a six-year-old and sentenced to death. He was acquitted of all charges at retrial by the jury after 5 pathologists testified that the victim probably died of natural causes and that there was no evidence of sodomy.

1979: Gary Beeman, Ohio; conviction: 1976. Convicted of aggravated murder and sentenced to death. Acquitted at the retrial when evidence showed that the true killer was the main prosecution witness at the first trial.

1980: Jerry Banks, Georgia; conviction: 1975. Sentenced to death for two counts of murder. The conviction was overturned because the prosecution knowingly withheld exculpatory evidence. Banks committed suicide after his wife divorced him. His estate won a settlement from the county for the benefit of his children.

*59 Larry Hicks, Indiana; conviction: 1978. Convicted on two counts of murder and sentenced to death, Hicks was acquitted at the retrial when witnesses confirmed his alibi and when the eyewitness testimony at the first trial was proved to have been perjured. The Playboy Foundation supplied funds for the reinvestigation.

1981: Charles Ray Giddens, Oklahoma; conviction: 1978. Conviction and death sentence reversed by the Oklahoma Court of Criminal Appeals on the grounds of insufficient evidence. Thereafter, the charges were dropped.

Michael Linder, South Carolina; conviction: 1979. Linder was acquitted at retrial on the grounds of self-defense.

Johnny Ross, Louisiana; conviction: 1975. Sentenced to death for rape, Ross was released when his blood type was found to be inconsistent with that of the rapist's.

1982: Anibal Jarramillo, Florida; conviction: 1981. Sentenced to death for two counts of first degree murder; released when the Florida Supreme Court ruled the evidence did not sustain the conviction.

Lawyer Johnson, Massachusetts; conviction: 1971. Sentenced to death for first degree murder. The charges were dropped when a previously silent eyewitness came forward and implicated the state's chief witness as the actual killer.

1986: Anthony Brown, Florida; conviction: 1983. Convicted of first degree murder and sentenced to death. At the retrial, the state's chief witness admitted that his testimony at the first trial had been perjured and Brown was acquitted.

Neil Ferber, Pennsylvania; conviction: 1982. Convicted of first degree murder and sentenced to death. He was released at the request of the state's attorney when new evidence showed that the conviction was based on the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

perjured testimony of a jail-house informant.

1987: Joseph Green Brown (Shabaka Waglini), Florida; conviction: 1974. Charges were dropped after the 11th Circuit Court of Appeals ruled that the prosecution had knowingly allowed false testimony to be introduced at trial. At one point, Brown came within 13 hours of execution.

Perry Cobb, Illinois; conviction: 1979; Darby Williams, Illinois; conviction: 1979. Cobb and Williams were convicted and sentenced to death for a double murder. They were acquitted at retrial when an assistant state attorney came forward and destroyed the credibility of the state's chief witness.

Henry Drake,* Georgia; conviction: 1977. Drake was resentenced to a life sentence at his second trial. Six months later, the parole board freed him, convinced he was exonerated by his alleged accomplice and by testimony from the medical examiner.

John Henry Knapp,* Arizona; conviction: 1974. Knapp was originally sentenced to death for the arson murder of his two children. He was released in 1987 after new evidence about the cause of the fire prompted a judge to order a new trial. In 1991, his third trial resulted in a hung jury. Knapp was again released in 1992 after an agreement with the prosecutors in which he pleaded no contest to second degree murder. He has steadfastly maintained his innocence.

*60 Vernon McManus, Texas; conviction: 1977. After a new trial was ordered, the prosecution dropped the charges when a key prosecution witness refused to testify.

Anthony Ray Peek, Florida; conviction: 1978. Convicted of murder and sentenced to death. His conviction was overturned when expert testimony was shown to be false. He was acquitted at his second retrial.

Juan Ramos, Florida; conviction: 1983. Sentenced to death for rape and murder. The decision was vacated by the Florida Supreme Court because of improper use of evidence. At his retrial, he was acquitted.

Robert Wallace, Georgia; conviction: 1980. Sentenced to death for the slaying of a police officer. The 11th Circuit ordered a retrial because Wallace had not been competent to stand trial. He was acquitted at the retrial because it was found that the shooting was accidental.

1988: Jerry Bigelow, California; conviction: 1980. Convicted of murder and sentenced to death after acting as his own attorney. His conviction was overturned by the California Supreme Court and he was acquitted at the retrial.

Willie Brown, Florida; conviction: 1983; Larry Troy, Florida; conviction: 1983. Originally sentenced to death after being accused of stabbing a fellow prisoner, Brown and Troy were released when the evidence showed that the main witness at the trial had perjured himself.

William Jent,* Florida; conviction: 1980; Earnest Miller,* Florida; conviction: 1980. A federal district court ordered a new trial because of suppression of exculpatory evidence. Jent and Miller were released immediately after agreeing to plead guilty to second degree murder. They repudiated their plea upon leaving the courtroom and were later awarded compensation by the Pasco County Sheriff's Dept. because of official errors.

1989: Randall Dale Adams, Texas; conviction: 1977. Adams was ordered to be released pending a new trial by the Texas Court of Appeals. The prosecutors did not seek a new trial due to substantial evidence of Adam's innocence. Subject of the movie, The Thin Blue Line.

Jesse Keith Brown,* South Carolina; conviction: 1983. The conviction was reversed twice by the state Supreme Court. At the third trial, Brown was acquitted of the capital charge but convicted of related robbery charges.

Robert Cox, Florida; conviction: 1988. Released by a unanimous decision of the Florida Supreme Court on the basis of insufficient evidence.

Timothy Hennis, North Carolina; conviction: 1986. Convicted of three counts of murder and sentenced to death. The State Supreme Court granted a retrial because of the use of inflammatory evidence. At the retrial, Hennis was acquitted.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

James Richardson, Florida; conviction: 1968. Released after reexamination of the case by prosecutor Janet Reno, who concluded Richardson was innocent.

1990: Clarence Brandley, Texas; conviction: 1980. Awarded a new trial when evidence showed prosecutorial suppression of exculpatory evidence and perjury by prosecution witnesses. All charges were dropped. Brandley is the subject of the book White Lies by Nick Davies.

*61 Patrick Croy, California; conviction: 1979. Conviction overturned by state Supreme Court because of improper jury instructions. Acquitted at retrial after arguing self-defense.

John C. Skelton, Texas; conviction: 1982. Convicted of killing a man by exploding dynamite in his pickup truck. The conviction was overturned by the Texas Court of Criminal Appeals due to insufficient evidence.

1991: Gary Nelson, Georgia; conviction: 1980. Nelson was released after a review of the prosecutor's files revealed that material information had been improperly withheld from the defense. The district attorney acknowledged: " There is no material element of the state's case in the original trial which has not subsequently been determined to be impeached or contradicted."

Bradley P. Scott, Florida; conviction: 1988. Convicted of murder ten years after the crime. On appeal, he was released by the Florida Supreme Court because of insufficiency of the evidence.

1993: Kirk Bloodsworth, Maryland; conviction: 1984. Convicted and sentenced to death for the rape and murder of a young girl. Bloodsworth was granted a new trial and given a life sentence. He was released after subsequent DNA testing confirmed his innocence.

Federico M. Macias, Texas; conviction: 1984. Convicted of murder, Macias was granted a federal writ of habeas corpus because of ineffective assistance of counsel and possible innocence. A grand jury refused to reindict because of lack of evidence.

Walter McMillian, Alabama; conviction: 1988. McMillian's conviction was overturned by the Alabama Court of Criminal Appeals and he was freed after three witnesses recanted their testimony and prosecutors agreed case had been mishandled.

Gregory R. Wilhoit, Oklahoma; conviction: 1987. Wilhoit was convicted of killing his estranged wife while she slept. He was acquitted at a retrial after 11 forensic experts testified that a bite mark found on his dead wife did not belong to him.

Mr. LEVIN.

Mr. President, that last point, pressure to prosecute, is well reflected in the case of Kirk Bloodsworth. This is a very recent example of a mistaken conviction of a capital offense. Kirk Bloodsworth was convicted of first-degree murder twice. The first time he was sentenced to death. The second time he was sentenced to life in prison. He was convicted of the rape and the murder of a young girl. It was a horrendous crime.

He was innocent. This was later proven, and I am going to get into that in *S15768 a moment. Had he been executed instead of being given a life term for the murder of which he was convicted, the mistake that I will read about in a moment could not have been corrected.

That mistake was set forth in a CBS TV program called "Eye to Eye with Connie Chung." The name of the program was "A Free Man." It was aired on October 28, just a few weeks ago. These are some of the excerpts from this TV program.

The reporter said that:

It was the summer of 1984 in Baltimore County, Maryland. A 9-year-old girl, Dawn Hamilton, was tortured, sodomized and murdered in the woods near her home. It was one of the most horrifying crimes ever committed in the area. There was tremendous pressure to solve the case. Sixteen days and hundreds of possible suspects later, the police closed in on one 23-year-old Kirk Bloodsworth.

*62 And the reporter then said that Robert Lazzaro was the lead prosecutor of the case, and Mr. Lazzaro is interviewed here a number of times in this transcript.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

LAZZARO. We didn't have a confession. We didn't have any physical evidence.

MAGNUS. What the State did was to have two witnesses putting Bloodsworth near the murder scene, two boys ages 10 and 7. They were fishing when they saw a man walk with Dawn--

That is the little girl.

into the woods shortly before she was murdered.

LAZZARO. The crux of the case really was putting him at the scene with the girl, the two young boys.

MAGNUS. And then they pegged him at 6 foot 5 and Kirk was only about 6 feet.

LAZZARO. Well, that's not unusual.

MAGNUS. They said he had blond hair. Kirk had red hair. I mean they weren't necessarily describing Kirk Bloodsworth.

LAZZARO. I understand that. But the bottom line is that they selected him independently of each other, as absolutely being the one, the person that they saw.

Lazzaro said:

Yes, I was absolutely convinced that he did it.

MAGNUS. It fit for the jury. They took only 2 hours to find Bloodsworth guilty of Dawn Hamilton's murder.

And then Bloodsworth speaking:

I was standing there. And the judge sentenced me to death for something I didn't do. And here I am and the people are applauding. I was alone. I was labeled something that's not even close to me as a person and a human being.

MAGNUS. Bloodsworth was sent to the Maryland State Penitentiary for 2 years and spent 23 hours a day in a cell just above the gas chamber.

Magnus: What Bloodsworth didn't know was that three days after his conviction, the police and prosecutors learned about a compelling possible suspect. Someone who, just after Dawn's murder, had shown up at a nearby mental health clinic * * * with, according to one witness, fresh scratches on his face. Someone who told a therapist he was in trouble with a little girl. Someone who looked like the composite. But with Bloodsworth behind bars * * * the police seemed in no rush to check out the tip.

The Baltimore County Police refused to talk to eye to eye about the case. But we obtained the detectives' report on their only meeting with the potential suspect-David Rehill. They wrote that although he resembled the composite, Rehill was smaller than the man the little boys described. They never checked his alibi; never put him in a line-up.

What do you say to the criticism that the system closed in on one guy, with some evidence, and that everybody just stopped looking at other things that didn't fit.

Lazzaro: I would say that unfortunately that is not all that rare of an occurrence in our criminal justice system.

Since those are the words of the detective in charge of the case, I am going to repeat them.

They ought to give us a little pause.

Lazzaro: I would say that unfortunately that is not all that rare of an occurrence in our criminal justice system.

*63 Magnus: After two years under a death sentence, Bloodsworth finally seemed to catch a break. He got a new trial on a legal technicality * * * not because of the possible suspect. In fact, although the state had known about Rehill for two years, the information was withheld from the defense until just days before the second trial. Bloodsworth's lawyers didn't have time to investigate and didn't ask for a postponement, so the second jury never heard about this potential suspect. Bloodsworth was convicted again. When evidence about Rehill finally did get to the court, it was too late. Bloodsworth was sentenced to life.

Magnus: Kirk Bloodsworth would be in prison today were it not for his persistence and the help of a lawyer of last resort. In 1989, his fifth year in prison, Bloodsworth met Bob Morin.

Morin: I walked out of the prison. And I said-this is a little scary. This kid is innocent.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Magnus: But now to prove it? Morin reinvestigated and rechecked everything. Three more years went by. It looked hopeless. And then Bloodsworth heard about sophisticated new DNA tests that weren't available when he was on trial.

Magnus: A private lab analyzed the tiny semen sample. In April of this year the result came back. Bloodsworth was completely eliminated as the source of the semen. Morin called him with the news.

Magnus: On June 28, almost 9 years after he was locked up, Kirk Bloodsworth's conviction was set aside. He was free at last.

What this story seems to indicate is that it is eerily easy with a weak case to convict an innocent man.

Lazzaro: Yes. In retrospect, it is.

Let me repeat that.

Magnus: What this story seems to indicate is that it is eerily easy with a weak case to convict an innocent man.

Lazzaro: Yes. In retrospect, it is.

Not only is it possible in retrospect, it is possible prospectively too because our system of justice is fallible, because we, as human beings, are fallible.

Some proponents of the death penalty might have just heard what I read and said, well, that is terrible and tragic, but mistakes are made. Mistakes, they might say, are a cost of doing business. When trying to operate a criminal justice system in which some very bad people must be punished very harshly, I can respect that response as a response in the abstract. But I do question whether those who offer that response would make it confidently at all if Kirk Bloodsworth were not a figure in a TV program, but also their father or their brother or their uncle.

I have to believe that if they thought a member of their family was innocent, but was nevertheless sentenced to death, they would question how a justice system worthy of that name could presume the infallibility to impose a penalty with the finality of death. I find it hard to believe that rhetoric would be as demanding or as loudly uncompromising if they thought that a member of their own family risked being executed, even though innocent, by the Government. Would a mistake then just be a cost of doing business?

*64 Some people say, well, what about a case that absolutely-I mean how about somebody who pleads guilty to murder? I mean, you cannot make a mistake if somebody pleads guilty to murder, can you? Oh, yes, you can. You can make a mistake even then. Recently, too.

The Commonwealth of Virginia versus David Vasquez. Vasquez pled guilty to murder. Vasquez was innocent, acknowledged later by the Commonwealth to be innocent and released after serving many years in prison.

The transcript of his plea of guilty is a fascinating document. I am going to read just a portion of it.

He entered a plea of guilty with a fixed term because he was afraid that he would be found guilty and sentenced to death and did not want to take that risk. In this case, the death penalty promoted the false plea. That is one interesting part of it. That is one impact of the death penalty which is not often discussed.

But what is even more intriguing about this plea of guilty is what the officers in charge of this case testified to at the time of the taking of the plea.

Mind you, they are talking about somebody who, by the acknowledgment of the Commonwealth of Virginia recently, is totally innocent of this crime. Somebody else committed the crime. But here is what the detective in charge said at the plea of guilty, if we want to talk about fallibility and worse. Listen to this one.

The detective: Eventually he told us about a dream that he had where he described this horrible dream. Based on the information that he gave us about those dreams it lined up exactly with the murder based on the information that we had.

Question: Now, Detective Shelton, in the course of your investigation of this case, have you had occasion to consult with any physicians about the medical significance of these dreams and their contents?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Answer: Yes.

Question: What did you learn from these physicians?

Answer: That the dreams are a way to repress a crime, explain away a criminal intent, and that is a very common way of repressing this memory.

Question: OK. During the course of your discussions with him about his dreams, did he reveal to you a number of facts concerning their content?

Answer: Yes. There were facts that came up in his dream that no one on the outside knew.

*S15769 Question: Would you outline very briefly, Detective Shelton, what he stated?

Answer: Yes. One of the things he talked about was the victim's hands, and he described how he put her down and in his dreams he put her down. In fact her body was found in that position. He indicated at one point prior to her hands being tied that she was assaulted in the middle of the living room. He indicated to us that after the break in he went to the living room. That was confirmed by the position of the rope and the pubic hairs found on the rope.

Question: The position of the rope was discussed. Is that correct?

Answer: Exactly. The rope was discussed in terms of the rope lying in the middle of the living room floor. He indicated that when he came in through the window, he stepped on a hose that extended to the dryer. There are also many things discussed that were not known to anyone but us. For instance he made reference to jewelry and where it was left and that information was known only to us. He also indicated that in his dream that there were also two or three Venetian blind cords cut. That information was also known only to us.

*65 Question: Were there three Venetian blind cords cut?

Answer: Yes.

Question: What else did he tell you with respect to rope?

Answer: He also told us in his dreams that he took the cord and wrapped the victim's hands 10 times, and that was exactly how many times her hands had been wrapped. He told us that in his dream he stood there in front of the house for several minutes prior to banging on the window. This turned out to be a fact from the information given to us.

Question: What did he indicate with respect to the purse?

Answer: He indicated that he discovered the purse at the top of the steps and he indicated to us that in his dream he emptied it out, and it was already known to us that the purse had in fact been emptied out at the top of the steps. Finally, he indicated to us that he saw something in his dream on the kitchen table. He stated what he saw was a camera. Again, this information was only available to the authorities.

That is the testimony of the detectives introduced at the time of the plea of guilty of a man who was innocent at the time he pled guilty. That was the testimony which helped persuade a court to accept a plea of guilty. That is the testimony which could not have been accurate, and was not accurate.

Yes, even people who are entering a plea of guilty can be innocent of the offense. That was a plea to murder.

This amendment which I offer on behalf of a number of our colleagues and myself recognizes our own fallibility. It imposes a harsh penalty, yet allows the criminal justice system to correct for its mistakes.

Finally, a few words on deterrence and the death penalty. Some of the people who would be subject to the death penalty under this bill face a much greater chance of death from involvement in a drug deal or a terrorist act than an imposition of the death penalty. If a greater certainty of death does not deter, how will a lesser certainty have that effect?

Second, what statistical evidence there is indicates that the death penalty does not deter on a statewide basis. As this chart indicates, the States that have a death penalty have a higher murder rate than the States where life imprison is the most severe penalty that can be imposed.

In 1990, the murder rates in the States with a death penalty was 9.5. In the States without a death penalty it

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

was 8.4. In 1992, the murder rate in the States with a death penalty had remained at 9.5. The murder rate in States without the death penalty actually declined somewhat to 7.9. But this pattern is the same as it has been for decades. The murder rate in States that have a death penalty is higher than the murder rate in the States that have life in prison as the harshest penalty that can be imposed.

Within the last couple of weeks, the district attorney in Texas, named Patrick Batchelor, raised some questions on a network news program about the deterrent value of the death penalty, as compared to life imprisonment without the possibility of release. And then we asked him if he would put his thoughts in a letter.

*66 He wrote me the following:

Senator LEVIN, * * * I want you to understand that I firmly want the harshest punishment available to be handed out to the worst of criminals who commit these terrible murders. Having this belief and having prosecuted many capital murder cases where the death penalty was handed down, I inevitably have come to some conclusions concerning the death penalty as a punishment and as a deterrent to crime.

Then, skipping down, he said:

I feel that locking a person in a cage for the rest of his natural life with no hope of parole or ever getting out of that cage, would be a far more harsh punishment than simply putting him to sleep.

I ask unanimous consent that this letter from the district attorney of Navarro County, Patrick Batchelor, be printed in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

NOVEMBER 3, 1993.
Senator CARL LEVIN,
U.S. Senate, Washington, DC.

DEAR SENATOR LEVIN: I am writing in response to my conversation with Ms. Jackie Parker concerning my appearance in a report on capital punishment televised on the CBS Evening News a week or so ago. To clarify my position on capital punishment and the death penalty, I want you to understand that I firmly want the harshest punishment available to be handed out to the worst of criminals who commit these terrible murders. Having this belief and having prosecuted many capital murder cases where the death penalty was handed down, I inevitably have come to some conclusions concerning the death penalty as a punishment and as a deterrent to crime.

I personally feel that considering the procedure and method used presently to inflict the death penalty, it has become no different than checking into the hospital to have your appendix taken out and just not waking up from the anesthesia. I feel that locking a person in a cage for the rest of his natural life with no hope for parole or ever getting out of that cage, would be a far more harsh punishment than simply putting him to sleep.

As far as a deterrent to crime, I think most anyone looking at the crime statistics simply has to concede that the death penalty has not deterred capital murders. I say this full well knowing that there is no absolute way we can gage whether potential criminals consciously decide not to commit murder when they engage in criminal activities because of fear of the death penalty. I also can not say that a sentence of life without parole would deter capital murderers either, but I think it may be time to consider it.

If I can be of further assistance to you, please let me know.

Sincerely,
PATRICK C. BATCHELOR.

Mr. LEVIN.

Mr. President, the amendment we offer imposes a very harsh penalty: life imprisonment without the possibility of release. It imposes it for the very awful crimes that are described in the bill before us, but it does not run the risk of adding to those human tragedies where we have executed by mistake innocent persons. Until our system of justice is infallible-and it is far from that-our system will make mistakes. A death penalty mistakenly in-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

flicted cannot be cured, unlike other mistakes in our justice system.

*67 Life without the possibility of release, in the words of District Attorney Batchelor, is a "far more harsh punishment than simply putting a defendant to sleep." It also has the advantage of allowing our mistakes to be corrected.

I yield the floor.

Mr. HATCH.

How much time remains?

The PRESIDING OFFICER.

The Senator from Utah controls 30 minutes. The Senator from Michigan controls 9 minutes 27 seconds.

Mr. BIDEN.

Mr. President, last week I introduced an amendment to reauthorize the Court Appointed Special Advocate Programs, the Child Abuse Training Programs for Judicial Personnel and Practitioners, and the grants for televised testimony under the Victims of Child Abuse Act, a measure on which I worked with Senator REID to pass as part of the Crime Control Act of 1990. I commend both Senator REID and Senator HATCH for cosponsoring this measure.

In the past, children who were victims of abuse were often victimized a second time by our criminal justice system. The Victims of Child Abuse Act supported programs to reduce the trauma of child victims.

Through the Court-Appointed Special Advocate Program, children are assured that their interests will be adequately represented. Advocates provide for the immediate reporting of abuse, facilitate the prompt review of cases, and make recommendations for the child's best interests.

Through the Child Abuse Training Program, judicial personnel and practitioners are trained to improve the system's handling of child abuse cases. One of the main objectives is to avoid the unnecessary placement of children in foster care or institutional care.

*S15770 Finally, through televised testimony, children are given a voice. Closed circuit televising and the video taping of testimony alleviate the terror that has, in the past, silenced too many of our children when forced to face their assailants in court.

These programs have gone a long way in making the system of justice more sensitive to children's needs. I am honored to have played a role in their development.

Mr. HATCH.

Mr. President, I oppose the amendment offered by my colleague from Michigan. This amendment would require that capital defendants be given a sentence of mandatory life rather than a possible death sentence. It is intended to abolish capital punishment in the Federal system.

Mr. President, the proponents of this provision imply that this bill creates a Federal death penalty where none had existed before. This is not the case. There has always been a Federal death penalty. What we have lacked since the 1972 Supreme Court decision in Furman versus Georgia, is the constitutional procedures to allow the death penalties already on the books to be constitutionally imposed and carried out.

This bill puts in place the necessary procedures for 47 separate statutory offenses. These offenses all require murder to occur with the exception of cases involving treason, espionage, and attempted assassination.

*68 I respect those of my colleagues who oppose the death penalty. But the people of America have spoken on the question of the death penalty. Although the death penalty statutes of 37 States were invalidated in 1972 as a result of the Supreme Court's decision in Furman versus Georgia, in the years that have followed 40 State legislatures have voted to adopt the death penalty. Today, 36 states have the death penalty on the books. The overwhelming margins by which the death penalties have been adopted by referendum in states like California and Illinois are also testament to the nation's sense that this ultimate form of punishment is needed in appropriate cases.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The death penalty can be justified on several basis. First, there is retribution. Retribution embodies society's view that the most serious of crimes warrant the most severe punishment. That is also my personal view. Although I would personally use the death penalty in limited cases-and our bill prevents unfettered imposition of the death penalty-there are some crimes so brutal, so depraved, and unconscionable that justice dictates imposition of the death penalty. Some will assert that retribution should play no role in our system of justice. In response, I would note that the role of retribution in justifying the death penalty has been recognized by the Supreme Court in Gregg v. Georgia, 428 U.S. 153, 183 (1976).

Another justification for the death penalty is its deterrent value, both as a general deterrent and specific deterrent. No one can question its effectiveness as a specific deterrent. Murderers who are executed will clearly never kill again. Yet, there are convicted murderers who were not sentenced to death who have, either in prison or out on the streets, killed again. Had these murderers been given the death penalty, it is an undeniable fact that their second victims would still be alive.

The death penalty is also a general deterrent to crime. For some offenses this is undeniable. Consider treason, espionage, murder for hire-it is clear that the likelihood of such a crime being committed will be significantly diminished if the potential punishment includes the death penalty. This is a price some criminals will not want to risk. Finally, I believe the mere existence of the death penalty deters the commission of capital crimes generally. By associating the penalty with the crimes for which it is inflicted, society is made more aware of the horror of those crimes, and there is instilled in the citizens a need to avoid such conduct and appropriately punish those who do not.

Mr. President, more attention is given to the establishment of truth in death penalty cases than ever before. Most death penalty cases involve no claim of innocence on the part of the criminal-many confess their criminal actions and never withdraw or dispute their confession. Take, for example, the just completed trail in Virginia of Lonnie Weeks, who fatally shot Virginia State Trooper Jose Cavazos. He does not deny his guilt. In fact, he confessed to the murder and took the stand at his own sentencing and admitted guilt. His defense strategy, as in so many other cases, was to avoid imposition of the death penalty. Would those who say they oppose the death penalty because of the possibility of error, not oppose the death penalty in those cases where the defendant admits to the crimes? I doubt it.

*69 Further, no one should be misled by the claims that the death penalty is carried out on innocent persons. I want to be abundantly clear that I do not condone the execution of an innocent person. Nor would I defend a system that does not provide appropriate safeguards against such an execution-safeguards aimed at freeing the innocent, not ending the death penalty for the guilty. It is claimed by death penalty opponents that 23 innocent people were executed in the United States. This is not true. Utah law professor and former Assistant U.S. Attorney Paul Cassell conclusively demonstrated at a recent Judiciary Committee hearing that no alleged instance of an alleged innocent person being executed has ever been proved. Mr. Cassell and former U.S. Attorney Stephen Markman authored the leading study in this area which refutes each alleged instance of mistaken execution.

For example, take the often cited example of Joe Hill, the celebrated union organizer who, it is alleged, was wrongly executed by the State of Utah. Whatever his accomplishments as a union organizer, he was eventually convicted of a sordid murder that was not motivated by any high purpose whatsoever. He robbed a grocery store on West Temple Street in Salt Lake City, leaving the store owner and his son dead. For that reason, and no other, he was tried, convicted of murder, sentenced to death and executed.

Death penalty opponents have asserted that Joe Hill was innocent and wrongfully executed. What is the authority for this assertion? The principal source they cite to establish Hill's innocence is a book by Wallace Stegner entitled "Joe Hill: A Biographical Novel". Mr. Stegner is an author who I respect, but he is a novelist, not a historian. Even Mr. Stegner admits this in the forward of his book. He writes that the book "is fiction, with fiction's prerogatives and none of history's limiting obligations. Joe Hill, as he appears here-is an act of the imagin-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ation." This is what social scientists opposed to the death penalty cite as research? A novel.

Others will argue that the risk of executing an innocent person have been increased as a result of the Supreme Court's 1993 decision in the case of Herrera v. Collins, 113 S. Ct. 853 (1993). I want to remind my colleagues that the evidence in the Herrera case was overwhelming. Mr. Herrera is not an innocent man under the law. He was found guilty beyond a reasonable doubt and convicted of murdering a Texas police officer. As Justice O'Connor noted in her concurrence, "not even the dissent expresses a belief that <Herrera> might possibly be innocent." <113 S.Ct. at 871>. The case against Herrera included a deathbed declaration by his victim identifying him as the killer; a lengthy handwritten letter found on Herrera's person at the time of his arrest in which he stated that he was "terribly sorry" for crimes "that brought grief to the lives" of his victims. He even pled guilty to the murder of a second police officer.

*70 The underlying issue before the Court in Herrera was whether the current capital sentencing schemes of the States have a sufficient array of safeguards to prevent the execution of an innocent person. The Court correctly recognized that they do. Furthermore, the Court in Herrera did leave the door open for consideration of future cases where the evidence of innocence is great and the State fails to provide a process for considering such claims after a person has been convicted.

Before I yield the floor, I want to discuss a few specific cases where the death penalty is clearly warranted. For every misleading case cited by death penalty opponents, like the Hill or Herrera cases, there are numerous undisputed cases of depraved, heartless murders which warrant imposition of the death penalty. I believe a discussion of a few examples will demonstrate to *S15771 those of my colleagues who oppose the death penalty why I, and a majority of Americans, support capital punishment.

In Ogden, UT, Pierre Selby and William Andrews robbed a hi-fi shop and in the course of their armed robbery, forced five bound victims-three of whom were teenagers-to drink cups of poisonous liquid drain cleaner. Selby also tried to force Orrin Walker, the father of one of the teenagers, to pour the drain cleaner down his own son's throat. When Walker refused, Selby attempted to strangle him to death with an electrical cord and then repeatedly kicked a ballpoint pen deep into his ear. Selby then proceeded to shoot each one of his victims in the head. Both Selby and Andrews were convicted for their crimes and received the death penalty.

In Illinois, there is the case of Henry Brisbon, the I-57 murderer. He was let off death row on a technicality. Then he turned around and murdered a prison guard. That was after having kidnapped, tortured and murdered numerous women on I-57 in Illinois.

The case of Hernando Williams who kidnapped a woman teacher off the streets of Chicago. He drove around with her in the trunk of his car for 3 days. He drove to his bail hearing for an unrelated rape charge with the still live body of his victim pounding on the inside of his car trunk. Then after forcing her to call home to say goodbye forever to her husband and children, he murdered her in cold blood.

Finally, the case of Robert Alton Harris should be mentioned. We must not forget the heinous crime Harris committed. On July 5, 1978, just six months after he completed a two and a half year prison term for beating a man to death, Harris decided to rob a bank in San Diego. Looking first for a getaway car, he spotted two teenage boys parked at a fast-food restaurant. Harris forced the youths at gunpoint to drive to a nearby reservoir, where he shot and killed them as they begged God to save them. Later, he ate their unfinished hamburgers.

I ask all of my colleagues, what kind of punishment is fitting for these crimes? I respect the beliefs of those who oppose capital punishment but I must admit that it is difficult for me to understand how anybody could oppose capital punishment in these cases.

*71 These cases truly provide examples of individuals who should face imposition of the death penalty. Under current Federal law, were the Federal Government to have jurisdiction over the underlying offense, the death penalty could not even be considered.

In closing, this amendment would prohibit juries from even considering the death penalty for the types of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

crimes I outlined above. Instead, it would provide for a mandatory life sentence. The law abiding citizens of this Nation demand action on Federal death penalty legislation, not life imprisonment legislation. They deserve to have a death penalty which will deter violent action against them and will provide swift, appropriate punishment for individuals who choose to commit heinous crimes.

For these reasons, I oppose this amendment.

Mr. NATCH.

We are prepared to yield the remainder of our time.

The PRESIDING OFFICER.

The Senator from Utah has indicated a willingness to yield back the remaining time of the 29 minutes 40 seconds.

Mr. LEVIN.

Mr. President, I know of no one coming to the floor at this time that wants to speak on the issue. In the absence of such folks, I will yield the remainder of my time.

Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER.

Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER.

All time has been yielded back.

The vote on the Levin amendment will occur immediately after the vote on the Smith amendment tomorrow, November 17.

Mr. NATCH.

I ask the chair how many votes are lined up now starting at 9:30?

The PRESIDING OFFICER.

Including the amendment that was just ordered, there will be total of 7 votes tomorrow morning.

Mr. HATCH.

If my understanding is correct, this completes the work on the crime bill, subject to those statements in the morning and those particular amendments.

Mr. BIDEN.

Mr. President, I think there is one potential outstanding amendment that remains.

Mr. HATCH.

Other than Senator DOLE's amendment. Is that correct?

The PRESIDING OFFICER.

Under the unanimous-consent agreement, the only amendment which is available to be offered is an amendment by Senator DOLE.

Mr. HATCH.

And as I understand it, the manager's package.

Mr. BIDEN.

Yes. Is that correct, Mr. President?

The PRESIDING OFFICER.

Yes; that is correct.

## RAPID DEVELOPMENT FORCE AMENDMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. LIEBERMAN.

Mr. President, it is time for us to recognize that the Federal Government must send more than money to our State and local officials to help them fight crime. Our State and local police are simply overwhelmed. Criminals have the upper hand in too many cities, neighborhoods and communities across the country. The recent appeal by the Mayor of our Nation's Capital to send the National Guard, as well as the actual deployment of the Guard in Puerto Rico, are evidence enough of the extent to which local officials are desperate for Federal action.

*72 Last week, the Senate adopted my amendment to provide the President with the authority to respond to such calls for help from local officials by declaring areas that have been particularly hard-hit by crime as violent crime and drug emergency areas. The President, with the assistance of the Attorney General, will be able to direct agencies to respond with personnel, equipment, technical, financial, managerial and other assistance, much as he is able to respond to natural disasters. I am very appreciative of the support I received from the chairman and ranking member of the committee on the amendment. I had hoped to offer a supplemental amendment that would have provided the President with a powerful additional tool with which to lead that response. Given the large number of proposed amendments to the bill and the justifiably set time agreement, my amendment has been withheld. However I am encouraged by my colleagues' interest in this issue and would like to especially thank my colleague from Massachusetts, Senator JOHN KERRY, who planned to cosponsor the amendment. Because I hope to offer the amendment at a later date, I wanted to take this opportunity to review it with my colleagues.

The amendment would have authorized the creation of a Federal rapid deployment force of 2,500 highly trained, equipped, and motivated crime fighters that would be specially designed to restore order and assist local police on a temporary basis to combat crime and violence. The rapid deployment force is a cavalry of sorts that could be dispatched, under the direction of the Attorney General, into any community in the country at the request of local authorities to provide for short-term backup for the local police force when it is confronted with a crime emergency. The unit is intended not only to assist in investigations, arrests, and prosecutions, but to participate in the patrolling of particularly hard-hit areas. The members of the unit could be drawn from existing federal law enforcement agencies such as FBI, DEA, BATF, and the Marshals Service.

In order to ensure that this assistance is not misdirected or misused, state and local law enforcement officials would have to demonstrate that their existing resources are being organized and coordinated as effectively as possible. Local communities would be required to submit plans demonstrating the localities will take the necessary steps to prevent a rebound in the crime levels following departure of the rapid deployment force. Through these provisions, the force can be used to leverage improvements in local law enforcement.

The deployment force is designed to help a locality restore order and buy it time to organize and beef up its own anticrime and antiviolence efforts. The deployments of the force will be for limited duration to allow regrouping of local efforts. Deployment force members will be experience and highly trained, ready not only to back up local police but also to train them in *S15772 the latest techniques of combating drug crime, gangs, and juvenile violence. This training role would be particularly helpful to the small and midsized cities that do not yet have sophisticated forces and are now being hit for the first time by a tidal wave of violence and crime they are not fully equipped to handle.

*73 The case for this special unit is reinforced by recent events in my own State. Facing a particularly violent rash of gang activity in Hartford, city government and law enforcement officials launched Operation Liberty-an aggressive State and local effort to reduce violence in a number of targeted neighborhoods throughout the city. In an attempt to supplement and bolster local law enforcement efforts in dealing with this emergency, the State has provided additional police officers and other forms of tactical support sorely needed in certain areas of the city.

As a result of these coordinated efforts, citizens in affected areas are regaining a sense of security that was

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

stripped from them by these gangs. Hartford Police Department's statistics reveal that during the first 35 days of Operation Liberty crimes against persons went down 51 percent and 38 percent in the two communities that were the focus of the patrols, as compared to the 5 weeks prior to the operation. Reported incidents involving firearms went down 64.8 percent and 61.8 percent in those two communities and 40 percent across the city.

While there will be critics of this admittedly strong medicine I am prescribing, the history of the Federal Government's role in law enforcement has been one of responding to constantly changing local needs, not-as some suggested in explaining their concerns about my amendment-a static division of authority between Federal authorities and state or local authorities. A review of the history of American law enforcement reveals what I mean.

The American law enforcement system, much like so much else in the new republic, was modelled on the system of local law enforcement in England at the time of our independence. England's system was entirely local, with a constabulary drawn from local communities and controlled by local communities. America adopted that approach at the time it was founded. With the passage of the U.S. Constitution, a system of Federal courts and U.S. attorneys evolved for the enforcement of Federal laws. But this was a modest initial step.

Meanwhile, the pressures of industrialization and the Foreclosure Acts, which blocked access to agricultural lands, created a large, poor underclass in England with an exploding level of violence and crime. Sir Robert Peel, twice England's Prime Minister in the first half of the 19th century, saw, while serving as Home Secretary in 1829, the need for a national effort to combat what was increasingly a national problem, and so he invented Scotland Yard and the first modern police force, nicknamed the "Bobbies" from Peel's name. These new institutions evolved into a central, national force to combat crime.

America missed this step in England's movement toward national law enforcement, and the experience here with industrialization was far less painful. With a vast area to farm and occupy, and a corresponding expanding economy, America avoided England's problems of crime and violence for most of the 19th century. However, violence and crime in the Nation's huge frontier areas called for national law enforcement, with the cavalry and U.S. Marshals playing a central role.

*74 The first major step in national law enforcement in the United States came with the end of the Civil War and the early civil rights laws. To enforce these laws, the Federal Government found it necessary to establish a centralized law enforcement system dealing with what had previously been considered local issues, including voting rights, civil rights, and related violence over enforcement of these laws. The Federal Government at the time asserted the authority to establish national law enforcement and there was major growth in the Justice Department, shifting it toward a national law enforcement body. This effort was in direct response to a local problem.

With the Hayes-Tilden election and the withdrawal of Federal troops from the South, national law enforcement efforts were put on hold. However, with the post-World War I prohibition laws and the corresponding growth in organized crime, the Federal Government again asserted, in response to local needs, a national law enforcement role. The FBI was organized and expanded to combat these problems. It also took on a role fighting interstate crimes, such as bank robbery and kidnapping, that locally organized law enforcement officials could not handle.

Since this post-World War I period, the growth of national law enforcement has been steady. The Federal Government is now deeply involved in combating drug traffic, organized crime, and the myriad of Federal crimes that come out of these areas. The FBI, DEA, AFT, and U.S. Attorneys' offices are now elements in a long-established national crime effort, run centrally by the Federal Government but in cooperation with local officials.

The issue before us is not whether there is going to be a national law enforcement effort; there are many precedents for it and major elements have long been in place. The Federal Government has played an increasing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

role in supporting local efforts and has long been available in criminal areas for back-up and support. The Federal response to crime has always been pragmatic and flexible; one of the Nation's law enforcement strengths has been that we have avoided becoming locked into rhetoric over local or Federal control but instead have cooperated to meet local needs as they came up. The very effective Federal-State-local crime task forces continue that tradition today in numerous American cities. The amendment I would have proposed simply would have continued this ongoing historical process by making a Federal back-up force available to help with local law enforcement.

More and more crime today involves drugs and weapons that are transported over State lines. Gangs are increasingly national in scope. There is substantial historical precedent for Federal action when local law enforcement needs to call on its broad Federal authority over law enforcement to help meet local needs and local crises where local officials are overwhelmed.

I note that there is very substantial protection under this proposed amendment for local law enforcement jurisdiction. First, the rapid deployment force can be used only if the chief executives of both State and local governments requested it. Second, the force would be deputized into the local enforcement agency. Third, the force would serve under overall local control, subject to a detailed command and operational deployment agreement acceptable to both State and Federal authorities. So the amendment carefully protects local law enforcement prerogatives and authority.

*75 Mr. President, I believe that the provisions of this amendment must be enacted into law in the future if we are to send an effective signal to lawbreakers that we take their crimes seriously and are willing to fight back. The infusion of added manpower and other logistical assistance into a crime-plagued region, quickly bolsters the limited scope of local police, giving the law enforcers the force they need to use against lawbreakers. We need to adopt what we have learned from our military forces-that nothing short of overwhelming force should be brought to bear in a battle against an enemy. That concept worked in the gulf war, and it can work in our streets if we commit ourselves to devoting the resources necessary to get the job done right.

I recognize that this amendment would have called for a significant investment of Federal resources. However, such funds as are necessary to implement this amendment could be drawn from the crime bill trust fund established by this act. We are creating in this bill some 100,000 new police positions for local communities. It seems to me that we could appropriately reserve a small percentage of these slots for a backup force which would be available as reinforcement to local law enforcement.

I believe this amendment would have been an important crime-fighting initiative. It's adoption would have gone a long way in helping to restore the public's trust and faith in government's ability to provide the security and protection to which they are entitled*S15773 and deserve. I look forward to continuing the discussion concerning this amendment with my colleagues and to its inclusion in future crime control and prevention legislation.

I ask unanimous consent that the draft amendment be printed in the RECORD following my remarks.

There being no objection, the draft amendment was ordered to be printed in the RECORD, as follows:

At the appropriate place insert the following:

Subtitle -Rapid Deployment Strike Force

SEC. XXX. ESTABLISHMENT.

(a) IN GENERAL.-The Attorney General shall establish in the Federal Bureau of Investigation a unit, to be known as the Rapid Deployment Force, which shall be made available to assist units of local government in combatting crime in accordance with this subtitle.

(b) ASSISTANT DIRECTOR.-The Rapid Deployment Force shall be headed by a Deputy Assistant Director

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the Federal Bureau of Investigation (referred to as "Deputy Assistant Director").

(c) PERSONNEL.-

(1) IN GENERAL.-The Rapid Deployment Force shall be comprised of approximately 2,500 Federal law enforcement officers with training and experience in-

(A) investigation of violent crime, drug-related crime, criminal gangs, and juvenile delinquency; and

(B) community action to prevent crime.

(2) REPLACEMENT.-To the extent that the Rapid Deployment Force is staffed through the transfer of personnel from other entities in the Department of Justice or any other Federal agency, such personnel of that entity or agency shall be replaced through the hiring of additional law enforcement officers.

SEC. XXX. DEPLOYMENT.

*76 (a) IN GENERAL.-On application of the Governor of a State and the chief executive officer of the affected local government or governments (or, in the case of the District of Columbia, the mayor) and upon finding that the occurrence of criminal activity in a particular jurisdiction is being exacerbated by the interstate flow of drugs, guns, and criminals, the Deputy Assistant Director may deploy on a temporary basis a unit of the Rapid Deployment Force of an appropriate number of law enforcement officers to the jurisdiction to assist State and local law enforcement agencies in the investigation of criminal activity. For the purposes of this subtitle, the term "State" shall be deemed to include the District of Columbia and any United States territory or possession.

(b) APPLICATION.-An application for assistance under this section shall-

(1) describe the nature of the crime problem that a local jurisdiction is experiencing;

(2) describe, in quantitative and qualitative terms, the State and local law enforcement forces that are available and will be made available to combat the crime problem;

(3) demonstrate that such State and local law enforcement forces have been organized and coordinated so as to make the most effective use of the resources that are available to them, and of the assistance of the Rapid Deployment Force, to combat crime;

(4) demonstrate a willingness to assist in providing temporary housing facilities for members of the Rapid Deployment Force;

(5) delineate opportunities for training and education of local law enforcement and community representatives in anticrime strategies by the Rapid Deployment Force;

(6) include a plan by which the local jurisdiction will prevent a rebound in the crime level following departure of the Rapid Deployment Force from the jurisdiction; and

(7) such other information as the Deputy Assistant Director may reasonably require.

(c) CONDITIONS OF DEPLOYMENT.-The Deputy Assistant Director, upon consultation with the Attorney General, may agree to deploy a unit of the Rapid Deployment Force to a State or local jurisdiction on such conditions as the Deputy Assistant Director considers to be appropriate, including a condition that more State or local law enforcement officers or other resources be committed to dealing with the crime problem. The unit shall serve under the overall control of the senior state or local law enforcement authority in the deployment area, pursuant to a clearly delineated command and operational deployment agreement reached prior to the deployment of the Deputy Assistant Director and such senior state or local authority.

(d) DEPUTIZATION.-Members of the Rapid Deployment Force who are deployed to a jurisdiction shall be deputized in accordance with State law so as to empower such officers to make arrests and participate in the prosecution of criminal offenses under State law.

SEC. -. LEAVE SYSTEM.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Notwithstanding the provisions of subchapter I of chapter 63 of title 5, United States Code, the Attorney General of the United States shall, after consultation with the Director of the Office of Personnel Management, establish, and administer an annual leave system applicable to the Federal law enforcement officers serving in the Rapid Deployment Force.

Sec. -. LOCATION OF UNITS AND FUNCTIONS WHEN NOT DEPLOYED.

*77 (a) LOCATION.-Units of the Rapid Deployment Force shall be based in the nation's major regions at locations and in facilities determined by the Attorney General. Members of the Rapid Deployment Force shall receive training and education in the regional crime problems of the region where they are based. The Deputy Assistant Director whenever possible shall deploy units in the region where they are based.

(b) NON-DEPLOYMENT FUNCTIONS.-When not deployed pursuant to a deployment agreement to a locality, the Deputy Assistant Director shall use members of a unit to provide special training and education to local law enforcement agencies. To the extent Rapid Deployment Force units are not needed for deployment or training, members of such units shall be available to support ongoing regional Federal Bureau of Investigation efforts and programs, and, as appropriate, other federal law enforcement efforts, until required for deployment and training.

SEC. -. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated such sums as are necessary to carry out this subtitle.

Mr. DASCHLE.

Mr. President, I am pleased to be a cosponsor of Senator DECONCINI's amendment to facilitate tribal government participation in the Cops on the Beat Program. This amendment will go a long way toward ensuring that tribal law enforcement agencies have the resources needed to address the serious crime problems facing our reservations today. As such, it is a significant addition to the crime bill.

This amendment enhances an already strong crime fighting tool. The Cops on the Beat Program is an innovative means to restore safety and a sense of security to our streets, and I commend the administration for its commitment to community-oriented policing. This concept holds special potential for Indian communities. Community policing is an idea that, given the chance, should flourish and would have a notable effect on the crime rate on Indian reservations. This amendment will help ensure that tribes have an opportunity to participate fully in this program.

The amendment will do four things. First, it will ensure that funding received by tribes under the Cops on the Beat program does not in any way supplant or jeopardize funding received from the Bureau of Indian Affairs. Second, it will allow tribes to use federally appropriated money to satisfy the 25 percent non-federal funds requirement. This is important because tribes, like the District of Columbia-which is already covered under this provision-receive most of their law enforcement funding from Federal appropriations. Third, it will allow a tribe to submit grant proposals directly to the Attorney General, instead of submitting them first to the State. This will allow tribes to bypass the ranking process that most grant applications must undergo at the State level. Finally, this amendment expresses the sense of the Senate that tribes should receive an appropriate amount of funds under he Cops on the Beat Program.

*78 Mr. President, it is clear that crime is reaching into the farthest corners and pockets of our society like never before. One need only listen to the statements and the stories-and even the personal testimony-given on the Senate floor in the past 2 weeks to realize that crime is touching not only those in metropolitan areas, but residents of small towns and rural communities as well. We would be hard-pressed to find a person in America who is not touched in some way by the violence pervading our communities. This includes communities on our

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Nation's Indian reservations.

As a Senator who represents a number of Indian tribes, I am particularly sensitive to the need for additional law enforcement funding on reservations. I would like to briefly tell you about the law enforcement situation on one of South Dakota's reservations. The Pine Ridge Indian Reservation is located in the southwest corner of South Dakota. Pine Ridge is our Nation's second largest Indian reservation, covering an area of about 100 square miles. It has a population of over 20,000. It is also home to some of our Nation's poorest communities-it encompasses all of Shannon County, which has been listed as the poorest county in the United States in the last two national censuses. I am told that the unemployment rate on Pine Ridge is 60 to 70 percent or higher.

And yet, Pine Ridge's police force is only 100 persons strong. And this is not just police who are out on the street-it includes dispatchers, investigators, *S15774 and others whose tasks are an integral part of the overall effort to combat crime. Pine Ridge is divided into nine districts, each of which has at least one community. As in so many other communities, the number of cops on the beat on Pine Ridge is not high enough. Our reservations, and Pine Ridge is only one example, are in direct need of more police on the street. The Cops on the Beat Program is an innovative attempt at addressing this need, and the community policing idea in general is one that promises to work well on reservations.

We are devoting serious effort and a significant amount of time to addressing the issue of crime. And that is as it should be. It is one of the most pressing issues facing our Nation today. The crime bill we are considering is a comprehensive and far-reaching effort to address this problem. As we debate its provision, we must ensure that no one is left out of our solution. Funding for tribal law enforcement is severely deficient, and adoption of this amendment constitutes a long-overdue step toward ensuring that the needs of tribal law enforcement agencies are not overlooked any longer. Indian communities should be given every appropriate chance to participate in this program. This amendment contributes to that objective.

Mrs. FEINSTEIN.

Mr. President, I rise today as a member of the Senate Judiciary Committee to address the issue of habeas corpus reform and my strong conviction that no such reform should be effected by this Congress without complete public hearings on the matter. There is, I believe, strong bipartisan agreement on that point.

*79 Abuse of the writ of habeas corpus-most egregiously by death-row inmates who file petition after groundless petition-has imposed substantial burdens on already overtaxed courts and delayed properly ordered executions in case after case.

I want to see true reform achieved in this area. There are legitimate questions, however, about whether title III of S. 1607 and Senator SPECTER's legislation, neither of which have been subject to public hearings, are the best vehicles to achieve such reform. I, and many other Senators, have concluded that they are not.

I did not come to that decision lightly. This is a highly complicated issue; one that puzzles many lawyers. And habeas reform is even more difficult for a non-lawyer, like me.

Legal experts from throughout the country, and particularly from my own State of California, object strenuously to the habeas corpus reform provision in this Crime Bill and in S. 1657. Rather than repair a system that is now abused, they tell me that the so-called reform efforts now before the Senate will only result in more baseless appeals and more delays.

The input of these experts, Democrat and Republican alike, has been very persuasive. Before detailing what they have had to say, let me take a minute to describe one case that figures prominently in this debate and which has impacted my views on the issue.

ROBERT ALTON HARRIS CASE

On July 5, 1978, Robert Alton Harris murdered two teenage boys near San Diego, CA. Following a jury trial,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

he received a death sentence on March 6, 1979. His conviction became final in October 1981. Yet, Harris was able to delay the enforcement of California's capital sentence until April 21, 1992-almost 14 years later.

Over that time, Harris filed no fewer than six Federal habeas petitions, and another 10 such petitions in State court. Five execution dates were set during the pendency of his case. In all, Harris and his attorneys engineered almost 14 years of unresolved grief for the survivors of his young victims.

Against this backdrop, one of the most persuasive arguments that I have heard for striking title III of this crime bill was made in a letter to me dated October 12 from Dan Lungren, attorney general of the State of California. He wrote:

<If> Title III were in effect at the time of the Harris case, my department would likely still be litigating this case in federal court!

As Mr. Lungren underscores, the Senate must approach this issue very carefully and, indeed, guarantee that true reform is achieved.

Let me now outline what senior law enforcement officials in my State and in every corner of the country have had to say about the proposed habeas corpus reforms in the crime bill and in Senator SPECTER's independent legislation, S. 1657.

### ATTORNEYS GENERAL OPPOSED

A majority of attorneys general in the ninth circuit-the court system with 25 percent more habeas corpus reforms than the next most burdened circuit-oppose title III of the omnibus crime bill.

**\*80** The attorneys general of seven jurisdictions in the ninth circuit-of 11 total-support striking title III from this crime bill. Those seven regions are: Arizona, Alaska, my home State of California, Idaho, Montana, Nevada, and the Northern Mariana Islands.

They are joined in opposition to title III by 11 other attorneys general throughout the country in: Alabama, Colorado, Florida, Georgia, Nebraska, North Carolina, South Dakota, Texas, Utah, Virginia, and Wyoming.

In total, 18 State attorneys general agree that this Congress should strike the habeas corpus provisions of the crime bill now before the Senate.

In a joint and bipartisan letter of October 29, 1993, 14 of these attorneys general wrote:

Significantly, many of the provisions contained in \* \* \* Title III have never been debated in the Congress \* \* \*. The legislation would also overturn or modify key U.S. Supreme Court precedent which promotes finality in our criminal justice process, including the Teague doctrine, which is essential for capital and non-capital cases. In addition, concerns have been noted over the impact of the legislation on the deterrent objective of the death penalty. All of these consequences should be carefully studied before Congress embarks down this legislative path.

I ask unanimous consent that the joint letter from which I've quoted, and similar correspondence from individual attorneys general that I have received, be printed in the RECORD at the conclusion of my remarks.

Obviously, these chief law enforcement officials want reform, but they want real reform.

### DISTRICT ATTORNEYS OPPOSED

In addition to the opinions of State attorneys general, I also sought and received the advice of district attorneys, chiefs of police, and sheriffs throughout California.

Virtually every one of California's 58 district attorneys-and a unanimous board of directors of the California District Attorneys Association-oppose the habeas provisions of S. 1607.

Let me quote from the Association's Resolution of October 26, 1993:

The California District Attorneys Association Board of Directors strongly supports any motions to strike the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

habeas corpus provisions from the omnibus crime bill. * * * The merits of any habeas reform bill should be considered independently of other crime reform issues. The habeas provisions contained in Title III of the omnibus crime bill should not delay consideration of other anti-crime measures.>

### CHIEFS OF POLICE/SHERIFFS OPPOSED

California's district attorneys are in good company. The chiefs of police or sheriffs of 24 California cities and counties spread across the State also have written to me directly to share their conviction that title III should be deleted from the bill now before the Senate. They wrote on behalf of: Baldwin Park, Costa Mesa, El Monte, Foster City, Fullerton, Glendale, Glendora, Hawthorne, Huntington Beach, Irvine, Laguna Beach, Lassen County, Long Beach, Manhattan Beach, Marysville, Montebello, Monterey Park, Pomona, Sacramento, San Carlos, San Luis Obispo, Santa Ana, Santa Barbara, and Walnut Creek.

*81 The reason for this deep and broad concern is clear: this so-called reform will actually create exceptions and loopholes that permit endless, protracted litigation.

Although drafted with the best of intentions and care by Chairman BIDEN and Senator SPECTER, there is serious and educated doubt that title III of S. 1607 will advance the current state of the law with regard to habeas corpus.

Let me highlight three specific problems with the reforms proposed in S. 1607.

First, there is currently a one bite of the apple rule for habeas corpus petitions, according to California's attorney general.

In order for a defendant to file a second petition based on a new evidence, for example, he or she must show cause as to why the claim was not previously raised and that prejudice resulted. Alternatively, the petitioner may demonstrate*S15775 that there has been a miscarriage of justice-for instance, that he or she is factually innocent or factually ineligible for the death penalty.

Under title III, however, petitioners would for the first time, have been able to present evidence related to mitigating factors in sentencing that would not have been deemed relevant or admissible when they were first sentenced, such as whether they were exposed to fetal alcohol syndrome, or parental abuse.

Thus, while the claim is made that title III would preserve the one bite rule, it actually expands the exceptions to the rule in a manner that would have allowed prisoners to file habeas petition after successive habeas petition had it become law. The exceptions would, in effect, have swallowed the one bite rule.

Second, the proposed reforms will undermine an important doctrine in habeas cases articulated by the U.S. Supreme Court in Teague v. Lane and refined in subsequent cases.

Today, once a judgment becomes final, the Teague doctrine prevents Federal courts from applying new rules of law not in effect when the defendant was convicted except in very narrow and well-understood circumstances.

Title III, as written, would expand the opportunities to apply newly announced rules to reverse State death penalty convictions. This provision also could result in prolonged habeas appeals.

Although S. 1607 is said to incorporate the Teague ruling, I am advised that it actually opens wide the door for newly-announced decisions to be applied retroactively.

Third, title III sets specific standards for court-appointed attorneys who must be provided to convicted felons. These standards are so strict, in fact, that fewer than 1 in 400 of California's 125,000 lawyers would meet them. As a result, this reform sets States up for inevitable lawsuits based on their failure to comply with mandated counsel qualifications standards.

Moreover, at present, there is no constitutional right or entitlement to any minimum level of counsel performance in habeas proceedings. Can Congress simply create such standards out of whole cloth? This very question will invite complicated and protracted litigation over constitutional issues and standards.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*82** Finally in this regard, in order to meet title III's counsel requirements, California-and many other States-will be forced to spend huge sums of money to train, monitor, and provide attorneys in capital cases. Although title III provides for grants to partially defray the significant increase in the cost of capital litigation that it mandates, States must come up with at least 25 percent of the funds needed in 1994, 1995, and 1996. What's worse, the States' share of such costs will at least double to 50 percent in 1997 and remain at that minimum level every year thereafter.

Although different in several   respects from title III of S. 1607, Senator SPECTER'S legislation also is unlikely to reduce abuse of the Federal habeas process, according to the legal advisers that I have consulted. Let me make four key points.

First, eliminating the requirement that State prisoners must exhaust all State rights of appeal before filing a Federal habeas petition could shorten the habeas process incrementally. In so doing, however, Senator SPECTER'S proposal would radically reconfigure the traditional balance of State and Federal courts' respective responsibilities.

Second, by allowing successive habeas petitions in cases in which the Supreme Court establishes new fundamental constitutional rights, S. 1657 would invite protracted litigation over the meaning of those terms and undermine the all-important Teague doctrine. It would be necessary to litigate, for example, what rights are fundamental, and when the Supreme Court has established such a right-rather than merely discussed, proposed, clarified, or refined an existing one.

Third, S. 1657 would require Federal courts of appeals to review second and subsequent habeas petitions before such petitions may be filed in appropriate Federal district courts. Appellate courts could permit district courts to accept such a petition only if probable cause existed that the petition satisfied the limit on successive petitions detailed in title III of S. 1607 as now written.

Interposing this additional layer of review, it has been suggested, will unnecessarily burden already overtaxed courts of appeal. Moreover, it will require courts of appeals to engage in fact-finding-an activity ordinarily reserved for trial courts at the district level.

Fourth, and finally, S. 1657 imposes time limits on district courts for ruling on habeas petitions. While that time is short on its face, the loopholes left in the provision for delay could swallow the rule. The provision thus, I fear, will not accomplish its objective.

Clearly, I have strong technical objections to the habeas corpus provisions of S. 1607 and S. 1657, based on extensive consultation with law enforcement officials throughout California and the Nation.

Before concluding, however, I also want to stress that we also must not ignore the human cost of abuse of the habeas corpus process, particularly by death row inmates. Each time there is a new petition filed in such cases, the families of the victims of brutal crimes must relive the tragedy that put the petitioner behind bars often years before. Many organizations, formed to support the victims of violent crimes, have spoken out strongly against the habeas corpus reform contained in S. 1607. Let me name a number of them:

**\*83** Citizens for Law and Order, Oakland.

California Correctional Peace Office Association, Sacramento.

Justice for Murder Victims, San Francisco.

Memory of Victims Everywhere, San Juan Capistrano.

Crime Victims United, Sacramento.

Victims and Friends United, Sacramento.

Leagues of Victims and Empathizes (LOVE), Tarpon Springs, FL.

VIGIL, Round Rock, TX.

Organized Victims of Violent Crime, Madison, TN.

The Joey Fournier Anti-Crime Committee, Boston.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Citizens for a Responsible Judiciary, Apopka, FL.
Survivors of Crime, Essex, VT.
Victims of Crime and Leniency, Montgomery, AL.
Survival, Inc., Saltillo, MS.
Citizens Against Violent Crime (CAVE), Charleston, SC.
Speak Out for Stephanie Overland, KS.
Citizens for Truth in Punishment, Willis, TX.
Justice for Surviving Victims, Denver, CO.
Advocates for Survivor of Victims of Homicide, Walls, MS.

Clearly, then, there is a strong body of thought-among attorneys general, district attorneys, chiefs of police, sheriffs, and victims rights organizations-that the habeas corpus reforms contained in the crime bill and in S. 1657 present substantial and real impediments to the States, would not truncate successive habeas appeals, and would create substantial confusion and litigation.

By moving precipitously, and without benefit of further public hearings, the Senate risks unsettling hundreds of final judgments reached in criminal cases across the country. With 376 prisoners on death row in California, and 99 of the 105 pending ninth circuit habeas petitions in my State, that is simply not a risk that I am willing to take.

In conclusion, that is why I am grateful for my colleagues' unanimous consent to strike title III of the crime bill and urge them to oppose the pending legislation.

Mr. BIDEN.

Mr. President, I thank everyone for their cooperation. I realize the hour is late. As the Senator from Utah has indicated, there is only one potential remaining amendment, the amendment of the Senator from Kansas, the Republican leader. Other than that, there is only final passage.

I thank everybody for their cooperation.

Mr. HATCH.

Mr. President, I thank everybody for their cooperation. It has been an ordeal for everybody. But it also is turning out to be the finest anticrime bill in history. We hope we can complete it tomorrow.


1 The principal sources for this information are news articles, M. Radelet, H. Bedau, & C. Putnam, In Spite of Innocence (1992), H. Bedau & M. Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stanford L. Rev. 21 (1987), and the files of the National Coalition to Abolish the Death Penalty.
139 Cong. Rec. S15745-01, 1993 WL 470986 (Cong.Rec.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT D

| | | |
|---|---|---|
| Scott | Stokes | Valentine |
| Sensenbrenner | Strickland | Velazquez |
| Serrano | Studds | Vento |
| Sharp | Stupak | Visclosky |
| Shaw | Sundquist | Volkmer |
| Shays | Swett | Vucanovich |
| Shepherd | Swift | Walker |
| Shuster | Synar | Walsh |
| Sisisky | Talent | Waters |
| Skaggs | Tanner | Watt |
| Skeen | Tauzin | Waxman |
| Skelton | Taylor (MS) | Weldon |
| Slattery | Tejeda | Wheat |
| Slaughter | Thomas (CA) | Whitten |
| Smith (MI) | Thomas (WY) | Williams |
| Smith (MI) | Thompson | Wilson |
| Smith (NJ) | Thornton | Wise |
| Smith (OR) | Thurman | Wolf |
| Smith (TX) | Torkildsen | Woolsey |
| Snowe | Torres | Wyden |
| Solomon | Torricelli | Wynn |
| Spence | Towns | Yates |
| Spratt | Traficant | Young (AK) |
| Stark | Tucker | Young (FL) |
| Stearns | Unsoeld | Zeliff |
| Stenholm | Upton | Zimmer |

NAYS—2

Hefley       Taylor (NC)

NOT VOTING—14

| | | |
|---|---|---|
| Bacchus (FL) | Grandy | McNulty |
| Engel | Houghton | Ridge |
| Evans | Istook | Stump |
| Fish | Kaptur | Washington |
| Gallo | McDade | |

☐ 1156

So (two-thirds having voted in favor thereof) the rules were suspended and the resolution, as amended, was agreed to.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

## VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

The SPEAKER pro tempore (Mrs. MEEK of Florida). Pursuant to House Resolution 401 and rule XXIII, the Chair declares the House in the Committee of the Whole on the State of the Union for the further consideration of the bill, H.R. 4092.

☐ 1158

IN THE COMMITTEE OF THE WHOLE

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 4092) to control and prevent crime, with Mr. SPRATT (Chairman pro tempore) in the chair.

The Clerk read the title of the bill.

The CHAIRMAN pro tempore. When the Committee of the Whole rose on Tuesday, April 19, 1994, amendment No. 16 printed in part 1 of House report 103-474 offered by the gentleman from New Jersey [Mr. HUGHES] had been disposed of.

AMENDMENTS EN BLOC, AS MODIFIED, OFFERED BY MR. BROOKS

Mr. BROOKS. Mr. Chairman, I offer amendments en bloc made in order under the rule, and I ask unanimous consent that the modifications be considered as read and printed in the RECORD.

The CHAIRMAN pro tempore. Is there objection to the request of the gentleman from Texas?

There was no objection.

The CHAIRMAN pro tempore. The Clerk will designate the amendments en bloc, as modified.

The text of the amendments en bloc, as modified, is as follows:

Amendments en bloc, as modified, offered by Mr. BROOKS, consisting of amendment No. 32 offered by Mr. BEILENSON, amendment No. 36 offered by Mr. KENNEDY, amendment No. 40 offered by Mr. MORAN, amendment No. 48 offered by Ms. PRYCE of Ohio, amendment No. 49 offered by Mr. CANADY, and amendment No. 50 offered by Mr. CANADY:

AMENDMENT OFFERED BY MR. BEILENSON

At the end insert the following new title:

TITLE XXIV—CRIMINAL ALIENS

SEC. 2401. FEDERAL INCARCERATION OF UNDOCUMENTED CRIMINAL ALIENS.

(a) FEDERAL INCARCERATION.—Section 242 of the Immigration and Nationality Act (8. U.S.C. 1252) is amended by adding at the end the following:

"(i) FEDERAL INCARCERATION.—

"(1) Subject to paragraph (2), the Attorney General shall take into the custody of the Federal Government, and shall incarcerate for a determinate sentence of imprisonment, an undocumented criminal alien if—

"(A) the chief official of the State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of the undocumented criminal alien submits a written request to the Attorney General; and

"(B) the undocumented criminal alien is sentenced to a determinate term of imprisonment.

"(2)(A) If the Attorney General determines that adequate Federal facilities are not available for the incarceration of an undocumented criminal alien under paragraph (1), the Attorney General shall enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of such undocumented criminal alien for such determinate sentence of imprisonment.

"(B) Compensation under subparagraph (A) shall be determined by the Attorney General and may not exceed the median cost of incarceration of a prisoner in all maximum security facilities in the United States as determined by the Bureau of Justice Statistics.

"(3) For purposes of this subsection, the term 'undocumented criminal alien' means an alien who—

"(A) has been convicted of a felony and sentenced to a term of imprisonment, and

"(B)(i) entered the United States without inspection or at any time of place other than as designated by the Attorney General,

"(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State, or

"(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 248, or to comply with the conditions of any such status.

"(4)(A) In carrying out this subsection, the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

"(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.".

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect October 1, 1998.

(c) LIMITATION.—The authority created in section 242(i) of the Immigration and Nationality Act (as added by this section) shall be subject to appropriation until October 1, 1998.

AMENDMENT OFFERED BY MR. KENNEDY

At the end of the bill add the following new title:

TITLE __—NATIONAL STALKER AND DOMESTIC VIOLENCE REDUCTION

SEC. __. AUTHORIZING ACCESS TO FEDERAL CRIMINAL INFORMATION DATA BASES.

(a) ACCESS.—The Attorney General shall amend existing regulations (published at 28 C.F.R. 20.33(a)) to authorize the dissemination of information from existing national crime information databases, including the National Crime Information Center and III ("Triple I"), to courts and court personnel, civil or criminal, for use in domestic violence or stalking cases. Nothing in this subsection shall be construed to permit any person or court access to criminal history record information for any other purpose or for any other civil case other than for use in a stalking or domestic violence case.

(b) ENTRY.—The Attorney General shall amend existing regulations to permit Federal and State criminal justice agencies, assigned to input information into national crime information databases, to include arrests, warrants, and orders for the protection of parties from stalking or domestic violence, whether issued by a criminal, civil, or family court. Such amendment shall include a definition of criminal history information that covers warrants, arrests, and orders for the protection of parties from stalking or domestic violence. Nothing in this subsection shall be construed to permit access to such information for any purpose which is different than the purposes described in subsection (a).

(c) PROCEDURES.—The regulations required by subsection (a) shall be proposed no later than 90 days after the date of the enactment of this Act, after appropriate consultation with the Director of the Federal Bureau of Investigation, the officials charged with managing the National Crime Information Center, and the National Crime Information Center Advisory Policy Board. Final regulations shall be issued no later than 180 days after the date of the enactment of this Act.

SEC. __. NONSERIOUS OFFENSE BAR.

The Attorney General shall amend existing regulations to specify that the term "nonserious offenses", as used in 28 C.F.R. 20.32, does not include stalking or domestic violence offenses. Nothing in this section is intended to change current regulations requiring that juvenile offenses shall be excluded from national crime information databases unless the juvenile has been tried as an adult.

SEC. __. PERFORMANCE GRANT PROGRAM.

(a) IN GENERAL.—The Attorney General, through the Director of the Bureau of Justice Assistance, is authorized to provide performance grants to the States to improve processes for entering data about stalking and domestic violence into national crime information databases.

(b) ELIGIBILITY.—Eligible grantees under subsection (a) are States that provide, in their application, that all criminal justice agencies within their jurisdiction shall enter into the National Crime Information Center all records of (1) warrants for the arrest of persons violating civil protection orders intended to protect victims from stalking or domestic violence; (2) arrests of persons vio-

lating civil protection orders intended to protect victims from stalking or domestic violence; and (3) orders for the protection of persons from violence, including stalking and domestic violence.

(c) PERFORMANCE-BASED DISTRIBUTION.—Eligible grantees under subsection (a) shall be awarded 25 percent of their grant moneys upon application approval as "seed money" to cover start-up costs for the project funded by the grant. Upon successful completion of the performance audit provided in subsection (d), the grantees shall be awarded the remaining sums in the grant.

(d) PERFORMANCE AUDIT.—Within 6 months after the initial 25 percent of a grant is provided, the State shall report to the Federal Bureau of Investigation and the Bureau of Justice Assistance, the number of records included in national crime information databases as a result of the grant funding, including separate data for warrants, arrests, and protective orders. If the State can show a substantial increase in the number of records entered, then it shall be eligible for the entire grant amount. However, the Director shall suspend funding for an approved application if an applicant fails to submit a 6 month performance report or if funds are expended for purposes other than those set forth under this title. Federal funds may be used to supplement, not supplant, State funds.

(e) GRANT AMOUNT.—From amounts appropriated, the amount of grants under subsection (a) shall be—

(1) $75,000 to each State; and

(2) That portion of the remaining available money to each State that results from a distribution among the States on the basis of each State's population in relation to the population of all States.

SEC. . APPLICATION REQUIREMENTS.

The application requirements provided in section 513 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.) shall apply to grants made under this title. In addition, applications shall include documentation showing—

(1) the need for grant funds and that State funding does not already cover these operations;

(2) intended use of the grant funds, including a plan of action to increase record input; and

(3) an estimate of expected results from the use of the grant funds.

SEC. . DISBURSEMENT.

(a) GENERAL RULE.—No later than 30 days after the receipt of an application under this title, the Director shall either disburse the appropriate sums provided for under this title or shall inform the applicant why the application does not conform to the terms of section 513 of the Omnibus Crime Control and Safe Streets Act of 1968 or to the requirements of section of this title.

(b) REGULATIONS.—In disbursing moneys under this title, the Director of the Bureau of Justice Assistance shall issue regulations to ensure that grantees give priority to the areas with the greatest showing of need.

SEC. . FEDERAL NONMONETARY ASSISTANCE.

In addition to the assistance provided under the performance grant program, the Attorney General may direct any Federal agency, with or without reimbursement, to use its authorities and the resources granted to it under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) in support of State and local law enforcement efforts to combat stalking and domestic violence.

SEC. . AUTHORIZATION.

There are authorized to be appropriated for each of the fiscal years 1994, 1995, and 1996,

$2,000,000 to carry out the purposes of the Performance Grant Program under this title.

SEC. . TRAINING PROGRAMS FOR JUDGES.

The National Institute of Justice, in conjunction with a nationally recognized nonprofit organization expert in stalking and domestic violence cases, shall conduct training programs for judges to ensure that any judge issuing an order in stalking or domestic violence cases has all available criminal history and other information, whether from State or Federal sources.

SEC. . RECOMMENDATIONS ON INTRASTATE COMMUNICATION.

The National Institute of Justice, after consulting a nationally recognized nonprofit associations expert in data sharing among criminal justice agencies and familiar with the issues raised in stalking and domestic violence cases, shall recommend proposals about how State courts may increase intrastate communication between family courts, juvenile courts, and criminal courts.

SEC. . INCLUSION IN NATIONAL INCIDENT-BASED REPORTING SYSTEM.

Not later than 2 years after the date of enactment of this Act, the Attorney General, in coordination with the Federal Bureau of Investigation and the States, shall compile data regarding stalking civil protective orders and other forms of domestic violence as part of the National Incident-Based Reporting System (NIBRS).

SEC. . REPORT TO CONGRESS.

The Attorney General shall submit to the Congress an annual report, beginning one year after the date of the enactment of this Act, that reports information on the incidence of stalking and other forms of domestic violence, and evaluates the effectiveness of State anti-stalking efforts and legislation.

SEC. . DEFINITIONS.

As used in this title—

(1) the term "national crime information database" refers to the National Crime Information Center and its incorporated criminal history databases, including III ("Triple I");

(2) the term "stalking" includes any conduct that would, if proven, justify the issuance of an order of protection under the stalking, or other, laws of the State in which it occurred; and

(3) the term "domestic violence" includes any conduct that would, if proven, justify the issuance of an order of protection under the domestic violence, or other, laws of the State in which it occurred.

AMENDMENT OFFERED BY MR. MORAN

At the end, add the following:

TITLE —PROTECTING THE PRIVACY OF INFORMATION IN STATE MOTOR VEHICLE RECORDS

SEC. . SHORT TITLE.

This title may be cited as the "Driver's Privacy Protection Act of 1994".

SEC. . PROHIBITION ON RELEASE AND USE OF CERTAIN PERSONAL INFORMATION FROM STATE MOTOR VEHICLE RECORDS.

Title 18, United States Code, is amended by inserting after chapter 121 the following:

"CHAPTER 123—PROHIBITION ON RELEASE AND USE OF CERTAIN PERSONAL INFORMATION FROM STATE MOTOR VEHICLE RECORDS

"§ 2721. Prohibition on release and use of certain personal information from State motor vehicle records

"(a) IN GENERAL.—Except as provided in subsection (b), a State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record.

"(b) PERMISSIBLE USES.—Personal information referred to in subsection (a) of this section shall be disclosed for paragraphs (1) and (2) to carry out the purpose of the Automobile Information Disclosure Act, the Motor Vehicle Information and Cost Saving Act, the National Traffic and Motor Vehicle Safety Act of 1966, the Anti-Car Theft Act of 1992, and the Clean Air Act, and may be disclosed for paragraphs (3) through (14), as follows:

"(1) For use by any Federal, State, or local agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

"(2) For use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alteration, recall or advisory, and motor vehicle customer satisfaction.

"(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only—

"(A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

"(B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

"(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

"(5) For use in research activities, including survey research, and for use in producing statistical reports, provided that the personal information is not published or redisclosed and provided that the personal information is not used to direct solicitations or marketing offers at the individuals whose personal information is disclosed under this paragraph.

"(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

"(7) For the purpose of providing notice of the owners of towed or impounded vehicles.

"(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

"(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under the Commercial Motor Vehicle Safety Act of 1986 (49 U.S.C. App. 2710 et seq.).

"(10) For use in connection with the operation of private toll transportation facilities.

"(11) For any other purpose in response to requests for individual motor vehicle records if the motor vehicle department has provided in a clear and conspicuous manner to the individual to whom the information pertains an opportunity to prohibit such disclosures.

"(12) For bulk distribution for marketing or solicitations if the motor vehicle department has implemented methods and procedures to ensure—

"(A) that individuals are provided an opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and

"(B) that the information will be used, rented, or sold solely for bulk distribution for marketing and solicitations, and that such solicitations will not be directed at those individuals who have requested in a timely fashion that they not be directed at them.

'Methods and procedures' includes the motor vehicle department's use of a mail preference list to remove from its records before bulk distribution the names and personal information of those individuals who have requested that solicitations not be directed at them.

"(13) For use by any requestor, if the requestor demonstrates it has obtained the written consent of the individual to whom the information pertains.

"(14) For any other purpose specifically authorized under the law of the State that holds the record, if such purpose is related to the operation of a motor vehicle or public safety.

"(c) RESALE OR REDISCLOSURE.—Any authorized recipient of personal information may resell or redisclose the information for any use permitted under subsection (b). Any authorized recipient (except a recipient under subsections (b)(11) or (12)) that resells or rediscloses personal information covered by this title must keep for a period of 5 years records identifying each person or entity that receives the information and the permitted purpose for which the information will be used.

"(d) WAIVER PROCEDURES.—A State motor vehicle department may establish and carry out procedures under which the department or its agents, upon receiving a request for personal information that does not fall within one of the exceptions in subsection (b), may mail a copy of the request to the individual about whom the information was requested, informing such individual of the request, together with a statement to the effect that the information will not be released unless the individual waives such individual's right to privacy under this section.

§2722. Additional unlawful acts

"(a) PROCUREMENT FOR UNLAWFUL PURPOSE.—It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any purpose not permitted under section 2721(b) of this title.

"(b) FALSE REPRESENTATIONS.—It shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record.

§2723. Criminal penalty

"Any person that knowingly violates this chapter shall be fined under this title.

§2724. Civil Action

"(a) CAUSE OF ACTION.—A person who knowingly obtains, discloses or uses personal information, derived from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

"(b) REMEDIES.—The court may award—
"(1) actual damages, but not less than liquidated damages in the amount of $2,500;
"(2) punitive damages upon proof of willful or reckless disregard of the law;
"(3) reasonable attorneys' fees and other litigation costs reasonably incurred; and
"(4) such other preliminary and equitable relief as the court determines to be appropriate.

§2725. Definitions

"As used in this chapter—
"(1) 'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles;
"(2) 'personal information' means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (by not the 5-digit zip code), telephone number, and medical or disability information. Such term does not include information on vehicular accidents, driving violations, and driver's status; and
"(3) 'person' means an individual, organization or entity, but does not include a State or agency thereof.".

SEC.    EFFECTIVE DATE.
This title shall take effect 3 years after the date of enactment. In the interim, personal information covered by this title may be released consistent with State law or practice.

AMENDMENT OFFERED BY MR. CANADY
At the end of the bill insert the following:
TITLE   —CIVIL RIGHTS OF INSTITUTIONALIZED PERSONS ACT

SEC.    EXHAUSTION REQUIREMENT.
Section 8 of the Civil Rights of Institutionalized Persons Act (42 U.S.C. 1997e) is amended—
(1) in subsection (a)—
(A) in paragraph (1)—
(i) by striking "in any action brought" and inserting "no action shall be brought";
(ii) by striking "the court shall" and all that follows through "require exhaustion of" and insert "until"; and
(iii) by inserting "are exhausted" after "available"; and
(B) in paragraph (2), by inserting "or are otherwise fair and effective" before the period at the end.

SEC.    FRIVOLOUS ACTIONS.
Section 8(a) of the Civil Rights of Institutionalized Persons Act (42 U.S.C. 1997e(a)) is amended by adding at the end the following:
"(3) The court shall on its own motion or on motion of a party dismiss any action brought pursuant to section 1979 of the Revised Statutes of the United States by an adult convicted of a crime and confined to any jail, prison, or other correctional facility if the court is satisfied that the action fails to state a claim upon which relief can be granted or is frivolous or malicious.

SEC.    MODIFICATION OF REQUIRED MINIMUM STANDARDS.
Section 8(b)(2) of the Civil Rights of Institutionalized Persons Act (42 U.S.C. 1997e(b)(2)) is amended by striking subparagraph (A) and redesignating subparagraphs (B) through (E) as subparagraphs (A) through (D), respectively.

SEC.    REVIEW AND CERTIFICATION PROCEDURE CHANGES.
Section 8(c) of the Civil Rights of Institutionalized Persons Act (42 U.S.C. 1997e(c)) is amended—
(1) in paragraph (1), by inserting "or are otherwise fair and effective" before the period at the end; and
(2) in paragraph (2), by inserting "or is no longer fair and effective" before the period at the end.

SEC.    PROCEEDINGS IN FORMA PAUPERIS.
(a) DISMISSAL.—Section 1915(d) of title 28, United States Code, is amended—
(1) by inserting "at any time" after "counsel and may";
(2) by striking "and may" and inserting "and shall";
(3) by inserting "fails to state a claim upon which relief may be granted or" after "that the action"; and

(4) by inserting "even if partial failing fees have been imposed by the court" before the period.
(b) PRISONER'S STATEMENT OF ASSETS.—Section 1915 of title 28, United States Code, is amended by adding at the end the following:
"(f) If a prisoner in a correctional institution files an affidavit in accordance with subsection (a) of this section, such prisoner shall include in that affidavit a statement of all assets such prisoner possesses. The court shall make inquiry of the correctional institution in which the prisoner is incarcerated for information available to that institution relating to the extent of the prisoner's assets. The court shall require full or partial payment of filing fees according to the prisoner's ability to pay.".

AMENDMENT OFFERED BY MR. CANADY
At the end of the bill insert the following:
TITLE   —PRISON OVERCROWDING

SEC.    APPROPRIATE REMEDIES FOR PRISON OVERCROWDING.
(a) AMENDMENT OF TITLE 18, UNITED STATES CODE.—Subchapter C of chapter 229 of part 2 of title 18, United States Code, is amended by adding at the end the following.
"§3626. Appropriate remedies with respect to prison crowding
"(a) REQUIREMENT OF SHOWING WITH RESPECT TO THE PLAINTIFF IN PARTICULAR.—
"(1) HOLDING.—A Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate.
"(2) RELIEF.—The relief in a case described in paragraph (1) shall extend no further than necessary to remove the conditions that are causing the cruel and unusual punishment of the plaintiff inmate.
"(b) INMATE POPULATION CEILINGS.—
"(1) REQUIREMENT OF SHOWING WITH RESPECT TO PARTICULAR PRISONERS.—A Federal court shall not place a ceiling on the inmate population of any Federal, State, or local detention facility as an equitable remedial measure for conditions that violate the eighth amendment unless crowding is inflicting cruel and usual punishment on particular identified prisoners.
"(2) RULE OF CONSTRUCTION.—Paragraph (1) of this subsection shall not be construed to have any effect on Federal judicial power to issue equitable relief other than that described in paragraph (1) of this subsection, including the requirement of improved medical or health care and the imposition of civil contempt fines or damages, where such relief is appropriate.
"(c) PERIODIC REOPENING.—Each Federal court order or consent decree seeking to remedy an eighth amendment violation shall be reopened at the behest of a defendant for recommended modification at a minimum of 2-year intervals.".
(b) APPLICATION OF AMENDMENT.—Section 3626 of title 18, United States Code, as added by paragraph (1), shall apply to all outstanding court orders on the date of enactment of this Act. Any State or municipality shall be entitled to seek modification of any outstanding eighth amendment decree pursuant to that section.
(c) CLERICAL AMENDMENT.—The table of sections at the beginning of subchapter C of chapter 229 of title 18, United States Code, is amended by adding at the end the following new item:
"3626. Appropriate remedies with respect to prison crowding.".
(d) SUNSET PROVISION.—This section and the amendments made by this section are re-

pealed effective as of the date that is 5 years after the date of enactment of this Act.

AMENDMENT OFFERED BY MS. PRYCE OF OHIO:

Add at the end the following:

TITLE —PRISON SECURITY ENHANCEMENT

SEC. . PRISON SECURITY.

(a) IN GENERAL.—Chapter 303 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 4047. Strength-training of prisoners prohibited

"The Bureau of Prisons shall take care that—

"(1) prisoners under its jurisdiction do not engage in any activities designed to increase their physical strength or their fighting ability; and

"(2) that all equipment designed for this purpose be removed from Federal correctional facilities."

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 303 of title 18, United States Code, is amended by adding at the end the following new item:

"4047. Strength-training of prisoners prohibited.".

The CHAIRMAN pro tempore. Pursuant to the rule, the gentleman from Texas [Mr. BROOKS] will be recognized for 5 minutes, and the gentleman from Florida [Mr. McCOLLUM] will be recognized for 5 minutes.

The Chair recognizes the gentleman from Texas [Mr. BROOKS].

MODIFICATION TO AMENDMENTS EN BLOC, AS MODIFIED, OFFERED BY MR. BROOKS

Mr. BROOKS. Mr. Chairman, I ask unanimous consent that the Bellenson amendment, as modified, be that which is at the desk now.

The CHAIRMAN pro tempore. Is there objection to the request of the gentleman from Texas?

There was no objection.

The Clerk will report the modification.

The Clerk read as follows:

Amendment No. 32, as modified, offered by Mr. BELLENSON:

At the end insert the following new title:

TITLE XXIV—CRIMINAL ALIENS

SEC. 2401. INCARCERATION OF UNDOCUMENTED CRIMINAL ALIENS.

(a) INCARCERATION.—Section 242 of the Immigration and Nationality Act (8 U.S.C. 1252) is amended by adding at the end the following:

"(j) INCARCERATION.—

"(1) If the chief official of the State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien (sentenced to a determinate term of imprisonment) submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General—

"(A) enter into a contractual arrangement which provides for compensation to the State of a political subdivision of the State, as may be appropriate, with respect to the incarceration of such undocumented criminal alien for such determinate sentence of imprisonment, or

"(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate such alien for such determinate sentence of imprisonment.

"(2) Compensation under paragraph (1)(A) shall be determined by the Attorney General and may not exceed the median cost of incarceration of a prisoner in all maximum secu-

rity facilities in the United States as determined by the Bureau of Justice Statistics.

"(3) For purposes of this subsection, the term 'undocumented criminal alien' means an alien who—

"(A) has been convicted of a felony and sentenced to a term of imprisonment, and

"(B)(i) entered the United States without inspection or at any time or place other than as designated by the Attorney General,

"(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State, or

"(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 248, or to comply with the conditions of any such status.

"(4)(A) In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

"(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted."

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect October 1, 1994.

(c) LIMITATION.—The authority created in section 242(j) of the Immigration and Nationality Act (as added by subsection (a)) shall be subject to appropriation until October 1, 1998.

Mr. BROOKS (during the reading). Mr. Chairman, I ask unanimous consent that the amendment, as modified, be considered as read and printed in the RECORD.

The CHAIRMAN pro tempore. Is there objection to the request of the gentleman from Texas?

There was no objection.

□ 1200

The CHAIRMAN pro tempore (Mr. SPRATT). The Chair recognizes the gentleman from Texas [Mr. BROOKS].

Mr. BROOKS. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, in the interest of moving this legislation toward completion, I am at this time offering a second en bloc amendment consisting of six provisions made in order under the rule. They are the Bellenson-Berman-Condit-Thurman amendment requiring the Federal Government to incarcerate or to reimburse States and localities for the costs of incarcerating undocumented aliens; the Kennedy amendment to provide criminal history information for use in stalking and domestic violence cases; the Moran amendment protecting the privacy of information provided to State motor vehicle departments; the Canady amendment requiring State prison inmates to exhaust the prison's administrative remedies prior to filing an action in Federal court; the Canady-Geren amendment on prison overcrowding; and finally the Pryce amendment on strength training for prisoners.

These amendments are discussed in the subject matter addressed. And,

while I strongly support the Beilenson, Kennedy, and Moran amendments, I have concerns about some of the others. I offer these Democratic and Republican amendments now simply to move this important legislation forward to passage, conference, and enactment into law.

Mr. Chairman, I reserve the balance of my time.

Mr. McCOLLUM. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I wish to first of all say that I support all of these amendments that are out here today that are being offered. I think that they are a good set of amendments.

They are being done en bloc so we will not have a lot of time to discuss all of them. I certainly support the Beilenson, Berman, Condit, Thurman amendment. It deals with reimbursing the States and paying for costs of housing undocumented aliens in our State prisons. My State of Florida is affected deeply by that.

I do not think it goes far enough. I think the date for its actual enactment ought to be moved up from 1999 so we get this process going on much closer, and I hope we have some opportunity to do that in this process.

I also particularly support the two Canady amendments, the Canady No. 49, and the Canady-Geren amendment. They go a great deal of the distance we need to go toward trying to help alleviate the problems Federal courts have created for prison overcrowding by making rulings that are not always consistent with the way that most of us would think would be the norm for judging these matters. I do strongly believe they should be ultimately in the final product of whatever comes out of this bill.

Mr. Chairman, I yield 1 minute to the gentleman from Florida [Mr. CANADY], the author of these two amendments.

Mr. CANADY. Mr. Chairman, I want to thank the gentleman, the gentleman from Texas [Mr. BROOKS], for the inclusion of these two amendments in the en bloc amendment at this time.

In recent years we have seen an explosion of frivolous litigation by prison inmates. We have also seen the Federal courts engage in micromanaging State and local correctional facilities.

My two amendments are designed to address these two problems. They are based on the commonsense notion that the inmates should not be allowed to run the institutions in which they are incarcerated.

Although the amendments, quite frankly, do not go quite as far as I would like to solve these problems, I believe that they do represent significant improvements in the status quo, and for that reason, I would urge the House to adopt them as a part of this en bloc amendment.

Mr. McCOLLUM. Mr. Chairman, I yield 1 minute to the gentleman from New Jersey [Mr. ZIMMER].

CONGRESSIONAL RECORD—HOUSE

Mr. ZIMMER. Mr. Chairman, I rise in support of the Canady/Geren amendment because I've seen close to home how court orders designed to limit prison populations can have perverse and disastrous results.

In 1989, a Federal district judge issued an order placing a ceiling on the population of inmates at the county jails in Essex County, NJ.

When the population rose above that cap, the county had to post bail for prisoners, using taxpayer dollars for their bond.

The court order created a nightmare. Of the 3,852 defendants who were released courtesy of the bail fund, 66 percent either committed a crime while on bail or jumped bail; 273 of them were arrested for violent crimes—11 for murder.

Court orders of this sort destroy the credibility of the criminal justice system. I urge my colleagues to support the Canady/Geren amendment by voting for the en bloc amendment.

Mr. McCOLLUM. Mr. Chairman, I yield 1 minute to the gentleman from California [Mr. POMBO].

Mr. POMBO. Mr. Chairman, I rise today in support of the Beilenson, Condit, Thurman amendment. For too long the States that are the victims of our national immigration policy have been forced to use their scare funds to educate, feed, and incarcerate illegal aliens. This arrangement is no longer acceptable.

Today, over 50,000 of our prisoners in State and Federal facilities are not citizens of this country. In my State of California, more than 12 percent of the State prison population, some 15,000 inmates, are illegal aliens. The cost to California for incarcerating undocumented criminal aliens in fiscal year 1994-95 will be $393 million.

In this legislation there are funds for prisoners, programs for gang members, and even court time for midnight basketball players. My question is: "Where is the support for the taxpayers of California, Florida and all other States affected by illegal immigration?" Shouldn't the taxpayers of these States be reimbursed for our Nation's failed immigration policy?

Congress has a bad habit of making "feel good" policy—but then does not provide the money to pay for it. Congress should end the failed national immigration policy, or at the very least it should have the decency to pay for it. Please join me in support of the Beilenson, Condit, Thurman amendment.

Mr. BROOKS. Mr. Chairman, I yield 1 minute to the distinguished gentlewoman from Florida [Mrs. THURMAN], the author of a very critical amendment that we have just been discussing.

Mrs. THURMAN. Mr. Chairman, I support the Beilenson-Berman-Condit-Thurman amendment to H.R. 4092. I prefer an amendment that takes effect next year, but we are forced to delay implementation.

With regard to the policy behind this amendment, our government was established by a special social contract. Certain responsibilities were given to the Federal Government; others remained with the States.

Immigration is a Federal responsibility. If the Federal Government fails to control our borders, then it must assume responsibility for the consequences of its inaction. So, if you let into this country aliens who commit crimes against Americans, then you should pay for their imprisonment.

I approach this situation from the perspective of 10 years in the Florida Senate. For years, I was forced to shift State funds from one or another program to criminal justice and other programs whose costs increased because of the presence of illegal aliens. In March, Governor Chiles released a report cataloging the cost of illegal aliens to Florida: $884 million a year.

In the criminal justice system, the problem has changed dramatically in the past 14 years. In 1980, the supervision cost–probation and parole—of criminal aliens in Florida totaled about $86,000 for 245 offenders. By 1993, this cost—which comes entirely from State revenues—increased to $6.8 million to cover nearly 5,100 aliens.

In 1988, the cost of incarcerating 1,288 other aliens—non-Mariel Cubans—was nearly $13.8 million. By 1993 it was $27.7 million for 2,042 prisoners—over $15,500 a year per prisoner. During this period, Florida spent $130.7 million from its general revenues. The Federal Government provided Florida with nothing.

Since 1988, Florida has spent nearly $52.6 million to incarcerate Mariel Cubans. The Federal contribution was $11.4 million, or 18 percent.

When you include the costs to California, Texas, New York, Illinois, New Jersey, and other States, you must conclude that the Federal Government has been abrogating its responsibilities to all taxpayers.

For too many years the Federal Government has created and sustained a fiction that alien criminals do not impact State criminal justice systems. The Federal Government repeatedly turned a deaf ear to pleas from States heavily impacted by these criminals.

The grievances that this amendment seeks to address are legitimate, and our needs substantial. All we seek is justice. It will be later rather than sooner, but nevertheless justice.

Mr. BROOKS. Mr. Chairman, I yield 30 seconds to the gentleman from Virginia [Mr. MORAN], the distinguished author of the Moran amendment.

Mr. MORAN. Mr. Chairman, the first thing we are going to do is yield to the subcommittee chairman, the gentleman from California [Mr. EDWARDS], who helped us on this bill that may provide more protection to the individual citizen than virtually any other amendment we have in this bill.

Very few people realize that anybody can write down the license plate number of your spouse and daughter and

find out where they live and their name and their Social Security number in many States; it should not be allowed to continue.

Mr. Chairman, I want to thank the Rules Committee for making this amendment in order and to particularly thank the chairman of the Judiciary Subcommittee on Civil and Constitutional Rights, Congressman DON EDWARDS, for holding very constructive hearings on the Driver's Privacy Protection Act, which helped to strengthen and improve this amendment. Congressman EDWARDS is a credit to this institution and he will be sorely missed after his retirement at the end of this session.

The amendment that I am offering today will close a loophole in State law that allows anyone, for any reason, to gain access to personal information—defined as a driver's name, address, and Social Security number—in your DMV file. Currently, in 34 States across the country anyone can walk into a DMV office with your tag number, pay a small fee, and get your name, address, phone number and other personal information—no questions asked. Think about that. A total stranger can obtain personal information about you without knowing anything more about you than your license plate number and you are helpless to stop it.

You may have gone to the trouble of getting an unlisted phone number and address, but the DMV will sell it anyway, to anyone who asks. That's what happened in California to Rebecca Schaeffer, promising young star of the television show "My Sister Sam." Although she had an unlisted home number and address, Ms. Schaeffer was shot to death by an obsessed fan who obtained her name and address through the DMV. In Iowa, a gang of thieves copied down the license plate numbers of expensive cars they saw, found out the names and addresses of the owners and robbed their homes at night. In Virginia, a woman regularly wrote to the DMV, provided the license plate numbers of drivers and asked for the names and addresses of the owners who she claimed were stealing the fillings from her teeth at night.

In each of these cases, the drivers whose personal information were released were never notified of the request or the subsequent release of their information. By selling personal information from DMV records without providing a name removal option, States are violating requirements for procedural fairness and the "due process principles," reflected in the Constitution.

The amendment I am offering simply gives drivers the ability to restrict release of personal information for reasons that are totally incompatible for the reasons it was collected. In doing so, it strikes a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for this information.

The amendment authorizes unlimited access to personal information for courts, law enforcement, governmental agencies, and for other driver and automobile safety purposes. It authorizes access to businesses to verify information provided by the driver and to access personal information if that information is incorrect or outdated. Licensed private detectives could access the information for any purpose authorized in the amendment.

Marketers use DMV lists to do targeted mailings and other types of marketing. This

amendment will allow them to continue to do so, as long as they agree not to market drivers who object to their personal information being used for marketing purposes. Eight States have already instituted opt-out systems which allow drivers to restrict the use of their name for marketing purposes. This amendment will not alter those opt-out systems.

My intent is for this provision to furnish States that proceed with opt-out systems with substantial flexibility in the operation of these systems, including the flexibility to furnish multi-purpose users with a single list of license holders. Any driver that had notified the State that he/she did not want to receive direct mail solicitations would still be on that list, but the State would have to clearly identify to the purchaser the individuals to whom solicitations should not be directed and the purchaser would have to agree not to direct solicitation to that driver. In addition, if the multipurpose user resold the file to a third party that only used the information for marketing purposes, the multipurpose user would have to delete all of the names of those individuals that did not want to receive solicitations before the sale of that file. To the extent that the possibility of confusion exists on this issue, I would welcome appropriate changes to the language in conference that would clarify my intention.

The amendment would also allow any non-authorized person to access DMV information, as long as the DMV provides all drivers the opportunity to restrict the sale of their personal information for non-authorized purposes. The basic presumption is that personal information in DMV records will be open unless a licensee specifically restricts access for non-authorized purposes. If drivers choose to restrict access to their file, someone coming in off the street, without a permissible purpose could not gain access to that person's file. However, insurance companies, law enforcement professionals, attorneys, and all other authorized users would continue to have access to this information.

This particular provision was added after hearings were held on the Driver's Privacy Protection Act and the press raised concerns that they would not have access to personal information held by the DMV. Although my staff tried to come up with language to specifically authorize access by the press, they didn't want it, claiming they didn't want to be treated any differently than the general public. So, in order to accommodate them, we changed the bill to allow access to all personal information unless a licensee specifically restricts it. Press groups support this approach.

It is very important to note that the amendment in no way affects access to accident information about the car or driver. Nothing in this bill would stop anyone from finding out another person's driving record, accidents, or status.

In addition, the amendment only penalizes individuals who knowingly obtain, disclose or use personal information for a purpose not permitted under the amendment. Individual drivers aggrieved by such illegal release could sue for damages in district court.

The amendment before the House today reflects many comments and suggestions received during hearings held by the Subcommittee on Civil and Constitutional Rights. Changes were made to the Driver's Privacy Protection Act as a result of those hearings that make this amendment very different than

the amendment that was offered to the crime bill by Senator BOXER. Unlike the Boxer amendment, my amendment allows greater access for private detectives and the press and more flexibility to the States in allowing additional uses of personal information.

Another aspect of this legislation which received considerable attention at the hearings was the potential impact of the Driver's Privacy Protection Act on access rules applying to other kinds of public records held by State and local governments. The key difference between DMV records and other public records comes from the license plate, through which every vehicle on the public highways can be linked to a specific individual. Anyone with access to data linking license plates with vehicle ownership has the ability to ascertain the name and address of the person who owns that vehicle. Other public records are not vulnerable to abuse in the same way.

Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and addresses from strangers, and thus limit their access to personally identifiable information. By contrast, no one is free to conceal his or her license plate while traveling by automobile.

Recognizing this distinction, this amendment applies only to specified categories of personal information contained in motor vehicle records. It does not apply to any other systems of public records maintained by States or local governments.

There are many organizations and businesses specifically concerned about easy access to DMV information. That's why this amendment is strongly supported by over 20 organizations, including the standard-making body for all State DMVs, the American Association of Motor Vehicle Administrators, the National Consumers League, the Fraternal Order of Police, the American Insurance Association, and other business, consumer, police, physician, and victim's groups.

I urge my colleagues to support this amendment and protect the privacy of all Americans.

Mr. BROOKS. Mr. Chairman, I yield 30 seconds to the gentleman from California [Mr. EDWARDS].

(Mr. EDWARDS of California asked and was given permission to revise and extend his remarks.)

Mr. EDWARDS of California. Mr. Chairman, the gentleman from Virginia [Mr. MORAN] worked very closely with the subcommittee I chair. We held 2 days of hearings on his amendment to this bill. It is a good bill.

The gentleman from Virginia [Mr. MORAN] was very skillful in writing the bill and very cooperative in working with the subcommittee, and we are looking forward to having the Moran proposal becoming law.

Mr. Chairman, this amendment requires States to adopt an opt-out when information about vehicle registrants or drivers is disclosed in bulk for use in marketing and solicitation.

Our intent is to give States that proceed with opt-out systems flexibility in the operation of these systems, including the flexibility to furnish multi-purpose users with a single list as long as the State ensures that solicitations are not directed at individuals who have requested of the DMV in a timely fashion that solicita-

tions not be directed at them based on their motor vehicle records.

One means of accomplishing this would be for the State to flag or otherwise identify to the list purchaser the individuals to whom solicitations should not be directed. This is a common practice in the States that currently have an opt-out system in place. It is our intent that this amendment permit the continuation of this method and procedure in those States and in other States wishing to implement an opt-out system. Such multipurpose users may redisseminate lists of drivers or registrants only after they have excluded the flagged names.

Indeed, one of the advantages of this flagging type of procedure is that it may be more effective than a suppression procedure in ensuring that individuals how have opted-out in fact not have solicitations directed at them. These individuals most probably already are on various solicitation lists previously compiled from information obtained from motor vehicle records and other sources. The list users update their data with information obtained from motor vehicle departments. If the updates simply skip over the names and addresses of individuals who have opted out, the desire of these individuals to opt-out will not be disclosed to the list users who in turn will leave undisturbed the names and addresses of these individuals in their historical lists. Consequently, without flagged names and addresses, the list users probably would continue soliciting these households based on the earlier record they compiled, eventually stopping years later when the data becomes obsolete. By comparison, flagging names and addresses permits the opt-out to go into effect immediately because it enables the list purchaser to match these individuals against all name and address outputs to ensure that a flagged record is not released.

To the extent that the possibility of confusion exists on this issue, we may make further changes to the language in conference that would clarify my intention.

One other aspect of this legislation which received considerable attention at the subcommittee's hearings deserves further discussion: The potential precedential impact of the Driver's Privacy Protection Act on access rules applying to other kinds of public records held by State and local governments. These governments collect and maintain large quantities of records that have traditionally been open to broad public access, including land transaction and ownership records, voter registration rolls, court records, and corporate legal filings, among others. The testimony before the subcommittee underscored the need to maintain the public record character of this data, even if it is necessary to impose restrictions on access to some personal data held by State motor vehicle administrations.

There are few differences between DMV records and other public records. There was no evidence before the subcommittee that other public records are vulnerable to abuse in the same way that DMV records have been abused. Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address from strangers, and thus limit their access to personally identifiable information contained in voter registration lists, court records, or land records. By contrast, no one

is free to conceal his or her license plate while traveling by automobile.

Recognizing this distinction, this legislation applies only to specified categories of personal information contained in motor vehicle records. It does not apply to any other systems of public records maintained by States or local governments. There was testimony before the subcommittee that these records should remain publicly accessible in accordance with applicable State law. Broad public access to such records remains enormously important to our society, for preservation of a free press, for government accountability, and for a number of valuable economic and business applications.

Mr. BROOKS. Mr. Chairman, I yield such time as he may consume to the gentleman from Texas [Mr. PETE GEREN].

(Mr. PETE GEREN of Texas asked and was given permission to revise and extend his remarks.)

☐ 1210

Mr. PETE GEREN of Texas. I thank the chairman, the gentleman from Texas [Mr. BROOKS], and I rise in support of the Canady-Geren amendment.

Mr. BROOKS. Mr. Chairman, I yield 30 seconds to the distinguished gentleman from New Jersey [Mr. HUGHES].

(Mr. HUGHES asked and was given permission to revise and extend his remarks.)

Mr. HUGHES. I thank the chairman for yielding.

Mr. Chairman, I support the packaging of these 6 en bloc amendments, but I must say that I do have some difficulties with No. 43, the Pryce amendment. As presently structured, I think it is overly broad, and I think it could be counterproductive. It is my hope that I can work with Ms. PRYCE and corrections officers around the country to narrow it so that we do not do more damage than good.

Mr. BROOKS. Mr. Chairman, I reserve the balance of my time.

Mr. McCOLLUM. Mr. Chairman, I yield 30 seconds to the gentlewoman from Ohio [Ms. PRYCE].

Ms. PRYCE of Ohio. I thank the gentleman for yielding this time to me.

I rise in support of the en bloc amendments. I thank the chairman for including my amendment in it. I would be very happy to work with the gentleman from New Jersey [Mr. HUGHES] to develop better language to accomplish what he thinks would improve this bill. I really think we are finally starting on the right road to addressing the rights of victims as opposed to the criminal. I urge support.

Mr. Chairman, today the House of Representatives is debating the issue of crime. I am offering an amendment which is a simple but a significant step toward reducing the threat of violence in America. My amendment will address a dual threat to our Nation's corrections officers and the general public. First, it will make our prisons safer by reducing the risk of assault and injury to prison personnel. Second, it will help protect potential victims of violent crime. Specifically, my amendment will prohibit the Federal Bureau of Prisons from al-

lowing prisoners to engage in certain activities which are designed to increase their physical strength and enhance their fighting ability. The types of activities which would be prohibited include training with free weights or martial arts instruction.

This amendment makes good common sense. History has unfortunately proven that weights and weight bars can be effectively used inside prisons as weapons. In my own State of Ohio last year, inmates at the Lucasville Prison used weight lifting bars to break through concrete stairwells in order to kidnap guards seeking refuge during an 11-day riot killing nine people. In addition, on March 14, 1994, 15 corrections officers and 10 inmates were injured in the Rikers Island prison gymnasium. In that incident, inmates hit two officers over the head with a 50-pound weight, and the two officers were seriously injured and hospitalized. It simply defies logic that we are using taxpayers' money to buy state-of-the-art health clubs for convicted criminals. In effect, our taxpayer dollars are being used to build bigger and better thugs.

According to the Federal Bureau of Investigation [FBI], 81 percent of the assaults on law enforcement officers in the United States during 1992 were committed with personal weapons, such as hands, fists, and feet. Our current prison system provides convicted felons, many of whom are already prone to violence, the chance to significantly increase their strength and their bulk—thus making future acts of violence even more likely.

This proposal is not based on idle speculation, but rather on statistical fact. According to a 1991 survey, 54 percent of inmates convicted of violent crimes used no weapon other than their own body when they committed their offense. Thus, by building a better thug, we are actually providing the weapon used in many violent crimes. Finally, of the 50,900 violent criminals put on probation during 1992, over 9,000 were rearrested for a violent crime within 3 years in the same state. Mr. Chairman, I think these statistics speak for themselves.

As a former prosecutor and judge who worked directly with law enforcement, jail and prison personnel, I know full well the value of exercise and stress reduction as an inmate management tool. However, there are many other forms of exercise—including basketball, jogging, aerobics, handball, and calisthenics—that cost much less and make much more sense.

I strongly believe that prison rehabilitation programs should focus on giving inmates the proper education and job skills needed to become productive members of society. State and Federal studies show that education and job training reduce recidivism and assist many exoffenders in obtaining gainful employment. By contrast, weight training and boxing classes can hardly be described as essential programs to provide prisoners with necessary job training skills.

Mr. Chairman, this amendment has been endorsed by the Law Enforcement Alliance of America; the American Society of Law Enforcement Trainers; the National Association for Crime Victims Rights; the Ohio Association of Chiefs of Police; the Buckeye State Sheriff's Association; the California Peace Officer's Association; Citizens for Law and Order; Victims of Irreparable Crime Experience; the Southern States' Police Association; and many others.

I realize my amendment is not a cure-all to crime. However, it is an important first step toward enabling the victims of crime to regain the upper hand. My amendment will not deprive prisoners of anything essential to their health or rehabilitation.

Why should be give convicted felons the ability to defeat us in our homes, on our streets, and within the correctional systems themselves. Mr. Chairman, who's running the prisons anyway? This amendment is a practical approach to protecting the public and our prison personnel right now. If you do not want to build a better thug, support the Pryce amendment.

Mr. McCOLLUM. I thank the gentlewoman for her remarks, and I want to continue that by closing out my 30 seconds. The amendment of the gentlewoman from Ohio [Ms. PRYCE] is super. She did not explain it during that 30 seconds, and probably did not have the time. But it involves the prohibiting of the Federal Bureau of Prisons from allowing prisoners under its jurisdiction from engaging in any activity designed to unduly strengthen their physical condition. I have had a lot of complaints about that. So I am very happy that it is here. The rest of the amendments are very, very important. I am happy to support this en bloc amendment.

Mr. Chairman, I yield back the balance of my time.

Mr. BROOKS. I yield the remaining time to the gentleman from New York [Mr. SCHUMER].

Mr. SCHUMER. Mr. Chairman, I thank the gentleman for yielding this time to me.

I rise in support of the en bloc amendments. There are 2 provisions in here that are rather noteworthy, and I think we should give credit to the sponsors. One is the Beilenson amendment, which the gentleman from California talked to, cosponsored by Berman-Thurman-Condit. That will finally force the Federal Government to live up to its responsibilities in terms of reimbursing imprisoned illegal aliens.

The second amendment is the Kennedy amendment, the gentleman from Massachusetts' amendment in terms of ensuring that stalkers are identified before their violent threats become a reality. They are both noteworthy provisions. They are part of the en bloc and worthy of our support.

Mr. KIM. Mr. Chairman, I rise in strong support of the amendment to reimburse States and localities for the costs of incarcerating undocumented criminal immigrants.

For too long, American tax dollars have been spent on feeding, clothing, and housing illegal immigrants in American prisons. In my own State of California, the cost of imprisoning illegal immigrants was over $500 million last year alone. Because the Federal Government has failed to abide by its own laws and reimburse California for faulty immigration policies made here in Washington, this responsibility has been shouldered by California's taxpayers.

But Californians are no longer able or willing to pay these high costs. Over the past 2 years, California has been rocked by devastat-

ing earthquakes, burned by rioters in Los Angeles, and bowled over by mudslides and floods. These tragedies have cost billions of dollars. Yet, the Federal Government still forces these same Californians to pay for benefits that go to nontaxpaying lawbreakers. This is outrageous.

And it doesn't stop there. Imagine my amazement when I opened my April 14 edition of the Washington Post and read with disbelief that the Immigration and Naturalization Service was halting its policy of running routine fingerprint checks on immigrants. INS officials claimed that it was a cost-saving measure, but is it really? Over 9,000 criminals have been prevented from entering the United States because fingerprint checks revealed that they had been convicted of felonies. I am pleased that the Attorney General has apparently reversed this policy change, but angered by the Federal Government's cavalier attitude toward dumping additional costs upon the States.

Every one of the criminals who could have gotten into the United States without the fingerprint check could have committed additional felonies. Those costs would have been borne by the victims, and every criminal who was caught would simply add to the growing burden of incarcerating undocumented criminal immigrants.

As I said, the fingerprint checking has been saved, but what other Federal initiatives are waiting to be unleashed that could increase crime and would increase the burden on the American taxpayer?

Since President Clinton was stalled to direct the Federal Government to reimburse the States for the costs of imprisoning illegal immigrants, it is our responsibility to force the Federal Government to reimburse the States for the faulty policies made in Washington.

So, today, I rise in strong support of Federal reimbursement of States and localities for the costs of incarcerating illegal immigrants. California needs it. The American people want it and we owe it to them to make it the law of the land.

Mr. LIGHTFOOT. Mr. Chairman, I rise in strong support of the amendment offered by the gentlewoman from Ohio [Ms. PRYCE] and the gentleman from Michigan [Mr. STUPAK]. As the House is aware, this amendment would prohibit the Federal Bureau of Prisons from allowing prisoners under its jurisdiction to engage in any activities designed to increase their physical strength. The amendment would ban free weights and all types of defensive and body-building training in prisons within the Federal Prisons System. This is a very simple amendment, but it just makes common sense, which may be why Congress hasn't done this sooner.

It is appalling to think that someone who has been convicted of a violent crime could use the taxpayer's money and resources to become even more capable of violent acts. In addition, I am aware of incidents in the gentlelady's home State of Ohio and in New York in which prisoners used weight lifting equipment as riot weapons. Why should we give those who have violated the safety of our communities additional resources to wreak havoc?

We need to make sure that individuals in prisons spend their time learning not to break the law again, not getting themselves pumped up at taxpayer's expense. Certainly, I know, and my colleagues acknowledge, that this one measure will not solve our Nation's crime problem. But I don't see any reason for us not to take all the steps we can while we have the chance. I thank Congresswoman PRYCE for her work on this measure, as well as the work done by my colleague from Michigan, Congressman STUPAK. Congresswoman PRYCE is a much valued member of the law enforcement caucus which Congressman STUPAK and I cochair. With this proposal, we can show our commitment to helping our Nation's law officers. I urge the House to adopt this measure.

Ms. HARMAN. Mr. Chairman, I rise in support in of the en bloc amendment offered by Chairman BROOKS, and, in particular, the amendment offered by Representatives BEILENSON, BERMAN, CONDIT, and THURMAN which would require the Federal Government to reimburse States and localities for the costs of incarcerating undocumented aliens who have been convicted of a felony.

The State of California will house about 18,000 undocumented felons this year at a cost to the State of more than $400 million. The number of undocumented workers in California prison is five times the number of any other State and represents a thirdfold increase over the last 6 years. Increases in incarceration costs to my State have even outpaced the growth of the costs of providing mandated medical care and education for the undocumented.

Enough is enough. The taxpayers of California cannot afford to continue paying the costs of incarcerating criminals who enter the country in violation of Federal law. We need to be tougher at the border and I support dramatically increased resources for the Border Patrol. But the Federal Government also has a responsibility to relieve States of the burden of incarceration of convicted undocumented felons.

Current Federal law recognizes this responsibility, and the Beilson amendment ensures that we will live up to this obligation by requiring that, by 1998, the Federal Government will either take custody of illegal aliens convicted of a felony or reimburse States for the costs of their incarceration.

Due in part to my strong support for the inclusion of this measure in the crime bill, I strongly support the chairman's en bloc amendment.

Mr. KENNEDY. Mr. Chairman, I would like to thank Chairman BROOKS and particularly Chairman Schumer for their tremendous support on this amendment. I would also like to recognize the efforts of Representatives RAMSTAD, SCHROEDER, MORELLA, and Senator BIDEN.

Mr. Chairman, stalking and domestic violence have reached epidemic proportions in this country—sending constant threats of fear, pain, and suffering for its victims and their families.

It's time to put an end to this horrifying cycle of violence—before another life is lost.

Experts believe that each year more than 200,000 women are stalked by their former husbands, boyfriends, or complete strangers.

At least nine women a day die at the hands of their stalkers.

Nearly 30 percent of all female murders are attributed to domestic violence.

In my own State of Massachusetts, 42 women were killed in a 14-month period by stalkers.

Kristin Lardner's tragic case sent shockwaves of the justice system failing the victims it was designed to protect. She was brutally abused, stalked, gunned down, and murdered by her former boyfriend. Her stalker had a long criminal history and was on probation for the abuse of a former girlfriend when she sought a restraining order. But, tragically, the judge overseeing the case did not have access to these criminal history records.

The courage of Kristin's family has turned their loss into hope for others. Her sister, Helen Lardner testified before this Congress that, "My sister might be alive today if the judge at the hearing had checked her eventual killer's record."

This amendment responds to the pleas for help.

It gives law enforcement officials and civil and criminal courts the tools to enforce civil protection orders, prevent further stalking and domestic violence, and track offenders across State lines and jurisdictions;

It gives civil and criminal State courts access to criminal history information for use in these cases; and

It calls on criminal justice agencies to include information about stalking and domestic violence offenses in criminal history records.

I urge my colleagues' support for taking steps outlined in this amendment to make the everyday lives of Americans safer.

Mr. BORSKI. Mr. Speaker, I rise today to express my strong support for the Canady-Geren amendment to H.R. 4092, the crime bill. I believe this legislation is essential to the success of controlling the outbreak of crime and assuring the safety of our children, our senior citizens, and our families.

Mr. Chairman, the Federal courts across the Nation are hindering local efforts of law enforcement. By imposing arbitrary caps on the number of prison inmates, criminals are released moments after they are arrested due to lack of holding facilities and prison overcrowding. Police are forced to spend their valuable time apprehending the same criminals who commit the same crimes, hours or days later. In the city of Philadelphia, you cannot be incarcerated pretrial for car jacking, stalking, drug dealing, burglary, manslaughter, or weaponless robbery, no matter how many times you commit these crimes or fail to appear in court, due to prison caps.

Mr. Chairman, the criminals across the Nation are winning the war on crime. They have learned that if they refuse to appear for trial, the local law enforcement does not have the facilities to go after them. Criminals rarely, if ever, report for trial. In Philadelphia, of all the defendants released under the prison cap, 47 percent fail to appear in court. What this means is that over a period of 6 years, from 1988 to 1994, over 230,000 cases remained unprosecutable due to prisoners refusing to appear in court. In one city, 230,000 criminal acts went unanswered and close to 230,000 victims did not receive justice. Mr. Speaker, it is time for us to stop this ridiculous game that criminals are playing with our criminal justice system.

Mr. Chairman, these prison caps are also endangering the lives and well-being of our families. In 1991, the city of Philadelphia was forced to release tens of thousands of prison cap defendants with pending criminal charges. Of these defendants, over 8,000 were rearrested for new charges, including: 77 mur-

ders, 851 burglaries, 1,993 drug charges, and 1,102 robberies.

Mr. Chairman, I would like to enclose an excerpt from a letter that I received from a detective of the Philadelphia Police Force. Det. Patrick Boyle has experienced, firsthand, the danger incurred by prison caps when his son, who was also a police officer in Philadelphia, was shot and killed by a criminal released due to the prison cap.

My son, Danny Boyle, was assigned to the 26th Police District and he soon became acquainted with all aspects of patrol work in a very busy area. As you well know, lawlessness and the complete disregard for human life is epidemic in our country. On February 4th 1991, 12 midnight, Dan reported for work and was assigned to a one man patrol car. At about 2:40 AM, Danny observed a vehicle which was traveling the wrong way on a one way street occupied by two males. Dan stopped the vehicle, which had been stolen earlier, the driver jumped from the auto and immediately began firing a 9mm semi-automatic handgun at Danny. One of the thirteen shots fired struck Dan in the right temple. Danny died of his wounds on February 6th 1991. Dan was 21 years old and served with pride and distinction for one year and one day.

The perpetrator of this crime was arrested, tried and convicted of first degree murder however (sic) he should not have been on the streets of Philadelphia to commit this murder. He had been arrested and released without posting any type of bond. He ignored two bench warrants and was free to commit whatever crime he chose including the murder of Dan. Danny's death was a direct result of the Philadelphia Prison Cap which serves the criminals well but condemns all of the law abiding citizens of Philadelphia . . . I beg you to stop this madness . . . and stop the revolving door of injustice.

Mr. Chairman, while we all agree that prisons must provide humane treatment for prisoners, prison caps should be a remedy of last resort. The Canady-Geren amendment would provide desperately needed help in the prevention of repeat criminals, while still enabling prisoners to obtain Federal court relief for inhumane prison conditions.

I urge my colleagues to vote for the Canady-Geren amendment and alleviate the apparent danger caused by prison caps. We cannot allow the minor discomforts of prisoners to dictate the safety of our children and our families.

Mrs. MORELLA. Mr. Chairman, I rise in support of the Kennedy amendment. Like Mr. KENNEDY and our other colleagues, I, too, am greatly concerned about stalking and its effects on women's physical safety and peace of mind.

Stalking is a despicable crime—a crime from which no one is completely safe. We have heard of obsessed fans who stalk celebrities, trying to become a part of their lives. In 1989, one such deranged fan murdered the actress he was stalking, bringing instant national attention to the danger of stalking.

Despite the attention this case generated, the most usual stalking case does not involve a celebrity. Many of you have read Washington Post reporter George Lardner's articles about his daughter, Kristin. Kristin was a bright, talented young woman who was stalked and later murdered by an obsessive former boyfriend. Kristin Lardner was typical of the most usual stalking victim, a woman who is stalked by a former husband or boyfriend

who is unable to let go after the relationship has ended.

For too long, women who knew they were in danger have gone to the authorities to seek protection. For too long, authorities have been unable to arrest and charge the stalker, frequently because isolated acts of stalking were not considered crimes. The police could do nothing until the woman had actually been assaulted. Imagine having to wait for someone to beat or rape you before the police are able to offer you protection from a stalker.

Many States are now aware of the need to define and criminalize stalking, so that police officers may arrest a stalker before he or she assaults or kills his or her target. In September 1993, the National Institute of Justice released its report on the Project to Develop a Model Anti-Stalking Code for States. The NIJ issued this report in response to congressional direction to prepare a constitutional and enforceable model antistalking code. The direction of Congress and the work of the NIJ allows States to criminalize stalking in clear and constitutional language, which manes States can move quickly to criminalize stalking.

The amendment before us would allow Congress to continue helping States in their efforts to protect all of their citizens from stalkers. Courts would have access to existing national crime information databases for use in domestic violence and stalking cases. Grants would be available to States to improve their processes for collecting stalking and domestic violence data and entering it into national crime information databases. The National Institute of Justice would conduct training programs for judges to ensure that those judges with responsibility for issuing restraining orders will have all relevant information available to them, and will know how to access it.

As Chair of the Congressional Caucus for Women's Issues Task Force on Violence, I am deeply concerned about all violence issues facing women. We must empower our police and judges to do everything possible to protect us from all criminals, including those who are known to us.

I commend my colleagues on the Judiciary Committee for including the Violence Against Women Act, H.R. 1133, in this crime bill. As one of the sponsors of the act, I am grateful to the committee and to the House for the support shown for this bill.

The Kennedy amendment will help to protect innocent people from the terror of stalking. I urge all my colleagues to join me in supporting this amendment.

Mr. BERMAN. Mr. Chairman, I rise in strong support of Beilenson-Berman-Condit-Thurman amendment.

In 1986, the Federal Government recognized its responsibility to be financially accountable for illegal aliens convicted of felonies in State courts. Section 501 of the Immigration Reform and Control Act specifically authorizes the Attorney General shall reimburse States for the costs of incarcerating undocumented criminal aliens; but to date, States that bear the burden of housing this population in their jails have seen no money from this program.

With over 30,000 criminal aliens in State and local prisons across the United States, the financial costs to these communities can be staggering. The State of California, with the largest criminal alien population in the country,

estimates that the costs of incarcerating criminal aliens will exceed $375 million this year.

In 1993, States including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Massachusetts, Nevada, New York, Oregon, Pennsylvania, Texas, and Washington reported that the number of criminal aliens exceeded 2 percent of their prison populations.

We all know and can say that immigration policy in this Nation rests in the hands of the Federal Government. The Federal Government must acknowledge its duty to secure our country's borders from illegal immigration, uphold our immigration laws, and investigate and prosecute Federal wage and hour violations which create incentives to hire persons illegally.

But the Federal Government's failure to responsibly manage our immigration policy, in this case, has resulted in a system which makes State and local governments pay the price for imprisoning people who have entered our country in violation of Federal laws. A policy of a whole nation has shifted tremendous financial costs to only certain States.

Strong action must be taken to provide assistance to States which deal with some key problems associated with individuals who enter the country illegally and commit crimes.

This amendment is an important step which will help ensure that the Federal Government will fulfill its obligations to all our communities by having the Department of Justice compensate States for the costs of incarcerating undocumented criminal felons or taking them into Federal custody.

Doing this alone will help relieve states of a heavy responsibility and allow revenues for other public purposes, including crime control.

As stewards of immigration policy, the Federal Government must live up to its responsibility of enforcing our country's immigration laws, but it must also assume financial obligations when it fails to enforce these laws.

I urge my colleagues to vote in favor of this amendment.

Mr. GOSS. Mr. Chairman, my colleague, Congressman MORAN, asks us to consider the Driver's Privacy and Protection Act of 1993 as an amendment to the omnibus crime bill. The intent of this legislation is simple—to protect the personal privacy and safety of all American licensed drivers. Specifically, this bill responds to the senseless murder of Rebecca Schaeffer, who was gunned down outside of her apartment by a crazed fan who got her unlisted telephone number and address from the DMV. Many people may not know that in 34 States, including Florida, anyone can walk into the DMV office with a license plate number, pay $5 to $10, and get the car owner's name, address, phone number, height, weight, date of birth, and other very personal information—no questions asked. As it stands in those States, a total stranger—potentially a stalker—can easily obtain personal information without knowing anything more than a license plate number. Despite the commonsense objective it seeks to meet, Congressman MORAN's version of the Driver's Privacy and Protection Act has generated some confusion and concern about who would be denied access to the DMV's personal records. I believe the legislation adequately balances the circumstances where access to the DMV information is justified relative to the very real concern for privacy protection. This amendment

April 20, 1994     CONGRESSIONAL RECORD—HOUSE     H2527

does not prohibit legitimate business, law enforcement and governmental access to such information. In fact, specific provisions within the bill ensure that the DMV will continue to provide information to individuals looking for lost relatives, people who are involved in court proceedings, law enforcement officials, and licensed private investigators. The amendment also provides for bona fide research and other purposes, which in effect gives access to journalists unless an individual specifically denies disclosure of personal information. The Driver's Privacy and Protection Act states that access to all information on vehicular accidents, driving violations, and a driver's record will not be limited. The flow of information would only be denied to a narrow group of people that lack legitimate business. The Amendment defines "legitimate business" broadly, including all the duties of Federal, State, and local law enforcement agencies and courts, verification and/or correction of personal information, private investigations, and anything related to the operation of a motor vehicle.

Mr. Chairman, the intent of this bill is simple and straightforward: We want to stop stalkers from obtaining the name and address of their prey before another tragedy occurs. We are not naive—we know this amendment will not stop all stalkers from commiting heinous crimes. Still, I believe the Driver's Privacy and Protection Act is a reasonable and practical crime fighting measure. The Driver's Privacy and Protection Act balances the legitimate public and business interests in keeping these records available with an individual driver's right to privacy.

Mr. BEILENSON. Mr. Chairman, the amendment Mr. BERMAN, Mr. CONDIT, Mrs. THURMAN, and I are offering addresses the serious burden placed on States and localities by the Federal Government's abdication of responsibility for the incarceration of criminal aliens. This amendment, which is similar to legislation I introduced earlier this year with Mr. BECERRA and several other Members of the California delegation, requires the Federal Government either to take custody of illegal aliens convicted of a felony, or to reimburse State and local governments for the cost of their incarceration beginning in 1998.

There are between 23,000 and 35,000 undocumented aliens incarcerated in State prisons. The States which have significant numbers of criminal aliens in their prisons—that is, over 2 percent of their prison population—include not just California, Florida, Texas, and New York, as one might expect, but also Alaska, Arizona, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Massachusetts, Nevada, New Jersey, Oregon, Pennsylvania, and Washington. At an annual cost of $18,000 or more per prisoner, this translates to a yearly financial burden of between $420 and $615 million on the criminal justice systems of affected communities.

These costs, which are increasing rapidly, are the result of the Federal Government's failure to enforce our immigration laws—a failure which has resulted in the unlawful entry into the United States of millions of illegal immigrants. In Los Angeles County alone, the cost of incarcerating deportable aliens is $34 million per year. If the cost of prosecutors, public defenders, and probation officers is included, the overall cost of deportable criminal aliens to the county's criminal justice system amounts to $75 million per year.

The impact of convicted criminal aliens on Los Angeles County was documented in two studies conducted in 1990 and 1992 by the countywide Criminal Justice Coordination Committee in conjunction with the County Sheriff and the Immigration and Naturalization Service [INS]. Those reports estimated that 19 percent of the inmates in Los Angeles County jails were foreign born and 11 percent were deportable aliens. They found that over 23,000 deportable aliens go through the Los Angeles County justice system each year.

Furthermore, as the 1992 report stated, "significant numbers of deportable aliens who are removed from the country do, in fact, return to Los Angeles County and sustain new contacts with the criminal justice system." The study found that 40 percent of the 1,875 deportable aliens who were released from the county jail in May 1990 were re-arrested an average of two times in the following 12 months. Only 339 of the 1,875—less than one-fifth—of those deportable aliens had no previous or subsequent arrests. The other 1,536 had been arrested an average of seven times, for a combined total of 10,989 arrests, since they arrived in the United States.

Yet, while State and local governments have the responsibility for incarcerating criminal aliens and processing their cases, they have no jurisdiction, obviously, over the enforcement of immigration laws, no authority to deport aliens who are convicted of crimes, and no authority to ensure that those deported are not permitted to re-enter the country.

Congress recognized the unfairness of this situation in the 1986 Immigration Reform and Control Act [IRCA], and acknowledged the Federal Government's responsibility for the criminal alien population. Section 501 of the act specifically authorizes the reimbursement to States of costs incurred in the imprisonment of illegal aliens. Unfortunately, however, this commitment has yet to be fulfilled, because Congress has failed to appropriate any funding for that purpose.

Currently, the Governors of several States are seeking relief from this predicament by requesting—or even suing—the Federal Government to take custody of thousands of illegal aliens housed in their prisons. I expect that more demands of this kind are likely to be forthcoming from States and localities with large criminal alien populations as these communities attempt to cope with the strain that the Federal Government's failed immigration policy places on their budgets. And I believe that those demands are fully justified.

This amendment will ensure that the Federal Government lives up to its financial obligations under the Immigration Reform and Control Act. Our amendment allows Congress and the administration 4 more years to pay for the incarceration of criminal aliens through the appropriations process; if that does not happen, then, beginning October 1, 1998, this amendment will force the Federal Government to pay for it. Knowing that the Federal Government will soon be required to assume this burden will, we hope, also encourage the administration, and the Congress, to take strong steps to stop illegal immigration altogether, so that potential criminal aliens will not be able to enter our country in the first place.

Mr. Chairman, some Members may argue against this amendment because it technically creates a new entitlement beginning in fiscal 1999, which is a violation of the Budget Act.

It's true that this proposal would increase mandated Federal spending, but this amendment is different from the classic kind of new entitlement spending, where the Government is assuming a new responsibility, and thus placing a new additional burden on the taxpayers. This is a case where, by assuming payment for what is unquestionably a Federal responsibility, the Federal Government would relieve the tax burden on many State and local taxpayers. The primary reason we try to control entitlement spending through the Budget Act is to avoid creating new tax burdens; this amendment, however, is tax-neutral—the net tax burden on Americans would remain the same—and so it does not break faith with the purpose of the Budget Act.

Furthermore, the mandatory-spending approach of this amendment is a last-resort proposition. We agree that funding for the incarceration of alien criminals should be provided for through appropriations. But we have waited patiently for 8 years for Congress to provide funding for that purpose, to no avail. We will wait patiently for 4 more years and then, if the funding is still not appropriated, it will be mandated.

Finally, I would point out that the cost of this amendment—roughly $600 million a year—is not a lot for the Federal Government; in fact, under the fiscal 1994 budget resolution, it is less than the amount we have in reserve for additional entitlement spending for the next fiscal year. On the other hand, for State and local governments, $600 million is quite a significant amount.

Mr. Chairman, this amendment provides relief to States for the cost of incarcerating people who have entered our country in violation of Federal laws. This cost should be borne by all U.S. citizens, not just those who live in regions with large numbers of illegal immigrants. Relieving States and localities of this substantial expense will free up revenues for other public purposes—including the very purpose served by this bill, crime control.

I urge my colleagues to support this amendment.

Ms. MORELLA. Mr. Chairman, I rise in support of the Moran amendment.

This amendment will allow people an opportunity to protect their safety by denying some individuals access to information about their whereabouts. Sadly, some people have used motor vehicle departments to learns the address of a person who does not want to give out his or her address. This is particularly a problem with stalkers, people who methodically invade every aspect of a person's life, denying them peace of mind and a sense of safety even in their own home. Stalkers follow, threaten, intimidate, assault, and sometimes kill those with whom they are obsessed. Allowing a government agency to aid stalkers in locating those they are harassing is untenable. We must ensure that the agencies are not misused, and that all individuals have an opportunity to protect their privacy.

I urge my colleagues to join in support of this amendment.

Mr. RAMSTAD. Mr. Chairman, I rise in strong support of the national stalker and domestic violence amendment offered by Mr. KENNEDY of Massachusetts.

As a strong supporter of the Violence Against Women Act, I know how important it is for Congress to take strong steps to prevent domestic violence and stalking. This amend-

# EXHIBIT E

Westlaw.

1994 WL 212698 (F.D.C.H.)
1994 WL 212698 (F.D.C.H.)

Page 1

Federal Document Clearing House
Testimony
February 4, 1994

House of Representatives
Judiciary
Civil and Constitutional Rights

Protecting Driver Privacy

STATEMENT OF CONGRESSMAN JAMES P. MORAN
BEFORE THE SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS ON
H.R. 3365, THE DRIVER'S PRIVACY PROTECTION ACT OF 1993
February 3, 1994
Mr. Chairman and Members of the Subcommittee, thank you for
inviting me to testify at this hearing today on H.R. 3365, the
Driver's Privacy Protection Act.  As the sponsor of this bill, I want
to thank Chairman Edwards for quickly convening this important
hearing, and Congressmen Jerrold Nadler and Barney Frank for
supporting this legislation through their cosponsorship.
I would like in my testimony today to address several key points
in this legislation: why it was drafted, what the legislation will
accomplish, where H.R. 3365 fits with other privacy legislation and
the balance between individual rights to privacy with legitimate
interests in accessing DMV information.
A couple of years ago I never thought about the personal
information the DMV collects.  Like everyone else, I went to the DMV
to register my car and get a drivers license, voluntarily giving out
very personal information about myself, including my height, weight,
date of birth, and other information, assuming it was only used in
connection with my ownership and operation of a vehicle.  It wasn't
until a constituent of mine brought to my attention the fact that DMVs
sell this information, both in bulk and individually to just about
anyone who asks for it, that I became aware of the privacy problems
associated with this practice.
Much to my surprise, I found out that in 3-4 states anyone can
walk into the DMV and for a small fee, and in some cases, nothing at
all, provide a person's license plate number and walk out with that
person's name and address.
I will share just a few examples of the abuse that results from
such easy access to DMV information.
*  In Iowa, a group of teenagers recorded the license plate
numbers of expensive cars they saw, obtained the names and addresses
of the owners, and robbed their homes.
*  In my own state of Virginia, a woman found out the names and
addresses of over 30 licensed drivers by tracing the information

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 212698 (F.D.C.H.)                                                    Page 2
1994 WL 212698 (F.D.C.H.)

through their license plate numbers, claiming she needed the
information because the drivers in question were stealing the fillings
from her teeth.
*  In California, actress Rebecca Schaeffer was gunned down at
her Los Angeles apartment, by a man who had -- through  a private
investigator -- obtained her home address  through the California DMV.
While these are extreme examples of what can happen when this
information falls into the wrong hands, they only serve to highlight
the need for individuals to have some control over how personal
information about them is used.
Advances in technology only make the need for control even more
important.  Twenty years ago, before we had such sophisticated
computer systems, most public record transactions were paper-based.
Individuals who wanted to find the address, driver's record, or
vehicle registration of another person had to physically go to the DMV
and request the information.  This process was very cumbersome and
time-consuming.  This is no longer true today.  Computers have enabled
individuals, with the click of a button, to pull up a person's DMV
record.  While the immediate accessibility to such personal data makes
it even more valuable, it also makes it more important that safeguards
are in place to protect personal information.
Most states sell DMV information in list form with personal
identifiers (name, address, and/or social security number) to direct
marketers for commercial purposes, but only five have a working "opt-
out" system (a system allowing licensees to restrict the sale of their
personal information).  Twenty-two states also use the social security
number as the driver identification number and eight of those states
have no restrictions on the release of this identification number as
part of the record.
While the release of this information to direct marketers does
not pose any inherent safety risks to people, it does present, to some
people, an invasion of privacy.  If you review the way in which people
are classified by direct marketers based on DMV information you can
see why some individuals might object to their personal information
being sold.  Take, for instance, the TRW catalog, which states, "motor
vehicle information is a key indicator of lifestyle and can help you
reach your best prospects." Info Direct, a list broker, even
classifies potential customers by the kinds of cars they drive.
Compact car owners, they claim, "are interested in getting a reliable
vehicle that provides great gas mileage.  These individuals spend
their disposable income carefully, getting the most for their dollar.
Typically seeking to improve their lives and financial status, this
large segment of the American population would be a prime target for
lease-to-own offers, credit cards, loan and debt consolidation, do-it-
yourself products, self-improvement and educational offers."  I think
a fair number of people in this room might restrict access to their
personal information in DMV files knowing that they are marketed in
this way.
This legislation before the Committee is designed to give
individuals control over the release of their personal information and
give them the opportunity to make choices as to whether this
information is released, not just for individual look-ups, but also
for release in bulk.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 212698 (F.D.C.H.)                                                                      Page 3
1994 WL 212698 (F.D.C.H.)

In drafting the Driver's Privacy Protection Act, my staff looked
first to other bills, reports, and legislation on similar topics to
determine the best approach in putting this bill together.
President Carter's 1977 Privacy Protection Commission Report was
important to us because the Commission was established to investigate
the standards in place (at the time) for the protection of personal
information.  The Commission found that an effective national
information policy must embody three principles: it must minimize
intrusiveness, maximize fairness and create legitimate, enforceable
expectations of confidentiality.  A specific recommendation of the
Commission was that each state review the direct-mail marketing and
solicitation uses that are made of state agency records and devise a
procedure whereby an individual can inform the agency that he does not
want a record pertaining to himself to be used for such purposes.
Unfortunately, most states, at this time, have not followed that
particular recommendation of the privacy commission.
The basic concept behind this legislation follows the philosophy
first coined by Congressman Ed Markey: knowledge, notice, and no.
Knowledge: individuals should have knowledge of how personal
information about them will be used.  Notice: they should have notice
when personal information about them is sold/resold.  No: they should
have the right to object to those uses/reuses.
If surveyed, the public feels very strongly that they should have
knowledge of how personal information about them is used and who is
accessing it.  Surveys by Lou Harris and the National Association to
Protect Individual Rights (NAPIR) have found that most adult
Americans, 92 percent according to NAPIR, think it is important for
state agencies (specifically, the DMV) not to sell or release personal
data about them without their knowledge and approval.
This bill acknowledges that registering with the DMV is mandatory
and provides individuals with knowledge of, and control over, the sale
of their personal information for uses which are not compatible with
the purpose for which it was collected.  The bill incorporates both
the intent of the 1974 Privacy Act, the recommendations of the
landmark 1977 Privacy Protection Study Commission Report, and the
ethical guidelines of the Direct Marketing Association.
The bill will prohibit motor vehicle departments (DMV) from
disclosing personal information (name, address, telephone number,
social security number, driver's identification number, medical and
disability information, photograph) about a licensee unless there is a
specific, approved reason for doing so.
This bill will still allow complete access to driver
record/vehicle registration information.  Reporters and private
investigators will still have complete access to all information
connected with the operation of a motor vehicle.
Careful consideration was given to the common uses now made of
this information and great efforts were made to ensure that those uses
were allowed under this bill.  Among those who will continue to have
unfettered access are federal and state governments and their
contractors, for use in auto recalls, by businesses (such as an
insurance company) to verify the accuracy of personal information
submitted by a licensee, for use in any civil or criminal proceeding,
in research activities, and in marketing activities as long as the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

individual has been given the opportunity to opt out.
The bill would allow DMVs to continue to sell DMV information in
bulk as long as every driver in that state had been given the
opportunity to restrict the sale of their name for marketing purposes.
The phrasing for our opt-out is the same as that in the Video Privacy
Protection Act.  The opt-out must be "provided in a clear and
conspicuous manner (so that) the individual has an opportunity to
prohibit disclosure (of personal information)."  The wording of the
opt-out would allow each state to craft an opt-out that best suits its
needs.  Additionally, the bill allows states to enact tougher
restrictions and gives them room to craft their own specific responses
to the regulations.
The Direct Marketing Association has operated, since the 1970s,
the Mail Preference Service, a system that allows consumers to
prohibit their name from being used in direct marketing solicitations.
Currently 1.6 million households participate in this system.  I
applaud DMAs efforts to ensure that consumers have some choice in the
mail that they receive.  I would hope that the DMA and other groups,
such as Time-Warner, that have in-house suppression systems, would
offer the states assistance and their expertise in putting an opt-out
program together.  I believe that with the help of the private sector,
all DMVs should be able to institute an opt-out system that meets the
requirements of this bill.
I believe that this bill represents a fair, reasonable approach
toward protecting personal information contained in DMV files.  It is
similar to other privacy bills passed by Congress and gives
individuals some control over how their personal information is used.
I want to reiterate that nothing in this bill should prohibit the
use of DMV information by automobile manufacturers and dealers in
doing customer follow-up.  I also want to work with groups such as
Carfax, tow truck drivers, and toll booth operators to ensure that
there are no impediments to their receipt of DMV information that is
necessary and essential for them to do business.
I would also ask the committee to include the following material
as part of the hearing record.  I would like to draw special attention
to a memorandum prepared for my office by law professor Erwin
Chemerinsky on the Constitutional basis for Congress enacting this
bill and a memorandum by CRS outlining the need for this legislation.
Finally, I want to thank the many groups that have worked with us
over the last several months in drafting this legislation, including
the National Association of Police Officers, the Fraternal Order of
Police, the Consumer Federation of America, the American Insurance
Association, the National Coalition Against Domestic Violence, and
over twenty other business and consumer organizations.  By enacting
this legislation, Congress will reaffirm that privacy is not a
Democratic or Republican issue, but a basic human right to which every
person is entitled.
     JAMES P. MORAN

     Congressman

     Eighth District of Virginia

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 212698 (F.D.C.H.)                                                     Page 5
1994 WL 212698 (F.D.C.H.)

   1994 WL 212698 (F.D.C.H.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT F

Westlaw.

139 Cong. Rec. S15958-04, 1993 WL 473509 (Cong.Rec.)

*1 Congressional Record --- Senate
Proceedings and Debates of the 103rd Congress, First Session
Wednesday, November 17, 1993

**\*S15958 VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1993**

The Senate continued with the consideration of the bill.

COMMUNITY SCHOOL AMENDMENT

Mr. BRADLEY.

Mr. President, with $22 billion available in this bill for prisons and police, a number of us have been concerned that we are not doing anything to get to the fundamental forces behind the epidemic of violence among disaffected, forgotten, angry and lonely young people. For that reason, I offered an amendment to add a community schools demonstration, to give every neighborhood a physical space and a support system for kids who need safety, a library, a quiet room, a gym, or a mentor. I am pleased that the chairman and ranking member of the Judiciary Committee have both enthusiastically agreed to accept this amendment to prevent crime.

One of the great outrages of our cities is that the one public building that is part of every neighborhood and every family's life-the school-bolts its doors tight every afternoon at 3:30 or 4 and every Friday for 48 hours. During that time, kids whose parents are not home often have no safe place to go and no one to help them with homework, sports, or the basic questions about growing up. The dedicated people of the community, who want to be a part of raising the community's children, have no place to come together and help. But if we look at what a few dedicated people have done, we can find an answer. In Newark, NJ, it's the Boys and Girls Club of Newark. In East Orange, NJ, a local YMCA is transforming itself into a safe haven for young people after school. And in Washington, DC, it's a former executive named Kent Amos, who gave up his career to give his full attention to the 50 or more kids who come to his home every afternoon for help with homework and other activities.

Meanwhile, the school buildings, with their gyms and libraries, their nurses' offices and auditoriums, are shuttered. Community schools will provide basic funds to open the schools after hours for purposes the community chooses. It might be a safe place for homework, or an athletic program, or a parenting program for young mothers. Kids need two things during their free time: a place and a mentor. This bill will give both, in communities where there is the kind of commitment that Kent Amos and others have demonstrated in Washington, DC. But now a caring community can affect hundreds of thousands of kids, not just 50.

This amendment is a little different from the bill we introduced last spring, in that it concentrates the effort on supervised activities designed to keep young people out of trouble. It is integrated with the Ounce of Prevention Council, an interagency council on violence prevention which has already begun work and which is given **\*S15959** grantmaking authority by another creative amendment to this bill, one developed by Senator DODD. The amendment authorizes $100 million a year for these grants.

**\*2** I want to stress that the point of this bill is that we are not putting a new burden or new responsibility on the school system, which has its hands full with the basic task of educating kids from 8:30 until 3. The school is a building, usually the only building, where there is a library, a gym, classrooms, a nurse's office, and all the basic facilities that the community needs to shelter and nurture its children. From 3 into the evening, we want that building to belong to the community, to use as it sees fit for its own children.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

This crime bill, with its unique new funding mechanism, can offer tough penalties, adequate prison space for those who are apprehended and convicted, and tighten the avenues through which criminals evade or delay justice. But it cannot get to its central purpose, which is "to prevent and control crime," without something that gets to people before they cross the line. Strong communities need the tools to keep young people engaged, ambitious, and optimistic about their futures. A community cannot do that if the schools it possesses are off-limits, owned and controlled by an external bureaucracy, after 3, on weekends, and for 3 months in the summer.

I want to thank my colleagues Senator DANFORTH, again, for his continuing involvement in this initiative, and Senator DOMENICI, who brought some ideas of his own to this amendment as well as enthusiasm for the idea.

## OMNIBUS CRIME BILL

Mr. BRADLEY.

Mr. President, I rise to speak in favor of this omnibus crime bill. Last week, Senator MITCHELL reminded us that crime is essentially a local issue. I agree with him that much of what we have done over the last few weeks will have only a negligible effect on crime across the country. But I think he would agree that the dialog we have started on crime and violence is an important one. I want to congratulate the chairman of the Judiciary Committee, Senator BIDEN, on this bill and I look forward to continuing the conversation about crime and violence which has gripped this body over the last few weeks.

We have all heard the stories: a child killed in drive-by shooting, an elderly woman afraid to walk out of her home for fear of being robbed in broad daylight by some drugged up young thug, a businessman driving in his car, the random victim of a car-jacking. These are the headlines. They disgust us, enrage us, frighten us, and then fade from our memories once another outrage is committed. We have become hardened to this senselessness. We turn on the nightly news expecting it.

But every day, in ways that have become part of our normal routine, we do little things to avoid becoming victims of crime. We lock our doors. Some people might laugh at this, but there was a time when we did not lock our doors. We hold our possessions closely as we walk through crowded areas. We do not walk out alone at night. We take quick glances behind ourselves when we take money out of ATM machines. We cross the street in an effort to avoid people that we think are threatening. Increasingly, the profile of the threatening person at least as depicted by the media and suggested by their disproportionate presence in our prisons, are young, black, and Hispanic men.

*3 We don't like to talk about that perception, but it is there. Regardless of how much the statistics show that most victims of crime share the same race as their victimizers, we have to acknowledge that many people take subtle and not-so-subtle actions based on their fears about who is committing crime. We buy guns under the mistaken impression that we can protect ourselves, even if our local police force cannot, and even if we know that for every intruder shot in self-protection there are 43 murders, suicides, and accidental killings, often a family member.

This crime bill attempts to respond to some of these concerns. It attempts to give people the ability to regain control of their communities. It is a good start toward this goal, and will, I am certain, spark serious discussion about what our escalating crime problem portends for our society in general.

This bill accomplishes many things. It makes certain that we as a society can rightly express our outrage at the perpetrators of heinous crimes by making sure they serve long sentences. It allows us to impose the sentence of death, where appropriate. And it takes steps to combat some of the social causes of crime, especially among youngsters.

This bill puts 100,000 new police on the street for community policing, increases the penalties for a number of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

violent and drug-related crimes, and allows people to attend college in return for agreeing to serve as local po-
lice officers after graduation. It also provides a variety of discretionary grant programs to help local communit-
ies combat youth violence, drug-related crime, and child abuse.

Recognizing that drug treatment is essential to reducing the rate of recidivism among prisoners, this bill au-
thorizes expanded drug treatment for Federal prisoners, and offers grants for drug treatment in State prisons, as
well.

While I believe this bill as a whole will be effective in shoring up public confidence in our criminal justice
system, I would like to highlight certain provisions of it which I believe will be particularly helpful in making
our communities safer.

As I have already mentioned, this bill puts 100,000 additional police on the street to conduct community poli-
cing. As the sponsor of similar community policing legislation, I strongly support this effort. Earlier this year, I
met a small business man in New Jersey. His store was in the shadow of City Hall, just blocks away, but when
he called the police, he said it took them 3 hours to respond. He concluded that Government would do nothing to
ensure his safety, and now he carries a gun.

Government's response to the epidemic of violent crime has been to toughen and toughen again the penalties. I
have supported this effort-because the penalties should fit the magnitude of the crime-but there is a larger point.
A police culture that isolates officers in squad cars, responding to crimes only after the fact, will never prevent
crime and rarely catch the criminal.

*4 While Government was speaking louder about crime, but carrying what looked like a smaller and smaller
stick, a few communities were inventing for themselves a new way to promote safety. In East Orange, NJ, police
officers recently took the roughest 12-block zone of the city and made it a miniprecinct, with an accessible of-
fice and distinct neighborhood beats for every officer.

A similar program that started in 1990 in Columbia, SC, brought an immediate 30 percent reduction in crime.
An elderly woman living in a housing project, who had slept on her floor for 5 years because she feared bullets
coming through her window, was finally able to get back into bed. Now police officers worry less about what
crimes have occurred, and spend more time talking to people, finding out where trouble is brewing, and inter-
vening before it happens. Police know the mothers who are worried about their sons and daughters; they know
the shopkeepers who are worried about neighborhood thugs, and they know the thugs the shopkeepers worry
about. With knowledge comes trust and trust is the foundation for security. These communities have invented
for themselves new ways to ensure safety and will benefit from this bill.

This bill mandates stiffer penalties for drug dealing in public housing. I introduced legislation establishing in-
creased penalties a few years ago. Inspired by the courageous parents of an Elizabeth, NJ, housing project, the
legislation toughens the penalty for selling drugs in the vicinity of a public housing project, as is done when a
person is convicted of selling drugs in or in the vicinity of a school or playground.

Like most families, families that live in public housing hope to build a better life for themselves and their chil-
dren. Drugs destroy that possibility, just as surely as drugs destroy the possibility of learning in school. This
provision will help families in public housing remake the possibilities by cracking down on those who sell drugs
in or near their homes.

This bill also authorizes funding for drug court programs like the successful program in Dade County, FL.
Drug *S15960 court programs provide drug testing, drug treatment, and alternative punishments for certain drug
offenders. If an offender comes through the drug court, he or she has to enter into treatment and commit to get-
ting his or her life together. The court monitors the progress of the offender, and if positive progress is made, he
or she can avoid incarceration. I know the Attorney General supports this program. I am pleased that it was in-
cluded in this bill.

Early intervention during initial contact with the criminal justice system has been credited with turning many

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

young offenders away from a life of drugs and crime. Instead of putting them with hardened criminals or ware-housing them in traditional prisons, some local governments have experimented successfully with the idea of sending some youthful offenders to boot camps or neighborhood-based half-way houses. This bill authorizes funds to support these local activities, so that we can get a better idea of how effective alternative incarceration programs can be in reducing recidivism among youthful offenders.

*5 Another important initiative in this bill is the Police Corps. Under this program, individuals will be given scholarships to complete their college educations. In exchange, they must commit to serving as police officers for 4 years after graduation. By placing more college-educated individuals within our police forces, this provision will strengthen the image of police work among the greater community and enhance police departments' ability to understand the social causes; that is, joblessness, low basic skills development, hopelessness, low parent-child supervision of crime. The more educated the police force, the better it is able to respond to crime in urban America.

An important benefit of the Police Corps is its emphasis on public service. Police work is difficult, stressful, and demanding. It often requires individual police officers to risk their lives in order to serve the larger community. It is with a sense of public purpose that most police officers serve their communities. The Police Corps affirms this public purpose.

The ratio of police power to violent crime today is one-tenth of what it was 35 years ago. Many students entering college today have seen their neighborhoods, the places in which they used to play ball and bike safely as first and second graders, become combat zones that their younger brothers and sisters watch from behind barricaded doors and windows. Others recognize that crime is a universal problem, and that America cannot live up to its promise as a Nation if it cannot offer safety to its citizens. Perhaps it is partially because of this sensitivity to the crime problem that a large number of college students polled by the Department of Justice recently said they would be eager to participate in the Police Corps.

The crime wave of recent years has led many cynics to proclaim a breakdown in the desire for public service in America. On the contrary, Mr. President, I believe we are witnessing a resurgence of citizenship and a renewed dedication among younger Americans to give something back to their communities. The Police Corps will allow us to draw on this renewed sense of citizenship to restore viability to our troubled neighborhoods and ensure that the most modest of American dreams-a life free from violence and terror-is a reality in every city in our land.

This bill also strengthens the Juvenile Justice Program to confront the problem of youth gangs in our country. It expands the initiatives set forth in the 1988 drug bill to fund support and prevention programs for young street gang members, offering these youth viable alternatives to life on the streets.

In 1988, Congress established the Community Youth Activity Program. This program authorized funds for education, training, and recreation programs aimed at reaching at-risk youth, including high school dropouts and gang members. New Jersey was awarded one of the program's first grants, which was aimed at reaching New Brunswick youth whose older siblings were involved in drugs, crime, and gangs. I have visited the program and can attest to its effectiveness. But one program in one city in New Jersey will not solve the problem. We must target more resources at gangs. If we do not spend the money now, we will spend much more later to apprehend and imprison those who are caught up in the vicious cycle of gang violence and crime.

*6 Under the expanded program required by this bill, $100 million will be made available to reduce the number of juveniles involved in gang-related crime, to reduce juvenile involvement in drug-related crimes, and to promote the involvement of juveniles in productive activities.

Mr. President, we were able to focus to some extent on guns during the debate on this bill. I know that many of my colleagues did not desire a discussion of guns on this bill, but I am happy we were able to at least start that discussion. I look forward to discussing the destructive effects of certain guns a bit more extensively in the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

future.

If you talk about crime to the residents of any community in America, you are going to hear about guns. You are going to hear about the high number of guns on the street. You are going to hear about the damage caused, lives lost, and bodies injured. We often think of guns in terms of their impact on the criminal justice system because more guns in the hands of people makes it much more difficult for our police to protect us against crime. But the widespread availability of guns is also a health issue. Gun violence costs the American taxpayers $3 billion a year in health care costs, and I believe we should use our taxing power to offset some of these costs.

There are now an estimated 209 million firearms in this country, about 71 million of which are handguns. A new handgun is produced every 20 seconds. For at least a decade now, almost half of America's households have owned at least one gun and at least 25 percent have owned a handgun. According to one commentator, "gun ownership has become so pervasive that the mere fact of possession has become a problem in and of itself. The presence of guns, especially handguns in homes, has begun to be recognized as a danger to the families who live in those homes."

Wide-spread gun ownership has its consequences. Every 14 minutes someone in the United States dies from a gunshot in a homicide, suicide, or accident. Every 6 hours, a youth between the ages of 10 and 19 commits suicide with a firearm. Nonfatal gunshot injuries have also risen dramatically. There were 240,000 such injuries in the United States in 1989.

Although handguns account for only one-third the number of firearms, they cause two thirds of the firearm-related deaths. They are also used in about 80 percent of all gun murders. Assault weapons cause a far fewer number of deaths, but, on account of their destructive capacity, they have created a crisis for hospitals and health care providers in many communities.

Ninety-five percent of the people injured by a handgun each year require emergency care or hospitalization. Of these, 68 percent require overnight care and 32 percent require a hospital stay of 8 days or more. A study by the University of Arizona Emergency Medical Research Center found that the average cost per gunshot victim was $16,704. When additional charges, such as physician services, ambulances, followup care and rehabilitation, are added in, the overall cost to our health care system is about $3 billion a year.

*7 According to the Centers for Disease Control, at least 80 percent of the economic costs of treating firearms injuries are paid for by taxpayer dollars, a fact every person concerned about the rising cost of health care should heed. The total life-time costs associated with firearm deaths and injuries were over $20 billion in 1990.

Ask any trauma center official about the health care cost of guns and you are certain to get a dose of reality. In 1982, 95 percent of gunshot victims treated at Cook County Hospital had been shot only once, usually with a low-velocity bullet. In 1991, 25 percent of gunshot victims were treated for multiple wounds, many of which were made by high-velocity bullets. The gunshot injuries are so devastating at the Washington, DC, Hospital Center that military trauma physicians are *S15961 being recruited to relieve the work load.

In northern New Jersey, a 16-year-old girl was shot recently by a fellow classmate during an argument. The victim was paralyzed by a spinal cord injury, and spent 34 days in acute care at a cost of $147,000. This figure does not even include the cost of physical therapy. An uninsured man in New Jersey recently became the unintended victim of a drive-by shooting. The cost of his treatment: in excess of $70,000.

I could mention many causes for the increase in gun violence: lack of opportunity, the waning of basic values, lack of respect for human life, weak law enforcement, light sentencing. But accepting many of these causes of gun violence does not erase the reality that crime and deviant behavior have become much more costly to our health care system because of the prevalence of handguns and assault weapons. Disputes that were settled with fists and knives 10 years ago are now settled with guns. The number, availability and destructive capacity of handguns and assault weapons have contributed significantly to this tragedy.

When the current firearm excise tax provisions were passed by Congress in 1954, the gun market was domin-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ated by sportsmen. We did not have a plethora of guns on the streets of our Nation threatening the physical well-being of our citizens. We did not suffer from the ravages of semiautomatic assault weapons and irresponsible gun use. We were not facing a crisis of gun violence. Because this situation in this country has changed, so should the taxes on handguns, assault weapons, and ammunition.

I want to emphasize that I am not suggesting that we impose a higher tax on gun purchases made for legitimate sporting purposes. To the contrary, I would impose an enhanced Federal tax only on the purchases of handguns, assault weapons, and the ammunition for these firearms. The data show that handguns and assault weapons are responsible for a disproportionate share of gun violence. It is reasonable to tax these firearms at a higher level.

Mr. President, this bill takes several important steps to reduce the incidence of crime in the United States. I am proud to be associated with it. It also starts us toward a dialog which is necessary if we are ever going to turn the tide on crime. I look forward to continuing this dialog and I congratulate my colleagues on this bill.

## SUPPORT OF BAN ON ASSAULT GUNS

Mr. AKAKA.

*8 Mr. President, I am pleased to be a cosponsor of Senator FEINSTEIN's amendment to restrict the use and possession of assault weapons. It is absolutely imperative to rid the streets of weapons of destruction that have no place in society.

Throughout the debate on S. 1607, many Members have related how violent acts have personally affected their lives. Several months ago, I didn't have a story to tell. Unfortunately, today I do. Only last month, I met with the family of John Scully, a young attorney from Hawaii, who was one of eight people murdered by a lone gunman with two assault guns during a rampage through a San Francisco law firm this past summer.

As I sat with John's parents, Niall and Pegi Scully of Honolulu, John's wife, Michelle Spiess Scully, his sister, Megin Scully-Minuth, and her husband, Reed, I became personally involved with the tragedy of a violent crime. I was no longer able listening to these fine people as just their Senator. I was drawn into this personal tragedy as a parent, a grandfather, and a friend of the family.

Despite their recent loss, the Scully family came to Capitol Hill to meet with Senators and their staffs to urge passage of gun control legislation. I know they met with a number of Members and were appreciative of the time that Senators spent with them. In addition to seeking enactment of gun control measures, the Scullys have established the John and Michelle Scully Fund, which will work toward reducing handgun-related violence in this country.

Their selflessness is remarkable; their commitment to change Senators' minds steadfast; and their willingness to relate their personal tragedy inspiring. Pegi described how she felt calling her six surviving children to tell them of their brother's death. Michelle, whose injuries from the attack are still evident, quietly spoke of her husband's last words as he shielded her from the gunman. Megin, a physician, provided staggering figures relating to the medical costs of gun violence. And her father, also a physician, called gun-related violence a devastating public health issue.

Mr. President, I bring this to my colleagues' attention because the seriousness of allowing individuals to own, or have access to, weapons of such dramatic destruction is unacceptable. We cannot have a crime bill without dealing with the issue of the availability of military style assault weapons. I urge adoption of this amendment.

## TRIBUTE TO STELLA BOYLE SMITH

Mr. PRYOR.

Mr. President, today, November 17, is Stella Boyle Smith's 100th birthday, and, this afternoon there is a spe-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

cial birthday party in Little Rock in her honor. On this day of well-deserved tribute for Mrs. Stella Boyle Smith, I would like to take just a few moments to recognize the generosity and spirit of this unique person.

Mrs. Smith says that instead of waiting until after her death to bequeath money to deserving institutions, she has been selfish enough to give it away while she could enjoy it. If that is the case, Mrs. Smith has certainly enjoyed a great deal over the 100 years of her life, and there are a number of causes that consider themselves very blessed to have been able to indulge her selfishness.

*9 Her bequests to Arkansas Children's Hospital alone total over $1 million. To show its appreciation, the hospital has named an entire pediatric unit after her, the Infant-Toddler Special Care Unit. The fourth-floor patient pavilion also bears her name.

Mr. President, over the years Mrs. Smith has made donations to many other institutions, including: the Arkansas Symphony Orchestra, St. Vincent Infirmary, the Baptist Medical System, the Central Arkansas Radiation Therapy Institute, the University of Arkansas at Little Rock, Arkansas College, the Malvern Boys Club and the Society to Prevent Blindness.

Among her most recent gifts was a $500,000 trust to the ophthalmology department in the College of Medicine at the University of Arkansas for Medical Sciences <UAMS>. Mrs. Smith was prompted to make this gift after undergoing cataract surgery.

In addition to her enormous monetary generosity over her almost 70 years of dedicated philanthropy, Mrs. Smith has also shown a willingness to give her time to countless causes.

Mrs. Smith marks her involvement with caring for others from a very early age. As the 7th of 10 children, she says he had to learn how to share. When she was only 4 years old, she began visiting shut-ins with her mother and her enthusiasm for helping those in need has not flagged since.

In commenting on her early good works, she has said, "I didn't always have the money, but I had the time."

Mrs. Smith has been honored many times for her years of philanthropy, including being named the Arkansas Democrat Woman of the Year in 1984 and Arkansas Philanthropist of the Year by the Arkansas Chapter of fund-Raising Executives in 1986.

Mrs. Smith herself best summed up what has made her life such a happy one, when she gave the following advice to young people just starting out in life, " Have pride. Enjoy what you're doing. * * * being happy in what you're doing is the main thing. And always be honest and trustworthy."

Happy 100th birthday, Stella Boyle Smith. Thank you for helping so many others.

### "KIDS AND GUNS" AMENDMENT (NO. 1148)

Mrs. FEINSTEIN.

Mr. President, I rise today in support of the amendment offered by the senior Senator from Wisconsin <Mr. KOHL>. The amendment is simple. It would:

First, make it illegal for anyone to sell a handgun or handgun ammunition to minors under the age of 18; and

Second, make it illegal for a minor to possess a handgun or handgun ammunition except under the supervision of an adult in certain circumstances.

These are two provisions that could save the lives of hundreds of children annually. And, I believe these two provisions do not encroach upon the right of adults to bear arms, but simply monitor a potentially dangerous activity for children.

*S15962 The fact is, the issue of kids and guns is becoming a chronic problem throughout the United States. Every day we hear stories of gun-related violence involving children. Examples include:

*10 The gun battle which erupted a few weeks ago in a crowded New York City movie theater, leaving one teenager dead and three others wounded. Police recovered four semiautomatic handguns from the theater;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The four 15-year-old children in Louisiana who were arrested last month for bringing guns to a high school football game. Police found 3 semiautomatic handguns and a 30-round semiautomatic assault rifle with a scope and bayonet in one suspect's car;

The story of the teenagers who terrorized a neighborhood for an hour in Dallas last September, randomly firing handguns and an AK-47 from a stolen school bus;

The shooting last summer at a crowded Washington DC, swimming pool in which a teenage gunman fired some 20 rounds into the pool and wounded 6 children; and

Just last week near Los Angeles, three children were shot and killed while coming home from a Halloween party. The police have no motive. The weapon used; a semiautomatic handgun.

When my generation grewup, we worried about the threat of nuclear attack. Today, children grow up worrying about being shot. I was shocked when I read in the Washington Post recently that District children no longer plan for their wedding, they plan for their funeral.

Young students today must walk through metal detectors to go to class. More than 300 metal detectors have already been installed in schools across the country.

The problem is only getting worse. More and more kids are becoming involved in gun-related violence, and more and more kids are using semiautomatic handguns.

A Chicago police superintendent attributed many of his city's 50 homicides of children just through September of this year to semiautomatic weapons. He stated:

We have younger immature individuals who have precision killing instruments in their hands. * * * They identify targets, but these weapons allow the emission of so many bullets by a single or easy series of trigger pulls they are * * * jeopardizing others as well.

Here are some statistics that reinforce my point:

A recent Joyce Foundation study found that 59 percent of all children in 6th grade through 12th grade said they could get a handgun if they wanted-36 percent said they could get one within an hour;

A national report by the American Psychological Association said that teenagers are 2 1/2 times more likely to be victims of violent crimes than people over 20 years of age;

Every 6 hours a young person unable to cope with adolescent pressures takes his or her own life using a gun;

Between 1980 and 1990 there was a 79-percent increase in the number of young people committing murder with guns; and

More than six young people are murdered each day by someone, often a peer, using a gun.

Kids are obviously getting the weapons from someone. Amazingly, it is currently not illegal for an adult to give or sell a handgun or handgun ammunition to children. It is only illegal for licensed gun dealers to sell to minors.

*11 For the entire population, homicide is the 12th leading cause of death. But for the young people, it is the second leading cause of death.

The Kohl amendment is simple. It is just common sense. It would make it illegal for adults to arm children. I urge my colleagues to support this important amendment.

## DRIVER'S **PRIVACY PROTECTION** ACT AND LAW ENFORCEMENT

Mr. HARKIN.

Mr. President, I want to clarify my understanding of the provision of the Driver's **Privacy Protection** Act concerning law enforcement access to driver's personal information. Under section 2720(b)(2), law enforcement agencies have unrestricted access to this information in carrying out its functions. I believe that, with respect to law enforcement agencies, this provision should be interpreted so as not to in any way restrict or hinder success-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ful law enforcement and crime prevention strategies.

In appropriate circumstances, law enforcement agencies may reasonably determine that disclosure of this private information to a citizen or group of citizens will assist in carrying out the function of the agency. In my view, section 2720(b)(2) authorizes such disclosure. This would include providing such information to neighborhood watch groups engaged in crime deterrence and prevention activities in their neighborhood. Neighborhood watch groups have been successful in reducing the incidence of crimes such as prostitution and drug trafficking by using this information to contact people seen acting suspiciously in their neighborhoods, and in my view, this legislation would not undermine their ability to continue this activity.

However, this exception is not a gaping loophole in this law. A false representation that this information will be used for law enforcement purposes would be punishable under section 2721(b)(1), and misuse of this information would be punishable under 2721(b)(2). Similarly, a law enforcement officer who knowingly provided personal information to a person or group who intended to use that information for purposes that were not in furtherance of the function of that officer's agency would be in violation of the provisions of section 2721(a).

Therefore, it is my view that legislation clearly provides law enforcement agencies with latitude in receiving and disseminating this personal information for the purpose of deterring or preventing crime or other legitimate law enforcement functions. The threshold question, in my view, is whether the law enforcement agency's action is taken in carrying out its functions. My strong support for this legislation is premised on the belief that its implementation will not in any way undermine law enforcement or community policing efforts.

## GRAHAM AMENDMENT (NO. 1200) ON THE TRANSFER OF CERTAIN CRIMINAL ALIENS TO FEDERAL FACILITIES

Mr. SIMPSON.

Mr. President, I rise to express my support for Senator GRAHAM'S amendment which was adopted on November 16.

This amendment permits the Attorney General at the request of the State, county, or municipality, to transfer to a Federal prison criminal aliens convicted of felonies and incarcerated in State or local correctional facilities.

*12 The aliens who may be transferred to Federal facilities under this amendment are those who entered the country illegally, or who are subject to exclusion or deportation.

We cannot deny that it is a Federal responsibility to control illegal immigration, and to assure that those who come legally, leave the country when their status has expired. If those who enter illegally or who become out-of-status are convicted of felonies in State or local jurisdictions, it is not unfair to expect the Federal Government to assume some responsibility of the cost of their incarceration.

To my colleagues that argue that the State and local governments should not have to pay for the cost of illegal aliens because of the failure of the Federal Government to control illegal immigration, I would point out that we cannot prevent illegal immigration without more border patrol, stronger employer sanctions, including a system to verify employment authorization, and the full cooperation of State and local governments with the immigration service.

If my colleagues who complain about the cost of illegal immigration to State governments want us to control our borders, then you must support enforcement measures I have described. Without them the State and local governments will continue to experience the costs of illegal immigration.

I am pleased that we adopted the Roth amendment, which provides a strong incentive for State and local law enforcement agencies to cooperate with the Immigration Service. We should have passed such a law years ago.

I will support this amendment, but I do urge my colleagues who complain about these costs to support our efforts to take the necessary steps to control illegal immigration.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*S15963 AMENDMENT NO. 1159**

Mr. LEVIN.

Mr. President, I will vote against the Helms amendment which is aimed at stripping the Federal courts of their jurisdiction.

There is a proper procedure for amending the Constitution as it affects the judicial branch. However, the attempt to strip the Federal courts of jurisdiction to rule on constitutional rights in an ad hoc manner on the Senate floor is an approach that will not work under our Constitution. It raises false expectations among those who support changing the underlying policy to which the limitations on the Federal courts' jurisdiction are directed.

**AMENDMENT NO. 1159**

Mr. MACK.

Mr. President, I am pleased to join in offering this amendment to the crime bill because it is high time we started favoring innocent citizens over convicted felons. This amendment is straight-forward and quite simple-it merely prevents Federal courts from imposing a cap on prison population unless the plaintiff before them can prove that they personally are suffering an eighth amendment violation because of overcrowding.

The burden of prison population caps arises out of the overlitigious nature of inmates. A judge issues a cap only after a group of clever prisoners brings a suit alleging that the prison population is so high that their right to be free from cruel and unusual punishment is being abridged. While I strongly believe that we should not be violating anyone's constitutional rights, the remedy of prison caps should not be the first or only answer. If a plaintiff cannot prove that he, as an individual, has so little space that his eighth amendment rights are being violated, then a prison cap should simply not be ordered.

**\*13** In order to meet these caps, prison officials must release felons in order to accommodate newly admitted inmates. These releases take place regardless of the behavior of the inmate. Prisoners are not released because of exemplary conduct or hard work while in prison. They automatically receive time off their sentence and an unearned, quick ticket to freedom. This just isn't right. Unfortunately, the friends and relatives of detective Evelyn Gort know the danger and tragedy of these one-way passes first hand. The individual accused of murdering her was twice released early because of judicially imposed prison caps.

While the early release of inmates is just one aspect of the pervasive fear that grips the streets of my State, it is one we here in Congress can do something about. This fear, that any one of us could be the next victim of a random act of violence, perpetrated by someone who should be paying for their last crime, can be assuaged by passing this amendment. If we limit the power of Federal courts to order these prison caps where they are not absolutely necessary, we keep more violent thugs in prison for more of their full sentence-and that's a good thing. I believe this approach is the least we can do to protect law-abiding citizens and I urge my colleagues to approve the amendment.

**GRAHAM/MACK AMENDMENT ON CRIMINAL ALIENS**

Mr. MACK.

Mr. President, I rise today with my colleague from Florida, and with the support of many others, to ask that the Federal Government be responsive to a problem of its own creation. This amendment permits, but does not require, the Attorney General of the United States to take custody of, or financial responsibility for, criminal aliens incarcerated in State prisons and jails. The flow of illegal immigrants into this country is a Federal problem, not a State problem. An individual State such as Florida can do nothing to prevent illegal immigration. This is solely the province of the Department of Justice, the Federal Customs Service and INS. Florida citizens, like

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

those of California, New York, Texas, and Illinois, are weary of bearing the financial burden for the failure of these agencies to secure our borders.

The injustice perpetuated upon the good citizens of our States are twofold: First, these aliens are able to circumvent our immigration system and illegally gain entry to our country. In many cases, this results in a drawdown of scarce State human resources funds. Federal reimbursement for unpaid medical bills and the educational costs for the children of these immigrants never fully compensates our States. Worse yet, some of these illegal aliens commit crimes, again subjecting the State taxpayers to paying the freight for incarceration costs. The fact of the matter is that these individuals would not be in our jails, and thus depleting our State resources if it weren't for the failures of the Federal Government.

It is not the fault of anyone in my State that the Customs Service didn't catch the boat coming in, or the passenger with fraudulent documents. Why should my constituents or those of any other State be forced to pay for their mistakes? In Florida alone, we have 3,433 illegal aliens serving time in our prisons. That comes out to $58.6 million in State taxpayer funds that could be going to keep more violent criminals behind bars for longer.

*14 The amendment we have offered is based on fundamental fairness and the notion that the Federal Government can and should be accountable for its failure to maintain control of our borders and I urge my colleagues to vote in favor of its passage.

### MORGAN P. HARDIMAN TASK FORCE ON MISSING AND EXPLOITED CHILDREN

Mr. D'AMATO.

Mr. President, I wanted to speak briefly on the passage of an amendment that Senator DECONCINI and I attached to S. 1607, the 1993 Crime Bill on November 10, 1993. This amendment establishes the Morgan P. Hardiman Task Force on Missing and Exploited Children.

This issue is one that is particularly close to my heart, both because of the dire need to organize this task force on missing and exploited children, but also for whom it is named.

Morgan joined my staff in January 1983, and handled crime and drug issues with great success, traveling and seeing, firsthand, the awful effect on people of illegal drug use, as well as the terrible crime this country faces on a daily basis. Until just before his final illness this past month, Morgan remained dedicated to his work. Morgan always fought for what was just, and that included the rights of children and the effort to locate the thousands who have been abducted and exploited throughout the country.

Mr. President, the U.S. Department of Justice national incidence study found 4,600 nonfamily abductions reported to police, 438,600 children lost, injured, or otherwise missing, and 354,100 children abducted by family members. These numbers are overwhelming.

As we discuss the various amendments to the crime bill, we aim to protect our people. This amendment does just that. Moreover, it seeks to protect our Nation's children by establishing a task force offering the combined resources and expertise of the FBI, ATF, Secret Service, Customs, Postal Inspections Service, U.S. Marshals Service, and the DEA, all to help local governments and police forces in the search for these children. The task force will work together with the Center for Missing and Exploited Children to identify what actions are needed.

Our local police forces are often overwhelmed with an enormous caseload and many times they need expert assistance. With the help of the National Center, and expertise of this task force, critical cases will get the necessary specialized attention to perhaps help solve more outstanding cases. Information and evidence cannot be allowed to fall through the cracks and investigations must continue. This will be the job of the Morgan P. Hardiman Task Force on Missing and Exploited Children.

Mr. President, Morgan P. Hardiman was a quiet hero. He was a colleague and a friend. I am glad that his achievements can be memorialized with his task force. He poured his energy into the creation of Project Alert-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

America's Law Enforcement Retiree Team-as part of the National Center for Missing and Exploited Children and this task force is a natural outgrowth of his efforts. The people who worked with him in these efforts know that he made a remarkable contribution to his country, and I want to thank Senator DECONCINI for the thoughtful gesture of proposing to name the task force after Morgan. It is a fitting tribute to a man who worked arduously to end the abuse of our nation's children and to bring those missing, home to their families.

**\*15 \*S15964** I want to thank Senator DECONCINI for this fine amendment, and for the tribute that it provides to my former staffer, Morgan P. Hardiman.

### NATIONAL CHILD PROTECTION ACT OF 1993

Mr. COATS.

Mr. President, several years ago I supported an effort to address a need that many working American families have for safe and affordable child care. The compromise proposal we passed and the President signed, recognized the reality of working parents and their need to have safe, clean, and secure environments for their children.

Subtitle B of the legislation before us today is, in my opinion, a logical and necessary next step in providing a safe and secure environment for children.

The National Child Protection Act of 1993, which has been included in the crime bill, establishes a nationwide criminal background check for child care workers to determine if persons who are caring for children have committed child abuse or other serious crimes.

Mr. President, this is a very important provision. Protecting our children must be one of our Nation's highest priorities. And I say that not just as a parent, and not just as ranking member of the Subcommittee on Children, but as a former volunteer of an organization which has for the last 90 years, endeavored to help our Nation's children overcome the many obstacles they face by providing one-to-one services to children in need. I am speaking of Big Brothers/Big Sisters of America.

Selection of the most appropriate volunteers to serve as Big Brothers and Big Sisters is a task their more than 500 affiliates take very seriously-the result of which has been the establishment of a very comprehensive mechanism to enable selection of the most qualified and committed volunteers. This process of selection includes a criminal background check. However, some States do not permit or do not assist with the obtaining of police checks; for example, New York and New Jersey, while others require cost prohibiting fees.

This legislation will greatly assist organizations like Big Brothers/Big Sisters in providing valuable services to children in need.

In his testimony before the House Subcommittee on Civil and Constitutional Rights, Big Brothers' President Lynn C. Swann told the committee that:

This legislation of national criminal background checks would create a uniform and consistent method of reporting and tracking individuals who have been involved in child abuse crimes. As a national organization, with affiliates in all 50 States, we are most interested in an approach on a national level that will enable our agencies to access criminal background checks. The modest investment of dollars would pay significant dividends, if only a few children are saved by this reporting requirement.

Mr. President, this is modest investment in the safety of our children and I am pleased to support it.

### KASSEBAUM-SIMPSON SENSE-OF-THE-CONGRESS AMENDMENT NO. 1172

Mr. SIMPSON.

Mr. President, I rise in support of the Kassebaum-Simpson amendment which was adopted on November 10, 1993.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*16** Our asylum system has been turned on its head in recent years as would-be immigrants have found it more attractive to come to the United States and claim asylum than to apply for refugee status abroad, or to enter through our regular immigration process.

Mr. President, it's more attractive because once they get into the United States, they then become entitled to all the due process our Constitution provides for American citizens.

If they apply for refugee status abroad, and if they are then found to not have a well-founded fear of persecution, they will be denied refugee status, and that is the end of it.

However, if they can manage to get to the United States to claim asylum, they are then entitled to appeal after appeal, with the final decision made by the Federal Circuit Court of Appeals.

This process can take years, and in the meantime, the alien has an opportunity to live and work in the United States, which was often the primary objective.

The original purpose of asylum was to provide a refuge for people who found themselves in the United States when conditions changed at home, making it unsafe for them to return. That is why we provided an annual allotment of only 5,000 asylum slots when we passed the Refugee Act of 1980.

We have a separate refugee policy to enable people who are outside their countries of nationality, and who have a well-founded fear of persecution, to apply for refugee status at our refugee processing centers, our Embassies, and our consulates abroad.

We should not make it more attractive for aliens to enter the United States, legally of illegally, to apply for asylum, than it is for them to apply for refugee status abroad.

I support the findings of the Kassebaum amendment, and I support the policy it proposes.

We are currently working in the subcommittee, with the administration, to draft expedited asylum procedures for those aliens attempting to enter with fraudulent documents, or no documents.

We are also drafting legislation to provide a more streamlined asylum process for those people already in the country who then claim asylum.

This sense-of-the-Congress amendment expresses the appropriate policy, and one that Congress should support.

### BOXER AMENDMENT NO. 1183 TO INCREASE PENALTIES FOR DOCUMENT FORGERY

Mr. SIMPSON.

Mr. President, I rise in support of Senator BOXER's amendment adopted on November 10.

Mr. President, this amendment increases the civil penalties for immigration document fraud.

In 1990, I offered an amendment to the Immigration Act of 1990 to create civil penalties for document fraud. This amendment was necessary because U.S. attorneys were reluctant to bring criminal charges against aliens and others who used fraudulent documents to obtain immigration or employment benefits.

By establishing new civil penalties for this type of document fraud, immigration officers could file complaints and bring these charges without involving the U.S. attorneys.

**\*17** This amendment would increase the civil penalties for a first offense from a minimum of $250 to a minimum of $1,000, and it would increase the maximum penalty from $2,000 to $5,000.

The amendment would also increase the civil penalties for subsequent offenses from a $2,000 minimum to $5,000, and from a $5,000 maximum to $10,000.

In addition to increasing the civil penalties for document fraud under the immigration laws, the amendment would also increase the criminal penalties for document fraud under the Criminal Code.

Document fraud is one of the most serious and difficult problems we are encountering in our efforts to control illegal immigration. Stiffer penalties may reduce the incidence of document fraud, and I support the amendment.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

### BOXER CRIME BILL AMENDMENTS-INCREASED PENALTIES FOR DOCUMENT FORGERY

This is a simple amendment. It increases the civil and criminal penalties for any visa, border crossing card, alien registration receipt card, or any other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or used to satisfy any requirement of the Immigration and Nationality Act.

Current law has civil penalties of not less than $250 and not more than $2,000 for each document used, accepted, or created and each instance of use, acceptance, or creation. My amendment would increase these penalties to a $1,000 and a maximum of $5,000.

For those persons who are already under a cease and desist order for document violations, the current penalty is not less than $2,000 and not more than $5,000. My amendment would raise the civil penalty for repeat offenders to not less than $5,000 and not more than $10,000 for each document used, accepted, or created or each instance of use, acceptance, or creation.

My amendment would also increase the criminal penalties for fraud and misuse of visas, permits, and other documents. For violations under this section, my amendment would raise the current prison term from not more than 5 years to not more than 10 years and, for other circumstances, from not more than 2 years to not more than 5 years.

Additionally, my amendment would increase fines to $10,000 or $5,000 for certain violations under this section of our criminal statutes.

### FEDERAL GUN DEALER LICENSING REFORM

Mrs. FEINSTEIN.

Mr. President, I rise today in strong support of the amendment offered by the Senator from Illinois <Mr. SIMON>. Simply put, this commonsense amendment would help bring sanity to the federally licensed firearms business.

*S15965 Everyone in this body has heard the nightmare stories about federally licensed firearms dealers. Such as:

The Maryland man who sold 9mm Glock handguns and Tec-9 semiautomatic weapons out of the trunk of his car;

The Los Angeles gang member who sold more than 1,500 guns to his colleagues-one of the more than 3,000 licensed firearms dealers in Los Angeles County-and only four of the weapons were properly registered with California authorities;

*18 The many Virginians who obtain Federal licenses to avoid the one-gun-per-month law recently adopted;

The Californian who was arrested for selling machineguns and other weapons out of his parents' home to the Fourth Reich skinheads-a group that planned racially motivated terrorist attacks against minority groups, including the well-known first AME church; and

The gun dealership known simply as "Chuck's Guns," which operated out of room 744 of the Frontier Hotel on skid row in downtown Los Angeles.

These are just some examples. There are many, many more.

Unfortunately, as noted above, the results when a criminal receives a Federal firearms license can be deadly. A single dealer has the power to put a large number of guns into the wrong hands before he or she is caught. As one Alcohol, Tobacco and Firearms agent put it, "Hopefully we can catch them <the bad dealers> before too much damage is done. But in the meantime, how many people have been injured or worse?"

The problem is that it is just too easy for criminals to obtain licenses. Just fill out the application, send in the $30 fee, and within 45 days almost anyone can have a 3-year license to sell firearms. Chances are, no one will

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

call or visit the applicant to verify any of the information. In fact, due to a lack of resources, less than 1 out of 10 applicants are personally visited by an ATF inspector before a license is issued.

This headline from the Wall Street Journal says it all: "Want A Gun? Become A Gun Dealer".

As this chart illustrates, the problem is only getting worse. As the number of ATF inspectors who conduct investigations has declined by 13 percent, the number of Federal firearms dealers has increased to 286,000-an increase of 99 percent over the last two decades. There are now more firearms dealers in California than there are high school teachers.

An example of how flawed the system is occurred when a Washington Post reporter sent in an application for his dog "Fifi". ATF ran the required computer check, found no record of criminal activity, and after the 45-day limit, issued "Fifi" a Federal firearms license. The problem is simple and is best described by ATF's head of gun dealer licensing-"If a criminal lies, I catch that up front".

Fault lies not with the Bureau of Alcohol, Tobacco and Firearms. Fault lies with Congress. Unfortunately, ATF just doesn't have the resources to do their job properly.

Under current law, ATF is supposed to process Federal firearms dealer applications as quickly and as efficiently as possible. And even if a full investigation has not been completed, ATF must issue a license after 45 days unless the applicant is disqualified. If ATF does not issue the license, the applicant can sue the Government. I am not aware of any other application procedure in the United States where an applicant can sue the Government if an application is not approved after 45 days.

Congress must act to reform the system of obtaining Federal firearms licenses. When it is harder to get a liquor license, or even a driver's license, than it is to get a firearms license, something is wrong.

*19 The Simon amendment is simple. It would do the following seven things:

First, increase the 45-day ATF license processing requirement to 60 days to ensure that a thorough background check is completed before a license is issued;

Second, make sure that license recipients are in compliance with State and local laws to help make sure that those selling guns are law abiding citizens. The former ATF Director recently testified that "ATF must issue licenses even in situations where we <ATF> may have every reason to believe that the business will be operated in violation of State or local law";

Third, require licensees to report the theft or loss of a firearm within 48 hours of being discovered so ATF can conduct timely investigations;

Fourth, make sure that all Federal firearms dealers are finger-printed and have photo identification-similar to when applying for a drivers license;

Fifth, allow ATF to inspect dealer's inventory and records when a firearm involved in a crime is traced to the dealer;

Sixth, let State and local governments know who has a Federal firearms license in their jurisdiction; and

Seventh, require all licensees to respond to requests from ATF for information in a dealers record within 24 hours. This would help ensure that law enforcement agencies can receive timely information during a criminal investigation.

This amendment is just common sense. I understand that most dealers are law abiding citizens. But, many are not and there are numerous examples to prove that. Let's reform the system to ensure that law abiding citizens and only law abiding citizens can obtain Federal firearms licenses.

As one legitimate federally licensed firearms dealers stated, "It's a joke. The politicians are screaming about gun control, but the Federal Government is handing out licenses to every Tom, Dick, and Harry. And then they never check the people. It makes you want to scream."

I strongly support the Simon amendment, but believe that real reform of Federal firearms licensing procedures can not occur without a discussion of the fee structure. A recent report from ATF estimates that the actual costs

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to issue a Federal firearms license and to maintain the compliance program is more than $600 per dealer annually. I believe that this taxpayer subsidy must end, and I intend to address this important issue in the future.

The Simon amendment is a good first step that will bring some sanity to the licensing of Federal firearms dealers, and I urge my colleagues to support the amendment.

I ask unanimous consent that the Wall Street Journal article and the AFT cost analysis be entered into the RECORD at this time.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

Firearms Dealer Compliance Costs

First year costs for:
Firearms dealer dealing in any title 1 firearms:

Application processing (Incl. 3 FBI name chk) $107

Field investigation of applicant 275

Related program costs 220

Admin support 44

*20 Total first year cost 646
Subsequent year cost for:
1. Firearms dealer dealing in any title 1 firearms:

Application processing-renewal 34

Field compliance inspection 275

Related program costs 220

Admin support 44

Total out year cost 573
2. Pawnbroker dealing in any title 1 firearms:

Application processing-renewal 34

Field compliance inspection 382

Related program costs 305

Admin support 61

Total out year cost 792
3. Dealer in (sporting) long guns only:

Application processing-renewal (every other year) 34

Field compliance inspection 275

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Related program costs 220

Admin support 44

Total annual out year cost 286
    Source: Bureau of Alcohol, Tobacco, and Firearms.

----

<From the Wall Street Journal Nov. 4, 1993>

WANT A GUN? BECOME A GUN DEALER

(By Josh Sugarmann)

Sen. Bill Bradley's statement Thursday that Congress should raise the licensing fee on gun dealers to $2,500 from $30 highlighted one of the most overlooked aspects of the national debate on firearms: the ease with which nearly any American over the age of 21 can become a federally licensed gun dealer.

Mr. Bradley's statement follows the recent signing of an executive order by President Clinton directing the federal Bureau of Alcohol, Tobacco and Firearms to begin restricting federal firearms licenses (FFLs) to bona **\*S15966** fide gun dealers. This sensible step will help stem the flow of guns to America's criminals, a move that conservatives, who repeatedly emphasize the "rights with responsibilities" ethic, should applaud.

The Type 1 FFL is the basic federal license required to sell guns in America and grants the licensee unique and broad privileges. America's 246,532 Type 1 FFL holders can ship and receive firearms and ammunition in interstate commerce via common carrier and purchase weapons at wholesale prices. Most activity can be conducted free of local and state regulations that apply to individual " over-the-counter" purchases, such as waiting periods or background checks.

LAX PROCEDURES

One would assume that to become a federally licensed firearms dealer, a rigorous set of regulations would be in place to keep undesirables out of the business. But the reality is that any American over the age of 21 can become a gun dealer upon paying a $30 three-year licensing fee and undergoing a loophole-ridden background check for possible felony convictions.

Because of the cursory nature of the application check, those with felony records can avoid detection merely by having relatives, girlfriends, or even pets register for them In 1990, ATF officials were embarrassed when it was revealed that they had approved a license application for two dogs. "The point is well taken," an ATF spokesman acknowledged. The dogs would clearly pass a record check designed for human beings."

The result of these incredibly lax procedures is that in many states, it is easier to become a dealer in firearms than to purchase a handgun legally. It's not surprising that from 1975 to 1993, the number of Type 1 FFLs jumped more than 68%. The licensing procedure is so lenient that today the U.S. has more gun dealers than it does gas stations.

**\*21** Yet according to a July ATF report, only 18% of the holders of Type 1 FFLs operate actual storefront businesses such as gun or sporting goods stores. The vast majority, 74%, are "kitchen-table" dealers who conduct business out of their homes-often in violation of state and local zoning, business, or firearms laws. (The remainder conduct business out of commercial premises not associated with the sale of goods to the public, e.g. real estate offices, auto repair shops, or beauty shops.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

While most of the ATF's regulatory lethargy as regards FFL issuance, renewal and revocation has been self-imposed, in 1986 Congress placed major roadblocks in the agency's way when it passed the Firearms Owner's Protection Act. The law helped curtail FFL enforcement by limiting ATF to one unannounced dealer inspection per year; reducing the record-keeping requirements for dealers selling guns from their "personal" collections; removing record-keeping requirements for ammunition dealers; prohibiting ATF from centralizing or computerizing dealers' records; and imposing a higher standard of proof (violations need to be "knowing" or "willful") while lessening penalties for dealer violations.

Moreover, less than 6% of all FFL holders are inspected in an average year. In 1990, the agency revoked only three of the 235,700 Type 1 FFLs then held. The ATF estimates that at current funding levels it would take the agency more than a decade to inspect every FFL holder.

For the first time, however, the ATF recently began visiting or calling all new applicants. Two cases cited by former ATF Director Stephen Higgins in June testimony before the House Subcommittee on Crime illustrate the need for increased oversight.

The first case concerned a New Jersey man whose stated place of business was a room at the YMCA. The applicant had several guns in the room and was reloading ammunition while talking to the inspector. "The applicant," Mr. Higgins testified, "was watching movies about the Vietnam War and appeared to be irrationally enthralled with that conflict." In a second case, after a preliminary inspection the prospective gun dealer withdrew his application. " One week later," Mr. Higgins continued, "the applicant was arrested for possessing . . . machine guns. He was subsequently released, only to later engage in a shootout with local police."

The bureau has also improved its inspection process by visiting the holders of FFLs in select urban areas prior to renewal, in an attempt to confirm that they have met all state and local licensing requirements. Those who have not met the requirements are informed that their licenses will most likely not be renewed.

Yet an unknown number of FFLs remain in criminal hands. Licensee abuses cited at the June House hearing included those of Detroit kitchen-table dealer Larry Wilson, who sold 2,169 handguns and assault rifles off the books to criminals; New York City resident John Adams, who ordered more than 1,000 handguns through the mail and then sold them on the city's black market; and fellow New Yorker John Zodda, who over a five-year period used his own FFL and a series of falsified licenses to buy and sell more than 2,400 firearms, including assault weapons.

**\*22** These are not isolated cases. A 1992 study by the Violence Policy Center found that kitchen-table dealers contribute significantly to criminal gun flow. In an analysis of ATF crime-gun traces for Detroit, the study found that one-third of all dealers who had five or more guns used in crimes traced back to them were kitchen-table dealers; the average number of crime guns traced per kitchen-table dealer was nearly 50% higher that than of gun shop owners; and six of the top 10 dealers with five or more criminal gun traces were kitchen-table dealers. These statistics illustrate the folly of the federal government's permissive firearms licensing procedures. Even opponents of gun control should be in favor of measures that would limit gun-dealing licenses to legitimate gun dealers.

WHAT'S NEEDED

As a result of President Clinton's directive, additional steps to be undertaken by ATF include the development of a more comprehensive application form, finger-printing applicants, and automating the bureau's dealer records. The problem cannot be solved, however, until Congress moves to limit license availability to legitimate storefront operations by-at the very least-increasing the annual dealer licensing fee and requiring that before a federal license is granted applicants show proof of having obtained all necessary local and state permits. The recent resignation of Mr. Higgins from the ATF highlights the need for a new director who is committed to imple-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

menting these regulations.

These moves will not make it any more difficult for law-abiding citizens to obtain firearms. The will, however, be a big step forward in reducing the number of kitchen table dealers and in the process limiting criminal access to guns. That's as effective a weapon as any in the fight against crime.

## LEVIN AMENDMENT TO THE CRIME BILL

Mr. DURENBERGER.

Mr. President, I rise to explain the reasons I am a cosponsor of the amendment by my friend and colleague from Michigan, Senator LEVIN.

Senator LEVIN'S amendment would replace the death penalty provisions of this bill with mandatory life in prison without the possibility of parole.

The crime bill began by imposing the Federal death penalty for 47 offenses, and in our mad rush to appear tough on crime the Senate has kept adding to that list. The tone of the debate on this bill has been so extreme that the Senate defeated a very reasonable amendment by Senator Simon that would have prohibited the execution of juveniles.

I am philosophically opposed to the death penalty as a matter of conscience. But I believe that there are also many practical policy reasons to oppose the death penalty. If we were less concerned about appearing tough on crime and more concerned about crafting rational and effective policy, the Senate would adopt the Levin amendment.

First, we should dispel several myths that have been perpetuated about the death penalty:

Myth No. 1: The death penalty is the only way to permanently incapacitate dangerous criminals. The public supports the death penalty to prevent dangerous individuals from reentering society. But this can also be accomplished by life imprisonment without possibility of parole. Public support for the death penalty drops dramatically when life without parole is mentioned as an alternative.

*23 Myth No. 2: The death penalty is less costly than life imprisonment. Actually, the average trial and one appeal to a State court in a capital case costs about twice as much as incarcerating a prisoner for life. Putting criminals on death row drains the limited resources of our criminal justice system.

Myth No. 3: The death penalty is a deterrent to crime. There is no statistical evidence that the death penalty is a deterrent to violent crime. In fact, murder rates have risen the most over the past ten years in States with the death penalty. My home State of Minnesota and other States without the death penalty have comparatively low murder rates.

Myth 4: The death penalty is needed to make victims whole. In 1991, the Minnesota State Legislature considered a bill that would have reimposed the death penalty in my home State. The parents of Carin Streufert, a University of Minnesota student who was brutally murdered, testified against the bill. Don and Mary Streufert stated that the death penalty could never erase the pain and grief of victims' families. Don said, "We see no sweetness in revenge, only bitterness and alienation." The death penalty only accomplishes vengeance, and vengeance does not make victims whole.

Another factor that should cause the Senate to stop and think before it drastically expands the death penalty is the inconsistent application of the death penalty. One Federal death penalty is currently in effect under the *S15967 Anti-Drug Abuse Act of 1988. Under that act, the Justice Department has sought the death penalty against 30 defendants. 22 of these prosecutions were against African Americans. Half of the remaining eight were Hispanic defendants. It is troubling that the Justice Department has not explained this racial disparity.

Mr. President, the vast majority of the free world has rejected the death penalty, while America is in the company of the some of the most intolerant and backward governments on the globe. Our use of the death penalty

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

undermines our standing as a proponent of human rights around the world.

Imposing a Federal death penalty for dozens of offenses is no solution to violent crime. The death penalty is not a deterrent. The death penalty is not a cost-effective alternative to incarcerating criminals. It cannot erase the pain and grief of victims' families. The only thing that can be said for the death penalty is that it feeds our lust for vengeance and perpetuates the cycle of violence.

I urge the Senate to inject some rationality in the crime bill debate and adopt the Levin amendment.

## FEINSTEIN AMENDMENT TO THE CRIME BILL

Mr. DURENBERGER.

Mr. President, I rise to explain my reasons for opposing the amendment by my distinguished colleague from California, Senator FEINSTEIN, which imposes a ban on certain types of semiautomatic weapons.

First, I must compliment Senator FEINSTEIN for her efforts to exempt hunting and sporting rifles from the ban. I respect her attempt to find a compromise between those who advocate a complete ban on semiautomatic weapons and those who want to protect legitimate sporting rifles. I have often found myself in the same position of trying to find common ground on controversial issues, and I know how difficult that can be.

*24 But I cannot support this amendment at this time because I am not convinced that a ban on semiautomatic weapons will have any real impact on the problem of violent crime.

Semiautomatic weapons make up approximately 15 percent of the firearms owned by Americans. Yet, less than half of 1 percent of violent crimes involve these types of weapons. According to the FBI, more people were killed in 1992 by fists and feet than by rifles of any type. Five times as many people were killed by knives.

Further, if semiautomatic weapons are inherently a danger to the community-and the statistics do not indicate that they are-then I would question why so many weapons have been exempted by this amendment. If semiautomatic weapons are inherently dangerous, then this amendment will not amount to much more than a symbolic gesture.

Crime and violence in America has become a public health crisis. We are in a battle for the hearts and minds of young people in our communities. We are not going to solve the problem through the expansion of the death penalty, nor are we going to solve it through weapons bans. It misdirects our limited resources to think that we can. That is why I will cast my vote against the Feinstein amendment.

## REGARDING THE HUTCHISON AMENDMENT TO S. 1607

Mr. PELL.

Mr. President, I particularly want to clarify what may be some misunderstanding about the participation of the incarcerated in the Pell grant program. It is important to understand, at the outset, that no prisoner displaces another deserving student who is not in prison. The Pell grant program functions as a quasi-entitlement in which a student qualifies for a grant, and the size of the grant depends on the availability of sufficient appropriations. Thus, a student is not cut out of the program because a prisoner qualifies for a grant. If they are both eligible, they both receive a grant and there is little relationship between the two.

Also, regarding the number of prisoners who receive Pell grants, the Inspector General at the U.S. Department of Education estimates that the number is far less than the 100,000 figure that has been cited, and is actually only about 25,000. This is less than one-half of 1 percent of the 4.5 million students who received Pell grants last year. Further, the actual cost is also considerably less than the $200 million cited, and is much closer to $40 million, which is about six-tenths of 1 percent of the total Pell appropriation.

Mr. President, today there are currently more than 1,000,000 men and women in our Nation's jails. The cost of incarceration of this magnitude is enormous. On average, we spend $30,000 a year to keep a person in jail. As I

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

have said on many, many occasions, it costs us more to send a person to jail than to Yale.

Education is our primary hope for rehabilitating prisoners. Without education, I am afraid we are doomed to a recidivism rate of somewhere between 50 and 70 percent. The door into jail will remain a revolving one. With little or no education, a person will leave prison only to commit another crime and be returned to prison.

**\*25** Mr. President, we know that postsecondary education for incarcerated students dramatically helps to reduce recidivism rates. Rates for prisoners who receive 2 years of schooling are about only 10 percent, compared with an overall rate of five to seven times that. In Arkansas, for example, inmates who get a high school degree and postsecondary training have a recidivism rate of 8%, less than one-sixth the national rate. Graduates of Alabama's largest inmate education program, J.F. Ingram State Technical College, have a recidivism rate that is one-third lower than that of the Alabama prison system as a whole.

It is most important, however, to understand that these results are achieved with only a very small Federal effort. We spend almost $30 billion a year to keep people in prison. The amount we spend on education through the Pell Grant Program is only one-tenth of 1 percent of what we spend simply to keep a person behind bars. Given that situation, the very small Federal effort we make through the Pell Grant Program certainly helps achieve some very important and remarkable results.

In reauthorizing the Higher Education Act of 1965 last year, we were careful to address concerns about prisoners receiving Pell grants. We now exclude from Pell grant eligibility inmates under a death sentence or serving a life sentence without parole. Postsecondary institutions may not participate in the Pell Grant Program if incarcerated students comprise more than 25 percent of their total student population. Pell grant money cannot supplant State postsecondary correction educational assistance. And finally, incarcerated students eligible for Pell grant aid are limited to tuition and fees. The cost of living expenses for incarceration are not allowed, and this very definitely limits the size of the grants they can receive.

Mr. President, I realize that this is a difficult and highly charged issue. We can take still more steps to ensure that funds go to those with the best chance of rehabilitation, but I do not believe that we should end our commitment to postsecondary education for prisoners. Criminals should be sentenced and incarcerated, but let us also be concerned with their rehabilitation so that they will not return to a life of crime upon release from prison.

Mr. BIDEN.

Mr. President, I rise at this late hour because we have been debating the crime bill for an extended period of time now, a number of days, and we have been working out very complicated agreements whereby we would be able to proceed to act on some very, very consequential legislation and very controversial legislation, including what we did today, the vote on the Feinstein-Metzenbaum-DeConcini assault weapons provision and what we hope we can do tomorrow, finally disposing of the Brady bill, hopefully in the fashion I would like to see it disposed of-that is passed.

Tomorrow will be a busy day. Our staffs, as we speak now, our Republican and Democratic staff, leader staff, manager's staff of this bill are trying to work out how to proceed under a time agreement on the Brady bill tomorrow.

**\*26** So, the reason I tell you all this is to explain why I am about to do something I have not done in 20 years, and that is come and speak on an issue at this late hour rather than during the regular hours because tomorrow, I imagine, if all goes well there will not be much time to discuss what I want to discuss.

**\*S15968** That is I want to speak specifically and briefly to one of the literal casualties of the inability or unwillingness of the Nation to respond to violence in America.

As we debate how best to respond to the epidemic of violent crime in America and hopefully bring to resolution that debate in the Senate tomorrow before the sun sets, and it is a debate that by necessity will last long beyond whatever action we will take on this legislation currently under consideration, in our discussions we inadvertently spend a lot of time talking about statistics.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

I have stood on this spot over the last five, six, seven, eight-I do not know how many days now-reciting unfortunately from memory because I have come to know them too well the awesome statistical carnage that occurs on our streets, but they are statistics. And I have cited how bad things are but the empirical evidence is, in fact, very important.

But what we must never forget in the course of quoting the studies and citing the numbers is that every statistic represents a very real human life, in all its riches of experience and emotion, every one of the statistics we have cited on the floor is a human life that has been affected or taken as a consequence of an action by a violent individual and the statistics we state.

Every statistic represents a family, a future, a whole interdependent web of feelings, hopes and plans that has been dashed as a consequence of a malfeasance in our society.

No one who was involved, or who even witnessed, our Judiciary Committee hearings on the proposed assault weapons ban earlier this year, none of us will ever forget, none of us will ever be able to forget if he wanted to, the testimony of a young widower-father and young widow, the living victims of fatally violent acts that shattered their families and so much of what they, like all of us, had assumed could be counted on in life.

I would like tonight to submit written testimony into the RECORD, testimony that reveals another face behind the statistics of violent crime, and a family that, after more than a decade of living with their loss, continues to struggle every day with the scars left by the violent death of a loved one.

The faces in this family are very familiar to me, because one of them belongs to a very good friend of my wife and mine, Kathleen Anderson Winter.

Kathy is a person who can accurately be described as joyful. She is a successful professional, married to a successful professional, with a beautiful young family. She has a great spirit, both generous and warm.

Kathy is also one of the many Americans for whom the violent death of a family member-her brother-remains an inescapably pervasive, fundamental and defining fact of her life and the life of her family.

**\*27** The testimony I will submit was sent to me in letter form by Kathy's mother, Suzanne Slate Anderson, and I hope all my colleagues will take the time to read it in full. For it is a truly, and painfully, powerful expression of the struggle faced by this and so many other families, who have been victims of tragedy and violence.

What Mrs. Anderson herself describes as "continuing anguish * * * an ongoing awareness that there can never be a wholeness again." She writes that life does go on, but in "a painful, broker rhythm."

The testimony is a powerful expression, too, of how much we all lost the night of August 12, 1982, when Thomas Clark Anderson-age 20, college student, working at a suburban restaurant for his summer job-was killed, by a drug-addicted, would-be robber with a handgun.

It is where we lose every day because of violence in America-promise, security, trust, hope, opportunity, justice, liberty-the very foundations of all that we cherish in our private and our communal lives are threatened by violent crime.

When Mrs. Anderson was going through her son's belongings after his death, she came across a statement he'd written in a chemistry notebook, which read:

Let me leave you with this thought. Remember that the American dream can not die; for when you are deprived of something you want, you dream about it, and your dream will last as long as you strive to turn it into reality.

Mrs. Anderson speaks to all of us when she quotes that statement and writes:

Young Americans out there have dreams. I charge you this day with stabilizing our society so that these dreams can be realized. Young people should not have to live in fear that guns will kill them, that schools and neighborhoods are not safe. And parents should not have to bury their children, for they are never whole again.

Unfortunately, Mr. President-and I think I have only mentioned this one other time in 20 years-I can, as we say in our antiseptic language in the Senate, associate with Mrs. Anderson's loss. For the loss of a child, I think,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

is like no other loss that anyone can experience.

Mr. President, it is time, I believe, for us to answer the charge of Mrs. Anderson to do all that we can to preserve the trend we hope to get started of dealing with violence and reverse the trend of increasing violence in America.

America should not, and must not, be a society where the reasons for fear are greater than the capacity to dream.

Mr. President, I would like to take time now to read-and it is a relatively short letter-portions of Mrs. Anderson's letter to me.

DEAR SENATOR BIDEN: The following testimony hopefully will reveal to you the continuing, anguish over the violent death of a fine young man felt by his family. It is still acutely painful to reveal the emotion of the loss. Yet, it is still too clinical just to give a statistical accounting of the effect of his death on our lives. Where we are and who we are today has been immeasurably influenced by his death.

**28** There is an exponential factor in reaction to murder, to grieving and to the justice process. It is not a television whodunit where only the question of the guilty is solved. For those who suffer, for those who try to comfort, for those who seek to bring legal and social justice, there is an ongoing awareness that there can never be a wholeness again. Life will never be the same. It is essential for the populace to know that recovering from a death by violent means does not get better in the morning. Time does not necessarily heal all wounds. Anger is not dissipated by years. There is no antidote for this pain, ever.

Thomas Clark Anderson was born on January 19, 1962. He followed two sisters, Kathleen and Jane and was the older brother to John, who was born three years later. He was energetic, had a tremendous work ethic even as a little boy of three, and felt a great sense of family responsibility. Tom loved sports, was popular with his peers and he enjoyed the respect and friendship of people of all ages. He was independent, savvy, and wonderfully polite and well mannered. He was goal oriented and had a vitality that would tire us all. We loved him and he loved us.

Tom was educated in the public schools until the fourth grade, when he moved with his family to Geneva, Switzerland (as a result of his father's employment) where for five years he attended the International School of Geneva. Upon the family's move back to the United States, he returned to public school, but mainstreaming into a non-flexible program that did not allow for his course of study in Geneva proved difficult. This led us to enroll him in The Hill School, a private school in Pottstown, Pennsylvania.

At The Hill School, Tom was an above average student, a really good soccer player and a prefect his senior year. He was selected by the faculty to counsel younger classmates on values, studies and student life. For his service as a counselor, he was chosen as one of the three outstanding prefects his senior year. Capitalizing on his years in Switzerland, he received honors in the study of French. Tom was accepted at Duke University and entered Duke in January of 1981.

In January 1980, Tom turned 18. One gray winter day when he was on holiday from school, he and I were running errands. He turned to me and said that he needed to register for the draft and would it be all right to do so that day. With a certain emotional tightening, I realized that this was indeed a responsibility of an 18 year old and I agreed to go along. That registration was a time of painful reflection for me. Fortunately, we were at peace. No wars were actually being fought, but I could well remember that there had been wars and friends of mine had lost brothers. I remember the gray sadness when Bill Lentz, a tall blond, blue eyed young man, a recent graduate from NC State, B-17 pilot, an only son and older brother of my friend, was killed in W.W.II. I recall the loss of Charles Long Casey in Korea and how unreal it seemed because he had just been swimming at the country club the summer before and now it was summer again and life at the country club was just the same. For the Casey family it was a painful realization. And then there was C.L. Corn, serving his country as young men who graduated in 1954 had to do. All had died before age 25. Too young, too soon. I was grateful that the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

reality of war was remote and Tom would be spared that threat.

*29 Tom worked after graduation from high school in a nearby restaurant. He washed *S15969 dishes at first and then served as a busboy, and did this until I drove him one snowy morning to Duke University. Tom loved Duke. It was the perfect match. He went to both sessions of summer school in 1981 so there was no summer job. In the summer of 1982, he returned to our home in West Chester, Pennsylvania. Summer jobs were not plentiful, so he ended up at the same restaurant working as a busboy, much to the delight of the owner. His brother John, then age 16, joined Tom in working at the restaurant and at times shared the same schedules. John used to complain that Tom was a task master while cleaning up those tables. Tom was saving his money to buy a car and commenced in an exhaustive search for most of the summer. Two years prior to this, he and I had made an indepth study of all the cars and test drove many of them together. He brought a metallic light blue Honda Accord, where he paid for half and we assisted with a loan for the other half. Tom loved this car and enjoyed showing everyone how the car would talk to you if you left the lights on.

Two weeks prior to the start of the 1982 fall semester, Dennis Dreibelbus, the night manager of the restaurant quit his job to take a position with the Boy Scouts of America. While the owner of the restaurant looked for another night manager, he asked Tom to assume that position. Tom was thrilled and said that this job experience would look good on his resume. We admonished him to be careful, but had no real concern for his safety as the parking lot was well lit and it was a nice suburban area.

On August 12, 1982 our world fell apart. Tom and John were working at the restaurant that night. After the restaurant closed, John talked a few moments with Tom and Teresa Miley, a college student who also worked at the restaurant and dated Tom that summer. John left and went home. Tom and Teresa got into their respective cars to start over to a friend's house. Neither of them saw the 2 robbers with stockings over their heads approach them. Jerry Mims, by his own admission, was high on cocaine and needed money for more drugs. He thought that he might rob the restaurant where he had once worked as he figured it to be an easy target. Mims fired a shot over the hood of Tom's car, then ran around to the driver's side window and fired a shot point blank into Tom's head. The car drifted slowly backwards into the side of the restaurant as Tom was fatally injured. Mims turned and fired a shot at Teresa, but unfortunately the bullet lodged in her car door. Had it been a later model car, she too would have taken a bullet in the head. Mims ran off without the money. Teresa got out of her car and ran to check on Tom. Realizing that he was in need of medical attention, she ran for help. As she ran onto the highway, she fully expected to be shot in the back, but she knew she had to try to get help.

The third car finally stopped for her. She asked the driver to take her to Lasorda's Marchwood Tavern that was the closest thing open and where she could get to a phone to call for an ambulance. When she reached the tavern and asked if she could use the phone, that someone had been shot and needed help, she was told to use the pay phone outside. She found change and called.

*30 The phone rang at our house just as we were getting ready for bed. John had just come in and we chatted a few minutes with him. Tom's father answered the phone. I could hear the subdued voice suddenly filled with anguish. I asked if it was his mother, who was in her nineties. No, it was Kathy, our daughter who worked as a nurse at the local hospital. She had been called down to the emergency room after her shift because one of the nurses in the emergency department, a neighbor, recognized Tom. Tom had been brought in as a John Doe and they needed identification. Kathy said that Tom had been shot, that it was bad, and to come quickly because he was dying. My reaction was total disbelief and my mental picture was of a shot to the shoulder. Oh, that it might have been just that.

We were at the nearby hospital in just a few minutes. John went with us, but we left Jane at home asleep. There was simply not time to apprise her of the situation.

In the emergency room, there were spots of blood on the floor leading to the stretcher where Tom lay. There was hushed apprehension as all service focused on this emergency. No, we could not see Tom. No, I could not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

hold his hand. No, it was not a good picture; the outlook was bad. The doctor was pale and concerned. Machines kept making those electric impulse sounds and the room was eerily quiet. We all looked at each other not wanting to recognize the reality, wanting this moment to go away. This was not supposed to happen in this safe town. The sounds of the machine stopped. The doctor appeared and said with a choked voice how sorry he was. Tom was dead at 20 years of age.

Sometime later they let me see Tom. I bent over his white sheeted body to kiss that dear young face whose head was wrapped in bandages. He was cold, he was gone. Too soon. Too young. The vitality and laughter of the morning was gone. The energy and expectation forever quieted. This could not be real. But it was and this was only one incident in the many shootings that increasingly have followed.

As we made funeral plans, the Chester County Detectives under Sgt. Mike Carroll began their work. I can never say enough good about these detectives and the judicial system. Their dedication to this case and their compassion for us created a bond that exists with us to this day. They were completely there for us.

Life continued with a painful, broken rhythm. Jane had been told of Tom's death when we returned home that night. Two weeks later she hesitantly packed for the new semester at Lynchburg College. Thank goodness this was a small school where students and professors cared and expressed concern.

Kathy moved back home from her aparement. She managed to complete her second college degree that fall while continuing to work. Her work took on new meaning while dealing with life, death and dying.

John began his senior year in high school. Suddenly the youngest had a forced growing up. He and Tom had been very close, quite different people, but very close.

**31** In 1982, shootings did not happen in public areas such as shopping centers. Violent crime did not happen to people like us. Shooting and murders occurred in "bad" neighborhoods. People with whom you worked were to be trusted. Tom was not that lucky. Dennis Dreibelbus had been the previous night manager of the restaurant. Tom liked and respected Dennis. Dennis quit to take a job with the Boy Scouts of America and Tom was given Dennis' job. It was disclosed during the investigation that Dennis was surreptitiously dealing drugs. Jerry Mims bought drugs from Dennis Dreibelbus. Jerry Mims owed Dennis money. Dennis knew that Mims was going to rob the restaurant. Dennis did not tell anyone. Tom was killed. Dennis Dreibelbus is still alive. Dennis was fired by the Boy Scouts of America upon learning of his drug activity. Justice is not always served.

The detectives did catch the two men who shot Tom. We have been through two trials and we have witnessed their indifferent, callous confessions. It was a painful, stressful experience. Life did not mean much to the person holding the gun. They are in prison serving life sentences without parole.

As the fall began, I knew that it was necessary that I gather together Tom's things. I did not want help. I wanted to grieve, be angry, but recall the good memories that were there among his possessions. I opened every notebook and there among his chemistry notes was a page full of philosophical thoughts on what was important in life. As days turned into weeks and I had almost completed this task, I found the following statement which was so indicative of his life. He had written: "Let me leave you with this thought. Remember that the American dream can not die; for when you are deprived of something you want, you dream about it, and your dream will last as long as you strive to turn it into reality."

Young Americans out there have dreams. I charge you this day with stabilizing our society so that these dreams can be realized. Young people should not have to live in fear that guns will kill them, that schools and neighborhoods are not safe. And parents should not have to bury their children for they are never whole again. Each day is always an acknowledgment of reality. Each day you hope that the surface of your healing will not be scratched, for if it is, you will only bleed again.

Respectfully yours,

SUZANNE SLATE ANDERSON.

As I said, in 20 years I have never read a personal letter in the Chamber, but I have never had such a profound

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

letter written to me. I believe as I said-and I will conclude with this-after all the statistics which I have cited, I know with numbing accuracy, having done this for 15 years, even sometimes I forget that there is a face attached to every one of those statistics.

It is my hope, Mr. President, that when we pass this crime bill tomorrow, eventually pass it in conference with the House, and send it to the President's desk, that we will spare other mothers, fathers, brothers, and sisters, from having to deal with what Mrs. Anderson says, paraphrasing her; the reality that the dream has died, and the scar never heals.

**\*32** Mr. President, I thank you for your indulgence. I realize that I have kept you longer than you need be here. But knowing the gentleman that you are, you probably would have stayed if I had gone another half hour.

I thank the staff for listening as well.

I yield any time that is available to me.

139 Cong. Rec. S15958-04, 1993 WL 473509 (Cong.Rec.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT G


Special Counsel
Telephone: (202) 514-3826
Fax: (202) 514-3071

Main Justice Building, Room 5643
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

October 9, 1998

Peter Sacks
Chief, Government Bureau
Office of the Attorney General
The Commonwealth of Massachusetts
One Ashburton Place
Boston, MA  02108-1698

RE: Interpretation of the Driver's Privacy Protection Act of 1997

Dear Mr. Sacks,

   This responds to your letter of May 1, 1998 (Encl), requesting guidance on the U.S. Department of Justice's interpretation of 18 U.S.C. §§ 2721-2725, the Driver's Privacy Protection Act of 1997.  Specifically, you posed the question of whether the Massachusetts Registry of Motor Vehicles may release personal information to a commercial distributor who disseminates the information only to other authorized recipients or entities that use the information solely for authorized purposes.  Under these circumstances, we believe that such releases are permissible under the statute.

   We agree with the general proposition that a commercial distributor may qualify as an authorized recipient of personal information under the statute.  Several of the permissive release provisions in the statute regulate only the ultimate use of the personal information without specifying or restricting who may obtain the information in order to accomplish that authorized purpose.  Accordingly, personal information reasonably may be released to an entity that certifies that it will use the information for an authorized purpose.  The entity receiving the information for that purpose would be an "authorized recipient" under the statute, and may further disseminate the information in accordance with the resale or redisclosure provisions of subsection (c).  Notably, the redisclosure section does not limit resales or redisclosures of personal information to the single

APP 087

106

EXHIBIT 3

Case 1:09-cv-04760   Document 13-4   Filed 09/30/09   Page 47 of 47

Case 2:07-cv-00001-TJW   Document 204-4   Filed 04/18/2008   Page 2 of 2
Case 2:07-cv-00001-TJW   Document 19   Filed 09/26/2007   Page 2 of 2

egory of uses for which the information was obtained. Rather, the authorized recipient may redisclose the information for "a use permitted under subsection (b)" (except subsections (b)(11) and (b)(12)). Thus, a distributor may obtain information for one authorized purpose, but redisclose that information for a different authorized purpose (or to another authorized recipient) under the statute.

Under the circumstances described in your letter, the Massachusetts Registry of Motor Vehicles may release personal information to a distributor upon reasonably concluding that the information will be used for authorized purposes only. Such a practice would be consistent with current Department of Justice enforcement policy recommendations to the Attorney General. This opinion is merely advisory, however. It is not binding upon the U.S. Attorney General and should not be construed as creating any substantive rights or benefits under the law.

Sincerely,

Robert C. McFetridge

Robert C. McFetridge
Special Counsel to the Assistant
Attorney General,
Civil Division

Encl

APP 088

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

LISA M. GRACZYK, MATTHEW M.      : Case No.: 1:09-cv-04760 (RWG)
JORGE, and BRIAN WILLINGHAM     :
Individually and on behalf of others      :
similarly situated,      :
      :
       Plaintiffs,      :
v.      :
      :
WEST PUBLISHING CORP., a      :
Minnesota corporation,      :
      :
      Defendant.      :
_____ :

## NOTICE OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT

PLEASE TAKE NOTICE that on October 7, 2009, at 9:15 A.M., we shall appear before the Honorable Judge Robert W. Gettleman, United States Judge, or any Judge sitting in his stead, in Room 1703 at the United States District Courthouse, 219 South Dearborn Street, Chicago, Illinois, and present the **Motion to Dismiss Plaintiffs' Complaint**, a copy of which is has been filed with the ECF system with the Northern District of Illinois and is being served upon all counsel of record via the ECF systemm.

Respectfully submitted,

**REED SMITH LLP**
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-3875
Attorneys for Defendant
West Publishing Corp.,
A Minnesota Corporation

By:/s Diane Green-Kelly_____
 Diane Green-Kelly, Esq

Dated: September 30, 2009         David Z. Smith, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2009, I electronically filed the foregoing **NOTICE**

**OF MOTION, MOTION TO DISMISS PLAINTIFFS' COMPLAINT AND**

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS**

**PLAINTIFFS' COMPLAINT** with the Clerk of the Court using the CM/ECF system which

sent notification of such filing to the following:

BARNOW AND ASSOCIATES, P.C.    LAW OFFICE OF ARON D. ROBINSON
Ben Barnow    Aron David Robinson
Blake Strautins    19 South LaSalle Street
One North LaSalle Street, Suite 4600    Suite 1200
Chicago, IL 60602    Chicago , IL 60603
(312) 621-2000    (312) 857-9050
*Attorneys for Plaintiff*    *Attorneys for Plaintiff*

West Publishing Corp.,
A Minnesota Corporation

By: /s/ Diane Kelly-Green____
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207 1000
(312) 207 6400 (fax)
*Attorneys for Defendants*

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
### ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

| In the Matter of | Case Number: | 1:09-cv-04760 |
|---|---|---|

Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham individually
and on behalf of all others similarly situated v. West Publishing Corp.

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

(In the space below, enter the name of the party or parties being represented)

West Publishing Corp.

| | |
|---|---|
| NAME (Type or print) <br> Diane Green-Kelly | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically) <br> s/Diane Green-Kelly | |
| FIRM   Reed Smith LLP | |
| STREET ADDRESS   10 S. Wacker Drive | |
| CITY/STATE/ZIP   Chicago, Illinois 60606 | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) 6216868 | TELEPHONE  NUMBER  312-207-1000 |
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? (Enter "Y" or "N") Y | |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? (Enter "Y" or "N") N | |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? (Enter "Y" or "N") Y | |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? (Enter "Y" or "N")  Y | |
| IF THIS IS A CRIMINAL CASE, USE AN "X" TO DESCRIBE YOUR STATUS IN THIS CASE. | |
| RETAINED COUNSEL | APPOINTED COUNSEL |

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.3
### Eastern Division

Lisa M. Graczyk, et al.

Plaintiff,

v.

Case No.: 1:09–cv–04760

Honorable Robert W. Gettleman

West Publishing Corp.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, October 8, 2009:

MINUTE entry before the Honorable Robert W. Gettleman: Motion hearing held on 10/8/2009 regarding motion to dismiss[12]. Response is due by 10/29/2009. Reply is due by 11/6/2009. Status hearing set for 1/14/2010 at 9:00 a.m. Mailed notice (gds, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

**In The United States District Court**
**For The Northern District Of Illinois**

| | |
|---|---|
| Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| | Case No: 1:09-cv-04760 (RWG) |
| v. | |
| | Jury Trial Demanded |
| West Publishing Corp., a Minnesota corporation, | |
| Defendant. | |

**Plaintiffs' Response in Opposition to**
**Defendant's Motion to Dismiss Plaintiffs' Complaint**

NOW COME plaintiffs, Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham ("Plaintiffs"), on behalf of themselves and all others similarly situated, and as their Response in Opposition to Defendant's Motion to Dismiss Plaintiffs' Complaint ("Defendant's Motion"), state as follows:

### Introduction

Defendant's Motion is based on an incorrect interpretation and denial of the plain language of the Driver's Privacy Protection Act ("DPPA"), and must be denied. Defendant's argument that actually adhering to the statutory requirements of the DPPA would cause it and others great inconvenience is a failed attempt to escape the law. Indeed, such an argument suggests that Defendant knows it is violating the law. There is a clear line between providing a "practical way to quickly access" individuals' personal information and complying with the law. *See* Defendant's Memorandum of Law in Support of the Motion to Dismiss Plaintiffs' Complaint

("Def. Mem.") at 1. While Defendant has crossed that line and, in doing so, has violated the DPPA, at this stage of the litigation all that is required is a sufficient allegation that such conduct has occurred. Perhaps attempting to escape the applicable pleading requirements, Defendant ignores the plain and clear allegations of Plaintiffs' Class Action Complaint ("Complaint") and instead attempts to turn its motion into one for summary judgment. Plaintiffs have made the necessary allegations under Fed. R. Civ. P. 8 and 12(b)(6), and, respectfully, Defendant's Motion must be denied. Should facts develop as Defendant may be suggesting, denial of its motion to dismiss does not prevent Defendant from filing a motion for summary judgment, should Defendant later consider that prudent.

I.   Factual Background

    The DPPA was enacted to restrict states' abilities to disclose the personal information of drivers without their consent. *Reno v. Condon*, 528 U.S. 141, 144 (2000). Under the DPPA, personal information is defined as:

> information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information . . . .

18 U.S.C. § 2725(3) (hereinafter referred to as "Personal Information").

    The DPPA states that "[i]t shall be unlawful for any person knowingly *to obtain* or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title."[1] 18 U.S.C. § 2722(a) (emphasis added). Section 2721(b) refers to 14 discrete exceptions to liability enumerated in

---

[1] The DPPA defines "person" to include entities. 18 U.S.C. § 2725(2).

the statute. *See* 18 U.S.C. § 2721(b)(1)-(14). Plaintiffs are entitled to bring a civil

action for Defendant's alleged violations, and are entitled to:

> (1) actual damages, but not less than liquidated damages in the amount of $2,500;

> (2) punitive damages upon proof of willful or reckless disregard of the law;

> (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and

> (4) such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C.A. § 2724.

The DPPA categorically prohibits obtaining Personal Information unless that

obtainment fits within one of the exceptions in § 2721(b). Defendant does not claim

that its conduct falls under any of these exceptions, all of which are narrowly

focused on the protection and lawful obtainment of individuals' Personal

Information. Nor does Defendant contend that it has obtained the express consent

of Plaintiffs or any other member of the putative Class to obtain or disclose their

Personal Information. Plaintiffs have alleged that Defendant has violated the DPPA

by obtaining their Personal Information and making it available for search and sale

on the Internet via its website, whereby such obtainment was not for a permitted

purpose under the DPPA. Class Action Complaint ("Compl.") at ¶¶14–16, 31.

## II.  Legal Standard on a Motion to Dismiss.

A court must accept a complaint's well-pled allegations as true and draw all

favorable inferences for the plaintiff. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50

(2009). "The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint,

not to determine the merits of the case." *Wood v. City of Elgin*, No. 07c 05418, 2008 WL 151382, at *1 (N.D. Ill. Jan. 14, 2008). The Supreme Court of the United States made clear that it was not imposing a heightened pleading standard in federal courts when it held that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and that Rule 8 "does not require 'detailed factual allegations.'" *Iqbal*, 129 S. Ct at 1949. To survive a motion to dismiss, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III. Plaintiffs Have Sufficiently Stated a Claim That Defendant Has Violated the DPPA.

Under the plain language of the statute, Plaintiffs have sufficiently alleged that Defendant has violated the DPPA by obtaining Plaintiffs' and the Class members' Personal Information for an impermissible use—re-sale to the general public for a profit. Defendant does not dispute the allegations of Plaintiffs' Complaint, but instead raises affirmative defenses that it claims absolve it of liability. Irrespective of its confusion of the applicable legal standard to be applied here, Defendant is not an "authorized recipient" under the plain language of the DPPA, and its reliance on legal authorities that hold to the contrary are distinguishable.

### A. Plaintiffs have properly alleged that Defendant violated the DPPA when it obtained their Personal Information.

*Roberts v. The Source for Public Data*, 2008 WL 5234675, at *1 (W.D. Mo. Dec. 12, 2008) (attached as Exhibit B to Defendant's Index of Exhibits [D.E. #13-2]), is

directly on point here. There, one of the defendants, Shadowsoft, Inc., obtained a database of individuals' Personal Information from the Missouri Department of Revenue, and then sold that database to another defendant, Public Data, who made that information available to the public. *Id.* There, like here, the defendants argued that § 2721(c) of the DPPA expressly provides for and allows the re-sale of Personal Information, "no matter the purpose for which that entity obtained the information, so long as the re-sale or re-disclosure is to individuals who have a permissible purpose for obtaining the information under section 2721(b)." *Id.* at 3; Def. Mem. at 7–8. But *Roberts* held that such a reading of the DPPA runs contrary to the plain meaning of the statute, as "a recipient becomes authorized only by virtue of obtaining the information for a reason listed in section 2721(b)." *Roberts*, 2008 WL 5234675, at *3. As the DPPA expressly states, it is unlawful for business entities to "obtain . . . personal information . . . for any use not permitted under section 2721(b)." 18 U.S.C. § 2722. As the *Roberts* court aptly held:

> Section 2722's prohibition on *obtaining* information for any purpose other than one listed in section 2721(b) makes no sense if under section 2721(c) a business entity is allowed to *receive* personal information for the purpose of re-selling or re-disclosing it to others whose uses would fall under exceptions in section 2721(b)—a purpose for which there is no exception in section 2721(b).

*Roberts*, 2008 WL 5234675, at *4 (emphasis in original).

According to ordinary definitions of the words "obtain" and "receive", each "indicate that one has taken or acquired possession of some thing." *Id.* (citing Black's Law Dictionary 1078, 1268 (6th ed. 1990); *Webster's II New College Dictionary* 756, 924–25 (Margery S. Berube, *et al.* eds. 1995)). Thus, under the

5

plain meaning and reading of the DPPA, "an 'authorized recipient' is one authorized to receive (or obtain) something; one who is prohibited from obtaining something cannot also be an 'authorized recipient' of it."[2] *Id.*

Plaintiffs do not assert that Defendant does not potentially have the right to obtain the Personal Information of some individuals. Rather, Plaintiffs assert that obtaining any person's information must be for a permissible purpose under the plain language of the statute. As enumerated above, however, Defendant obtained Plaintiffs' and the Class' Personal Information for no permissible purpose under the plain language of the DPPA. "Section 2724(a) makes a[n] [entity] liable when [it] knowingly obtains personal information from a motor vehicle record for a purpose not permitted under the Act regardless whether [it] proceeds to disclose or use the information." *Parus v. Allstate Ins. Co.*, 2005 WL 2240955, at *4 (W.D. Wis. Sept. 14, 2005).

Thus, under 18 U.S.C. § 2722(a), which refers to and incorporates the exceptions enumerated in § 2721(b), a business entity cannot legally obtain Personal Information unless it does so pursuant to one of the express exceptions in the DPPA. In their Motion, Defendant does not, and cannot, assert or argue that it obtained Plaintiffs' Personal Information under any of those exceptions. For this reason alone, Defendant's Motion is fatally flawed and should be denied.

---

[2] As the *Roberts* court noted, "Congress could have included an additional exception in section 2721(b) to allow business entities to obtain highly restricted personal information for the purpose of reselling or re-disclosing it to others with permissible uses; it did not do so." *Roberts*, 2008 WL 5234675, at *4.

B. Defendant's legal authorities are distinguishable and without merit, as they are contradicted by the plain language of the DPPA.

The majority of Defendant's argument in support of its Motion hinges on two decisions from a lone district court judge in the Eastern District of Louisiana, and one unpublished decision from the Eastern District of Texas. *See Russell v. ChoicePoint Servs., Inc.*, 300 F. Supp. 2d 450 (E.D. La. 2004) (*Russell I*); *Russell v. ChoicePoint Servs., Inc.*, 302 F. Supp. 2d 654 (E.D. La. 2004) (*Russell II*); *Taylor v. Acxiom Corp.*, No. 2:07-cv-0001 (E.D. Tex. Sept. 8, 2008) (attached as Exhibit A to Defendant's Index of Exhibits [D.E. #13-2]). But, these cases and their rationales are distinguishable, and were distinguished by the *Roberts* court. *See Roberts*, 2008 WL 5234675, at *4 ("The *Russell* court's interpretation of section 2721(c) is inconsistent with the plain language of the DPPA, which makes it unlawful for business entities to "obtain . . . personal information . . . for any use not permitted under section 2721(b)."). *Russell I*, *Russell II*, and *Taylor* all employed the same flawed reasoning, and their interpretations of the DPPA should not be followed.

These courts (*Taylor*, *Russell I*, and *Russell II*) premised their decisions on the erroneous assumption that:

> . . . Congress anticipated that entities like defendant Resellers would obtain drivers' personal information from DMV's solely for the purpose of redistributing the information to persons with permissible purposes.

*Taylor*, at 10; *Russell I*, 300 F. Supp. 2d at 455–56; *Russell II*, 302 F. Supp. 2d at 654. *Russell I* and *Russell II* expounded on this assumption:

> The inclusion of the term "authorized recipient" and the exclusion of any reference to "users" in DPPA § 2721(c) indicates an intent on behalf of Congress to delegate authorization to the states and thereby to permit personal information resellers like [defendant] who are authorized by the

state or its DMV to obtain drivers' personal information for the purpose of redistribution to persons with "permissible uses."

*Russell I*, 300 F. Supp. 2d at 456–57; *Russell II*, 302 F. Supp. 2d at 665; *see also*

*Russell I*, 300 F. Supp. 2d at 456 ("Congress intended to leave the recipient

authorization to the states."). Defendant does not assert that any of the states or

their respective DMV's have authorized it to obtain Plaintiffs' and the Class'

Personal Information, or that Plaintiffs and the putative Class gave their

permission for such dissemination. Regardless, as of the filing of the Complaint,

Defendant stated on its website that it obtained individuals' Personal Information

from various third-parties. Complaint at ¶11. Defendant has made no

representations in its filings as to where or how it obtained Plaintiffs' and the Class'

Personal Information and, in any event, this question is irrelevant at this stage of

the litigation. Thus, *Russell I*, *Russell II*, and *Taylor*, and their accompanying

rationales for allowing the defendants in those cases to obtain such information, are

contrary to the plain language and import of the DPPA, and are wholly inapplicable

here.

## IV. Canons of Statutory Interpretation Dictate That Defendant Has Violated the DPPA.

Unless otherwise defined, words in a statute will be interpreted as having their

ordinary, contemporary, common meaning.  *See, e.g.*, *Perrin v. United States,* 444

U.S. 37, 42 (1979). "In construing a federal statute, it is appropriate to assume that

the ordinary meaning of the language that Congress employed 'accurately expresses

its legislative purpose.'" *Mills Music, Inc. v. Snyder,* 469 U.S. 153, 164 (1985)

(quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 195 (1985)).

"[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 586 (2005). Indeed, looking to the legislative history of a statute has its downfalls:

> We are governed by laws, not by the intentions of legislators. As the Court said in 1844: "The law as it passed is the will of the majority of both houses, *and the only mode in which that will is spoken is in the act itself....*" *Aldridge v. Williams,* 3 How. 9, 24, 11 L. Ed. 469 (emphasis added). But not the least of the defects of legislative history is its indeterminacy. If one were to search for an interpretive technique that, *on the whole,* was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history.

*Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (emphasis in original). As to what Congress may or may not have "intended", Justice Scalia continues:

> When I say "Congress intended," here and hereafter in this excursus into legislative history, I am speaking as legislative historians speak, attributing to all Members of both Houses of Congress (or at least to a majority of the Members of each House), and to the President (or, if the President did not sign the bill in question, then to at least two-thirds of the Members of both Houses of Congress) views expressed by the particular personage, or committee of personages, whose statements are being described—in the case of the citation at issue in this sentence, a committee of the House of Representatives. It is to be assumed—by a sort of suspension of disbelief—that two-thirds of the Members of both Houses of Congress (or a majority plus the President) were aware of those statements and must have agreed with them; or perhaps it is to be assumed—by a sort of suspension of the Constitution—that Congress delegated to that personage or personages the authority to say what its laws mean.

*Id.* at 521 n.2; s*ee also Exxon Mobil Corp.*, 545 U.S. at 586 ("[L]egislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's

memorable phrase, an exercise in 'looking over a crowd and picking out your friends.'") (internal citation omitted). Respectfully, Plaintiffs read Justice Scalia's forceful articulation of the matter to mean that the statements regarding a law of just one or two members of Congress—out of hundreds—should not be interpreted to represent the intent of Congress, which approved the law.  Plaintiffs agree.

Here, where the language of the DPPA is clear on its face, no further inquiry is necessary. The DPPA's use of "the disjunctive 'or' to connect the terms 'obtains,' 'discloses' and 'uses'" mandates that each term be given a separate meaning. *Parus v. Allstate Ins. Co*, 2005 WL 2240955, at *4 (W.D. Wis. Sept 14, 2005) (citing *Reiter v. Sanotone Corp.*, 442 U.S. 330, 337 (1979)). Obtaining Personal Information under the DPPA is an act separate and apart from disclosing or using said information, and Defendant's alleged obtainment of Plaintiffs' and the Class' Personal Information constitutes a sufficient allegation that Defendant violated the DPPA.

Defendant references select portions from congressional hearings that were held in conjunction with the passage of the DPPA from just one (1) representative and one (1) senator. Def. Mem. at 8–9. A closer look at the legislative history of the DPPA tells a different story, though.  As Senator Boxer stated:

> I had no idea when I went into my State to get licensed that all this information that I provided was going to be made public. Those in public life expect much of our factual data to be public but, indeed, others who are not in public life have a need to protect their privacy, particularly women.

139 Cong. Rec. S15745–01, S15764 (attached as Exhibit C to Defendant's Index of Exhibits [D.E. #13-2]). Senator Boxer went on to note that the DPPA "will provide individuals with knowledge of and control over the disclosure of their personal

10

information for uses unrelated to the purpose(s) for which it was collected." *Id.*

Representative Moran echoed these sentiments, in that he wanted to "give[] drivers

the ability to restrict release of personal information for reasons that are totally

incompatible for the reasons it was collected."  140 Cong. Rec. H2518-01, H2522

(attached as Exhibit D to Defendant's Index of Exhibits [D.E. #13-2]).  Further,

Representative Moran noted that the DPPA:

> is designed to give individuals control over the release of their personal
> information and give them the opportunity to make choices as to whether this
> information is released, not just for individual look-ups, but also *for release
> in bulk.*

1994 WL 212698 (Feb. 3, 1994) (emphasis added) (attached as Exhibit E to

Defendant's Index of Exhibits [D.E. #13-2]). As Senator Shelby so accurately

articulated the matter:

> It boils down to this:  We have doors on our homes so that outsiders who seek
> entry must knock and ask our permission to enter. When we want such
> people to come in, we invite them. When we do not want them in, they are not
> permitted to enter. Doors provide us with the means to control our
> interaction with other people. American citizens should have the power to put
> "doors" on all aspects of their private lives and to expect that anyone who
> wants to enter must seek and gain consent.

2000 WL 374404 (F.D.C.H.) (statement of Senator Shelby). Here, Plaintiffs have

alleged that Defendant has unilaterally taken control over their Personal

Information, and has done so without Plaintiffs' permission and for pure profit.

## V.  Defendant's Other Arguments are Without Merit.

Defendant further argues that persons and entities with actual, permissible uses

for Plaintiffs' and the Class' Personal Information will have "no centralized

databases of motor vehicle record information to turn to" for such information. Def.

Mem. at 9. Defendant is wrong, however, as each state's department of motor vehicles is the appropriate database for such information, and Congress has made it clear that this Personal Information can only be obtained for a permissible use. While Defendant may disagree with the law, mass obtainment of Personal Information for resale for profit in the circumstances involved here is not one of the statutorily authorized permissible uses.

Defendant also points to a 1998 letter from the United States Department of Justice in support of its argument that it is "unequivocally" authorized to obtain individuals' Personal Information. Def. Mem. at 9–10; *see also* Exhibit G to Defendant's Index of Exhibits [D.E. #13-2]. But, the letter also "unequivocally" states that it is "merely advisory," and that "[i]t is not binding upon the U.S. Attorney General and should not be construed as creating any substantive rights or benefits under the law." *See* Exhibit G. Defendant selectively chooses to ignore this plain language, as it undercuts any legitimate reliance on the merely advisory nature of the letter.

Defendant makes another futile attempt at justifying its unlawful conduct by pointing to 92 Ill. Adm. Code 1002.60, which provides for the purchase of information such as "drivers, vehicle, or title lists, or driving or identification card abstracts," but requires that the purchaser of such information enter into an Access Agreement with the State of Illinois. Irrespective of the fact that this code provision does not apply to the Personal Information at issue here, and Defendant's corresponding unlawful obtainment of it under the express provisions of the DPPA,

Defendant does not contend that it has entered into any such Access Agreement with the State of Illinois or any other state, and fails to attach copies of any such agreements to its Motion.

Defendant's generalized references to the constitutionality of the DPPA's liquidated damages provision are devoid of merit.[3]  There is no question of statutory construction here, nor is there an issue of punitive damages being awarded at this extremely early stage of the litigation. Defendant cites to *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, (2003), and *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), but "[t]hose cases are clearly distinguishable, however, because they involve the constitutionality of excessive punitive damages awarded by juries and not statutorily-prescribed damage awards." *Sadowski v. Med1 Online, LLC*, 2008 WL 489360, at *5 (N.D. Ill. Feb. 20, 2008). Moreover, the Seventh Circuit has expressly held that statutory damages similar to those in the DPPA are permissible. *Murray v. GMAC*, 434 F.3d 948, 953 (7th Cir. 2006) (reversing denial of class certification even though the defendant faced billions of dollars in damages for violations of the Fair Credit Reporting Act, and holding that "[t]he reason that damages can be substantial . . . does not lie in an 'abuse' of Rule 23; it lies in the legislative decision to authorize awards as high as $1000 per person.").

This is strictly a case of applying the plain language of the DPPA to Defendant's conduct. Defendant cannot complain about the clear statutory damages provided by

---

[3] The cases cited by Defendant for this proposition, *Northwest Hosp., Inc. v. Hosp. Serv. Corp.*, 687 F.2d 985, 992 (7th Cir. 1982), and *Batanic v. I.N.S.*, 12 F.3d 662, 666 (7th Cir. 1993), both dealt with determinations by administrative agencies of administrative regulations, and the review thereof. This case, on the other hand, is a matter of federal law—the DPPA.

and available under the DPPA for violations it knowingly engaged in.[4] *See, e.g.*, *Irvine v. 233 Skydeck, LLC*, 597 F. Supp. 2d 799, 805 (N.D. Ill. 2009) ("[T]he mere possibility of an excessive statutory and punitive damages award under FACTA does not constitute a due process violation and does not require dismissal of the complaint.") (citing *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831, 839 (N.D. Ill. 2008); *Harris v. Best Buy Co.*, 254 F.R.D. 82, 90 (N.D. Ill. 2008); *Matthews v. United Retail, Inc.*, 248 F.R.D. 210, 216 (N.D. Ill. 2008); *Follman v. Village Squire, Inc.*, 542 F. Supp. 2d 816, 821–22 (N.D. Ill. 2007)).

VI. The Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims.

While Defendant asserts that it seeks to dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, it provides no support for this argument. Nevertheless:

> The DPPA is designed to protect personal information. It protects drivers' privacy by placing restrictions on the purposes for which personal information may be obtained, used, and disclosed. The Complaint's allegations that the Defendants unlawfully obtained Plaintiffs' highly restricted personal information, in violation of their privacy rights under the DPPA, suffice to establish injury-in-fact. Under the DPPA, "improperly obtaining [a] plaintiff's information [*is*] an injury."

*Roberts*, 2008 WL 5234675, at *5 (quoting *Parus v. Allstate Ins. Co*, 2005 WL 2240955, at *5 (W.D. Wis. Sept 14, 2005) (internal citations omitted) (emphasis in original). The Court clearly has subject matter jurisdiction over Plaintiffs' claims, as

---

[4] Defendant's bizarre reference to, and reliance on, the rule of lenity is of no consequence to its motion. Def. Mem. at 12–13. The DPPA unambiguously provides for a private right of action for the unlawful obtainment of individuals' Personal Information, separate and apart from any criminal liability under the DPPA.

they have all suffered injury by way of Defendant's unlawful obtainment of their Personal Information.

VII.    Plaintiffs' Claims for Unjust Enrichment and Injunctive Relief Are Well-Pled.

Defendant has received a benefit from Plaintiffs and the Class—obtaining and selling their Personal Information for a profit and without their consent—to the detriment of Plaintiffs and the Class, and Plaintiffs and the Class have been damaged by this conduct by way of having their Personal Information and privacy compromised from Defendant's repeated and continuing violations of the DPPA. Compl. at ¶¶35–38. It is for this reason that Plaintiffs' claim for injunctive relief is proper—Defendant continues to violate the DPPA with its conduct, and it must be stopped. Compl. at ¶¶41–43. Defendant's strained arguments indicate both a recognition of the error of its ways and a refusal to conform its conduct to the law.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss, and grant such other relief the Court deems just and appropriate.

Dated:  October 29, 2009                    Respectfully Submitted,

                                            Lisa M. Graczyk, Matthew M. Jorge, and
                                            Brian Willingham, on behalf of themselves
                                            and all others similarly situated,


                                            By:    /s/ Ben Barnow
                                                   Ben Barnow
                                                   Sharon Harris
                                                   Blake A. Strautins
                                                   Barnow and Associates, P.C.
                                                   1 North LaSalle Street, Suite 4600
                                                   Chicago, Illinois 60602
                                                   (312) 621-2000

                                                   *Attorneys for Plaintiffs*


Aron D. Robinson
The Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, Illinois 60603
(312) 857-9050

*Of Counsel:*

Ralph K. Phalen Atty. at Law
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 589-0753

Mitchell L. Burgess
Keith C. Lamb
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 471-1700

Don P. Saxton
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 471-1700

**Certificate of Service by Electronic Means**

I, Ben Barnow, hereby certify that Plaintiff's Response in Opposition to Defendant's Motion to Dismiss Plaintiffs' Complaint was caused to be served electronically this 29th day of October, 2009, pursuant to ECF as to Filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.

/s/  Ben Barnow

## United States District Court  Northern District of Illinois
## MOTION FOR LEAVE TO APPEAR PRO HAC VICE

| Case Title: | | Plantiff(s) |
|---|---|---|
| | VS. | |
| | | Defendant(s) |

| Case Number: | Judge: |
|---|---|

I, _____ hereby apply to the Court

under Local Rule 83.14 for permission to appear and participate in the above-entitled action on behalf of

_____ by whom I have been retained.

I am a member in good standing and eligible to practice before the following courts:

| Title of Court | Date Admitted |
|---|---|
| | |
| | |
| | |
| | |

I have currently, or within the year preceding the date of this application, made pro hac vice applications to this Court in the following actions:

| Case Number | Case Title | Date of Application (Granted or Denied)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

*If denied, please explain:
(Attach additional form if necessary)

Pursuant to Local Rule 83.15(a), applicants who do not have an office within the Northern District of Illinois must designate, at the time of filing their initial notice or pleading, a member of the bar of this Court having an office within this District upon who service of papers may be made.

**Has the applicant designated local counsel?**　　**Yes** ○　　　　**No** ○

If you have not designated local counsel, Local Rule 83.15(b) provides that the designation must be made within thirty (30) days.

Has the applicant ever been:

**censured, suspended, disbarred, or witherwise disciplined by any court?**         **Yes** ○         **No** ○

**or is the applicant currently the subject of an investigation of the applicant's professional conduct?**         **Yes** ○         **No** ○

**transferred to inactive status, voluntarily withdrawn, or resigned from the bar of nay court?**         **Yes** ○         **No** ○

**denied admission to the bar of any court?**         **Yes** ○         **No** ○

**held in contempt of court?**         **Yes** ○         **No** ○

NOTE: If the answer to *any* of the above questions is yes, please attach a brief description of the incident(s) and the applicant's current status before any court, or any agency thereof, where disciplinary sanctions were imposed, or where an investigation or investigations of the applicant's conduct may have been instituted.

I have read the Rules of Professional Conduct for the Northern District of Illinois, effective November 12, 1991 (Local Rules 83.50 through 83.58), and the Standards for Professional Conduct within the Seventh Federal Judicial Circuit, effective December 15, 1992, and will faithfully adhere to them.  I declare under penalty of perjury that the foregoing is true and correct.

S/

| Date | | Electronic Signature of Applicant |

| Applicant's Name | Last Name | First Name | Middle Name/Initial |
|---|---|---|---|
| Applicant's Law Firm | | | |
| Applicant's Address | Street Address | | Room/Suite Number |
| | City | State | ZIP Code | Work Phone Number |

**(The pro hac vice admission fee is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date, and shall be paid to the Clerk.  No admission under Rule 83.14 is effective until such time as the fee has been paid.)**

**NOTE:**   Attorneys seeking to appear pro hac vice may wish to consider filing a petition for admission to the general bar of the Court.  The fee for admission to the General Bar is $150.00  The fee for pro hac vice admission is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date.  Admission to the general bar permits an attorney to practice before this Court.  Pro hac vice admission entitles an attorney to appear in a particular case only.  Application for such admission must be made in each case; and the admission fee must be paid in each case.

## United States District Court  Northern District of Illinois
## MOTION FOR LEAVE TO APPEAR PRO HAC VICE

Case Title:                                                                         Plantiff(s)

VS.

Defendant(s)

Case Number:                                    Judge:

I, _____ hereby apply to the Court

under Local Rule 83.14 for permission to appear and participate in the above-entitled action on behalf of

_____ by whom I have been retained.

I am a member in good standing and eligible to practice before the following courts:

| Title of Court | Date Admitted |
|---|---|
| | |
| | |
| | |
| | |

I have currently, or within the year preceding the date of this application, made pro hac vice applications to this Court in the following actions:

| Case Number | Case Title | Date of Application (Granted or Denied)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

*If denied, please explain:
(Attach additional form if necessary)

Pursuant to Local Rule 83.15(a), applicants who do not have an office within the Northern District of Illinois must designate, at the time of filing their initial notice or pleading, a member of the bar of this Court having an office within this District upon who service of papers may be made.

**Has the applicant designated local counsel?   Yes ◯        No ◯**

If you have not designated local counsel, Local Rule 83.15(b) provides that the designation must be made within thirty (30) days.

Has the applicant ever been:

**censured, suspended, disbarred, or witherwise disciplined by any court?**   **Yes** ◯   **No** ◯

**or is the applicant currently the subject of an investigation of the applicant's professional conduct?**   **Yes** ◯   **No** ◯

**transferred to inactive status, voluntarily withdrawn, or resigned from the bar of nay court?**   **Yes** ◯   **No** ◯

**denied admission to the bar of any court?**   **Yes** ◯   **No** ◯

**held in contempt of court?**   **Yes** ◯   **No** ◯

NOTE: If the answer to *any* of the above questions is yes, please attach a brief description of the incident(s) and the applicant's current status before any court, or any agency thereof, where disciplinary sanctions were imposed, or where an investigation or investigations of the applicant's conduct may have been instituted.

I have read the Rules of Professional Conduct for the Northern District of Illinois, effective November 12, 1991 (Local Rules 83.50 through 83.58), and the Standards for Professional Conduct within the Seventh Federal Judicial Circuit, effective December 15, 1992, and will faithfully adhere to them.  I declare under penalty of perjury that the foregoing is true and correct.

S/

| Date | Electronic Signature of Applicant |
|---|---|

| Applicant's Name | Last Name | First Name | Middle Name/Initial |
|---|---|---|---|
| Applicant's Law Firm | | | |
| Applicant's Address | Street Address | | Room/Suite Number |
| | City | State | ZIP Code | Work Phone Number |

**(The pro hac vice admission fee is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date, and shall be paid to the Clerk.  No admission under Rule 83.14 is effective until such time as the fee has been paid.)**

**NOTE:**  Attorneys seeking to appear pro hac vice may wish to consider filing a petition for admission to the general bar of the Court.  The fee for admission to the General Bar is $150.00  The fee for pro hac vice admission is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date.  Admission to the general bar permits an attorney to practice before this Court.  Pro hac vice admission entitles an attorney to appear in a particular case only.  Application for such admission must be made in each case; and the admission fee must be paid in each case.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

LISA M. GRACZYK, MATTHEW M.          :
JORGE, and BRIAN WILLINGHAM          :
Individually and on behalf of others :
similarly situated,                  :
                                     :
                                     :    No.: 1:09-cv-04760
            Plaintiffs,              :
v.                                   :    Hon. Robert W. Gettleman
                                     :
WEST PUBLISHING CORP., a             :
Minnesota corporation,               :
                                     :
            Defendant.               :
_____:

**DEFENDANT'S UNOPPOSED MOTION FOR EXTENSION OF TIME
TO FILE REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant West Publishing Corporation ("West"), by its undersigned counsel, respectfully requests that the Court modify the briefing schedule on Defendant's Motion to Dismiss by extending Defendant's deadline to file its reply brief by one week.  In support of its Unopposed Motion, West states as follows:

1.      On September 30, 2009, West filed its Motion to Dismiss.  On October 9, 2009, the Court set the following briefing schedule: Plaintiffs' Response brief due by October 29, 2009 and Defendant's Reply brief due by November 6, 2009.  The Court also set this matter for status on January 14, 2009.  (D.E. #16.)

2.      On October 29, 2009, Plaintiffs filed their Response brief.

3.      During discussions between the parties after Plaintiffs' filing, Plaintiffs agreed to extend the date for West's Reply by one week (*i.e.*, to November 13, 2009).

4.      Neither party will be prejudiced by this short extension.

WHEREFORE, for the reasons stated above, West Publishing Corporation respectfully requests that the Court grant it leave to file its Reply brief in support of its Motion to Dismiss by November 13, 2009.

Dated: November 6, 2009                    Respectfully submitted,

                                           WEST PUBLISHING CORPORATION
                                           *Defendant*

                                           By: /s/  David Z. Smith
                                                 One of its attorneys

Mark S. Melodia (*pro hac vice* application pending)     Diane Green-Kelly (ARDC # 6216868)
Paul Bond (*pro hac vice* application pending)            David Z. Smith (ARDC # 6256687)
REED SMITH LLP                                            REED SMITH LLP
Princeton Forrestal Village                               10 South Wacker Drive
136 Main Street, Suite 250                                Chicago, IL  60606-7507
Princeton, N.J. 08540                                     (312) 207 1000
(609) 987-0050                                            (312) 207 6400 (fax)
                                                          dzsmith@reedsmith.com

## CERTIFICATE OF SERVICE

       I hereby certify that on November 6, 2009, I electronically filed the foregoing **DEFENDANT'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

BARNOW AND ASSOCIATES, P.C.
Ben Barnow
Blake Strautins
One North LaSalle Street, Suite 4600
Chicago, IL 60602
(312) 621-2000
*Attorneys for Plaintiff*

LAW OFFICE OF ARON D. ROBINSON
Aron David Robinson
19 South LaSalle Street
Suite 1200
Chicago , IL 60603
(312) 857-9050
*Attorneys for Plaintiff*

       /s/ David Z. Smith
       David Z. Smith (ARDC # 6256687)
       REED SMITH LLP
       10 South Wacker Drive
       Chicago, IL  60606-7507
       (312) 207 1000
       (312) 207 6400 (fax)
       dzsmith@reedsmith.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA M. GRACZYK, MATTHEW M. JORGE, and BRIAN WILLINGHAM Individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WEST PUBLISHING CORP., a Minnesota corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

No.: 1:09-cv-04760

Hon. Robert W. Gettleman

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on November 12, 2009, at 9:15 A.M., we shall appear before the Honorable Judge Robert W. Gettleman, United States Judge, or any Judge sitting in his stead, in Room 1703 at the United States District Courthouse, 219 South Dearborn Street, Chicago, Illinois, and present the **Defendants's Unopposed Motion for Extension of Time to File Reply Brief in Support of Its Motion to Dismiss**, a copy of which is has been filed with the ECF system with the Northern District of Illinois and is being served upon all counsel of record via the ECF system.

Dated: November 6, 2009

Respectfully submitted,

WEST PUBLISHING CORPORATION
*Defendant*

By: /s/  David Z. Smith
       One of its attorneys

| | |
|---|---|
| Mark S. Melodia (*pro hac vice* application pending) | Diane Green-Kelly (ARDC # 6216868) |
| Paul Bond (*pro hac vice* application pending) | David Z. Smith (ARDC # 6256687) |
| REED SMITH LLP | REED SMITH LLP |
| Princeton Forrestal Village | 10 South Wacker Drive |
| 136 Main Street, Suite 250 | Chicago, IL  60606-7507 |
| Princeton, N.J. 08540 | (312) 207 1000 |
| (609) 987-0050 | (312) 207 6400 (fax) |
| | dzsmith@reedsmith.com |

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2009, I electronically filed the foregoing **NOTICE OF MOTION** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

BARNOW AND ASSOCIATES, P.C.  
Ben Barnow  
Blake Strautins  
One North LaSalle Street, Suite 4600  
Chicago, IL 60602  
(312) 621-2000  
*Attorneys for Plaintiff*

LAW OFFICE OF ARON D. ROBINSON  
Aron David Robinson  
19 South LaSalle Street  
Suite 1200  
Chicago , IL 60603  
(312) 857-9050  
*Attorneys for Plaintiff*

   /s/ David Z. Smith                   
David Z. Smith (ARDC # 6256687)  
REED SMITH LLP  
10 South Wacker Drive  
Chicago, IL  60606-7507  
(312) 207 1000  
(312) 207 6400 (fax)  
dzsmith@reedsmith.com

US_ACTIVE-102623379.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

LISA M. GRACZYK, MATTHEW M.          : Case No.: 1:09-cv-04760 (RWG)
JORGE, and BRIAN WILLINGHAM          :
Individually and on behalf of others :
similarly situated,                  :
                                     :
            Plaintiffs,              :
v.                                   :
                                     :
WEST PUBLISHING CORP., a             :
Minnesota corporation,               :
                                     :
            Defendant.               :
_____ :

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

I.      **PRELIMINARY STATEMENT**

Defendant West Publishing Corporation ("West") writes in further support of its Motion to Dismiss the Complaint.  Contrary to Plaintiffs' suggestion, West's motion is not akin to a motion for summary judgment. Rather, the motion presents a dispositive issue of pure law, namely, whether the allegations in the Complaint -- that West obtained Plaintiffs' personal information for resale -- state a claim under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*  As West clearly demonstrated in its opening brief, the Complaint fails that test.[1]

The DPPA expressly permits the resale of personal information and does not require resellers, such as West, to have their own permissible use in order to obtain personal information for resale, as Plaintiffs suggest. Three federal decisions, ruling on three separate motions to dismiss, have concluded that mere obtainment of personal information by a reseller does *not* violate the DPPA. These decisions are consistent with the wording of the DPPA as well as with the legislative history of the DPPA and with subsequent interpretations of the law provided by the United States Department of Justice ("DOJ"), the government agency charged with responsibility for enforcing the DPPA.  They also strike a balance between the privacy interests of individuals and the legitimate needs of law enforcement, legal professionals and others using motor vehicle records.  Because the DPPA expressly permits the alleged conduct, Plaintiffs' Complaint fails to state a violation of the DPPA.   Therefore, their Complaint should be dismissed.

---

[1]     Defendant's Memorandum of Law in Support of the Motion to Dismiss Plaintiffs' Complaint is cited herein as "Def. Mem."

II.     **LEGAL ANALYSIS**

A.      **Plaintiffs Do Not Allege A DPPA Violation.**

Despite their assertion to the contrary, Plaintiffs do not allege a DPPA violation by alleging that West obtained their personal information for "re-sale to the general public for a profit."[2]  *See* Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint ("Plnts. Opp.") at 4.

Plaintiffs' first argument is a red herring; they contend, incorrectly, that West's assertion that § 2721(c) of the DPPA expressly permits authorized recipients (such as West) to obtain personal information for resale as a matter of law, is an affirmative defense, and therefore cannot form the basis for a motion to dismiss.  *Id.*   However, Plaintiffs do not cite any legal authority for their novel theory either (1) that § 2721(c) gives rise to an affirmative defense or (2) that an affirmative defense cannot form the basis of a motion to dismiss.[3]  More important, in at least three separate federal cases, based on the precise arguments that West has asserted here under § 2721(c), courts have dismissed, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), complaints virtually identical to Plaintiffs' complaint.  *See*, *Russell v. ChoicePoint Services, Inc.*, 300 F. Supp. 2d 450, 455, 461 (E.D. La. 2004) (hereafter, "*Russell I*"); *Russell v. ChoicePoint Services, Inc.*, 302 F. Supp. 2d 654, 664-65 (E.D. La. 2004) (hereafter, "*Russell II*"); *Taylor v. Acxiom*

---

[2]     Nowhere in the Complaint do Plaintiffs allege that West resells personal information to "the general public" – nor can they – because West does not sell to the "general public."  Rather, West only resells to subscribers, which are carefully vetted to verify that they are legitimate business entities.

[3]     Indeed, complaints often are dismissed on statute of limitations grounds, a classic affirmative defense.

*Corp.*, No. 2:07-cv-0001, slip op. at 11-13 (E.D. Tex. Sept. 8, 2008)[4] (attached as Ex. A to Def. Mem.). Plaintiffs' assertion that § 2721(c) is an affirmative defense that somehow precludes dismissal on the pleadings is completely unsupported and should be rejected.

The remainder of Plaintiffs' opposition to West's motion rests almost exclusively on the notion that West cannot obtain personal information for resale (*i.e.*, be an "authorized recipient") without having its own permissible use for that personal information.  Plnts. Opp. at 5-6. Plaintiffs' argument misstates the law and is based on flawed reasoning.

Plaintiffs' rely on *Roberts v. The Source for Public Data*, No. 08-4167-CV-C-NKL, 2008 WL 5234675 (W.D. Mo. Dec. 12, 2008), a case that stands alone in its incorrect interpretation of § 2721(c) of the DPPA.   *See* Ex. B to Def. Mem.   *Roberts* is contrary to the three other cases that have squarely addressed the issue, and as discussed more fully below, it produces an absurd result which renders the "reseller" provision of the DPPA, § 2721(c), meaningless.

Plaintiffs strain to criticize as "without merit" the three federal cases (out of four total) that have addressed and upheld the argument that West asserts here – *i.e.* that, *as a matter of law*, pursuant to § 2721(c) of the DPPA, a reseller is an authorized recipient of personal information without having a permissible use of its own.  Plnts. Opp. at 7-8.  Each of those cases held that under § 2721(c) resellers are not required to have an independent permissible use in order to resell personal information.  *See Russell I*, 300 F. Supp. 2d at 455 ("The plain language of the DPPA permits entities like ChoicePoint to obtain drivers' personal information" just to "subsequently resell that information to third parties with a permissible use"); *Russell II*, 302 F. Supp. 2d at 664 (finding that a commercial reseller need not have any immediate, direct use of its

---

[4]  The *Taylor* decision is on appeal to the United States Court of Appeal for the Fifth Circuit. Docketed as No. 08-41083.

own for covered information obtained for resale); *Taylor*, No. 2:07-cv-0001, slip op. at 9 (rejecting the notion that a commercial reseller needs to have its own, immediate use for covered information) (Ex. A to Def. Mem.).

As the court correctly reasoned in *Russell I*, Congress's conscious decision to permit resale by "authorized *recipients*" rather than by "authorized *users*" in § 2721(c) evidences "Congress' expectation that entities such as [West] would obtain drivers' personal information," not for their own use, but "strictly to redistribute it to persons with permissible uses." *Russell I*, 300 F. Supp. 2d at 456. "Any interpretation of 'authorized recipient' to mean 'authorized user' runs afoul of the words' common definitions and, in effect, renders the term 'recipient' meaningless under the DPPA." *Id.* at 456.

Plaintiffs' interpretation of § 2721(c) produces absurd results and fails to consider the DPPA as a whole. The DPPA contemplates that the state department of motor vehicles ("DMV") will not be the only entities selling personal information, because while subsection (a) of § 2721 governs the release of personal information by a DMV, subsection (c) governs the release of personal information by a reseller.[5] Both of those subsections similarly permit the release of personal information (by DMVs and resellers) only for a use permissible under subsection (b). *See* 18 U.S.C. § 2721(a)-(c).

Plaintiffs' interpretation of § 2721(c) -- that resellers need their own permissible uses to obtain data -- would render § 2721(c) meaningless. To begin with, no DMV could release personal information in motor vehicle records to West or any other data aggregator because § 2721(a) only permits a DMV to release personal information to a person or entity with a

---

[5]     Section 2721 of the DPPA regulates (1) the *release* of personal information and (2) the *use* of personal information. *See* 18 U.S.C. § 2721, entitled "Prohibition On Release And Use Of Certain Personal Information From State Motor Vehicle Records."

permissible use listed in § 2721(b), and § 2721(b) does not list "for resale" as a permissible use. It is unreasonable to believe that Congress included a reseller provision in the DPPA (*i.e.*, § 2721(c)) but intended to require resellers (*i.e.*, data aggregators, such as West) to have a permissible use listed in § 2721(b) for *each driver* in *each state* in order to obtain and compile personal information for resale to subscribers of their data services. Plaintiffs' interpretation would produce that result.

A court should not "interpret [the] statute in such a way as to make a nullity of its provisions if a sensible construction is available." 73 *Am. Jur.* 2d Stat. § 164, *Giving Effect to Statutes*. Indeed, the Seventh Circuit recently refused to do so in *Lake v. Neal*, a case that affirmed this Court's interpretation of the DPPA, stating: "[W]e would not accept [plaintiff's] argument even if a literal interpretation of the DPPA would seem to compel it because that would 'lead to an absurd result . . . .'" *Lake v. Neal*, No. 08-3765, 2009 WL 3673086, at *2, (7th Cir. Nov. 6, 2009) (quoting *Castellon-Contreras v. INS*, 45 F.3d 149, 153 (7th Cir. 1995) (citing *Born v. United States*, 498 U.S. 1126 (1991)) (attached as **Exhibit A** hereto). The absurd results that follow from Plaintiffs' theories are proof of their incorrectness.[6] *See FutureSource L.L.C. v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002) (noting that "nonsensical interpretations" of statutes are disfavored because legislators are unlikely to pass statutes "that they believe will have absurd consequences").

---

[6]    Significantly, West is well known for its services and neither the DOJ nor any other government agency has brought an enforcement action against West for reselling personal information from motor vehicle records during the many years that the DPPA has been in effect. If the mere obtainment of personal information for resale to subscribers with a permissible use was actionable under the DPPA, which it manifestly is not, the DOJ certainly would have brought an enforcement action to stop such conduct many years ago.

Plaintiffs also make the unsupportable assertion that the DPPA provision that provides a private right of action, § 2724(a), supports their position that a reseller cannot obtain personal information for resale without first having its own permissible use from § 2721(b).  However, Section 2724(a) provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted *under this chapter* shall be liable to the individual to whom the information pertains."   18 U.S.C. § 2724(a) (emphasis added).   Section 2721(c) is under "this chapter," and it expressly permits the resale of personal information for a permissible purpose.  *See* 18 U.S.C. § 2721(c).  Significantly, § 2721(c) is completely devoid of any language which would require a reseller to have its own permissible use for the information in order to obtain it for resale to others with a permissible use.

Further, Plaintiffs' reliance on *Parus v. Allstate Ins. Co.*, No. 05-C-0063-C, 2005 WL 2240955 (W.D. Wis. Sept. 14, 2005) (attached as **Exhibit B** hereto) is wholly misplaced.  Plnts. Opp. at 6.  In *Parus*, the plaintiff alleged that a police officer (Officer Kreitlow) violated the DPPA by obtaining plaintiff's personal information from the DMV at the request of another police officer (Officer Cator) who requested the information for an impermissible use (*i.e.*, because Cator wanted to purchase the car and wanted to know who owned it), even though Officer Kreitlow ultimately refused to disclose the information to Cator after he learned of the intended impermissible use and thereby caused no injury.  Officer Kreitlow cited *Russell I* to support his argument that he was not liable because merely obtaining personal information without disclosing it or putting it to an impermissible use was not a violation of the DPPA.  The court rejected Kreitlow's reliance on *Russell I* stating that it was distinguishable because Kreitlow, unlike the defendants in *Russell I*, was not a reseller: "*Russell* involved a claim against a commercial entity authorized under § 2721(c) to resell personal information for a purpose

permitted under § 2721(b).  Defendant Kreitlow is not (and does not purport to be) an authorized recipient of information under § 2721(c)."  *Parus*, 2005 WL 2240955, at *4.  The court further noted that § 2724(a) makes a person liable when he knowingly obtains personal information "for a purpose not permitted *under the Act*."  *Id*. (emphasis added).  Here, as noted above, § 2721(c) is included within "the Act."  Therefore, *Parus* supports West's arguments, not Plaintiffs'.

Plaintiffs also assert, incorrectly, that West is not an "authorized recipient" under § 2721(c) because West "does not assert that any of the states or their respective DMV's have authorized it to obtain Plaintiffs' and the Class' [*sic*] Personal Information[.]"  Plnts. Opp. at 8. However, Plaintiffs cite to no provision of the DPPA that conditions the ability to resell personal information on an authorization by the DMV.  Plaintiffs seek to add language (and requirements) to the DPPA that simply does not exist.

Plaintiffs quote at length various statements from the *Taylor* and *Russell* decisions to support the definition of "authorized recipients" that they have invented here.  Plnts. Opp. at 7-8. However as discussed in detail in West's opening brief, those decisions -- which dismissed complaints alleging what Plaintiffs allege here -- unanimously held that the term "authorized recipient" includes persons who purchase information for the sole purpose of resale to persons with permissible uses.  Def. Mem. at 4-7.  Each of those decisions expressly rejected the arguments that Plaintiff assert here.  As the *Taylor* court held:  "Because the DPPA allows 'authorized recipients' to obtain 'personal information' solely for purposes of resale to third parties with permissible uses, Plaintiffs' may not maintain a DPPA claim against Resellers for improper obtainment under 18 U.S.C. § 2724(a) without alleging an accompanying impermissible use."  *Taylor*, No. 2:07-cv-0001, slip op. at 11 (Ex. A to Def. Mem.).

In short, Plaintiffs' Complaint does not state a violation of the DPPA. Rather, the Complaint alleges that West (an authorized recipient) took actions which are wholly lawful -- obtaining Plaintiffs' personal information for resale to persons with permissible uses in compliance with the DPPA. Therefore, Plaintiffs' DPPA claim should be dismissed.

### B. Canons of Statutory Interpretation Dictate That Plaintiffs Have Not Alleged A DPPA Violation.

Plaintiffs correctly acknowledge that the Court must look to the plain language of the DPPA and give that language its ordinary meaning. Plnts. Opp. at 8. Plaintiffs also correctly concede that in doing so, the Court must assume that the language Congress employed accurately expresses its legislative purpose. *Id.* Here, the purpose of the DPPA is undisputed; it is to protect drivers from criminals (especially stalkers), abusive marketers, and others who would misuse drivers' information to intrude into their private lives. The DPPA lists 14 permissible uses for personal information contained in motor vehicle records and permits both the state DMVs and resellers to release personal information to others with one of the 14 permissible uses. *See* 18 U.S.C. §§ 2721(a)-(c).

Plaintiffs assert incorrectly that the Court should not consider the legislative history of the DPPA to interpret that statute, (Plnts. Opp. at 8-10), yet Plaintiffs cite snippets of DPPA legislative history in an attempt to show that in this case legislative history is unrevealing. *Id.* at 10-11. Of course, the excerpts that Plaintiffs cite simply demonstrate that the Act was generally intended to enhance the privacy of licensed drivers. That point is uncontroverted. Those citations do nothing to contradict the demonstrated intent of Congress to allow for the resale of personal information for "legitimate needs of business and government," those enumerated in 18

U.S.C. § 2721(b) and certified to by all purchasers.[7]  139 CONG. REC. S15745-01, S15763 (Nov. 16, 1993) (statement of Senator Boxer) (attached as Ex. C to Def. Mem.).

Plaintiffs assert that "[o]btaining Personal Information under the DPPA is an act separate and apart from disclosing or using said information, and Defendant's alleged obtainment of Plaintiffs' . . . Personal Information constitutes a sufficient allegation that Defendant violated the DPPA.  Plnts. Opp. at 10.  That assertion is contrary to the holdings in *Russell I*, *Russell II*, and *Taylor*.  Even in *Parus*, a case that Plaintiffs cite (*id.* at 6), the court noted that a reseller, such as West, under § 2721(c) cannot be liable "for improperly obtaining [] information unless . . . [the reseller] had *used* the information for a purpose not permitted under § 2721(b).  *Parus*, 2005 WL 2240955, at *4 (emphasis added) (citing *Russell I*, 300 F.Supp. 2d at 455, 457).

The plain language of the DPPA permits West to obtain personal information, provided it resells it only for a permissible use provided in § 2721(b).  Plaintiffs do not allege that West *used* their personal information in violation of the DPPA.[8]  Therefore, Plaintiffs' Complaint fails to state a violation of the DPPA and it should be dismissed.

---

[7]     Indeed, the State of Texas filed an amicus brief (attached as **Exhibit C** hereto) in support of the defendant data reseller in the U.S. Court of Appeals for the Fifth Circuit in *Taylor* (as discussed above in footnote 2), urging the Fifth Circuit to reject the plaintiffs' interpretation of the DPPA – the interpretation that Plaintiffs propose here – as "impractical in the extreme" because it would hamper efficient access to personal information needed by governments and businesses to combat identity theft and other crimes.  (Exhibit C hereto, p. 5).  The State of Texas noted that "the Attorney General's Office routinely uses national databases provided by private resellers to track down individuals who are delinquent in their child-support payments, as well as to help locate suspects in the course of conducting consumer protection and criminal investigations.  Plaintiffs' theory of liability would not just drive these resellers out of business – it would eliminate a valuable tool of law enforcement."  *Id.*, pp. 2-3.

[8]     Significantly, Plaintiffs' Complaint is completely devoid of any allegation that West resold Plaintiffs' personal information to anyone without a permissible use or that any buyer of that information from West has caused them to suffer an actual injury in any way.

C.      **Plaintiffs' Other Arguments Are Without Merit.**

Plaintiffs' remaining arguments in opposition to West's motion to dismiss the DPPA claims are equally without merit:

First, Plaintiffs make the incredible assertion that the state DMVs are the only "appropriate database[s] for [personal] information" and that "mass obtainment of Personal Information for resale for profit in the circumstances involved here is not one of the statutorily authorized permissible uses."  Plnts. Opp. at 12.  Plaintiffs' assertion completely ignores § 2721(c), which expressly authorizes resale and redisclosure of personal information and clearly demonstrates Congress' recognition that the DMVs are *not* the sole databases for personal information.  Congress would not have included subsection (c) if Plaintiffs' assertion were true.

Next, Plaintiffs contend that the Court should ignore the DOJ letter that West referenced in its opening brief, on grounds that it is "merely advisory." *Id.* at 12.  West has never suggested otherwise. The letter contains advice to the Commonwealth of Massachusetts by the DOJ, which is charged with criminal enforcement of the DPPA, opining that it is permissible for persons to obtain motor vehicle records solely for the purpose of resale.  The DOJ noted that "several of the permissive release provisions in the statute regulate *only the ultimate use* of the personal information without specifying or restricting *who may obtain* the information in order to accomplish the authorized purpose." (emphasis added) (**Exhibit D** attached hereto).[9]  Plaintiffs

---

[9]      Attached as **Exhibit D** hereto certified copies of the DOJ letter and the letter from the Commonwealth of Massachusetts seeking the advice, to be substituted for the uncertified copies that West submitted with its opening brief.  Counsel for West did not receive those certified copies until November 11, 2009, after West filed its opening brief.  The letter from the Commonwealth describes a situation, akin to that alleged here, where a reseller sought to obtain information from motor vehicle records solely for purpose of resale to purchasers with

Continued on following page

present no reason that this Court should not be duly advised by a directly on-point construction of the statute, offered to help a state comply with and avoid substantial penalties under the DPPA.

Plaintiffs then incorrectly assert that, because West did not submit a copy of its Access Agreement with the State of Illinois, the Court should ignore Ill. Admin. Code. Tit. 92, §1002.60, the Illinois regulation that West cited in its opening brief.  Plnts. Opp. at 12-13.  That regulation allows commercial resellers to enter into Access Agreements with the state to obtain personal information without requiring resellers to certify to their own permissible use.  West cited to the regulation to demonstrate the State's understanding of the DPPA (an understanding inconsistent with Plaintiffs' position here).   The State's regulations are probative of the meaning of the DPPA that West asserts here.  Plaintiffs do not make any allegations regarding an Access Agreement with the State of Illinois; therefore, Plaintiffs' arguments here are irrelevant for purposes of this Motion to Dismiss and should be viewed for what they are:  a transparent attempt to manufacture an issue of fact where none exists.

Plaintiffs also suggest that this Court defer to another day the fact that Plaintiffs' reading of the DPPA leads to constitutional infirmities.  *Id.* at 13-14.  Plaintiffs are urging a construction of the DPPA that would impose potential billion dollar liability on resellers solely because they themselves did not use the information obtained.  Such a construction would impose catastrophic penalties even where there is no allegation of actual or intended misuse of information.  Statutory

---

Continued from previous page
permissible uses.  The Commonwealth asks whether such a reseller would be an "authorized recipient" under § 2721 (c), to which the Commonwealth could provide the information.  Having the question further clarifies and reinforces the DOJ answer that "Under these circumstances, we believe that such releases are permissible under the statute."  (Ex. D).

construction is a matter of law, and is properly decided on a Motion to Dismiss.  Plaintiffs'

baseless theory of the DPPA is ready to be dismissed, as is Plaintiffs' case.

Lastly, Plaintiffs assert that their Complaint cannot be dismissed pursuant to Fed. R. Civ.

P. 12(b)(1).  However, the courts in *Russell II* and *Taylor* dismissed those plaintiffs' complaints,

which were virtually identical to Plaintiffs' Complaint here, both under Rules 12(b)(1) and

12(b)(6). *Russell*, 302 F.Supp. 2d at 670-71; *Taylor*, No. 2:07-cv-0001, slip op. at 12-13 (Ex. A

to Def. Mem.).  Those courts held that because the plaintiffs did not allege an injury in fact, the

court lacked jurisdiction over the claims, and therefore dismissal pursuant to Rule 12(b)(1) was

appropriate.  The same applies here; Plaintiffs have not alleged that they suffered any actual

injury in fact.  Therefore, their Complaint should be dismissed pursuant to *both* Rules 12(b)(1)

and 12(b)(6).

### D. The Complaint Fails To State Claims For Unjust Enrichment, And Injunctive Relief Is Not A Cause Of Action.

Finally, to oppose West's motion to dismiss Plaintiffs' claims for unjust enrichment and

injunctive relief, Plaintiffs do nothing more than summarize their allegations.  Again, Plaintiffs

would prefer to fight a straw man, pretending that West seeks dismissal of the state claims

merely because they are not well pled (when, in reality, such claims are *legally* doomed).

Plaintiffs cite to no case law to show why their unjust enrichment claim should not be dismissed.

And, they cite to no case or statute to show that "injunctive relief" is a separate cause of action,

which it is not.  For the reasons stated in West's opening brief, Plaintiffs have failed to state a

claim for unjust enrichment and Illinois does not recognize a separate cause of action for

"injunctive relief."  Def. Mem. at 14-16.  Therefore, the Court should dismiss those claims, as a

matter of law.

**IV.      CONCLUSION**

For all of the reasons stated above and in West's opening brief, this Complaint should be

dismissed in its entirety.


Dated: November 13, 2009                          Respectfully submitted,

                                                  WEST PUBLISHING CORPORATION
                                                  *Defendant*

                                                  By: /s/  David Z. Smith
                                                           One of its attorneys

Mark S. Melodia (*pro hac vice* application pending)      Diane Green-Kelly (ARDC # 6216868)
Paul Bond (*pro hac vice* application pending)            David Z. Smith (ARDC # 6256687)
REED SMITH LLP                                            REED SMITH LLP
Princeton Forrestal Village                               10 South Wacker Drive
136 Main Street, Suite 250                                Chicago, IL  60606-7507
Princeton, N.J. 08540                                     (312) 207 1000
(609) 987-0050                                            (312) 207 6400 (fax)
                                                          dzsmith@reedsmith.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2009, I electronically filed the foregoing **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION TO DISMISS PLAINTIFFS' COMPLAINT** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

BARNOW AND ASSOCIATES, P.C.
Ben Barnow
Blake Strautins
One North LaSalle Street, Suite 4600
Chicago, IL 60602
(312) 621-2000
*Attorneys for Plaintiff*

LAW OFFICE OF ARON D. ROBINSON
Aron David Robinson
19 South LaSalle Street
Suite 1200
Chicago , IL 60603
(312) 857-9050
*Attorneys for Plaintiff*

/s/ David Z. Smith
David Z. Smith (ARDC # 6256687)
REED SMITH LLP
10 South Wacker Drive
Chicago, IL  60606-7507
(312) 207 1000
(312) 207 6400 (fax)
dzsmith@reedsmith.com

US_ACTIVE-102624642.2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA M. GRACZYK, MATTHEW M. JORGE, and BRIAN WILLINGHAM Individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>WEST PUBLISHING CORP., a Minnesota corporation,<br><br>        Defendant. | : Case No.: 1:09-cv-04760 (RWG)<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## INDEX OF EXHIBITS

A.   *Lake v. Neal*, No. 08-3765, 2009 WL 3673086 (7th Cir. Nov. 6, 2009)

B.   *Parus v. Cator*, No. 05-C-0063-C, 2005 WL 2240955 (W.D. Wis. Sept. 14, 2005)

C.   Brief of the State of Texas as Amicus Curiae Supporting Defendants, *Taylor v. Acxiom Corp.*, Nos. 08-41083, 08-41180, and 08-41232 (5th Cir. May 7, 2009)

D.   Letter from Robert L. Quinan, Jr., Assistant Attorney General, to Paul J. Bond (Nov. 10, 2009) (enclosing Department of Justice Opinion Letter to Peter Sacks, Massachusetts Office of the Attorney General (Oct. 9, 1998) and letter from Peter Sacks to Eleanor Dean Acheson, Assistant U.S. Attorney General (May 1, 1998))

US_ACTIVE-102668541.1

# EXHIBIT A

Westlaw.

--- F.3d ----, 2009 WL 3673086 (C.A.7 (Ill.))
**(Cite as: 2009 WL 3673086 (C.A.7 (Ill.)))**

**H**Only the Westlaw citation is currently available.

United States Court of Appeals,
Seventh Circuit.
**Joseph LAKE**, individually and on behalf of all
persons similarly situated, Plaintiff-Appellant,
v.
**Langdon D. NEAL**, et al., Defendants-Appellees.
**No. 08-3765.**

Argued Sept. 14, 2009.
Decided Nov. 6, 2009.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division. No. 07
C 2742-Robert W. Gettleman, Judge.
Nicholas C. Kefalos, Adolfo Mondragon, Vernor
Moran, Chicago, IL, for Plaintiff-Appellant.

Terrence M. Burns, Dykema, Chicago, IL, for De-
fendants-Appellees.

Before EASTERBROOK, Chief Judge, and BAUER
and EVANS, Circuit Judges.

EVANS, Circuit Judge.

*1 The *Duck Test* holds that if it walks like a duck,
swims like a duck, and quacks like a duck, it's a duck.
**Joseph Lake**, the plaintiff in this suit, flunks the
*Duck Test.* He says, in effect, that if it walks like a
duck, swims like a duck, and quacks like a duck, it
sure as heck isn't a duck.

The crux of Lake's argument in this appeal is that a
voter registration form is actually a motor vehicle
record. He argues that the Chicago Board of Election
Commissioners (Board) violated the Driver's Privacy
Protection Act (DPPA) [FN1]-which regulates motor
vehicle records-by disclosing personal information it
obtains from voter registration records that were
completed at an office of the Illinois Department of
Motor Vehicles (DMV). After a parallel claim in
state court was dismissed with prejudice, Lake insti-
tuted this class action suit against the Board. Recog-
nizing a fatal flaw in Lake's argument, the district
court granted the' motion to dismiss for failure to

state a claim.

FN1. 18 U.S.C. §§ 2721-25.

Because this case comes to us on an appeal from an
order granting a motion to dismiss for failure to state
a claim, we accept as true all well-pleaded facts al-
leged, drawing all possible inferences in the's favor.
*Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d
777, 782 (7th Cir.1999). Here are the facts.

In 1998, Lake applied for a driver's licence at an of-
fice of the Illinois DMV. Pursuant to the National
Voter Registration Act (NVRA),[FN2] he exercised an
option to register to vote at the same time. He filled
out and submitted a voter registration form, which
was attached to the driver's license application. The
completed voter registration form was transmitted to
the Board. In 2007, a fellow named Peter Zelchenko
acquired Lake's personal information-he says it was
his name, date of birth, sex, address, former address,
phone number, and social security number [FN3]-by
simply asking the Board for it. Zelchenko informed
Lake that he acquired his personal information from
the Board.

FN2. 42 U.S.C. § 1973.

FN3. Although we are required to accept as
true the facts as pled, we have a hard time
believing that the Board, in this day and age,
would intentionally release a registered
voter's social security number.

Lake raises two issues on appeal, but we need only
discuss one: Did his complaint state a cause of action
under the DPPA?

The district court dismissed the complaint for failure
to state a claim after it determined that a voter regis-
tration form filled out at the DMV under the NVRA
is not a motor vehicle record under the DPPA. We
review grants of motions for failure to state a claim
*de novo. Hickey v. O'Bannon,* 287 F.3d 656, 657 (7th
Cir.2002).

A bit of background on the two statutes is necessary.

--- F.3d ----, 2009 WL 3673086 (C.A.7 (Ill.))
**(Cite as: 2009 WL 3673086 (C.A.7 (Ill.)))**

The DPPA regulates the ways a DMV can disclose information. Congress passed the DPPA in response to safety and privacy concerns stemming from the ready availability of personal information contained in state motor vehicle records. The most prominent example of the realization of these concerns was the 1989 murder of actress Rebecca Schaeffer, star of the television series "My Sister Sam." *See* 137 Cong. Rec. 27, 327 (1993). An obsessed fan stalked and killed the actress, in her own apartment, after he obtained her unlisted address from the California DMV. The second statute, the NVRA, allows eligible citizens to register to vote while applying for a driver's license. Congress passed the NVRA to (1) make it easier to register to vote and (2) to help protect the integrity of the process by ensuring that accurate voter registration rolls are maintained.

**\*2** The basis for plaintiff's claim is § 2724 of the DPPA, which creates a private cause of action against "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter...." The DPPA defines a motor vehicle record as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles[.]" The issue for us is whether the voter registration form that Lake filled out at the DMV is a "motor vehicle record" under the DPPA. It qualifies as such only if it "pertains" to one of the documents mentioned in the statute.

The plain language of both statutes makes it clear that a voter registration form filled out pursuant to the NVRA does not "pertain" to any of the listed DMV documents. The dictionary tells us that "pertain" means "to belong as a part, member, accessory, or product." [FN4] The voter registration form, which is filled out separately and at the applicant's option, is not a part, member, accessory, or product of a motor vehicle operator's permit. Other than the fact that it is filled out simultaneously with a driver's license application, the voter form has nothing to do with, nor does it "pertain" to, a motor vehicle operator's permit.

> FN4. Merriam-Webster's Collegiate Dictionary (11th ed.2004).

Finally, we would not accept Lake's argument even if a literal interpretation of the DPPA would seem to compel it because that would "lead to an absurd result...." *Castellon-Contreras v. INS,* 45 F.3d 149, 153 (7th Cir.1995) (citing *Born v. United States,* 498 U.S. 1126 (1991)). The Board receives voter registration forms from a variety of sources. The Illinois DMV, pursuant to the NVRA, is one such source. All voter registration forms contain the same basic information, which the Board must-according to Illinois state law-make available to the public. *See* 10 Ill. Comp. Stat. Ann. 5/6-35 (2009). Accepting Lake's argument would lead to an absurd situation: the Board violates federal law when it discloses the personal information it receives from the DMV pursuant to the NVRA but does not violate federal law when it discloses the same personal information it receives from other sources. This result also likely contravenes the purpose of the NVRA, which is to increase voter registration in federal elections. If it is against federal law for the Board to disclose the voter information it receives from the DMV, but against state law to not make it publicly available, the Board will likely be forced to stop accepting voter registration forms received from the DMV. That would nullify an important purpose of the NVRA.

Since a voter registration form filled out at the DMV is not a motor vehicle record under the DPPA, the Board could not have violated the DPPA by disclosing Lake's personal information to the extent that it did.

Accordingly, the judgment of the district court is AFFIRMED.

C.A.7 (Ill.),2009.
Lake v. Neal
--- F.3d ----, 2009 WL 3673086 (C.A.7 (Ill.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 2240955 (W.D.Wis.)
**(Cite as: 2005 WL 2240955 (W.D.Wis.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
W.D. Wisconsin.
William A. PARUS, Plaintiff,
and
ALLSTATE INSURANCE COMPANY, Intervening
Plaintiff,
v.
Andrew C. CATOR, Thomas Kroeplin, Dawn
Bresnahan, individually and in her official capacity
as an employee of the Town of Minocqua Police De-
partment, Town of Minocqua, Wisconsin, Clay Kreit-
low, individually and in his capacity as an employee
of the Town of Woodruff Police Department, and
Town of Woodruff, Wisconsin, Defendants.
No. 05-C-0063-C.

Sept. 14, 2005.

Richard M. Burnham, for Plaintiff.

Mark P. Wendorff, Wendorff, Ellison, Noteboom &
David, Wausau, WI, for Defendants.

OPINION AND ORDER

CRABB, J.

*1 In this civil action for monetary relief, plaintiff
William A. Parus contends that defendants Kreitlow
and Town of Woodruff, Wisconsin, illegally obtained
his personal information from the Department of Mo-
tor Vehicles database in violation of the Driver's Pri-
vacy Protection Act of 1994, 18 U.S.C. § 2721. Ju-
risdiction is present under 28 U.S.C. § 1331.

This case is before the court on defendants Clay
Kreitlow and Town of Woodruff's motion for sum-
mary judgment. (Intervening plaintiff Allstate Insur-
ance Co. has not filed a response to defendants' mo-
tion. Because intervening plaintiff plays no role in the
relevant facts of this case, all references to "plaintiff"
will be to William A. Parus.) Defendants Thomas
Kroeplin and Andrew Cator have filed separate mo-
tions for summary judgment. Each of those motions
will be decided in separate orders.

Plaintiff and defendants Kreitlow and Town of
Woodruff agree that on September 20, 2004, defen-
dant Kreitlow obtained plaintiff's personal informa-
tion from the Department of Motor Vehicles data-
base. They disagree about defendant Kreitlow's rea-
son for doing so. I conclude that resolution of the
disagreement is material to the outcome of this law-
suit and therefore will deny defendants' motion.

From the parties' proposed findings of fact, I find the
following to be material and undisputed.

UNDISPUTED FACTS

On September 20, 2004, at approximately 1:30 p.m.,
defendant Clay Kreitlow, a police officer employed
by the Town of Woodruff, Wisconsin, was on duty
when defendant Andrew Cator entered the police
department with a piece of paper in his hand. Defen-
dant Cator asked defendant Kreitlow to "run a license
plate number" on a vehicle defendant Cator said he
wanted to purchase.

Defendant Kreitlow was suspicious of defendant Ca-
tor's motives. (At some time prior to September 24,
2004, the Woodruff Police Department had con-
ducted an investigation involving defendant Cator. In
addition, defendant Kreitlow had stopped defendant
Cator several times for traffic violations.) Defendant
Kreitlow decided to investigate the request.

Defendant Kreitlow used a recorded telephone line to
contact defendant Dawn Bresnahan, a dispatcher with
the Minocqua Police Department. Defendant Kreit-
low gave defendant Bresnahan the license plate num-
ber and asked her to "run" the number and provide
him with information about the individual who
owned the vehicle. Defendant Bresnahan gave defen-
dant Kreitlow the information he requested, including
the name of the vehicle owner, plaintiff William A.
Parus. Defendant Kreitlow did not recognize plain-
tiff's name.

After ending his call to defendant Bresnahan, defen-
dant Kreitlow asked defendant Cator why he wanted
the vehicle owner's information. Defendant Cator

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2240955 (W.D.Wis.)
**(Cite as: 2005 WL 2240955 (W.D.Wis.))**

stated again that he wanted to purchase the vehicle.

It is the policy of the Woodruff Police Department not to divulge to the public personal information from the Department of Motor Vehicles database. Having successfully completed all courses relevant to the department's policies and procedures, defendant Kreitlow was aware of this policy. Despite defendant Cator's requests, defendant Kreitlow did not disclose plaintiff's personal information to defendant Cator; however, defendant Kreitlow did tell defendant Cator that the owner of the vehicle was "a local guy."

*2 Defendant Cator became frustrated and asked why defendant Kreitlow would not give him the information. Defendant Kreitlow told defendant Cator that police officers do not give out personal information because they do not know how the information they disclose might be used. Defendant Cator asked defendant Kreitlow which officer would be on duty next. Defendant Kreitlow told him that Officer William B. Rhodes would be working the next shift. Defendant Kreitlow wrote a note to Rhodes explaining the situation and defendant Cator left the police department. The interaction between defendant Kreitlow and defendant Cator lasted ten to fifteen minutes.

Immediately after defendant Cator left, defendant Kreitlow called defendant Bresnahan and explained to her why he had requested the vehicle owner's information. Defendant Kreitlow told defendant Bresnahan to not provide information about the license plate number or owner of the vehicle to anyone else. Defendant Kreitlow also directed defendant Bresnahan to leave a note for later shift officers telling them not to disclose the information.

OPINION

Defendant's motion for summary judgment raises two questions. First, on the basis of the undisputed facts and the reasonable inferences that can be drawn from them, could a jury find that defendant Kreitlow violated the Driver's Privacy Protection Act when he obtained plaintiff's personal information from the Department of Motor Vehicles database? Second, if defendant Kreitlow violated the Act when he obtained plaintiff's personal information, may defendants be held liable under the Act even though defendant Kreitlow did not disclose or use the information he obtained? The answer to both questions is yes.

A. *The Driver's Privacy Protection Act and the Law Enforcement Exception*

Congress passed the Driver's Privacy Protection Act of 1994 to limit the release of personal information contained in motor vehicle records. *Kehoe v. Fidelity Federal Bank & Trust,* --- F.3d ----, 2005 WL 2043055 at *1 (11th Cir. Aug.26, 2005). The Act prohibits the release of a motorist's personal information (defined as "information that identifies an individual, including an individual's ... name [and] address") from the Department of Motor Vehicles database, with specific exceptions. 18 U.S.C. § 2725(3); 18 U.S.C. § 2721(a). Among the Act's enumerated exceptions is § 2721(1)(b), which permits disclosure of personal information "for use by any government agency, including any ... law enforcement agency, in carrying out its functions." When personal information is released for a purpose not permitted under the Act, an individual whose information has been disclosed may bring suit in federal court against any person who has knowingly obtained, disclosed or used the information. 18 U.S.C. § 2724(a).

Plaintiff contends that defendant Kreitlow violated § 2721(a) when he obtained plaintiff's personal information from the Department of Motor Vehicles database for a purpose not permitted under the Act. When defendant Cator entered the Woodruff police station on September 15, 2004, he asked defendant Kreitlow to "run a license plate" for him. Defendant Cator told defendant Kreitlow he was planning to purchase the vehicle bearing the license plate and wanted to know whether the vehicle was owned locally. Plaintiff contends that defendant Kreitlow complied with defendant Cator's request for the sole purpose of determining whether plaintiff was "a local guy" and that in doing so defendant Kreitlow was not carrying out a law enforcement function. Therefore, plaintiff contends that defendant Kreitlow violated the Act and is liable under § 2724(a).

*3 In support of his position, plaintiff cites *Margan v. Niles,* 250 F.Supp.2d (N.D.N.Y.2003). In *Margan,* plaintiffs brought a lawsuit under the Driver's Privacy Protection Act against a police officer and the town that employed him, alleging that the officer knowingly obtained the plaintiffs' personal information from the Department of Motor Vehicles database and disclosed it to his friends, who used the information

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2240955 (W.D.Wis.)
**(Cite as: 2005 WL 2240955 (W.D.Wis.))**

to harass the plaintiffs. *Id.* at 66-67. Plaintiff argues that, like Margan, defendant Kreitlow obtained personal information for a non-law enforcement purpose and is liable for the violation.

Defendants Kreitlow and Town of Woodruff admit that defendant Kreitlow obtained plaintiff's personal information but they deny that defendant Kreitlow violated the Act. Instead, they argue that defendant Kreitlow obtained the information in the course of a law enforcement investigation as permitted by § 2721(b)(1). They point out that defendant Kreitlow was on duty as a police officer at the time he obtained the information, he believed defendant Cator had been involved in a prior police investigation, he did not disclose any of plaintiff's personal information to defendant Cator and he directed other police officers not to disclose plaintiff's personal information to anyone who requested it. Defendants contend that it was defendant Kreitlow's duty to investigate what he regarded as suspicious behavior on the part of defendant Cator and that he obtained plaintiff's personal information while performing a legitimate law enforcement function.

Although the parties agree on the material facts in this case, they dispute the inferences to be drawn from those facts. When deciding a motion for summary judgment, I must draw all reasonable inferences in favor of non-moving party. *Butera v. Cottey,* 285 F.3d 601, 605 (7th Cir.2002). Summary judgment is inappropriate if evidence could lead a reasonable jury to return a verdict in favor of plaintiff. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir.2003).

When defendant Cator entered the police station on September 20, 2004, it was against police department policy to make available to the general public information from motor vehicle records. Yet when defendant Cator asked defendant Kreitlow to "run a license plate" for him, defendant Kreitlow did so. Defendant Kreitlow obtained plaintiff's personal information from the Department of Motor Vehicles database and informed defendant Cator that the vehicle owner was "a local guy." From these undisputed facts, a jury could reasonably infer that defendant Kreitlow obtained plaintiff's personal information from the Department of Motor Vehicles for a non-law enforcement purpose.

*B. Liability Under the DPPA*

Next, defendants contend that defendant Kreitlow is not liable to plaintiff under the Act even if he did obtain plaintiff's personal information for a non-law enforcement purpose. They assert that unless defendant Kreitlow actually disclosed or otherwise used plaintiff's personal information they cannot be liable for improperly obtaining it. "No harm, no foul" is their argument; because plaintiff does not claim that he was injured as a result of defendant Kreitlow improperly obtaining his personal information, defendants cannot be held liable for any technical violation of the Act. In support of their position, defendants cite *Russell v. Choicepoint Serv., Inc.,* 300 F.Supp.2d 450 (E.D.La.2004), as persuasive authority.

*\*4* In *Russell,* the plaintiff alleged that defendant Choicepoint Services, Inc. had improperly obtained personal information from her motor vehicle record with intent to redistribute it for an impermissible purpose. *Id.* at 451. Choicepoint obtained Russell's personal information under § 2721(c), which permits "authorized recipient[s] of personal information" to "resell or redisclose" that information for uses permitted under § 2621(b). *Id.* at 455. The court found that because Choicepoint was an authorized recipient of personal information within the meaning of § 2721(c), it could not be liable to Russell for improperly obtaining her information unless she alleged also that Choicepoint had used the information for a purpose not permitted under § 2621(b). *Id.* at 455, 457. In the absence of an allegation of improper use, the court presumed that Choicepoint had not improperly obtained Russell's personal information. *Id.* at 460-61. The court dismissed Russell's claim, stating that she could "not maintain a [Driver's Privacy Protection Act] claim for improper obtainment under 18 U.S.C. § 2724(a) without alleging an accompanying impermissible use." *Id.* at 455.

The present case is distinguishable from *Russell. Russell* involved a claim against a commercial entity authorized under § 2721(c) to resell personal information for a purpose permitted under § 2721(b). Defendant Kreitlow is not (and does not purport to be) an authorized recipient of information under § 2721(c). Rather, he contends that as a law enforcement officer he was permitted to obtain information under § 2721(b)(1). Because defendant Kreitlow was not presumptively authorized to obtain plaintiff's information, there is no reason to require plaintiff to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2240955 (W.D.Wis.)
(Cite as: 2005 WL 2240955 (W.D.Wis.))

make an additional showing that defendant Kreitlow improperly used the information he obtained from the Department of Motor Vehicles database. The *Russell* court's requirement that a plaintiff allege both "improper obtainment" and "impermissible use" is relevant only in the context of a claim arising under § 2721(c). This is not such a case, and therefore *Russell* is not applicable.

This case is governed by the plain language of 18 U.S.C. § 2724(a), which authorizes civil remedies for violations of the DPPA. Section 2724(a) states:

A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

The statute uses the disjunctive "or" to connect the terms "obtains," "discloses" and "uses." Therefore, each term must be given a separate meaning. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Section 2724(a) makes a person liable when he knowingly obtains personal information from a motor vehicle record for a purpose not permitted under the Act regardless whether he proceeds to disclose or use the information.

**\*5** It is true that plaintiff has not alleged that he suffered injury as a *result* of defendant Kreitlow's obtaining his personal information. However, under the statute, improperly obtaining plaintiff's information *was* an injury. The Driver's Privacy Protection Act is designed to safeguard personal information. *See, e.g.,* 139 Cong. Rec. S15765 (1993) ("Easy access to personal information makes every driver in this nation vulnerable and infringes on their right to privacy.") (statement of Sen. Robb). If defendant Kreitlow obtained plaintiff's information in violation of the law, then he infringed upon plaintiff's privacy. The language of the statute protects not only against the wrongful dissemination of private information, but also against the wrongful acquisition of that information.

Resolution of this dispute turns on the answer to a single question: Was defendant Kreitlow carrying out a law enforcement function when he obtained plaintiff Parus's personal information from his motor vehi-

cle record? Because the parties dispute the answer to this question, I must deny defendants Kreitlow's and Town of Woodruff's motion for summary judgment.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Clay Kreitlow and the Town of Woodruff is DENIED as to plaintiff William A. Parus's claim that defendant Kreitlow obtained plaintiff's protected personal information in violation of the Drivers' Privacy Protection Act of 1994.

W.D.Wis.,2005.
Parus v. Cator
Not Reported in F.Supp.2d, 2005 WL 2240955 (W.D.Wis.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT C

Nos. 08-41083, 08-41180 and No. 08-41232

# In the United States Court of Appeals
# for the Fifth Circuit

---

SHARON TAYLOR, ET AL.

*Plaintiffs - Appellants,*

v.

ACXIOM CORPORATION, ET AL.

*Defendants - Appellees.*

---

On Appeal from the United States District Court for the
Eastern District of Texas, in Civil Action Nos.
2:07-cv-01, 2:07-cv-13, 2:07-cv-14, 2:07-cv-17, 2:07-cv-18, 2:07-cv-410

---

## BRIEF OF THE STATE OF TEXAS AS AMICUS CURIAE
## IN SUPPORT OF DEFENDANTS

---

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

JEFF L. ROSE
Deputy First Assistant
Attorney General

PAUL D. CARMONA
Chief, Consumer
Protection Division

JAMES C. HO
Solicitor General
State Bar No. 24052766

MICHAEL P. MURPHY
Assistant Solicitor General
State Bar No. 24051097

Office of the Attorney General
P.O. Box 12548 (MC-059)
Austin, Texas 78711-2548
[Tel.] (512) 936-1700
[Fax] (512) 474-2697

COUNSEL FOR THE STATE OF TEXAS

TABLE OF CONTENTS

Table of Authorities ................................................ iii

Statement of Interest of Amicus Curiae ............................... 1

Argument .......................................................... 3

I.    The Judgment Should Be Affirmed Because the DPPA Imposes
Liability Only if a Defendant Obtains, Discloses, or Uses Driver
Records for a "Purpose Not Permitted" by the Act—and
Combating Identity Theft Is a Valid Purpose Under the Act ....... 6

    A.    The Court Should Reject Plaintiffs' Bulk Obtainment
Theory of Liability—A Defendant Does Not Obtain Driver
Information for a "Purpose Not Permitted" by the Act
Simply by Storing It for a *Future* (Rather Than Immediate)
Valid Purpose ....................................... 7

    B.    The Court Should Reject Plaintiffs' Resale Theory of
Liability—A Defendant Does Not Obtain Driver
Information for a "Purpose Not Permitted" by the Act
Simply by Obtaining It *on Behalf of a Customer* for a Valid
Purpose ............................................ 11

II.    Texas Law Authorizes Bulk Obtainment and Resale of Personal
Driver Records, Subject to Restrictions to Prevent Misuse ....... 13

Conclusion ....................................................... 16

Certificate of Service ............................................. 18

Certificate of Compliance .......................................... 20

ii

## TABLE OF AUTHORITIES

**Cases:**

*Queensboro Farms Products, Inc. v. Wickard,*
    137 F.2d 969 (2nd Cir. 1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Langford,*
    688 F.2d 1088 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Statutes, Rules and Constitutional Provisions:**

18 U.S.C. § 2721(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

18 U.S.C. § 2721(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2721(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 6-8, 11, 12

18 U.S.C. § 2721(b)(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 2721(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

18 U.S.C. § 2722(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 2723(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

18 U.S.C. § 2724(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-9, 12, 13

**Other Authorities:**

37 TEX. ADMIN. CODE  § 15.141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

37 TEX. ADMIN. CODE  § 15.141(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

37 TEX. ADMIN. CODE § 15.142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

37 TEX. ADMIN. CODE § 15.142(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

37 TEX. ADMIN. CODE § 15.143(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEX. BUS. & COM. CODE § 521.052(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEX. BUS. & COM. CODE § 521.052(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEX. BUS. & COM. CODE § 521.151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEX. TRANSP. CODE § 730.007(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

TEX. TRANSP. CODE § 730.012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

TEX. TRANSP. CODE § 730.015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

http://www.oag.state.tx.us/consumer/identity_theft.shtml . . . . . . . . . . . . . . . . . . 2

http://www.texasfightsidtheft.gov/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Nos. 08-41083, 08-41180 and No. 08-41232

# In the United States Court of Appeals for the Fifth Circuit

---

SHARON TAYLOR, ET AL.

*Plaintiffs - Appellants,*

v.

ACXIOM CORPORATION, ET AL.

*Defendants - Appellees.*

---

On Appeal from the United States District Court for the
Eastern District of Texas, in Civil Action
Nos. 2:07-cv-01, 2:07-cv-13, 2:07-cv-14, 2:07-cv-17, 2:07-cv-18, 2:07-cv-410

---

### BRIEF OF THE STATE OF TEXAS AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS

---

### STATEMENT OF INTEREST OF AMICUS CURIAE

The State of Texas has multiple interests in this matter. To begin with, Plaintiffs are asking this Court to impose severe civil liability on the use of personal information contained in driver license records held by the Texas Department of Public Safety—information that, properly used, can be a highly effective tool in the fight against identity theft, an important priority for the State of Texas.

Identity theft costs Texans millions of dollars each year.  The Texas Attorney General's office is engaged in substantial efforts to protect honest consumers from the scourge of identity theft.[1]  And as Congress recognized in enacting the Driver's Privacy Protection Act, cooperation between government and the private sector is needed to combat identity theft effectively, 18 U.S.C. § 2721(b)(3)—after all, there are far too many private transactions for government alone to police.

To construe the DPPA to hamstring cooperation between government and private industry would not just thwart the important policy objectives of the State of Texas in detecting and preventing identity theft.  It would also expose the State to potential civil penalties under the Act.  18 U.S.C. § 2723(b).

The State's interest in this case extends beyond fighting identity theft.  As with other law enforcement agencies across the country, Texas itself uses personal driver information compiled and repackaged by private resellers into a convenient format (typically in combination with other databases nationwide) to help track down suspects, witnesses, and other persons of interest, and to achieve other important law enforcement objectives.  18 U.S.C. § 2721(b)(1).  For example, the Attorney General's Office routinely uses national databases provided by private resellers to

---

[1]  *See generally*  http://www.oag.state.tx.us/consumer/identity_theft.shtml; http://www.texasfightsidtheft.gov/.

2

track down individuals who are delinquent in their child-support payments, as well as to help locate suspects in the course of conducting consumer protection and criminal investigations.  Plaintiffs' theory of liability would not just drive these resellers out of business—it would eliminate a valuable tool of law enforcement.

Accordingly, the State of Texas files this amicus brief to protect its efforts to detect and prevent identity theft, to avoid the improper assessment of civil penalties, and to achieve other important law enforcement objectives.  The State agrees with Defendants' interpretation of the DPPA, but offers here an even simpler textual basis for defending the conduct challenged in this case.

## ARGUMENT

Any information can be used either for good or for ill, and the Driver's Privacy Protection Act reflects this practical reality.  On the one hand, Congress enacted the DPPA in order to forbid injurious uses of personal information held by state motor vehicle departments—in particular, to prevent criminals from accessing driver information in order to identify and locate potential victims, and to stop marketing agencies from engaging in unwanted commercial solicitations.  But it is also undisputed that the DPPA specifically authorizes the use of personal driver information to further various socially worthy causes—including working with businesses to protect consumers by combating identity fraud.  The DPPA expressly

3

authorizes businesses to access personal driver information in order to "verify the accuracy of personal information" submitted by consumers and to "obtain the correct information . . . for the purposes of preventing fraud." 18 U.S.C. § 2721(b)(3).

Plaintiffs do not dispute the substantial societal value that flows from allowing businesses to access personal driver information to combat identity theft. They dispute only the format that such information may take. But this dispute is not only legally meritless—it also has enormous negative practical consequences for the fight against identity theft.

In effect, Plaintiffs contend that government may provide, and businesses may obtain, personal driver information to detect and prevent identity theft—but only in the least convenient format possible. According to Plaintiffs, businesses may examine individual records only on a case-by-case basis, and only when an immediate need arises. They put forth this interpretation by stringing together textual inferences from various provisions of the DPPA.

But their approach is not only unsupported by text—it also eliminates the most convenient and effective format for accessing personal driver information in order to detect identity theft, in clear conflict with a core purpose of the Act. For example, businesses that wish to obtain instant verification of consumer identification cannot simply obtain individual driver records one at a time as a specific need arises—that

4

would be impractical and untimely for business, and burdensome and costly for government. To achieve the benefits of instant verification, businesses must have, and states must provide, access to the entire database all at once. Yet Plaintiffs contend that Congress somehow intended to criminalize such practices, and to impose punishing civil liability on businesses for doing nothing more than working with government to obtain the information in the most convenient and practical format available for preventing identity theft.

Plaintiffs' interpretation of the DPPA is impractical in the extreme, and nothing in the text of the Act compels it. To the contrary, as Defendants have comprehensively documented, the text, legislative history, and purpose of the DPPA all point in favor of permitting the use of driver information in a convenient format to combat identity theft, an interpretation that is further bolstered by the rule of lenity.

The State of Texas agrees with Defendants' legal analysis. Rather than duplicate their brief, the State presents an additional, even simpler textual basis for affirming the judgment below: By Plaintiffs' own admission, the standard for civil liability is stated in 18 U.S.C. § 2724(a). That provision requires a showing that the defendant obtained, disclosed, or used personal driver information for a "purpose not permitted" by the DPPA. Plaintiffs do not dispute that all Defendants obtain personal driver information for the socially worthy and legally authorized purpose of detecting

5

and preventing identity theft pursuant to § 2721(b)(3).  That concession is fatal to their claims.

For their part, Plaintiffs contend that some Defendants obtain and store personal driver information only to support some potential *future* effort to combat identity theft, while other Defendants do so only *on behalf of third party customers*. Neither contention is remarkable.  And neither fact alters the conclusion that all Defendants are acting in order to further a "purpose" that is plainly permitted by the DPPA—to combat identity theft.

I.   THE JUDGMENT SHOULD BE AFFIRMED BECAUSE THE DPPA IMPOSES LIABILITY ONLY IF A DEFENDANT OBTAINS, DISCLOSES, OR USES DRIVER RECORDS FOR A "PURPOSE NOT PERMITTED" BY THE ACT—AND COMBATING IDENTITY THEFT IS A VALID PURPOSE UNDER THE ACT.

Plaintiffs expend much of their energy interpreting various provisions of the DPPA, as well as *dicta* from the rulings of other courts.  But as they ultimately acknowledge, it is "[18 U.S.C.] § 2724(a) [that] provides the standard for civil liability" under the DPPA.  Pltfs' Br. at 27.  Section 2724(a) is the only provision of the DPPA that creates a civil action against defendants who wrongfully obtain or use personal driver information.

Nothing in the civil liability provision of the DPPA prohibits businesses from obtaining driver information and storing it for a valid use in the future (and thus not

6

using it until the need arises). Nor does it prohibit obtaining such information for the purpose of assisting third parties to achieve valid objectives. The provision only prohibits businesses from obtaining personal driver information for a "purpose not permitted" by the DPPA. 18 U.S.C. § 2724(a). *See also* Pltfs' Br. at 28 (same).

Plaintiffs do not deny that Defendants' ultimate "purpose" in obtaining personal driver information is to combat identity theft, as expressly authorized by the DPPA. Plaintiffs simply contend that this otherwise valid purpose is limited to either future use or to use by a third party. Neither contention, however, alters the fact that Defendants do not obtain personal driver information for a "purpose not permitted" by the DPPA.

A. **The Court Should Reject Plaintiffs' Bulk Obtainment Theory of Liability—A Defendant Does Not Obtain Driver Information for a "Purpose Not Permitted" by the Act Simply by Storing It for a *Future* (Rather Than Immediate) Valid Purpose.**

Plaintiffs do not deny that those Defendants who wish to use personal driver information themselves (so-called "Non-Sellers") intend to do so in order to combat identity theft, as the DPPA expressly contemplates. The Act expressly allows disclosure of personal driver information:

> [f]or use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only (A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors, and (B) if such information as so

7

submitted is not correct or is no longer correct, to obtain the correct information, but only for the purpose of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

18 U.S.C. § 2721(b)(3).

Although Plaintiffs do not dispute that Non-Sellers' ultimate purpose in obtaining such information falls well within this authorization, they argue that Non-Sellers do not expect to achieve this purpose in the immediate future with respect to each and every individual record obtained. In their words, "Plaintiffs' stated violations of the DPPA by Non-Sellers consisted of the fact that personal information from Plaintiffs' motor vehicle records were obtained by Non-Sellers for an impermissible purpose—'to save [themselves] time and/or money by not having to go back to the State of Texas each time [they] need additional information' and 'to avoid the inconvenience of having to go to the State each time [they] needed an additional customers' information.'" Pltfs' Br. at 28.

Plaintiffs' interpretation is impractical, contradicts Congressional intention, and is unsupported by the text of the DPPA. As they concede, the standard for civil liability under the DPPA is outlined in 18 U.S.C. § 2724(a), which imposes liability only if a defendant obtains information for a "purpose not permitted" by the Act. And as noted, Plaintiffs do not deny that the end use intended by Non-Sellers is to combat

8

identity theft. The fact that a Non-Seller's purpose may not be realized until some future unknown date in no way undermines the validity or sincerity of that purpose.

The biggest difficulty with Plaintiffs' theory of liability is that it requires a strange and cramped understanding of the term "purpose" under 18 U.S.C. § 2724(a). Consider the following analogy: Under Plaintiffs' approach, a person who buys a set of legal reporters does not do so for the "purpose" of reading the case law of a particular jurisdiction—unless the person plans to read the entire series immediately and all in one sitting. According to Plaintiffs, one who places those reporters on a bookshelf for future reading does not purchase those reporters for the "purpose" of reading them, and is instead guilty of acting in furtherance of some other purpose. There is no reason to impute to Congress such a strange and unexpected definition of "purpose." By the same token, a person who buys a box of chocolates does not do so for the "purpose" of eating them, unless the person eats them right away and all at once. That too is absurd. *Cf. United States v. Langford*, 688 F.2d 1088, 1096 (7th Cir. 1982) (interpreting federal law prohibiting the mailing of obscene materials "for the purpose of sale or distribution for sale" to "encompass[] and prohibit[] any future plan or scheme . . . to sell or distribute the obscene prints for sale").

For their part, Plaintiffs seem to argue that, although Defendants' *ultimate* "purpose" may be to combat identity theft, they also have an interim purpose to

9

achieve "convenience" or cost savings.    But that theory proves too much.    If a business can violate the DPPA simply by obtaining information in order to improve consumer or business convenience or to reduce costs, then every business that uses a driver record in the course of ordinary business would violate the DPPA.    After all, any business could (in theory) assemble its own private database of consumer information—an expensive and time-consuming endeavor.    By avoiding that effort—and by relying instead on government records—businesses save significant time and money and thereby increase convenience for themselves and for the consumers they serve.    In sum, accepting Plaintiffs' "convenience" and "cost savings" theory of business "purpose" would, taken to its logical conclusion, effectively nullify the ability of any business to access any driver record to combat identity theft—including activities that Plaintiffs themselves say they would allow:    Even a business that obtains personal driver information only on a case-by-case basis still saves itself from having to develop that specific information on its own.

Plaintiffs also contend that the DPPA elsewhere authorizes the "use" of personal driver information for "bulk distribution for surveys, marketing or solicitations," but only "if the State has obtained the express consent of the person to whom such personal information pertains." 18 U.S.C. § 2721(b)(12).    Because no such express consent has occurred here, Plaintiffs contend that no "bulk distribution"

10

of driver records is authorized by the Act.   But this argument conflates use with

purpose.   No business wishing to prevent identity theft actually *uses* driver

information in "bulk"—rather, businesses simply confirm the validity of individual

commercial transactions on a case-by-case basis.   But that does not change the fact

that the *purpose* of obtaining the entire driver database is to combat identity theft

pursuant to 18 U.S.C. § 2721(b)(3).

> **B.    The Court Should Reject Plaintiffs' Resale Theory of Liability—A Defendant Does Not Obtain Driver Information for a "Purpose Not Permitted" by the Act Simply by Obtaining It *on Behalf of a Customer* for a Valid Purpose.**

Separately, Plaintiffs seek to impose civil liability on those Defendants who

compile and repackage personal driver information into a convenient, more easily

searchable format (typically in combination with other databases nationwide) for

resale to business customers who wish to combat identity theft (so-called

"Resellers").  This contention is meritless.  Indeed, the DPPA expressly authorizes

the resale of personal driver information.  18 U.S.C. § 2721(c).

Plaintiffs theorize that the DPPA permits such resale, but only if the Reseller

first uses the information itself.  Notably, Plaintiffs do not explain what possible

Congressional objective such a "first use" requirement would achieve. They point to

no social ill that would result when a business chooses to offer the benefits of

enhanced information technology to the area of government records. They simply contend that "Resellers were in violation of the DPPA because they impermissibly obtained Plaintiffs' personal information for the purpose of reselling the data to other parties when they were not themselves 'users' of the information." Pltfs' Br. at 35. They note that § 2721(c) applies only to "authorized recipients," and they argue that this term covers only those Resellers who first use the information themselves as authorized under § 2721(b).

Once again, the civil liability standard in 18 U.S.C. § 2724(a) (which requires a showing that Defendants acted out of a "purpose not permitted" by the Act) provides the simplest answer: The "purpose" of Resellers is to help their third-party customers detect and prevent identity theft, as permitted by the DPPA. Nothing in § 2724(a) forbids a person from obtaining personal driver information on behalf of a third-party customer for the "purpose" of helping that customer achieve its objectives. The DPPA expressly authorizes a person to obtain personal driver information "[f]or use in the normal course of business by a legitimate business or its agents, employees, or contractors . . . to verify the accuracy of personal information." 18 U.S.C. § 2721(b)(3). A business that obtains personal driver information for the purpose of achieving this objective is no less sincere just because it is acting on behalf of another "legitimate business." To continue the earlier metaphor, a law

12

librarian may purchase and store a set of legal reporters so that those reporters can be read by others. The "purpose" served by the legal reporters is not altered just because the law librarian is acting on behalf of the lawyers for whom he or she works. *Cf. Queensboro Farms Products, Inc. v. Wickard*, 137 F.2d 969, 976 (2nd Cir. 1943) ("we take 'purpose' to mean that the handler's use may . . . be determined by reference to the use made by the handler's purchaser or by some subsequent purchaser").

Faithful application of the "purpose not permitted" standard of 18 U.S.C. § 2724(a) also explains why Plaintiffs' resort to 18 U.S.C. § 2722(a) is of no help to their cause. *See* Pltfs' Br. at 27. Section 2724(a) is the only provision of the DPPA that imposes civil liability. It applies equally to *any* defendant—whether it is a Reseller acting under § 2721(c) or a Non-Seller acting under § 2721(b) or § 2722(a)—who "obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted" by the DPPA. 18 U.S.C. § 2724(a).

## II.   TEXAS LAW AUTHORIZES BULK OBTAINMENT AND RESALE OF PERSONAL DRIVER RECORDS, SUBJECT TO RESTRICTIONS TO PREVENT MISUSE.

As contemplated by the DPPA, Texas law permits the bulk obtainment and resale of drivers license records, subject to a number of restrictions designed to prevent the diversion of such records for unauthorized use.

13

Any requestor must submit a written application documenting (1) the identity of the requestor, including all Internet addresses used by the requestor, (2) the nature of the requestor's business practices, (3) a detailed explanation of all intended uses of the requested information, (4) copies of any agreements between the requestor and any third parties for the release of personal driver information, and (5) any material provided to third parties regarding the authorized use of such information. *See* TEX. TRANSP. CODE §§ 730.007(a), 730.012; 37 TEX. ADMIN. CODE § 15.142. The Texas Department of Public Safety will not authorize the release of personal driver information to a requestor if "any of the information is incomplete, inaccurate, or does not meet statutory requirements." 37 TEX. ADMIN. CODE § 15.142(d). A requestor who misrepresents his identity or makes a false statement on the application is subject to criminal penalties. TEX. TRANSP. CODE § 730.015.

In the event that DPS approves an application for personal driver information, the requestor must enter into a written contract with DPS, 37 TEX. ADMIN. CODE § 15.141, requiring among other things a certification of permissible uses and a commitment that the information "shall not be used to engage in any method, act, or practice which is unfair or deceptive, nor shall they be used for marketing or solicitations, or surveys not authorized by law." Agreement For Purchasing Driver Record Information In Bulk, ¶ 5, App. A. The contract also conditions access to DPS

14

records on strict compliance with the DPPA as well as State law concerning the resale and disclosure of personal information. *Id.* at ¶¶ 2, 7, 8. Resellers are also required to "ensure that any party to which they release the driver record information" complies with federal and state law. 37 TEX. ADMIN. CODE § 15.143(a). Any violation of the agreement results in denial of future access to personal driver information. *Id.* at § 15.141(c).

More generally, Texas law protects consumers by requiring any business that possesses any personal information (including but not limited to information from driver records) to maintain the security of that information. Businesses must "implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information [including name and driver's license number], collected or maintained by the business in the regular course of business." TEX. BUS. & COM. CODE § 521.052(a). Disposal of personal information is also strictly regulated. A business that no longer wishes to retain personal information must arrange for its secure destruction by shredding, erasing, or modifying the information such that it is unreadable. *Id.* § 521.052(b). Violations are subject to civil prosecution by the Attorney General, with penalties ranging between $2,000 and $50,000 per violation. *Id.* at § 521.151.

\* \* \*

As the DPPA plainly recognizes, personal information contained in a motor vehicle record can be used either for good or for ill.   Congress understood that personal driver information can be an essential tool in the fight against identity theft, as well as in the achievement of other important law enforcement objectives, and expressly authorized such uses accordingly.   That authorization is not diminished just because a business obtains personal driver information for a future effort against identity theft, or on behalf of a third-party customer who wishes to detect and prevent acts of identity theft.   Plaintiffs' contention to the contrary falls far short of the DPPA standard for civil liability, which applies only where a defendant obtains, discloses, or uses such information for a "purpose not permitted" by the Act.[2]

## CONCLUSION

The judgment of the district court should be affirmed.

---

[2]    The standard for imposing civil penalties on government entities under the DPPA is, unsurprisingly, even more restrictive—triggered only where an agency engages in a "policy or practice of substantial noncompliance" under the Act.  18 U.S.C. § 2723(b).   Accordingly, if businesses are not liable as Plaintiffs allege, then a government agency *a fortiori* cannot be—as confirmed by the U.S. Justice Department advisory letter cited by Defendants.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

JEFF L. ROSE
Deputy First Assistant Attorney General

JAMES C. HO
Solicitor General
State Bar No. 24052766

MICHAEL P. MURPHY
Assistant Solicitor General
State Bar No.  24051097

PAUL D. CARMONA
Chief, Consumer Protection Division

P.O. Box 12548, MC-059
Austin, Texas 78711-2548
[Tel.] 512/936-1700
[Fax] 512/474-2697

COUNSEL FOR THE STATE OF TEXAS

17

## CERTIFICATE OF SERVICE

The undersigned counsel does hereby certify that two true and correct copies of the Brief of Amicus Curiae, along with a computer readable disk copy of the brief, was caused to be served via Federal Express on May 7, 2009 to:

Jeremy R. Wilson
THE COREA FIRM, PLLC
The Republic Center
325 N. St. Paul Street, Suite 4150
Dallas, Texas 75201
(214) 953-3900
(214) 953-3901 (fax)
and
Andy Tindel
PROVOST & UMPHREY LAW FIRM
112 E. Line Street, Suite 304
Tyler, Texas 75702
(903) 596-0900
(903) 596-0909 (fax)
**Counsel for Plaintiffs/Appellants
Sharon Taylor, et al.**

Chad M. Pinson
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-2980
(214) 953-6500
(713) 953-6503 (fax)
and
Aaron M. Streett
Elizabeth E. Baker
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1234
(713) 229-1522 (fax)
**Counsel for American Driving
Records, Inc., d/b/a First Advantage
ADR, a/k/a Agency Records, Inc.,
Southwestern Bell Telephone, L.P.
d/b/a Southwestern Bell Telephone
Company, a Texas Limited
Partnership, Safeway Inc., Ltd.,
Background Information Systems,
Inc., HEB Grocery Company, LP,
RealPage, Inc.**

18

Mark J. Dyer
Stephen D. Henninger
MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.
900 Jackson Street, Suite 710
Dallas, Texas 75202
(214) 420-5500
(214) 420-5501 (fax)
**Counsel for FedChex, L.L.C.**

Larry F. York
MCGINNIS, LOCHRIDGE &
KILGORE, L.L.P.
600 Congress Ave., Suite 2100
Austin, Texas 78701
(512) 495-6075
(512) 505-6375 (fax)
**Counsel for ACS State & Local
Solutions, Inc.**

Gregory R. Ave
Jason Wren
WALTERS BALIDO & CRAIN, L.L.P.
900 Jackson Street, Suite 600
Dallas, Texas 75202
(214) 749-4805
(214) 760-1670 (fax)
**Counsel for Spartan Insurance
Company and for Household Drivers
Report, Inc., d/b/a HDR, Inc.**

Wallace M. Smith
SMITH, ROBERTSON, ELLIOTT,
GLEN, KLEIN & BELL, L.L.P.
221 West Sixth Street, Suite 1100
Austin, Texas 78701
(512) 225-5800
(512) 225-5838 (fax)
**Counsel for Gila Corporation d/b/a
Municipal Services Bureau**

Charles L. Perry
ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
(214) 659-4681
(214) 659-4894 (fax)
**Counsel for Insurance Technologies
Corporation**

David M. Walsh IV
CHAMBLEE & RYAN, P.C.
2777 Stemmons Freeway, Suite 1157
Dallas, Texas 75207
(214) 905-2003
(214) 905-1213 (fax)
**Counsel for Hawkeye Insurance
Services**

Jonathan R. Donellan
Ravi V. Sitwala
THE HEARST CORPORATION
Office of General Counsel
300 West 57 Street, 40th Floor
New York, New York 10019
(212) 649-2000
      and
William W. Ogden
OGDEN, GIBSON, BROOCKS &
LONGORIA, L.L.P.
1900 Pennzoil South Tower
711 Louisiana
Houston, Texas 77002
(713) 844-3000
(713) 844-3030 (fax)
**Counsel for The Hearst Corporation
d/b/a Houston Chronicle**

Stephen S. Maris
Melissa J. Swindle
HUNTON & WILLIAMS LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
(214) 468-3300
(214) 468-3599 (fax)
**Counsel for American Student List,
LLC**

Michael Lawrence Bernoudy, Jr.
THE BERNOUDY LAW FIRM
202 S. College Street
Marshall, Texas 75670
(903) 935-4223
(903) 935-4228 (fax)
**Counsel for Coe Information
Publishers, Inc.**

Robert L. Ramey
Jill D. Schein
RAMEY, CHANDLER, MCKINLEY &
ZITO, P.C.
750 Bering Drive, Suite 600
Houston, Texas 77057
(713) 266-0074
(713) 266-1064 (fax)
**Counsel for Source Data, Inc.**

Eric P. Chenoweth
YETTER WARDEN & COLEMAN,
L.L.P.
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 (fax)
**Counsel for Reliant Energy, Inc.**

Randy Burton
BURLESON COOKE, LLP
711 Louisiana, Suite 1701
Houston, Texas 77002
(713) 358-1762
(713) 358-1721 (fax)
**Counsel for Driver Training
Associates, Inc. d/b/a
Ticketschool.com**

Robert M. Strasnick
ANDREWS & UPDEGRAPH, P.C.
70 Washington Street; Suite 212
Salem, Massachusetts 01970
(978) 740-6633
**Counsel for Jon Latorella, d/b/a
Locateplus Holding Corporation**

20

Richard N. Dodson
DODSON & DODSON
2005 Moores Lane
Post Office Box 1877
Texarkana, Texas 75503
(903) 794-3121
(903) 793-4801 (fax)
**Counsel for Texas Motor Transportation Association**

Stayton L. Worthington
David P. Henry
COGHLAN CROWSON, LLP
Suite 211, The Energy Centre
1127 Judson Road
P.O. Box 2665
Longview, Texas 75606-2665
(903) 758-5543
(903) 753-6989 (fax)
**Counsel for American Electric Power Service Corporation**

Donald R. Taylor
Steven D. Urban
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, Texas 78701
(512) 473-2257
(512) 478-4409 (fax)
**Counsel for United Teacher Associates Insurance Company**

Richard M. Abernathy
ABERNATHY ROEDER BOYD & JOPLIN, P.C.
1700 Redbud Blvd., Suite 300
McKinney, Texas 75069
(214) 544-4000
(214) 544-4040 (fax)
**Counsel for Tenant Tracker, Inc.**

Joel E. Geary
VINCENT LOPEZ SERAFINO JENEVEIN, P.C.
2001 Bryan Street, Suite 2000
Dallas, Texas 75201-3073
(214) 979-7451
(214) 979-7402
**Counsel for JI Specialty Services, Inc.**

Michael P. Heiskell
JOHNSON, VAUGHN, & HEISKELL
5601 Bridge Street, Suite 220
Fort Worth, Texas 76112
(817) 457-2999
(817) 496-1102 (fax)
**Counsel for National Statistical Services Corporation**

21

Robin L. Harrison
CAMPBELL HARRISON & DAGLEY
L.L.P.
4000 Two Houston Center
909 Fannin, Suite 4000
Houston, Texas 77010
(713) 752-2332
(713) 752-2330 (fax)
**Counsel for ADP Screening and
Selection Services, Inc. a/k/a Avert, Inc.**

Hastings L. Hanshaw
Collin D. Kennedy
HANSHAW KENNEDY, LLP
1125 Legacy Drive, Suite 250
Frisco, Texas 75034
(972) 731-6500
(972) 731-6555 (fax)
**Counsel for American Municipal
Services, Ltd.**

Douglas E. Koger
DOUGLAS E. KOGER
14090 Southwest Freeway, Suite 300
Sugar Land, Texas 77478
(281) 340-2050
(281) 340-2052 (fax)
**Counsel for Emaginenet Technologies,
Inc.**

Michael H. Collins
Thomas G. Yoxall
Kirsten M. Castañeda
LOCKE LORD BISSELL & LIDDELL
LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8000
(214) 740-8800 (fax)
**Counsel for Globe Life And Accident
Insurance Company**

Dwight M. Francis
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761
(214) 999-3000
(214) 999-4667 (fax)
**Counsel for Energy Future Holdings
f/k/a TXU Business Services
Company**

22

Larry D. Henry
John A. Burkhardt
BOONE, SMITH, DAVIS, HURST &
DICKMAN
500 Oneok Plaza
100 West 5th Street
Tulsa, Oklahoma 74103
(918) 597-0000
(918) 599-9317 (fax)
          and
Brendan C. Roth
THE ROTH FIRM
115 N. Wellington, Suite 200
Marshall, Texas 75670
(903) 935-1665
(903) 935-1797 (fax)
**Counsel for Softech International, Inc.**

J. Michael Dorman
Christopher Verducci
LOCKE LORD BISSELL & LIDDELL
LLP
600 Travis Street, Suite 3400
Houston, Texas 77002
(713) 226-1200
(713) 223-3717 (fax)
**Counsel for Defensive Driver Online,
Ltd.**

S. George Alfonso
THE LAW OFFICES OF S. GEORGE
ALFONSO
5340 Alpha Road
Dallas, Texas 75244
(972) 458-6800
(972) 458-6801 (fax)
**Counsel for ABC Data, Inc. d/b/a
UNICARD Systems, Inc. and Lee
Farish Computer Services, Inc.**

Jennifer Haltom Doan
Joshua R. Thane
HALTOM & DOAN
Crown Executive Center, Suite 100
6500 Summerhill Road
Texarkana, Texas 75503
(903) 255-1000
(903) 255-0800 (fax)
          and
Randall K. Miller
ARNOLD & PORTER LLP
1600 Tysons Boulevard, Suite 900
McLean, Virginia 22102
(703) 720-7030
(703) 720-7399 (fax)
**Counsel For Biometric Access
Company**

Brock C. Akers
PHILLIPS & AKERS, P.C.
3200 Phoenix Tower
3200 Southwest Freeway
Houston, Texas 77027
(713) 552-9595
(713) 552-0231 (fax)
**Counsel for Freeman Publishers, Inc.**

23

J. Richard Tubb
J. RICHARD TUBB, PLLC
Preston Commons West
8117 Preston Road, Suite 300
Dallas, Texas 75225
(214) 706-9234
(214) 706-9236 (fax)
**Counsel for Paradise Development, Inc.
d/b/a Drivesafe Defensive Driving and
Safety-USA Institute, LLC**

David J. White
GODWIN RONQUILLO PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270
(214) 939-4400
(214) 527-3206 (fax)
**Counsel for Talbot Group, Inc.**

Jonathan Cuneo
Alexandra C. Warren
CUNEO, GILBERT & LADUCA LLP
507 C Street NE
Washington, DC 20002
(202) 789-3960
(202) 789-1813 (fax)
**Counsel for Aristotle International,
Inc.**

James W. Grau
Scott A. Whisler
GRAU KOEN, P.C.
2711 N. Haskell Avenue,
Suite 2000
Dallas, Texas 75204
(214) 521-4145
214) 521-4320 (fax)
and

Hal M. Browne
LAW OFFICES OF HAL BROWNE
6008 Fieldstone Drive
Dallas, Texas 75252
(469) 878-4742
(972) 930-0772 (fax)
**Counsel for Continueded.Com LLC,
d/b/a Idrivesafely.Com**

Brian C. Jobe
WIMER & JOBE
Two Galleria Tower
13455 Noel Road, Suite 1000
Dallas, Texas 75240
(972) 701-9066
(972) 701-9069 (fax)
**Counsel for Allied Resident/Employee
Screening Service, Inc.**

Marvin C. Moos
EBANKS TAYLOR HORNE, L.L.P.
1301 McKinney, Suite 2700
Houston, Texas 77010-3079
(713) 333-4500
(713) 333-4600 (fax)
**Counsel for Zebec Data Systems, Inc.
and Infonation, Inc.**

William W. Allen
GESS MATTINGLY & ATCHISON,
P.S.C.
201 West Short Street
Lexington, Kentucky 40507
(859) 252-9000
(859) 233-4269 (fax)
**Counsel for Cross-Sell, Inc.**

24

Gayla C. Crain
Fred Gaona III
SPENCER CRAIN CUBBAGE HEALY
& MCNAMARA, PLLC
1201 Elm Street, Suite 4100
Dallas, Texas 75270
(214) 290-0000
(214) 290-0099 (fax)
     and
Catherine Sison
FEDERATED RETAIL HOLDINGS,
INC.
611 Olive Street, 10th Floor
St. Louis, Missouri 63101
(314) 342-6715
(314) 342-3066 (fax)
**Counsel for Federated Retail Holdings,
Inc., f/k/a The May Department Stores
Company d/b/a Foley's**

Jeffrey R. Elkin
PORTER & HEDGES, L.L.P.
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6617
(713) 226-6217 (fax)
**Counsel for PropertyInfo Corporation,
Successor by Merger to REI Data, Inc.**

Craig A. Haynes
THOMPSON & KNIGHT, LLP
One Arts Place
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (fax)
**Counsel for LML Payment Systems
Corp.**

Paul M. Boyd
BOYD & BROWN, P.C.
1215 Pruitt Place
Tyler, Texas 75703
(903) 526-9000
(903) 526-9001 (fax)
**Counsel for Realty Computer
Solutions, Inc. d/b/a Real-Comp**

Roger D. Higgins
Daniel P. Buechler
THOMPSON, COE, COUSINS &
IRONS, L.L.P.
700 N. Pearl Street
Twenty-Fifth Floor
Dallas, Texas 75201-2832
(214) 871-8256
(214) 871-8209 (fax)
**Counsel for Texas Farm Bureau
Mutual Insurance Company**

T. Belew Ellis
T. BELEW ELLIS
P.O. Box 802
Marshall, Texas  75671-0802
(903) 938-0593
(903) 938-9062 (fax)
**Counsel for Marshall Systems
Technology, Inc.**

Walter J. Cicack
Karl E. Neudorfer
SEYFARTH SHAW LLP
700 Louisiana Street, Suite 3700
Houston, Texas 77002
(713) 225-2300
(713) 225-2340 (fax)
**Counsel for U.S. Interactive, Inc.**

John E. Collins
BURLESON, PATE & GIBSON
2414 N. Akard, Suite 700
Dallas, Texas 75201
(214) 871-4900
(214) 871-7543 (fax)
**Counsel for Urapi, Inc. and D.B. Stringfellow**

J. Stephen Hunnicutt
THE HUNNICUTT LAW FIRM
Two Hillcrest Green
12720 Hillcrest, Suite 750
Dallas, Texas 75230
(214) 361-6740
(214) 691-5099 (fax)
**Counsel for Dallas Computer Information Systems**

Mark W. Bayer
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761
(214) 999-3000
(214) 999-4667 (fax)
**Counsel for ISO Claims Service, Inc. d/b/a Insurance Information Exchange**

Patrick Kelley
IRELAND, CARROLL & KELLEY, P.C.
6701 S. Broadway, Suite 500
Tyler, Texas 75703
(903) 561-1600
(903) 581-1071 (fax)
        and

Juan C. Enjamio
HUNTON & WILLIAMS LLP
1111 Brickell Ave., Suite 2500
Miami, Florida 33131
(305) 810-2500
(305) 810-2460 (fax)
**Counsel for Acxiom Corporation and Acxiom Risk Mitigation, Inc.**

David G. Russell
Jodi Emmert Zysek
PARKER   HUDSON   RAINER   &
DOBBS, LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303
(404) 523-5300
(404) 522-8409 (fax)
        and
Calvin Capshaw
Elizabeth L. DeRieux
CAPSHAW DERIEUX, LLP
Energy Centre
1127 Judson Road, Suite 220
P. O. Box 3999 (75606-3999)
Longview, Texas 75601-5157
(903) 236-9800
(903) 236-8787 (fax)
**Counsel for TeleCheckServices, Inc.**

26

J. Michael Walls
CARLTON FIELDS
4221 W. Boy Scout Blvd.,
Suite 1000
Tampa, Florida 33607
(813) 229-4257
(813) 229-4133 (fax)
        and
Alan N. Greenspan
JACKSON WALKER LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 953-5912
(214) 661-6632 (fax)
**Counsel for Certegy Check Services,
Inc.**

Kirk T. Florence
CROUCH & RAMEY, L.L.P.
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202
(214) 922-7100
(214) 922-7101 (fax)
        and
Christopher M. Mason
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
(212) 940-3000
(212) 940-3111 (fax)
**Counsel for Carfax, Inc.**

Michael P. Murphy

27

The undersigned counsel certifies that on May 7, 2009, the Brief of Amicus Curiae, 7 paper copies thereof, and one computer-readable disk copy in Adobe Portable Document Format, was dispatched to the clerk, as addressed below, via Federal Express:

    Mr. Charles R. Fulbruge III, Clerk
    U.S. Court of Appeals for the Fifth Circuit
    600 Maestri Place
    New Orleans, Louisiana 70130

                  Michael P. Murphy

**CERTIFICATE OF COMPLIANCE**
With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[ X ]   this brief contains 3564 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]    this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ]   this brief has been prepared in a proportionally spaced typeface using WordPerfect for Windows, version 12 in Times New Roman 14-point type face, or

[ ]    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

_____
Michael P. Murphy
Attorney for the State of Texas

Dated: May 7, 2009

29

# APPENDIX

The State of Texas
County of Travis

AGREEMENT FOR PURCHASING DRIVER RECORD INFORMATION IN BULK

Parties.  The agreement is made between the Texas Department of Public Safety, 5805 N. Lamar, Austin, Texas 78752, herein after DPS, and

_____

name
_____

address
herein after Purchaser.

WHEREAS, Texas law authorizes DPS to sell driver and related records individually and in bulk for specified permissible purposes; and

WHEREAS, state and federal law, including the federal Driver Privacy Protection Act of 1994 (PL 103-322; 18 USC § 2721 et seq.) and Texas' driver privacy protection legislation of 1995 (Tex. Trans. Code §730) extend privacy protection to personal information maintained in the files of the state motor vehicle agencies such as the Texas DPS; and

WHEREAS, the  Driver Privacy Protection Act of 1994, as amended by PL 106-69 (18 USC §2721, as amended), presently prohibits state motor vehicle agencies from selling personal information in bulk for purposes of marketing, solicitations, and certain surveys unless a state has first obtained express consent from each individual about whom listed personal information pertains, and

WHEREAS, the Texas State Legislature has refrained from enacting any express consent system for use in Texas; and

WHEREAS, Texas law requires each prospective purchaser of records in bulk, before receiving any records, to execute a written purchase agreement or contract containing such safeguards as DPS considers necessary or reasonable to ensure that all information and records purchased are used only for permissible purposes and that the rights of the individuals and DPS are protected; and

WHEREAS, the Purchaser, desires to purchase driver or related records, including personal information, from DPS,

IT IS AGREED, THEREFORE, that DPS shall sell and deliver to the Purchaser the driver records, subject to the following terms and conditions:

1.  Definitions
     a.  "Driver record" means a record that pertains to a motor vehicle operator or driver license or permit, or identification document issued by DPS.
     b.  "Personal information" means information that identifies a person, including the driver identification number, name, date of birth, and address.

2.  Certification of Permissible Use(s).

The Purchaser, by signing this agreement, hereby certifies compliance with all current provisions of the federal Driver Privacy Protection Act of 1994, as amended by PL 106-69 (18 USC §2721 et seq.), with applicable Texas driver privacy protection legislation, and with all other state and federal laws applicable to this agreement.  The Purchaser further certifies that his/her/its use of the record and information purchased under this contract is for the following permissible purpose(s) only and for no others:

1

Initial all that apply.

———— 1. For use in connection with any matter of (a) motor vehicle or motor vehicle operator safety; (b) motor vehicle theft; (c) motor vehicle emissions; (d) motor vehicle product alterations, recalls, or advisories; (e) performance monitoring of motor vehicles or motor vehicle dealers by a motor vehicle manufacturer; or (f) removal of nonowner records from the original owner records of a motor vehicle manufacturer to carry out the purposes of the Automobile Information Disclosure Act, the Anti Car Theft Act of 1992, the Clean Air Act, and any other statute or regulation enacted or adopted under or in relation to a law included in the above.

———— 2. For use by a government agency in carrying out its functions or a private entity acting on behalf of a government agency in carrying out its functions.

———— 3. For use in connection with a matter of (a) motor vehicle or motor vehicle operator safety; (b) motor vehicle theft; (c) motor vehicle product alterations, recalls, or advisories; (d) performance monitoring of motor vehicles, motor vehicle parts, or motor vehicle dealers; (e) motor vehicle market research activities, including survey research; or (f) removal of nonowner records from the original owner records of motor vehicle manufacturers.

———— 4. For use in the normal course of business by a legitimate business or an authorized agent of the business, but only to verify the accuracy of personal information submitted by the individual to the business or the authorized agent of the business and to obtain correct information if the submitted information is incorrect to prevent fraud by, pursuing a legal remedy against, or recovering on a debt or security interest against the individual.

———— 5. For use in conjunction with a civil, criminal, administrative, or arbitral proceeding in any court or government agency or before any self regulatory body, including service of process, investigation in anticipation of litigation, execution or enforcement of a judgment or order, or under an order of any court.

———— 6. For use in research or in producing statistical reports, but only if the personal information is not published, redisclosed, or used to contact any individual.

———— 7. For use by an insurer or insurance support organization, or by a self insured entity, or an authorized agent, of the entity, in connection with claims investigation activities, antifraud activities, rating or underwriting.

———— 8. For use in providing notice to an owner of a towed or impounded vehicle.

———— 9. For use by a licensed private investigator agency or licensed security service for a purpose permitted as stated on this page.

———— 10. For use by an employer or an authorized agent or insurer of the employer to obtain or verify information relating to a holder of a commercial driver's license that is required under 49 U.S.C. Chapter 313.

———— 11. For use in connection with the operation of a private toll transportation facility.

———— 12. For use by a consumer-reporting agency as defined by the Fair Credit Reporting Act (15 U.S.C.§1681 et seq.) for a purpose permitted under the Act.

———— 13. For any other purpose specifically authorized by law that relates to the operation of a motor vehicle or to public safety. Please provide statutory authority _____

_____

———— 14. For use in the preventing, detecting, or protecting against identity theft or other acts of fraud. DPS prior to release of personal information may require additional information.

It is expressly understood that the Purchaser may sell or furnish personal information obtained under this agreement to third parties, subject to the limitations herein, but may not sell or furnish personal information for any purpose or use that is not permitted by federal or state law. The Purchaser understands that he/she/it may not furnish personal information purchased under this agreement to any third party unless the third party certifies that his/her/its intended use of the information is for a use permitted under this contract and state and federal law. In addition the Purchaser agrees to the statutory restrictions on selling and/or redisclosing the information obtained from DPS. The Purchaser shall not sell or redisclose the personal information in the identical or substantially identical format the information was disclosed to the Purchaser. The Purchaser further understands that violating this paragraph is grounds for immediate termination of this agreement under Paragraph 13.

3.   Fees and Payments.

In consideration of receiving records and information purchased in bulk, the Purchaser agrees to pay to DPS the applicable statutory charge. At DPS request, the Purchaser shall pay to DPS, prior to transmittal of the records and information in bulk, a deposit in an amount determined by DPS to be the approximate charge and shall pay any balance due upon receipt of billing. If this method of payment is requested, DPS shall refund any overpayment, pursuant to state procedures, following delivery of the copies. If DPS does not request a deposit, the Purchaser shall remit payment immediately upon receipt of billing but shall not be considered in default for a period of thirty (30) days following receipt of billing. The Purchaser acknowledges and agrees that all postage and/or other shipping charges, as well as shipping media (e.g. magnetic tapes) shall be the Purchaser's responsibility and may be included in the billing.

4.   Acknowledgement and Disclaimer.

The Purchaser acknowledges that DPS is furnishing records and information "as is" and it makes no representation or warranty as to the accuracy of any record or the information furnished. DPS expressly disclaims responsibility for any failure to deliver records or information in a timely manner, or at all, in the event of staff shortages, failures of appropriations, breakdowns of equipment, compliance with new or amended laws, acts of authority exercised by a public official, acts of God, or other circumstances which may delay or preclude furnishing records and information in a timely fashion. If records and information are not furnished and the Purchaser has remitted a deposit, DPS shall refund the deposit. DPS has no further responsibility or liability to the Purchaser with respect to undelivered records and information and has no liability or responsibility whatsoever for delayed records and information.

5.   Consumer Protection.

The Purchaser agrees that the records and information furnished under this agreement shall not be used to engage in any method, act, or practice which is unfair or deceptive, nor shall they be used for marketing or solicitations, or surveys not authorized by law.

6.   Access to Information in Bulk.

The Purchaser agrees that no member of the public or any person outside the direct employ or control of the Purchaser shall be allowed direct access to records and information through the Purchaser under this agreement for any reason other than the Purchaser's intended and legitimate use of the records and information.

3

7.   Record Creation and Retention.

If the Purchaser resells or re-discloses any of the information or records purchased under this agreement to a third party, the Purchaser agrees to create records identifying each such person or entity who obtained personal information from the Purchaser and the legally permissible purpose for which the record or information was obtained. The Purchaser shall retain the records of identification and purpose for a period of not less than five (5) years following transfer of the information and or records to the third party.

8.   Provide Copies of Records and Notification of Release.

If the Purchaser resells or re-discloses any of the information or records purchased under this agreement to a third party, the Purchaser shall provide copies of those records identifying each person or entity who obtained personal information from the Purchaser and the permissible purpose for which it was obtained to DPS upon request. The Purchaser understands that DPS may exercise its reserved right to insert control records into bulk records and information furnished, as an independent means of identifying any entities to whom the Purchaser may have improperly resold or re-disclosed records and information under this agreement or if any inappropriate use has occurred. The Purchaser shall bear the expense of providing the copies of such records to DPS including any postage and/or shipping charges. The Purchaser will notify DPS of any inadvertent or unauthorized release of the Driver Record Information obtained under this contract within two days of when the Purchaser knows or should have known of such unauthorized or inadvertent release.

9.   Assignability.

The Purchaser may not assign, license, or transfer any of its rights, duties, and obligations under this agreement without the prior written consent of DPS.

10.   Incorporation of Other Documents.

This agreement incorporates by reference the document entitled the Purchaser's Information Form Attachment A to the Agreement for Purchasing Driver Record Information in Bulk, which provides DPS additional information about the Purchaser. With the exception to Attachment A, this agreement embodies the entire agreement between the Purchaser and DPS with relation to the transaction contemplated hereby, and there have been and are no other covenants, agreements, representations, warranties or restrictions between the parties other than those specifically set forth in the agreement.

11.   Effective Date and Renewal.

This contract shall automatically renew on a yearly basis. However, either party may terminate this agreement upon thirty days written notice to the other party. Notice should be given to the contact person designated in Paragraph 17 of this contract. Notice is effective upon receipt or three days after deposit in the U. S. mail, whichever occurs first.

12.   Cancellation.

Either party may cancel this agreement for any reason by giving the other party written notice of cancellation at least thirty (30) days prior to cancellation. If a party elects to cancel this agreement, all unfilled obligations, including the obligation to pay for copies received, shall remain in force.

13.   Termination.

DPS may terminate this agreement in writing at any time for any reason. Without limiting the foregoing, DPS may immediately terminate this agreement, without notice for any violation of the terms of this contract or for any violation of any state or federal law or regulation relating to the information provided by DPS under this agreement. This includes but is not limited to failure to remit charges due in a timely fashion or for inappropriate use of data, such as use for marketing or solicitations. The Purchaser

4

acknowledges that if this agreement is terminated for cause, DPS may refuse to provide records and information in bulk.

14. Change of Status.

The Purchaser may terminate this contract in writing at any time. This agreement will automatically terminate if the Purchaser ceases to conduct business, if the Purchaser substantially changes the nature of its business, if the Purchaser sells its business, if there is a significant change in the ownership of the Purchaser, if the Purchaser ceases to qualify for the information under the permissible use(s) certified in Paragraph 2, or if the Purchaser dies. The Purchaser, its successor in interest, or its personal representative will immediately notify DPS in writing of any change in status that would implicate this paragraph. If the contract is terminated under this paragraph, the Purchaser's successor in interest will be eligible to apply for and execute a new contract.

15. Amendments.

The Purchaser acknowledges that DPS may amend the terms and conditions of this agreement from time to time in order to accommodate changes in the records or information furnished under this agreement and for other reasons deemed appropriate by DPS. DPS agrees to notify the Purchaser in writing of the content of any amendment. The Purchaser can make no modification or amendment to this Agreement unless in writing and signed by both parties.

16. Indemnification.

The Purchaser agrees to indemnify and save harmless the State of Texas and DPS, and any of their officers, agents, or employees, with respect to any claim asserted against them under the federal Driver Privacy Protection Act of 1994, as amended (18 USC §2721 et seq.), Texas driver privacy protection legislation (Tex Trans Code §730, as amended), and other state or federal law pertaining to this agreement, for any act or omission attributable to the Purchaser, its officer, agents, and employees, and others who obtain information from the Purchaser.

17. Contact Information.

The following contact person is designated by the Purchaser to receive all correspondence regarding this agreement.

Name _____

Address _____

City, State Zip Code _____

Telephone _____

Fax _____

All correspondence to DPS regarding this contract must be mailed to the following address:

Texas Department of Public Safety
Driver Record Bureau
P.O. Box 4087
Austin, Texas 78773-0360
(512) 424-2009

18. Governing Law and Jurisdiction.

This agreement shall be construed in accordance with the laws of the State of Texas. The Purchaser agrees that any dispute which arises under this agreement and cannot be amicably resolved by the parties shall be submitted to a court of competent jurisdiction in Travis County, Texas, to which jurisdiction the Purchaser hereby submits.

19. Signatory Authority.

The signatories hereby certify that they are authorized by their respective parties to execute this agreement as party representatives and to bind their respective principals hereto.

IN WITNESS WHEREOF the representatives of the parties have affixed their signatures on the dates as written below.

_____        _____
PURCHASER                               DEPARTMENT OF PUBLIC SAFETY


_____        _____
NAME AND TITLE                          NAME AND TITLE


_____        _____
DATE                                    DATE

6

# EXHIBIT D



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.mass.gov/ago

November 10, 2009

Paul J. Bond
Reed Smith LLP
136 Main St., Suite 250
Princeton, NJ 08540-7839

Re:   **Your Public Records Request**

Dear Mr. Bond:

In response to your October 22, 2009, public records request, I enclose a true and accurate copy of the October 9, 1998, letter sent by Robert McFetridge of the U.S. Department of Justice to Assistant Attorney General Peter Sacks, and a signed copy of AAG Sacks's May 1, 1998, original letter to the Department of Justice.

Please be advised that, in our discretion, we have elected to waive any cost associated with the production of the enclosed responsive records you requested.

Very truly yours,

Robert L. Quinan, Jr.
Assistant Attorney General
Government Bureau

RLQ/dl

Enclosures



**U.S. Department of Justice**

Civil Division



RECEIVED

OCT 1 3 1998

OFFICE OF THE
ATTORNEY GENERAL

---

*Special Counsel*
*Telephone: (202)514-3886*
*Fax: (202) 514-8071*

*Main Justice Building, Room 3641*
*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530*

October 9, 1998

Peter Sacks
Chief, Government Bureau
Office of the Attorney General
The Commonwealth of Massachusetts
One Ashburton Place
Boston, MA  02108-1698

RE: Interpretation of the Driver's Privacy Protection Act of 1997

Dear Mr. Sacks,

This responds to your letter of May, 1, 1998 (Encl), requesting guidance on the U.S. Department of Justice's interpretation of 18 U.S.C. §§ 2721-2725, the Driver's Privacy Protection Act of 1997.  Specifically, you posed the question of whether the Massachusetts Registry of Motor Vehicles may release personal information to a commercial distributor who disseminates the information only to other authorized recipients or entities that use the information solely for authorized purposes.  Under these circumstances, we believe that such releases are permissible under the statute.

We agree with the general proposition that a commercial distributor may qualify as an authorized recipient of personal information under the statute.  Several of the permissive release provisions in the statute regulate only the ultimate use of the personal information without specifying or restricting who may obtain the information in order to accomplish that authorized purpose.  Accordingly, personal information reasonably may be released to an entity that certifies that it will use the information for an authorized purpose.  The entity receiving the information for that purpose would be an "authorized recipient" under the statute, and may further disseminate the information in accordance with the resale or redisclosure provisions of subsection (c).  Notably, the redisclosure section does not limit resales or redisclosures of personal information to the single

-2-

category of uses for which the information was originally
obtained.  Rather, the authorized recipient may redisclose the
information for "a use permitted under subsection (b)" [except
subsections (b)(11) and (b)(12)].  Thus, a distributor may obtain
information for one authorized purpose, but redisclose that
information for a different authorized purpose (or to another
authorized recipient) under the statute.

     Under the circumstances described in your letter, the
Massachusetts Registry of Motor Vehicles may release personal
information to a distributor upon reasonably concluding that the
information will be used for authorized purposes only.  Such a
practice would be consistent with current Department of Justice
enforcement policy recommendations to the Attorney General.  This
opinion is merely advisory, however.  It is not binding upon the
U.S. Attorney General and should not be construed as creating any
substantive rights or benefits under the law.

                              Sincerely,


                              Robert C. McFetridge
                              Robert C. McFetridge
                              Special Counsel to the Assistant
                                Attorney General,
                                Civil Division

Encl



*The Commonwealth of Massachusetts*
*Office of the Attorney General*
*One Ashburton Place*
*Boston, MA 02108-1698*

SCOTT HARSHBARGER
ATTORNEY GENERAL

(617) 727-2200

May 1, 1998

Eleanor Dean Acheson
Assistant Attorney General
Chief, Office of Policy Development
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

Re:   Interpretation of Drivers' Privacy Protection Act of 1997

Dear Ms. Acheson:

At the suggestion of several attorneys in your office, I write to you, on behalf of the Massachusetts Registry of Motor Vehicles (the "Massachusetts Registry"), to seek guidance from the Department of Justice on an interpretation question that has arisen with respect to the Drivers' Privacy Protection Act of 1994, 18 U.S.C. § 2721 (the "Act").

As you know, the Act, by its terms, is implemented by agencies of the various states, but is enforced federally by the Department of Justice. Our Office is presently confronted with its first potential challenge to the Massachusetts Registry's interpretation of the Act. This letter solicits the DOJ's view of the relevant language of the Act, or, at a minimum, the DOJ's assurance that the Massachusetts Registry's interpretation of the Act does not trigger any of the civil or criminal penalties enforced by the DOJ under the Act.

The specific question that has arisen is as follows:

A Massachusetts-based company has acted, for several years, as a distributor of information obtained from state Registries of Motor Vehicles. In Massachusetts, the company obtains "raw" data -- including "personal information" as that term is defined in the Act -- from the Massachusetts Registry, repackages the data in a CD-ROM format, and sells it to a variety of end-users, including law enforcement agencies, private investigators, and law firms. According to the company's attorney, its law enforcement customers include the DOJ and the Federal Bureau of Investigation. For the purposes of this analysis, I will accept the company's contention that all of its clients are either permitted recipients of personal information, as defined by the Act, or entities that have received the information for uses expressly permitted by the Act.

The question identified by the Massachusetts Registry is whether, and on what basis, it may release personal information to the distributor itself. The provision governing resale or redisclosure, section 2721(c), offers little guidance on the question, insofar as it permits an

Eleanor Dean Acheson
Assistant Attorney General
May 1, 1998
Page 2

"authorized recipient" of personal information -- a term that is defined nowhere in the Act -- to resell or redisclose the information to other parties for permitted uses. This, in turn, merely begs the original question: on what basis can the distributor be considered an "authorized recipient" of the personal information in the first place?

The distributor, through its lawyer, has identified several sections of the Act which, it contends, authorize the company to receive the personal information. Section 2721(b)(1) permits disclosure "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State or local agency in carrying out its functions." Also, section 2721(b)(3) permits disclosure to any "legitimate business or its agents, employees, or contractors" for the limited purpose of verifying personal information voluntarily provided by an individual. Finally, section 2721(b)(4) permits the use of personal information "in connection with," among other things, "investigation in anticipation of litigation, and the execution or enforcement of judgments and orders," irrespective of the identity of the party using the information for such purposes.

The distributor has made a number of different arguments in support of its position that it is entitled to receive personal information from the Massachusetts Registry. First, it asserts that, because the sale of its CD-ROM product is restricted to entities who themselves would qualify as permitted users under the Act, this, without more, entitles the distributor to receive the information in the first instance.

The distributor's alternate position is that, since subsections (b)(1) and (b)(3) both expressly provide for disclosure to the "agent" of a specifically permitted user, the company merely has to establish an agency relationship with each of its clients in order to come within those exceptions. The distributor further contends that the "agency" relationship required by the statute may be limited to the sole purpose of obtaining the information. This theory, in turn, begs the question of whether the Act requires the "agent" to disclose the identity of its "principal." As may be expected, the distributor is somewhat reluctant to provide the Massachusetts Registry with its customer list. Moreover, continually updating the distributor's list of "principals" prior to each purchase of personal information (this particular distributor has historically bought information from the Massachusetts Registry on a quarterly basis) would be administratively burdensome for both the distributor and the Massachusetts Registry. The distributor has taken the further position that it need only establish an agency relationship with one permitted end-user in order to become an "authorized recipient" of that information, consonant with Section 2721(c) of the Act. Thereafter, the distributor argues, it is free to resell the information to as many other entities as it wishes, as long as each one qualifies as a permitted user under the Act.

Finally, the distributor argues that, since subsection (b)(4) conditions legal receipt of the information only upon the ultimate use, and not upon the identity of the recipient, there is no reason why the distributor cannot receive the information on behalf of law firms, for example, as long as the law firms use the information for the purposes specified in (b)(4), and that no formal

Eleanor Dean Acheson
Assistant Attorney General
May 1, 1998
Page 3

agency relationship is required. According to the lawyer for the distributor, a number of other state motor vehicle agencies have accepted this type of general representation that a distributor is acting on behalf of a permitted end-user as sufficient to permit the release of the personal information to the distributor.

To date, the Massachusetts Registry has neither formally adopted nor rejected the various positions of the distributor, and has a number of reservations regarding the theories. First, there does not appear to be a permitted use category in the Act that specifically encompasses the "sell only to permitted users" concept. With regard to the agency theory, the "agency" language in the statute, at least on its face, is susceptible to more than one interpretation. For example, the phrase "legitimate business or its agents," narrowly construed, could be read to extend only to entities that had pre-existing agency relationships with the legitimate business, or relationships for purposes other than the mere retrieval of personal information. On the other hand, section 2721(b)(4) makes no reference to an agency relationship, nor does it appear to make any distinction based on the identity of the requestor.

The Massachusetts Registry finds itself in a difficult position. On the one hand, it does not want to restrict unnecessarily the sale of a product which, by all accounts, is a valuable tool for law enforcement and other legitimate users. On the other hand, the Massachusetts Registry is cognizant that adopting too expansive an interpretation of the language of the Act may increase the risk of improper use of personal information, particularly by entities that exercise less control over the distribution of their products than the distributor at hand appears to do. Finally, an overbroad interpretation may expose the Massachusetts Registry and its employees to civil and/or criminal liability for violation of the Act.

As you know, the Act did not go into effect until September of 1997. To date, no federal agency has promulgated any regulations pertaining to enforcement or interpretation of the Act. Nor has any case law arisen to aid in interpretation of the Act. Accordingly, I would be grateful for your views on the various issues raised by the distributor and outlined above. Two Assistant Attorneys General in our Government Bureau, Thomas Barnico and Daniel Hammond, have already discussed this case informally with David Karp of your Office of Policy Development and Craig Blackwell of the DOJ's Civil Division. While Messrs. Karp and Blackwell discussed the general structure of the Act, they acknowledged that they could offer us no advice with regard to our specific case, insofar as the DOJ, to date, has made no formal decisions about interpretation of the Act.

Toward that end, we would welcome your view of the legal questions described above. Our Office, as counsel to the Massachusetts Registry, does not seek needlessly to invite litigation over a

Eleanor Dean Acheson
Assistant Attorney General
May 1, 1998
Page 4

question that the DOJ may already have resolved; nor do we wish to expose Registry employees to civil or criminal penalties for unwittingly violating the Act.

Thank you in advance for your assistance.

Sincerely,

Peter Sacks
Chief, Government Bureau

F:\USERS\HAMMOD\WPWIN61\WPDOCS\RENO\LT.REN

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.3
### Eastern Division

Lisa M. Graczyk, et al.

                      Plaintiff,

v.                                          Case No.: 1:09−cv−04760
                                          Honorable Robert W. Gettleman

West Publishing Corp.

                      Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, November 13, 2009:

      MINUTE entry before the Honorable Robert W. Gettleman: Motion for extension of time to 11/13/2009 to file reply regarding motion by defendant West Publishing Corp. to dismiss *Plaintiffs' Complaint*[12] [20] is granted. Replies due by 11/13/2009. Telephone notice (gds, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LISA M. GRACZYK, MATTHEW M. JORGE, and BRIAN WILLINGHAM individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs,<br><br>   v.<br><br>WEST PUBLISHING CORP., a Minnesota corporation,<br><br>                 Defendant. | Case No: 1:09-cv-04760<br><br>JURY TRIAL DEMANDED |

**REPORT OF PARTIES' PLANNING CONFERENCE**

On October 15, 2009, the parties, by and through their respective counsel of record, met and conferred pursuant to Rule 26(f) to discuss the nature and bases of their claims and defenses; the possibilities for a prompt settlement or resolution of this case; to make or arrange for the disclosures required under Rule 26(a)(1); and to develop a discovery plan.

      A.      This matter has not been set for a Status Report before the Court. Defendant has appeared and filed a Motion to Dismiss, on which a briefing schedule has been set. Pursuant to this Court's Initial Status Report requirements, the parties report the following:

      B.      Attorneys of record:

For Plaintiff:

Ben Barnow (Lead Trial Attorney)
Sharon Harris
Blake A. Strautins
Barnow and Associates, P.C.
1 North LaSalle Street, Suite 4600
Chicago, IL 60602
(312) 621-2000

Aron D. Robinson
Law Office of Aron D. Robinson
19 S. LaSalle St. Suite 1200
Chicago, IL 60603
(312) 857-9050

Of Counsel:

Ralph K. Phalen Atty. at Law
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 589-0753

Mitchell L. Burgess
Keith C. Lamb
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 471-1700

Don P. Saxton
1000 Broadway, Suite 400
Kansas City, Missouri 64105
(816) 471-1700

For Defendant:

Diane Green-Kelly (Lead Trial Attorney)
David Z. Smith
Reed Smith LLP
10 S. Wacker Dr.
Chicago, IL 60606
(312) 207-1000
(312) 207-6400 fax

Mark Melodia
Paul Bond
Reed Smith LLP
Princeton Forrestal Village
136 Mail Street, Suite 250
Princeton, NJ 08540
(609) 987-0050
(609) 951-0824 fax

C.     The basis for Federal Jurisdiction is 28 U.S.C. § 1331, in that this action arises under statutes of the United States, specifically the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, et seq. The DPPA specifically authorizes the Court to exercise jurisdiction.

D.     A jury trial has been requested by Plaintiffs.

E.     Plaintiffs allege that Defendant improperly obtained, acquired, disclosed, sold, and/or disseminated Plaintiffs' and Class members' personal information for commercial purposes and profit.  Defendant offers certain personal information from motor vehicle records for sale from multiple states and the District of Columbia.  The DPPA defines personal information as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address..." 18 USCS § 2725. Plaintiffs allege that Defendant obtained and sold Plaintiffs' names, addresses, VIN numbers, vehicle types, makes, models, body style of their cars, and license plate numbers.  Plaintiffs contend that this is prohibited by the DPPA. The DPPA provides that an award may be made for actual damages, but not less than $2,500 in liquidated damages per violation of the DPPA. Plaintiffs also have asserted claims for unjust enrichment and injunctive relief.

Defendant has not answered the Complaint and instead has filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) contending that resale of the personal information for a permissible use is permitted by the DPPA as a matter of law.

F.     Plaintiffs seek actual damages, as proved, plus liquidated damages as provided by the DPPA.  Damages cannot be computed at this time because the precise size of the Class is unknown.

G.     All parties have been served and appeared.

H.      The principal legal issue in this action is whether Defendant's obtainment and/or resale of the personal information of Plaintiffs and the Class violate the DPPA. Section 2722(a) of the DPPA states: "It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title."  18 U.S.C. § 2722(a).  Section 2724(a) of the DPPA establishes a civil cause of action for violation of the DPPA.  Section 2724(a) states "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court."  18 U.S.C. § 2724(a).  Section 2721(c) provides that "[a]n authorized recipient of personal information . . . may resell or redisclose the information only for a use permitted under subsection (b) . . .."  18 U.S.C. § 2721(c).  Defendant contends that it is an authorized recipient of personal information and, pursuant to § 2721(c) of the DPPA, it is lawful for Defendant to obtain and resell, or re-disclose personal information to its subscribers who identify a permissible use for the information that comports with the uses identified in § 2721(b), and that this process comports with the intent of Congress in passing the statute.

I.      There are mixed issues of fact and law, including whether Defendant obtained or disclosed Plaintiffs' and other Class members' personal information for a use not permitted by the DPPA.  If so, then the other factual issues are (a) whether any of the Plaintiffs have suffered an actual injury and the amount thereof; (b) whether Defendant has been unjustly enriched and, if so, the monetary amount by which Defendant has been unjustly enriched; and (c) what type of injunctive relief should be fashioned, if any.  At this point in the litigation, the principal factual issues are unknown because Defendant has not answered the specific allegations in the

Complaint and no discovery has taken place.  The legal determinations may be outcome determinative.

J.      Defendant has filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Plaintiffs intend on filing a motion for class certification.  To the extent that any factual questions exist or dispositive determinations cannot be made on the motion to dismiss, motions for summary judgment will likely be filed.

Defendant has moved to dismiss or transfer a subsequently filed case from the Southern District of Florida to this Court, based on the first-filed rule.

K       The Parties propose the following Discovery Plan:

1.      All disclosures required by Rule 26(a)(1) shall be made on or before December 8, 2009.

2.      Any amendments to pleadings or actions to join other parties shall be filed on or before February 15, 2010.

3.      The cutoff of fact discovery is December 1, 2010.

4.      Plaintiffs shall disclose expert testimony pursuant to Rule 26(a)(2) on or before January 14, 2011.

5.      Defendant shall disclose expert testimony pursuant to Rule 26(a)(2) on or before February 14, 2011.

5.      The parties may depose the other side's expert at any time prior to March 7, 2011.

6.      The parties shall disclose any rebuttal expert pursuant to Rule 26(a)(2)(c) at any time prior to March 28, 2011.

7.      The parties shall have until April 11, 2011 to depose the opposing

party's rebuttal expert.

8.      Dispositive Motions are to be filed on or before April 29, 2011.

L.      The parties anticipate being ready for trial by June 20, 2011.

M.      The parties have discussed a prompt settlement or other resolution of this matter.

Plaintiffs' counsel discussed possible measures of class-wide relief and requested information

from Defendant in order to attempt to formulate a settlement proposal. Settlement has not

advanced past these discussions. The parties have discussed the possibility of alternative dispute

resolution and concluded that it is not feasible at this time.

N.      The parties do not consent to this matter being referred to a magistrate for final

disposition.

## Other Matters

**1.      Steps to Simplify the Issues in This Case**

The issues in this case are fairly straightforward.  The parties do not have any suggestions

for how to simplify the issues in this case at this time.  Suggestions may be made as the case

develops.

**2.      Modifications to the Discovery Requirements of the Federal Rules of
Civil Procedure or Local Rules**

Except as otherwise provided in this Report, the Federal Rules of Civil Procedure, the

Local Rules, and the Court's Standing Order shall apply in these proceedings.  However, the

parties believe the discovery provisions in this Report and the proposals set forth in the

concurrently filed Parties' Joint Submission on Scheduling, obviates any applicable

specifications on timing and sequencing of discovery set forth in Fed. R. Civ. P. 26(d).

Due to the complex, multi-state nature of this class action litigation, Plaintiffs propose that the limits on the number of written discovery and depositions imposed by the Federal Rules of Civil Procedure and Local Rules shall not apply in this matter, subject to the limitations set forth by the Court.  The Manual for Complex Litigation, Fourth, (2004), devotes a section exclusively to class actions.  *See Id.* at Part II, Ch. 21, pp. 242–341.  Plaintiffs believe that discovery in this matter may be needed on class certification issues, in addition to merits issues.

Defendant does not agree that the nature of this matter is complex.  More important, Defendant believes that the issues primarily are legal issues, and that there are few factual issues and those issues are not likely to be highly disputed (except, perhaps, the amount of actual damages, if any).  Therefore, Defendant believes that the limitations in Fed. R. Civ. 33(a)(1) of 25 interrogatories and Fed. R. Civ. P. 30(a)(2)(A)(i) of 10 depositions is more than sufficient.  The parties will strive to comply with the page limitations set forth in section 4 of this Court's Standing Order on Motion Practice, Briefs and Protective Orders in Civil Cases.  Should the need arise to file a pleading in excess of those limits, the parties will seek leave as required.

### 3. Anticipated Subjects for Discovery

Plaintiffs anticipate needing discovery relating to the, *inter alia*, following:  the size and scope of the Class; revenues obtained from the alleged misconduct; Defendant's knowledge and understanding of the DPPA as it pertains to obtaining the data at issue; the number of violations of the DPPA Defendant has made; and contracts or agreements with any state agencies or third parties related to the obtainment of Plaintiffs' and Class members' personal information.

Defendant anticipates discovery relating to the following: whether any of the Plaintiffs and any putative Class members have suffered any actual damages;  the amount of actual damages that Plaintiffs and putative Class members suffered, if any; whether any of the Plaintiffs

have granted permission to disclose their personal information; and the identity of each putative Class member who has granted permission to disclose their personal information.

**4.       Whether Discovery Should be Conducted in Phases**

At this time the parties do not believe conducting discovery in phases is appropriate.

**5.       Whether Discovery is Likely to be Contentious and Management Should be Referred to the Magistrate Judge**

At this stage, the parties are hopeful that discovery will not be contentious, although disputes reasonably arise.  Plaintiffs have no objection if the Court believes referral of discovery in this matter to a magistrate judge is appropriate. Defendant does not anticipate discovery disputes as to which referral to a magistrate would be appropriate.

**6.       Additional Methods of Expediting the Resolution of This Matter**

The parties have not determined any additional methods of expediting the resolution of this matter.

**7.       Additional Rule 26(f) Requirements**

The parties make the following submissions with respect to the additional matters contemplated by Rule 26(f)(3):

> a.      Rule 26(f)(3)(C): The parties have discussed the need for an electronic discovery protocol.  The parties will attempt to reach agreement upon such a protocol.
>
> b.      Rule 26(f)(3)(D):  The parties believe there are some unusual issues relating to privilege or protection or trial-preparation materials, because this case deals with personal and highly personal information. The parties anticipate agreement on a Protective Order that will apply to confidential information and

personal and highly personal information in documents or
otherwise produced in discovery. The parties intend to follow the
guidelines set forth in this Court's Standing Order and intend to
submit such proposed order to the Court as appropriate.


/s/  Blake A. Strautins _____          /s/  Diane  Green-Kelly _____
Attorney for Plaintiff                      Attorney for Defendant

Ben Barnow                                  Diane Green-Kelly
Sharon Harris                               David Z. Smith
Blake A. Strautins                          Reed Smith LLP
Barnow and Associates, P.C.                 10 S. Wacker Dr.
1 North LaSalle Street, Suite 4600          Chicago, IL 60606
Chicago, IL 60602

## <u>Certificate of Service By Electronic Means</u>

I, Blake A. Strautins, hereby certify that the foregoing Report of Parties' Planning Conference was caused to be served electronically this 4th day of December, 2009, pursuant to ECF as to E-Filers and I shall comply with LR 5.5 as to any party who is not an E-Filer or represented by an E-Filer.


/s/  Blake A. Strautins_____

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 4760 | **DATE** | 12/10/2009 |
| **CASE TITLE** | Lisa M. Graczyk      vs      West Publishing Corp. | | |

**DOCKET ENTRY TEXT:**

Motion [18] of Mark S. Melodia  for leave to appear pro hac vice is granted.
Motion [19] of Paul J. Bond for leave to appear pro hac vice is granted.

[Docketing to mail  notice]

00:00

| | Courtroom Deputy | GDS |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LISA M. GRACZYK, MATTHEW M. JORGE,  )
and BRIAN WILLINGHAM, individually and  )
on behalf of others similarly situated,  )
                                          )
            Plaintiffs,                   )        No. 09 C 4760
        v.                                )
                                          )        Judge Robert W. Gettleman
WEST PUBLISHING CORP., a Minnesota        )
Corporation,                              )
                                          )
            Defendant.                    )

## MEMORANDUM OPINION AND ORDER

Lead plaintiffs Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham have brought

a three count putative class action complaint against defendant, West Publishing Corporation,

alleging violation of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2722 *et seq*.,

(Count I), unjust enrichment (Count II), and a claim for injunctive relief (Count III).  Defendant

has moved to dismiss the entire complaint for failure to state a claim under Fed. R. Civ. P.

12(b)(6) and for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1).  For the reasons explained

below, defendant's motions are granted.

## BACKGROUND

Plaintiffs allege that defendant acquired motor vehicle records and the corresponding

"personal information" and/or "highly restricted personal information" of millions of licensed

drivers, including plaintiffs, from the department of motor vehicles of various states[1] (and/or

---

[1]   Lead plaintiffs are citizens of the State of Illinois and licensed to drive in Illinois.
Class members are individuals were licensed to drive in the States of Alabama, Alaska,
Colorado, Connecticut, Florida, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland,
Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico,

entities that acquired this information from those states) under the pretense that the data would be used only for legitimate purposes outlined in the DPPA.  Defendant then allegedly made the information in the records available for search and sale on the internet.

## DISCUSSION

### I.  Driver's Privacy Protection Act

State Departments of Motor Vehicles ("DMVs") require drivers and motor vehicle owners to supply personal information, such as their names, addresses, telephone numbers, Social Security numbers, photographs, medical conditions, and vehicle descriptions when applying for a driver's license or registering a vehicle.  Reno v. Condon, 528 U.S. 141, 143 (U.S. 2000).  In 1993 Congress enacted the Driver's Privacy Protection Act ("DPPA") to protect these individuals' privacy by setting limits on how state DMVs can share this personal information.[2]

The DPPA generally prohibits state DMVs, their officers, employees, or contractors from "knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information . . .  or highly restricted personal information about any individual obtained by the department in connection with a motor vehicle record."[3]  18 U.S.C. § 2721(a).  The DPPA also

New York, North Dakota, Ohio, Tennessee, Texas, Utah, Wisconsin, Wyoming, and the District of Colombia.

[2]   Congress passed the DPPA as an amendment to the Violent Crime Control and Law Enforcement Act of 1993 in response to nationwide reports of perpetrators obtaining with relative ease the personal information of their victims from state DMV records.  The most infamous of these incidents was the 1989 murder of a young actress named Rebecca Schaeffer. Schaeffer was killed in the threshold of her Los Angeles apartment by an obsessed fan who had obtained her address, via a private investigator, from the California DMV.

[3]   "Personal information" is defined as "information that identifies an individual, including an individual's photograph, social security number, driver identification number,

provides a private right of action whereby:  "[A] person who knowingly obtains, discloses or

uses information, from a motor vehicle record, for a purpose not permitted under this chapter

shall be liable to the individual to whom the information pertains, who may bring a civil action

in a United States District Court." 18 U.S.C. § 2724(a).

The DPPA's general prohibition on disclosure of personal information is subject to 14

exceptions which allow for the limited disclosure of personal information.  18 U.S.C. § 2721(b)

provides:

> Permissible Uses - Personal information referred to in subsection (a) shall be
> disclosed for use in connection with matters of motor vehicle or driver safety and
> theft, motor vehicle emissions, motor vehicle product alterations, recalls, or
> advisories, performance monitoring of motor vehicles and dealers by motor
> vehicle manufacturers, and removal of non-owner records from the original owner
> records of motor vehicle manufacturers to carry out the purposes of titles I and IV
> of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act
> (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters
> 301, 305, and 321-331 of title 49, and, subject to subsection (a)(2), may be
> disclosed as follows:
>    (1) For use by any government agency, including any court or law enforcement
> agency, in carrying out its functions, or any private person or entity acting on
> behalf of a Federal, State, or local agency in carrying out its functions.
>    (2) For use in connection with matters of motor vehicle or driver safety and
> theft; motor vehicle emissions; motor vehicle product alterations, recalls, or
> advisories; performance monitoring of motor vehicles, motor vehicle parts and
> dealers; motor vehicle market research activities, including survey research; and
> removal of non-owner records from the original owner records of motor vehicle
> manufacturers.
>    (3) For use in the normal course of business by a legitimate business or its
> agents, employees, or contractors, but only--
>       (A) to verify the accuracy of personal information submitted by the individual
> to the business or its agents, employees, or contractors; and
>       (B) if such information as so submitted is not correct or is no longer correct,
> to obtain the correct information, but only for the purposes of preventing fraud by,

---

name, address (but not the 5-digit zip code), telephone number, and medical or driving
violations, and driver's status."  "Highly restricted personal information" is defined as "an
individual's photograph or image, social security number, medical or disability information."

pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

(7) For use in providing notice to the owners of towed or impounded vehicles.

(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49 [49 USCS §§ 31301 et seq.].

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

In addition, § 2721(c) of the DPPA permits "authorized recipient[s]" of personal

information to resell or redisclose this information:

(c) Resale or redisclosure. An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b) (11) or (12)). An authorized recipient under subsection (b)(11) may resell or redisclose personal information for any purpose. An authorized recipient under subsection (b)(12) may resell or redisclose personal information pursuant to subsection (b)(12). Any authorized recipient (except a recipient under subsection

4

(b)(11)) that resells or rediscloses personal information covered by this chapter [18 USCS §§ 2701 *et seq*.] must keep for a period of 5 years records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request.

The complaint is based on the principal allegation that defendant is not an "authorized recipient" because authorized recipients are limited to those who have a permissible use for the information as provided by § 2721(b).  Notably, the DPPA does not define "authorized recipient."  Defendant has moved to dismiss the complaint for lack of standing under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  Because the standing inquiry is dependent on the outcome of the court's analysis of the Rule 12(b)(6) motion, the court will consider the latter issue first.

## II.  Motion to Dismiss Count I

### A.  *Rule 12(b)(6)*

Ruling on a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor.  Sprint Spectrum L.P. v. City of Carmel, Indiana, 361 F.3d 998, 1001 (7th Cir. 2004).  The complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which the claims rest.  The allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above the "speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-73, 167 L.Ed.2d 929 (2007).

Plaintiffs allege that defendant obtained, disclosed, and used their personal information for a purpose not permitted under the DPPA, namely resale of drivers' personal information for a

profit without their consent.  Under their reading of the statute, an "authorized recipient" is a recipient with at least one of the permissible uses listed in § 2721(b).  Defendant argues that the plain language of § 2721(c) clearly contradicts any intent by Congress to prohibit a data aggregator, like defendant, to obtain and resell plaintiffs' personal information as an authorized recipient.  According to defendant, it qualifies as an "authorized recipient" despite not having a "permissible use" listed in § 2721(b) because Congress did not specify that "authorized recipients" must be "permissible users."  Defendant further argues that it never "used" plaintiffs' personal information because it merely facilitated the process by which persons and entities with permissible uses gained access to the information.  Finally, defendant cites numerous policy reasons in support of its interpretation of the DPPA's language.  The court will consider each argument in turn, starting with a statutory analysis of the term "authorized recipients."

*1. Language of the Statute*

    The court begins with the language of the DPPA itself.  <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979).  It is a fundamental canon of statutory construction that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." <u>Id.</u>  Although the statute does not provide a definition of "authorized recipient," the meaning of the term can readily be inferred from its ordinary meaning and the context in which it appears. Read in the context of the DPPA, "authorized recipient" unambiguously refers to an individual or entity authorized to receive personal information for sale or resale.

    This interpretation is embraced in the majority of federal court decisions that have already considered this issue.  See <u>Russell v. ChoicePoint Services, Inc.</u> 300 F. Supp. 2d 450

(E.D. La. 2004)("Russell I"); Russell v. ChoicePoint Services, Inc., 302 F. Supp. 2d 654 (E.D. La. 2004)('Russell II") (reaffirming analysis of Russell I); Taylor v. Acxiom Corporation, 2:07-cv-0001 (E.D. Tex. Sept. 8, 2008)(same).  The plaintiff in Russell I alleged that the defendant had illegally obtained personal information from the Louisiana DMV for the impermissible purpose of disclosure and distribution by resale.  The Russell I court dismissed the claim under Rule 12(b)(6) on the ground that if the defendant (a data aggregator) was an "authorized recipient" of the plaintiff's personal information, then resale of this information to an entity with a permissible use was itself permitted under 2721(c).  The court also held that "[t]he plain language of the DPPA permits entities like [defendant] to obtain drivers' personal information" to "subsequently resell that information to third parties with a permissible use."  Russell I, 300 F. Supp. 2d at 455.  In reaching its decision, the Russell I court engaged in a lengthy analysis, distinguishing the dictionary definition of the words "recipient" and "user," and concluded that "[i]f Congress had intended to require that the 'authorized recipient' of personal information also be a user of that information, it could have written the DPPA exceptions explicitly to that effect." Id. at 457.  The court agrees.

The DPPA is written to restrict uses of personal information rather than users of that information.  In keeping with this use-based orientation, Section 2721(c) unambiguously allows for resale or redisclosure of personal information for uses permitted under section 2721(b).  The only restriction on resale or redisclosure is that it must be done by an authorized recipient. Because the DPPA is silent on who may be designated as an authorized recipient and nothing in the text of the requires that such a recipient also have a permissible use, the logical conclusion is that individual states can make this designation.  While it may be conceivable that Congress

could have deliberately intended "authorized recipient" to mean "authorized user," this interpretation becomes untenable when the overall statutory scheme is considered.

## 2. Legislative History and Policy Considerations

"When statutory language is unambiguous, it is presumed to express the legislative purpose and resort to the legislative history is not necessary." United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave., 903 F.2d 490, 493 (7th Cir. 1990) (citing American Tobacco Company v. Patterson, 456 U.S. 63, 68, 71 L. Ed. 2d 748, 102 S. Ct. 1534 (1982)). Nonetheless, the court may look beyond the express language of the statute to give force to Congressional intent "where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result." United States v. Tex-Tow, Inc., 589 F.2d 1310, 1313 (7th Cir. 1978) (quoting International Telephone and Telegraph Corporation v. General Telephone & Electronics Corp., 518 F.2d 913, 917-918 (9th Cir. 1975).

Defendant argues that "subjecting a company to potential billion-dollar liability when it merely helped accomplish the lawful use of information is an absurd result." It also argues that the DPPA expressly permits the resale of personal information and does not require resellers to have their own permissible use in order to obtain personal information for resale. Defendant further contends that "plaintiff's interpretation of § 2721(c) -- that resellers need their own permissible uses to obtain data -- would render § 2721(c) meaningless."

Specifically, defendant argues that the Congressional Record clearly reflects Congress' intention to restrict disclosure of personal information only for reasons totally incompatible with the reasons for which it was collected. It contends that defendant's resale and redisclosure of the

plaintiffs' personal information was compatible with the authorized purposes because it was ultimately released only to persons or entities with permissible uses under the DPPA.  Defendant again relies on Russell I, where the court dismissed a similar claim noting that if a bulk purchaser is an "authorized recipient" of the information, then resale to a person with a permissible use is itself permitted.[4]  The gravamen of defendant's argument is that state-authorized bulk purchasers can obtain drivers' personal information for resale or redistribution to other entities with a permissible use under § 2721(b), but not for its own use.  Under this reading of the statute, obtaining and reselling the data do not qualify as "uses" of the information.  The court agrees.

A thorough review of the Congressional Record strongly suggests that a literal interpretation, as discussed above, would thwart the purpose of the over-all statutory scheme and lead to absurd results.  The comments made during the Senate and House debates of the DPPA indicate a clear intention to prevent unfettered access to personal information and to give individuals more control over the disclosure of their personal information, while continuing to allow state DMVs to disclose the information for legitimate government and business needs.  Various senators and representatives, including the amendment's sponsors, further

---

[4]   Defendant also draws the court's attention to a private opinion letter authored by the U.S. Department of Justice ("DOJ") in response to an inquiry from the Massachusetts Registry of Motor Vehicles ("RMV") inquiring "whether [the DMV] may release information to a commercial distributor who disseminates that information only to other authorized recipients or entities that use the information solely for authorized purposes." In analyzing the DPPA, DOJ reasoned that the several provisions of the statute "regulated only the ultimate use of the personal information without specifying or restricting who may obtain the information in order to accomplish that authorized purpose."  DOJ concluded that if the RMV could reasonably conclude that the personal information would be used ultimately for authorized purposes only, it could release the information to a commercial distributor.

9

acknowledged that the DPPA was intended to allow state DMVs to continue selling personal information to direct marketers so long as individuals are given the opportunity refusing to allow the state to sell their personal information for "reasons that are totally incompatible with the purpose for which the information was collected." 139 Cong. Rec. S15745-01, S15763 (Nov. 16, 1993)(statement of Senator Boxer). These concerns are explicitly reflected in the final text of §§ 2721b(11) and b(12) as consent clauses. The emphasis of the consent clauses was to allow individuals a measure of control over the disclosure of their personal information for uses unrelated to the purpose(s) for which it was collected." 139 Cong. Rec. S15745-01, S15763 (Nov. 16, 1993)(statement of Senator Warner). In keeping with this intention to ensure that data is only sold or redisclosed to individuals or entities with permissible uses, § 2721(c) provides the additional safeguard that authorized recipients must keep records of the persons and entities that receive the information and the permitted purposes for which the information will be used.

Additionally, although not binding authority, the court notes that the DOJ and numerous states, including Illinois, have interpreted the DPPA to allow DMVs to authorize data aggregators to receive and resell data to facilitate efficient compilation and dissemination of personal information between and among users with permissible purposes across the country. If the court were to read the statute as barring data aggregators from reselling and redisclosing personal information to entities with permissible uses, many crucial government and legitimate business efforts, including criminal investigations, consumer protection, and driver safety, would be thwarted.

Moreover, if defendant was found liable for obtaining plaintiffs' and class members' personal information without a permissible use, its liability under § 2724 would potentially be in

the billions of dollars in liquidated damages.  This is an absurd result not in keeping with the

plain language, intent, or spirit of the DPPA.  Having considered the clear legislative intent of

Congress is passing the DPPA, the purpose of the over-all statutory scheme, the court grants

defendant's motion to dismiss Count I for failure to state a claim.


### B. Rule 12(b)(1)

Defendants have also moved to dismiss the complaint pursuant to Fed. R. Civ. P.

12(b)(1) arguing that because plaintiffs have not alleged that they suffered any actual injury in

fact, the court lacks subject matter jurisdiction over their DPPA claims.

To establish standing, a plaintiff must show: (1) injury in fact, meaning an invasion of a

legally protected interest that is concrete and particularized, actual or imminent, and not

conjectural or hypothetical; (2) a causal connection between the injury and the conduct

complained of such that the injury is fairly traceable to the defendant's actions; and (3) that a

favorable decision is likely to redress the injury.  Tobin for Governor v. Ill. State Bd. of

Elections, 268 F.3d 517, 527-28 (7th Cir. 2001) (citing Lujan v. Defenders of Wildlife, 504 U.S.

555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  Abstract injury is not enough to

establish injury in fact; the plaintiff must establish that he has sustained or is immediately in

danger of sustaining some direct injury.  See City of Los Angeles v. Lyons, 461 U.S. 95, 101-02,

103 S. Ct. 1660, 75 L. Ed. 2d 675 (1993).

The complaint alleges that defendant obtained and disseminated plaintiffs' and proposed

Class members' personal information and/or highly restricted personal information for search

and sale on the internet in violation of the DPPA.  In light of the discussion above, these

allegations fall woefully short of establishing standing.  First, because plaintiffs have not alleged

or pled any facts showing that defendant improperly obtained and/or used their personal

information, plaintiffs have failed to show that they have suffered an injury-in-fact.  Second,

plaintiffs have not pled a causal connection between defendant's alleged violations of the DPPA

and the alleged harm plaintiffs' suffered.  Finally, plaintiffs have failed to demonstrate that a

favorable decision in the instant case is likely to redress their alleged injury.    Accordingly,

plaintiffs' have failed to establish standing, and defendant's motion to dismiss pursuant to

12(b)(1) is granted.


**III.  Motion to Dismiss Count II - Unjust Enrichment**

Defendant has moved to dismiss Count II of the complaint under Fed. R. Civ. P. 12(b)(6)

arguing that plaintiffs do not and cannot explain how they have suffered any detriment as a result

of defendant's resale of their personal information to entities with permissible uses.

Under Illinois law, "to state a cause of action based on a theory of unjust enrichment, a

plaintiff must allege facts supporting the conclusion that the defendant unjustly retained a benefit

to the plaintiff's detriment, and that the defendant's retention of the benefit violates the

principles of justice, equity, and good conscience."  HPI Health Care Services, Inc. v. Mt.

Vernon Hospital, Inc., 131 Ill. 2d 145, 160 (Ill. 1989).   Additionally, there must be an

independent basis that establishes a duty on the part of the defendant to act and the defendant

must have failed to abide by that duty.  Martis v. Grinnel Mut. Reinsurance Co., 388 Ill. App. 3d

1017, 1025 (2009).

Plaintiffs have alleged that pursuant to the DPPA defendant had a duty to refrain from obtaining their personal information for an impermissible use, and that defendant financially benefited to plaintiffs' detriment when it violated this duty by acquiring plaintiffs' personal information and selling it on the internet for a profit.  However, as discussed above, even if defendant had a duty to refrain from obtaining plaintiffs' personal information for an impermissible use,  plaintiffs cannot show that defendant unjustly retained a benefit to plaintiffs' detriment because plaintiff fails to show that defendant was not an authorized recipient under the DPPA.   As such, plaintiffs have failed to alleged the requisite elements of an unjust enrichment claim, and defendant's motion to dismiss Count II is granted.

**IV.  Motion to Dismiss Count III - Injunctive Relief**

Defendant seeks dismissal of Count III of the complaint because injunctive relief is a remedy and not a stand-alone cause of action.  The court agrees.  Moreover, to the extent that plaintiffs' request is for post-judgment relief, the request for equitable relief fails because all other counts of the complaint have been dismissed.  Consequently, defendant's motion to dismiss Count III is granted.

<u>**CONCLUSION**</u>

For the reasons discussed above, defendant's motion to dismiss the entire complaint is granted.

**ENTER:**       **December 23, 2009**

**Robert W. Gettleman**

13

**United States District Judge**

2der Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 4760 | **DATE** | 12/23/2009 |
| **CASE TITLE** | Lisa M. Graczyk, et al      vs      West Publishing Corp. | | |

**DOCKET ENTRY TEXT:**

Memorandum opinion and order entered.
Accordingly, defendant's motion [12] to dismiss the entire complaint is granted.
Status hearing date of 1/14/2010 is stricken.

[For further detail see separate order]
[Docketing to mail  notice]

00:00

| | Courtroom Deputy | GDS |
|---|---|---|

```
MIME-Version:1.0
From:usdc_ecf_ilnd@ilnd.uscourts.gov
To:ecfmail_ilnd@ilndlei.ilnd.circ7.dcn
Bcc:
--Case Participants: David Zev Smith (bboksa@reedsmith.com, dzsmith@reedsmith.com), Blake
Anthony Strautins (b.strautins@barnowlaw.com), Diane Green-Kelly
(dgreenkelly@reedsmith.com, dperkowski@reedsmith.com), Ben Barnow (b.barnow@barnowlaw.com,
s.harris@barnowlaw.com), Aron David Robinson (adroblaw@aol.com), Honorable Robert W.
Gettleman (e-filing_gettleman@ilnd.uscourts.gov)
--Non Case Participants: Clerk of Court, US Court of Appeals
(jennifer_doerr@ca7.uscourts.gov), Denise Jordan (denise_brooks@ilnd.uscourts.gov), Gloria
Jones (gloria_jones@ilnd.uscourts.gov)
--No Notice Sent:

Message-Id:6960850@ilnd.uscourts.gov
Subject:Activity in Case 1:09-cv-04760 Graczyk et al v. West Publishing Corp. 455.00 fee
payment of notice of appeal
Content-Type: text/html
```

### United States District Court

### Northern District of Illinois – CM/ECF LIVE, Ver 4.0.3

## Notice of Electronic Filing

The following transaction was entered by Barnow, Ben on 1/22/2010 at 1:56 PM CST and filed on 1/22/2010

| | |
|---|---|
| **Case Name:** | Graczyk et al v. West Publishing Corp. |
| **Case Number:** | 1:09−cv−04760 |
| **Filer:** | Lisa M. Graczyk |
| | Matthew M. Jorge |
| | Brian Willingham |

**WARNING: CASE CLOSED on 12/23/2009**

| | |
|---|---|
| **Document Number:** | 28(No document attached) |

**Docket Text:**
 **PAYMENT by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham of Filing fee $ 455, receipt number 0752−4460505. (Barnow, Ben)**

**1:09−cv−04760 Notice has been electronically mailed to:**

Aron David Robinson    adroblaw@aol.com

Ben Barnow    b.barnow@barnowlaw.com, s.harris@barnowlaw.com

Blake Anthony Strautins    b.strautins@barnowlaw.com

David Zev Smith    dzsmith@reedsmith.com, bboksa@reedsmith.com

Diane Green−Kelly    dgreenkelly@reedsmith.com, dperkowski@reedsmith.com

**1:09−cv−04760 Notice has been delivered by other means to:**

Mark S. Melodia
Reed Smith LLP
136 MainStreet
Suite 250
Princeton, NJ 08540

Paul J. Bond
Reed Smith LLP
136 Main Street
Suite 250
Princeton, NJ 08540

**APPEAL TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No: 1:09-cv-04760 (RWG) |
| v. | Hon. Judge Robert W. Gettleman |
| West Publishing Corp., a Minnesota corporation, | |
| Defendant. | |

**PLAINTIFFS' NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs-Appellants, Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, hereby appeal to the United States Court of Appeals for the Seventh Circuit from:  (1) the Minute Order dated December 23 2009, (D.E. # 27), entered by the U.S. District Court for the Northern District of Illinois, Eastern Division, U.S. District Judge Robert W. Gettleman, Judge Presiding (hereinafter "the District Court"), dismissing Plaintiffs' case; and (2) the Memorandum Opinion and Order dated December 23, 2009, (D.E. # 26), entered by the District Court dismissing with prejudice Count I (Violation of the Federal Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*), Count

II (unjust enrichment), and Count III (injunctive relief) of Plaintiffs' Class Action

Complaint.

Dated:  January 22, 2010                    Respectfully Submitted,

                                            Lisa M. Graczyk, Matthew M. Jorge, and
                                            Brian Willingham, individually and on
                                            behalf of all others similarly situated,


                                            By:  ___/s/ Ben Barnow_____
                                                    Ben Barnow
                                                    Sharon Harris
                                                    Blake A. Strautins
                                                    Barnow and Associates, P.C.
                                                    1 North LaSalle Street, Suite 4600
                                                    Chicago, Illinois 60602
                                                    (312) 621-2000

                                            *Attorneys for Plaintiffs*

Aron D. Robinson
The Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, Illinois 60603
(312) 857-9050

**Certificate of Service by Electronic Means**

I, Ben Barnow, hereby certify that Plaintiffs' Notice of Appeal was caused to be served electronically this 22nd day of January, 2010, pursuant to ECF as to filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.


/s/  Ben Barnow_____

**APPEAL TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No: 1:09-cv-04760 (RWG) |
| v. | Hon. Judge Robert W. Gettleman |
| West Publishing Corp., a Minnesota corporation, | |
| Defendant. | |

**PLAINTIFFS' DOCKETING STATEMENT**

Pursuant to Circuit Rules 3(c) and 28(a), plaintiffs-appellants, Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by and through counsel, submit the following Docketing Statement:

**(1)     Jurisdiction of the District Court.**

The United States District Court for the Northern District of Illinois has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this action arises under statutes of the United States, specifically the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721, *et seq.* The DPPA specifically authorizes the district court to exercise jurisdiction. The district court has supplemental jurisdiction over the claims set forth in Counts II and III pursuant to 28 U.S.C.A. §1367.

Furthermore, the district has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, includes more than 100 Class members, and is a class action in which at least one of the Class members is a citizen of a different state than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A)

Plaintiff-Appellants Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham are citizens of Illinois. Defendant West Publishing Corp. is a Minnesota corporation with its principal place of business located in Minnesota.

**(2)      Jurisdiction of the Appellate Court.**

The jurisdiction of the appellate court arises under 28 U.S.C. § 1291 (final judgment). On December 23, 2009, the district court entered a final judgment in this matter.

Plaintiffs appeal the following judgments or decrees entered by the district court: (1) the Minute Order dated December 23 2009, entered by the district court, dismissing Plaintiffs' case; and (2) the Memorandum Opinion and Order dated December 23, 2009, entered by the district court, dismissing with prejudice Count I (Violation of the Federal Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*), Count II (unjust enrichment), and Count III (injunctive relief) of Plaintiffs' Class Action Complaint.

Plaintiffs' Notice of Appeal was filed on January 22, 2010.

Dated:  January 22, 2010

Respectfully Submitted,

Lisa M. Graczyk, Matthew M. Jorge, and
Brian Willingham, individually and on
behalf of all others similarly situated,


By:   _/s/ Ben Barnow_____
          Ben Barnow (counsel of record)
          Sharon Harris
          Blake A. Strautins
          Barnow and Associates, P.C.
          1 North LaSalle Street, Suite 4600
          Chicago, Illinois 60602
          (312) 621-2000

          ***Attorneys for Plaintiffs***

Aron D. Robinson
The Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, Illinois 60603
(312) 857-9050

**Certificate of Service by Electronic Means**

I, Ben Barnow, hereby certify that Plaintiffs' Docketing Statement was caused to be served electronically this 22nd day of January, 2010, pursuant to ECF as to filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.


/s/  Ben Barnow_____



# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### 219 SOUTH DEARBORN STREET
### CHICAGO, ILLINOIS 60604

**MICHAEL W. DOBBINS**
CLERK

312-435-5670

January 25, 2010

09cv4760            Graczyk et al v. West Publishing Corp.            Judge Gettleman

The attached copy of the Notice of Appeal is being mailed to all parties pursuant to F.R.A.P.3 (d).  The record on this appeal is due on or before 2/12/2010.

Circuit Rule 10 provides that the entire record except for certain miscellaneous procedural documents be forwarded to the Court of Appeals.  If any of the automatically excluded items need to be included in the record, counsel has until 2/5/2010 to inform the Clerk of the District Court; specifying in writing which are so required and the date of their filing (i.e. Descriptive list).

Counsel must ensure that Trial Exhibits to be included in the record which are not listed on the District Court docket and/or in the possession of the District Court Clerk are furnished to the Clerk on or before 2/5/2010, together with a Exhibit List.

F.R.A.P. 10 (b) requires that within fourteen (14) days of the filing of the Notice of Appeal, the appellant order a transcript of such parts of the proceedings not already on file which he/she deems necessary for the record.  Should appellant order less than the entire transcript, he/she is required to file and serve on appellee a description of the parts he/she intends to order.  Under such circumstances, appellee has fourteen (14) days after service within which to order any additional parts of the transcript.  Counsel in criminal cases should also be familiar with Circuit Rule 11(a) and 11(b).

In the event it becomes necessary to supplement the record on appeal with documents already on file with the Clerk, a court order will be required prior to any supplement being transmitted.

Sincerely,

Michael W. Dobbins, Clerk

By: _____
     G. Jones, Deputy Clerk

*INCLUDED ITEMS*: ALL BRIEFS, MEMORANDA.
*ITEMS NOT INCLUDED*: NOTICE OF FILING, NOTICE OF MOTION, SUBPOENAS, SUMMONS, BONDS, STATUS HEARINGS, EXTENSIONS OF TIME, AFFIDAVITS, AFFIDAVITS OF SERVICE, NOTICES OF SETTING, DEPOSITION AND NOTICES, AND JURY LIST.

**APPEAL TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No: 1:09-cv-04760 (RWG) |
| v. | Hon. Judge Robert W. Gettleman |
| West Publishing Corp., a Minnesota corporation, | |
| Defendant. | |

<u>**PLAINTIFFS' NOTICE OF APPEAL**</u>

Notice is hereby given that Plaintiffs-Appellants, Lisa M. Graczyk, Matthew

M. Jorge, and Brian Willingham (hereinafter "Plaintiffs"), individually and on

behalf of all others similarly situated, hereby appeal to the United States Court

of Appeals for the Seventh Circuit from:  (1) the Minute Order dated December

23 2009, (D.E. # 27), entered by the U.S. District Court for the Northern

District of Illinois, Eastern Division, U.S. District Judge Robert W. Gettleman,

Judge Presiding (hereinafter "the District Court"), dismissing Plaintiffs' case;

and (2) the Memorandum Opinion and Order dated December 23, 2009, (D.E. #

26), entered by the District Court dismissing with prejudice Count I (Violation

of the Federal Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*), Count

II (unjust enrichment), and Count III (injunctive relief) of Plaintiffs' Class Action

Complaint.

Dated: January 22, 2010                  Respectfully Submitted,

                                         Lisa M. Graczyk, Matthew M. Jorge, and
                                         Brian Willingham, individually and on
                                         behalf of all others similarly situated,


                                         By:    /s/ Ben Barnow
                                                Ben Barnow
                                                Sharon Harris
                                                Blake A. Strautins
                                                Barnow and Associates, P.C.
                                                1 North LaSalle Street, Suite 4600
                                                Chicago, Illinois 60602
                                                (312) 621-2000

                                                *Attorneys for Plaintiffs*

Aron D. Robinson
The Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, Illinois 60603
(312) 857-9050

2

**Certificate of Service by Electronic Means**

      I, Ben Barnow, hereby certify that Plaintiffs' Notice of Appeal was caused to be served electronically this 22nd day of January, 2010, pursuant to ECF as to filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.

                        /s/  Ben Barnow_____

## SEVENTH CIRCUIT COURT OF APPEALS INFORMATION SHEET

Include the names of all plaintiffs (petitioners) and defendants (respondents) who are parties to the appeal.  Use a separate sheet if needed.

NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION DOCKET NUMBER:   09cv4760

| PLAINTIFF (Petitioner) | v. | DEFENDANT (Respondent) |
|---|---|---|
| Lisa M. Graczyk, et al/Appellants | | West Publishing Corp./Appellee |

(Use separate sheet for additional counsel)

| PETITIONER'S COUNSEL | | RESPONDENT'S COUNSEL | |
|---|---|---|---|
| Name | Ben Barnow | Name | Diane Green-Kelly |
| Firm | Barnow and Associates, P.C. | Firm | Reed Smith LLP |
| Address | One North LaSalle Street Suite 4600 Chicago, IL 60602 | Address | 10 South Wacker Drive 40th Floor Chicago, IL 60606 |
| Phone | 312-621-2000 | Phone | 312-207-1000 |

| Other Information | | | |
|---|---|---|---|
| District Judge | Gettleman | Date Filed in District Court | 8/4/2009 |
| Court Reporter | J. Costales     7626 | Date of Judgment | 12/28/2009 |
| Nature of Suit | 890 | Date of Notice of Appeal | 1/22/2010 |

COUNSEL:          Appointed [ ]          Retained [ X ]          Pro Se [ ]

FEE STATUS:          Paid [ X ]          Due [ ]          IFP [ ]

          IFP Pending [ ]          U.S. [ ]          Waived [ ]

Has Docketing Statement been filed with the District Court Clerk's Office?          Yes [ X ]          No [ ]

If State/Federal Habeas Corpus (28 USC 2254/28 USC 2255), was Certificate of Appealability:

          Granted [ ]          Denied [ ]          Pending [ ]

If Certificate of Appealability was granted or denied, date of order: _____

If defendant is in federal custody, please provide U.S. Marshall number (USM#): _____

**IMPORTANT: THIS FORM IS TO ACCOMPANY THE SHORT RECORD SENT TO THE CLERK OF THE U.S. COURT OF APPEALS PURSUANT TO CIRCUIT RULE 3(A).   Rev 04/01**

**APPEAL TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No: 1:09-cv-04760 (RWG) |
| v. | Hon. Judge Robert W. Gettleman |
| West Publishing Corp., a Minnesota corporation, | |
| Defendant. | |

## PLAINTIFFS' DOCKETING STATEMENT

Pursuant to Circuit Rules 3(c) and 28(a), plaintiffs-appellants, Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by and through counsel, submit the following Docketing Statement:

**(1)     Jurisdiction of the District Court.**

The United States District Court for the Northern District of Illinois has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this action arises under statutes of the United States, specifically the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721, *et seq.* The DPPA specifically authorizes the district court to exercise jurisdiction. The district court has supplemental jurisdiction over the claims set forth in Counts II and III pursuant to 28 U.S.C.A. §1367.

Furthermore, the district has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, includes more than 100 Class members, and is a class action in which at least one of the Class members is a citizen of a different state than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A)

Plaintiff-Appellants Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham are citizens of Illinois. Defendant West Publishing Corp. is a Minnesota corporation with its principal place of business located in Minnesota.

**(2)    Jurisdiction of the Appellate Court.**

The jurisdiction of the appellate court arises under 28 U.S.C. § 1291 (final judgment). On December 23, 2009, the district court entered a final judgment in this matter.

Plaintiffs appeal the following judgments or decrees entered by the district court: (1) the Minute Order dated December 23 2009, entered by the district court, dismissing Plaintiffs' case; and (2) the Memorandum Opinion and Order dated December 23, 2009, entered by the district court, dismissing with prejudice Count I (Violation of the Federal Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*), Count II (unjust enrichment), and Count III (injunctive relief) of Plaintiffs' Class Action Complaint.

Plaintiffs' Notice of Appeal was filed on January 22, 2010.

Dated: January 22, 2010         Respectfully Submitted,

Lisa M. Graczyk, Matthew M. Jorge, and
Brian Willingham, individually and on
behalf of all others similarly situated,


By:   __/s/ Ben Barnow_____
       Ben Barnow (counsel of record)
       Sharon Harris
       Blake A. Strautins
       Barnow and Associates, P.C.
       1 North LaSalle Street, Suite 4600
       Chicago, Illinois 60602
       (312) 621-2000

       ***Attorneys for Plaintiffs***

Aron D. Robinson
The Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, Illinois 60603
(312) 857-9050

**Certificate of Service by Electronic Means**

I, Ben Barnow, hereby certify that Plaintiffs' Docketing Statement was caused to be served electronically this 22nd day of January, 2010, pursuant to ECF as to filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.

/s/  Ben Barnow_____

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 4760 | **DATE** | 12/23/2009 |
| **CASE TITLE** | Lisa M. Graczyk, et al          vs          West Publishing Corp. | | |

**DOCKET ENTRY TEXT:**

Memorandum opinion and order entered.
Accordingly, defendant's motion [12] to dismiss the entire complaint is granted.
Status hearing date of 1/14/2010 is stricken.

[For further detail see separate order]
[Docketing to mail  notice]

00:00

| | |
|---|---|
| Courtroom Deputy | GDS |

Page 1 of  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LISA M. GRACZYK, MATTHEW M. JORGE,    )
and BRIAN WILLINGHAM, individually and    )
on behalf of others similarly situated,    )
                                          )
           Plaintiffs,                    )          No. 09 C 4760
     v.                                   )
                                          )          Judge Robert W. Gettleman
WEST PUBLISHING CORP., a Minnesota        )
Corporation,                              )
                                          )
           Defendant.                     )

**MEMORANDUM OPINION AND ORDER**

Lead plaintiffs Lisa M. Graczyk, Matthew M. Jorge, and Brian Willingham have brought

a three count putative class action complaint against defendant, West Publishing Corporation,

alleging violation of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2722 *et seq.*,

(Count I), unjust enrichment (Count II), and a claim for injunctive relief (Count III).  Defendant

has moved to dismiss the entire complaint for failure to state a claim under Fed. R. Civ. P.

12(b)(6) and for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1).  For the reasons explained

below, defendant's motions are granted.

**BACKGROUND**

Plaintiffs allege that defendant acquired motor vehicle records and the corresponding

"personal information" and/or "highly restricted personal information" of millions of licensed

drivers, including plaintiffs, from the department of motor vehicles of various states[1] (and/or

---

[1]    Lead plaintiffs are citizens of the State of Illinois and licensed to drive in Illinois.
Class members are individuals were licensed to drive in the States of Alabama, Alaska,
Colorado, Connecticut, Florida, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland,
Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico,

1

entities that acquired this information from those states) under the pretense that the data would

be used only for legitimate purposes outlined in the DPPA.  Defendant then allegedly made the

information in the records available for search and sale on the internet.


**DISCUSSION**

**I.  Driver's Privacy Protection Act**

State Departments of Motor Vehicles ("DMVs") require drivers and motor vehicle

owners to supply personal information, such as their names, addresses, telephone numbers,

Social Security numbers, photographs, medical conditions, and vehicle descriptions when

applying for a driver's license or registering a vehicle.  Reno v. Condon, 528 U.S. 141, 143

(U.S. 2000).  In 1993 Congress enacted the Driver's Privacy Protection Act ("DPPA") to protect

these individuals' privacy by setting limits on how state DMVs can share this personal

information.[2]

The DPPA generally prohibits state DMVs, their officers, employees, or contractors from

"knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal

information . . .  or highly restricted personal information about any individual obtained by the

department in connection with a motor vehicle record."[3]  18 U.S.C. § 2721(a).  The DPPA also

---

New York, North Dakota, Ohio, Tennessee, Texas, Utah, Wisconsin, Wyoming, and the District
of Colombia.

    [2]  Congress passed the DPPA as an amendment to the Violent Crime Control and Law
Enforcement Act of 1993 in response to nationwide reports of perpetrators obtaining with
relative ease the personal information of their victims from state DMV records.  The most
infamous of these incidents was the 1989 murder of a young actress named Rebecca Schaeffer.
Schaeffer was killed in the threshold of her Los Angeles apartment by an obsessed fan who had
obtained her address, via a private investigator, from the California DMV.

    [3]  "Personal information" is defined as "information that identifies an individual,
including an individual's photograph, social security number, driver identification number,

provides a private right of action whereby:  "[A] person who knowingly obtains, discloses or

uses information, from a motor vehicle record, for a purpose not permitted under this chapter

shall be liable to the individual to whom the information pertains, who may bring a civil action

in a United States District Court." 18 U.S.C. § 2724(a).

The DPPA's general prohibition on disclosure of personal information is subject to 14

exceptions which allow for the limited disclosure of personal information.  18 U.S.C. § 2721(b)

provides:

> Permissible Uses - Personal information referred to in subsection (a) shall be
> disclosed for use in connection with matters of motor vehicle or driver safety and
> theft, motor vehicle emissions, motor vehicle product alterations, recalls, or
> advisories, performance monitoring of motor vehicles and dealers by motor
> vehicle manufacturers, and removal of non-owner records from the original owner
> records of motor vehicle manufacturers to carry out the purposes of titles I and IV
> of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act
> (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters
> 301, 305, and 321-331 of title 49, and, subject to subsection (a)(2), may be
> disclosed as follows:
>   (1) For use by any government agency, including any court or law enforcement
> agency, in carrying out its functions, or any private person or entity acting on
> behalf of a Federal, State, or local agency in carrying out its functions.
>   (2) For use in connection with matters of motor vehicle or driver safety and
> theft; motor vehicle emissions; motor vehicle product alterations, recalls, or
> advisories; performance monitoring of motor vehicles, motor vehicle parts and
> dealers; motor vehicle market research activities, including survey research; and
> removal of non-owner records from the original owner records of motor vehicle
> manufacturers.
>   (3) For use in the normal course of business by a legitimate business or its
> agents, employees, or contractors, but only--
>     (A) to verify the accuracy of personal information submitted by the individual
> to the business or its agents, employees, or contractors; and
>     (B) if such information as so submitted is not correct or is no longer correct,
> to obtain the correct information, but only for the purposes of preventing fraud by,

---

name, address (but not the 5-digit zip code), telephone number, and medical or driving
violations, and driver's status."  "Highly restricted personal information" is defined as "an
individual's photograph or image, social security number, medical or disability information."

3

pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

(7) For use in providing notice to the owners of towed or impounded vehicles.

(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49 [49 USCS §§ 31301 et seq.].

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

In addition, § 2721(c) of the DPPA permits "authorized recipient[s]" of personal

information to resell or redisclose this information:

(c) Resale or redisclosure. An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b) (11) or (12)). An authorized recipient under subsection (b)(11) may resell or redisclose personal information for any purpose. An authorized recipient under subsection (b)(12) may resell or redisclose personal information pursuant to subsection (b)(12). Any authorized recipient (except a recipient under subsection

4

(b)(11)) that resells or rediscloses personal information covered by this chapter [18 USCS §§ 2701 *et seq.*] must keep for a period of 5 years records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request.

The complaint is based on the principal allegation that defendant is not an "authorized recipient" because authorized recipients are limited to those who have a permissible use for the information as provided by § 2721(b).  Notably, the DPPA does not define "authorized recipient."  Defendant has moved to dismiss the complaint for lack of standing under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  Because the standing inquiry is dependent on the outcome of the court's analysis of the Rule 12(b)(6) motion, the court will consider the latter issue first.

## II.  Motion to Dismiss Count I

### A.  *Rule 12(b)(6)*

Ruling on a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor.  Sprint Spectrum L.P. v. City of Carmel, Indiana, 361 F.3d 998, 1001 (7th Cir. 2004).  The complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which the claims rest.  The allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above the "speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-73, 167 L.Ed.2d 929 (2007).

Plaintiffs allege that defendant obtained, disclosed, and used their personal information for a purpose not permitted under the DPPA, namely resale of drivers' personal information for a

5

profit without their consent.  Under their reading of the statute, an "authorized recipient" is a recipient with at least one of the permissible uses listed in § 2721(b).  Defendant argues that the plain language of § 2721(c) clearly contradicts any intent by Congress to prohibit a data aggregator, like defendant, to obtain and resell plaintiffs' personal information as an authorized recipient.  According to defendant, it qualifies as an "authorized recipient" despite not having a "permissible use" listed in § 2721(b) because Congress did not specify that "authorized recipients" must be "permissible users."  Defendant further argues that it never "used" plaintiffs' personal information because it merely facilitated the process by which persons and entities with permissible uses gained access to the information.  Finally, defendant cites numerous policy reasons in support of its interpretation of the DPPA's language.  The court will consider each argument in turn, starting with a statutory analysis of the term "authorized recipients."

*1. Language of the Statute*

The court begins with the language of the DPPA itself.  <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979).  It is a fundamental canon of statutory construction that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." <u>Id.</u>  Although the statute does not provide a definition of "authorized recipient," the meaning of the term can readily be inferred from its ordinary meaning and the context in which it appears. Read in the context of the DPPA, "authorized recipient" unambiguously refers to an individual or entity authorized to receive personal information for sale or resale.

This interpretation is embraced in the majority of federal court decisions that have already considered this issue.  See <u>Russell v. ChoicePoint Services, Inc.</u> 300 F. Supp. 2d 450

(E.D. La. 2004)("Russell I"); <u>Russell v. ChoicePoint Services, Inc.</u>, 302 F. Supp. 2d 654 (E.D.

La. 2004)('Russell II") (reaffirming analysis of <u>Russell I</u>); <u>Taylor v. Acxiom Corporation</u>, 2:07-

cv-0001 (E.D. Tex. Sept. 8, 2008)(same).  The plaintiff in <u>Russell I</u> alleged that the defendant

had illegally obtained personal information from the Louisiana DMV for the impermissible

purpose of disclosure and distribution by resale.  The <u>Russell I</u> court dismissed the claim under

Rule 12(b)(6) on the ground that if the defendant (a data aggregator) was an "authorized

recipient" of the plaintiff's personal information, then resale of this information to an entity with

a permissible use was itself permitted under 2721(c).  The court also held that "[t]he plain

language of the DPPA permits entities like [defendant] to obtain drivers' personal information"

to "subsequently resell that information to third parties with a permissible use."  <u>Russell I</u>, 300 F.

Supp. 2d at 455.  In reaching its decision, the <u>Russell I</u> court engaged in a lengthy analysis,

distinguishing the dictionary definition of the words "recipient" and "user," and concluded that

"[i]f Congress had intended to require that the 'authorized recipient' of personal information also

be a user of that information, it could have written the DPPA exceptions explicitly to that effect."

<u>Id.</u> at 457.  The court agrees.

    The DPPA is written to restrict uses of personal information rather than users of that

information.  In keeping with this use-based orientation, Section 2721(c) unambiguously allows

for resale or redisclosure of personal information for uses permitted under section 2721(b).  The

only restriction on resale or redisclosure is that it must be done by an authorized recipient.

Because the DPPA is silent on who may be designated as an authorized recipient and nothing in

the text of the requires that such a recipient also have a permissible use, the logical conclusion is

that individual states can make this designation.  While it may be conceivable that Congress

could have deliberately intended "authorized recipient" to mean "authorized user," this interpretation becomes untenable when the overall statutory scheme is considered.

*2. Legislative History and Policy Considerations*

"When statutory language is unambiguous, it is presumed to express the legislative purpose and resort to the legislative history is not necessary." United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave., 903 F.2d 490, 493 (7th Cir. 1990) (citing American Tobacco Company v. Patterson, 456 U.S. 63, 68, 71 L. Ed. 2d 748, 102 S. Ct. 1534 (1982)). Nonetheless, the court may look beyond the express language of the statute to give force to Congressional intent "where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result." United States v. Tex-Tow, Inc., 589 F.2d 1310, 1313 (7th Cir. 1978) (quoting International Telephone and Telegraph Corporation v. General Telephone & Electronics Corp., 518 F.2d 913, 917-918 (9th Cir. 1975).

Defendant argues that "subjecting a company to potential billion-dollar liability when it merely helped accomplish the lawful use of information is an absurd result." It also argues that the DPPA expressly permits the resale of personal information and does not require resellers to have their own permissible use in order to obtain personal information for resale. Defendant further contends that "plaintiff's interpretation of § 2721(c) -- that resellers need their own permissible uses to obtain data -- would render § 2721(c) meaningless."

Specifically, defendant argues that the Congressional Record clearly reflects Congress' intention to restrict disclosure of personal information only for reasons totally incompatible with the reasons for which it was collected. It contends that defendant's resale and redisclosure of the

8

plaintiffs' personal information was compatible with the authorized purposes because it was ultimately released only to persons or entities with permissible uses under the DPPA.  Defendant again relies on Russell I, where the court dismissed a similar claim noting that if a bulk purchaser is an "authorized recipient" of the information, then resale to a person with a permissible use is itself permitted.[4]  The gravamen of defendant's argument is that state-authorized bulk purchasers can obtain drivers' personal information for resale or redistribution to other entities with a permissible use under § 2721(b), but not for its own use.  Under this reading of the statute, obtaining and reselling the data do not qualify as "uses" of the information.  The court agrees.

A thorough review of the Congressional Record strongly suggests that a literal interpretation, as discussed above, would thwart the purpose of the over-all statutory scheme and lead to absurd results.  The comments made during the Senate and House debates of the DPPA indicate a clear intention to prevent unfettered access to personal information and to give individuals more control over the disclosure of their personal information, while continuing to allow state DMVs to disclose the information for legitimate government and business needs.  Various senators and representatives, including the amendment's sponsors, further

---

[4]   Defendant also draws the court's attention to a private opinion letter authored by the U.S. Department of Justice ("DOJ") in response to an inquiry from the Massachusetts Registry of Motor Vehicles ("RMV") inquiring "whether [the DMV] may release information to a commercial distributor who disseminates that information only to other authorized recipients or entities that use the information solely for authorized purposes." In analyzing the DPPA, DOJ reasoned that the several provisions of the statute "regulated only the ultimate use of the personal information without specifying or restricting who may obtain the information in order to accomplish that authorized purpose."  DOJ concluded that if the RMV could reasonably conclude that the personal information would be used ultimately for authorized purposes only, it could release the information to a commercial distributor.

acknowledged that the DPPA was intended to allow state DMVs to continue selling personal information to direct marketers so long as individuals are given the opportunity refusing to allow the state to sell their personal information for "reasons that are totally incompatible with the purpose for which the information was collected." 139 Cong. Rec. S15745-01, S15763 (Nov. 16, 1993)(statement of Senator Boxer). These concerns are explicitly reflected in the final text of §§ 2721b(11) and b(12) as consent clauses. The emphasis of the consent clauses was to allow individuals a measure of control over the disclosure of their personal information for uses unrelated to the purpose(s) for which it was collected." 139 Cong. Rec. S15745-01, S15763 (Nov. 16, 1993)(statement of Senator Warner). In keeping with this intention to ensure that data is only sold or redisclosed to individuals or entities with permissible uses, § 2721(c) provides the additional safeguard that authorized recipients must keep records of the persons and entities that receive the information and the permitted purposes for which the information will be used.

Additionally, although not binding authority, the court notes that the DOJ and numerous states, including Illinois, have interpreted the DPPA to allow DMVs to authorize data aggregators to receive and resell data to facilitate efficient compilation and dissemination of personal information between and among users with permissible purposes across the country. If the court were to read the statute as barring data aggregators from reselling and redisclosing personal information to entities with permissible uses, many crucial government and legitimate business efforts, including criminal investigations, consumer protection, and driver safety, would be thwarted.

Moreover, if defendant was found liable for obtaining plaintiffs' and class members' personal information without a permissible use, its liability under § 2724 would potentially be in

10

the billions of dollars in liquidated damages.  This is an absurd result not in keeping with the

plain language, intent, or spirit of the DPPA.  Having considered the clear legislative intent of

Congress is passing the DPPA, the purpose of the over-all statutory scheme, the court grants

defendant's motion to dismiss Count I for failure to state a claim.


**B. Rule 12(b)(1)**

Defendants have also moved to dismiss the complaint pursuant to Fed. R. Civ. P.

12(b)(1) arguing that because plaintiffs have not alleged that they suffered any actual injury in

fact, the court lacks subject matter jurisdiction over their DPPA claims.

To establish standing, a plaintiff must show: (1) injury in fact, meaning an invasion of a

legally protected interest that is concrete and particularized, actual or imminent, and not

conjectural or hypothetical; (2) a causal connection between the injury and the conduct

complained of such that the injury is fairly traceable to the defendant's actions; and (3) that a

favorable decision is likely to redress the injury.  Tobin for Governor v. Ill. State Bd. of

Elections, 268 F.3d 517, 527-28 (7th Cir. 2001) (citing Lujan v. Defenders of Wildlife, 504 U.S.

555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  Abstract injury is not enough to

establish injury in fact; the plaintiff must establish that he has sustained or is immediately in

danger of sustaining some direct injury.  See City of Los Angeles v. Lyons, 461 U.S. 95, 101-02,

103 S. Ct. 1660, 75 L. Ed. 2d 675 (1993).

The complaint alleges that defendant obtained and disseminated plaintiffs' and proposed

Class members' personal information and/or highly restricted personal information for search

and sale on the internet in violation of the DPPA.  In light of the discussion above, these

11

allegations fall woefully short of establishing standing. First, because plaintiffs have not alleged or pled any facts showing that defendant improperly obtained and/or used their personal information, plaintiffs have failed to show that they have suffered an injury-in-fact. Second, plaintiffs have not pled a causal connection between defendant's alleged violations of the DPPA and the alleged harm plaintiffs' suffered. Finally, plaintiffs have failed to demonstrate that a favorable decision in the instant case is likely to redress their alleged injury. Accordingly, plaintiffs' have failed to establish standing, and defendant's motion to dismiss pursuant to 12(b)(1) is granted.

### III. Motion to Dismiss Count II - Unjust Enrichment

Defendant has moved to dismiss Count II of the complaint under Fed. R. Civ. P. 12(b)(6) arguing that plaintiffs do not and cannot explain how they have suffered any detriment as a result of defendant's resale of their personal information to entities with permissible uses.

Under Illinois law, "to state a cause of action based on a theory of unjust enrichment, a plaintiff must allege facts supporting the conclusion that the defendant unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the principles of justice, equity, and good conscience." HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131 Ill. 2d 145, 160 (Ill. 1989). Additionally, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty. Martis v. Grinnel Mut. Reinsurance Co., 388 Ill. App. 3d 1017, 1025 (2009).

Plaintiffs have alleged that pursuant to the DPPA defendant had a duty to refrain from obtaining their personal information for an impermissible use, and that defendant financially benefited to plaintiffs' detriment when it violated this duty by acquiring plaintiffs' personal information and selling it on the internet for a profit.  However, as discussed above, even if defendant had a duty to refrain from obtaining plaintiffs' personal information for an impermissible use,  plaintiffs cannot show that defendant unjustly retained a benefit to plaintiffs' detriment because plaintiff fails to show that defendant was not an authorized recipient under the DPPA.   As such, plaintiffs have failed to alleged the requisite elements of an unjust enrichment claim, and defendant's motion to dismiss Count II is granted.

**IV.  Motion to Dismiss Count III - Injunctive Relief**

Defendant seeks dismissal of Count III of the complaint because injunctive relief is a remedy and not a stand-alone cause of action.  The court agrees.  Moreover, to the extent that plaintiffs' request is for post-judgment relief, the request for equitable relief fails because all other counts of the complaint have been dismissed.  Consequently, defendant's motion to dismiss Count III is granted.

<u>**CONCLUSION**</u>

For the reasons discussed above, defendant's motion to dismiss the entire complaint is granted.

**ENTER:**       **December 23, 2009**

**Robert W. Gettleman**

13

**United States District Judge**

APPEAL, NOLAN, TERMED

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 4.0.3 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:09-cv-04760
## Internal Use Only

Graczyk et al v. West Publishing Corp.

Assigned to: Honorable Robert W. Gettleman

Demand: $9,999,000

Cause: 28:1331 Federal Question

Date Filed: 08/04/2009

Date Terminated: 12/23/2009

Jury Demand: Plaintiff

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: Federal Question

**Plaintiff**

**Lisa M. Graczyk**          represented by  **Ben Barnow**
Barnow and Associates, P.C.
One North LaSalle Street
Suite 4600
Chicago, IL 60602
(312) 621-2000
Email:
b.barnow@barnowlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aron David Robinson**
Law Office of Aron D. Robinson
19 South LaSalle Street
Suite 1200
Chicago, IL 60603
(312) 857-9050
Email: adroblaw@aol.com
*ATTORNEY TO BE NOTICED*

**Blake Anthony Strautins**
Barnow and Associates, P.C.
One North LaSalle Street
Suite 4600
Chicago, IL 60602
(312) 621-2000
Email:

b.strautins@barnowlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Matthew M. Jorge**                    represented by  **Ben Barnow**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Aron David Robinson**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Blake Anthony Strautins**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian Willingham**                    represented by  **Ben Barnow**
*individually and on behalf of all*                     (See above for address)
*others similarly situated*                             *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Aron David Robinson**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Blake Anthony Strautins**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**West Publishing Corp.**               represented by  **Diane Green-Kelly**
*a Minnesota corporation*                               Reed Smith LLP
                                                        10 South Wacker Drive
                                                        40th Floor
                                                        Chicago, IL 60606
                                                        (312) 207-1000
                                                        Email:
                                                        dgreenkelly@reedsmith.com
                                                        *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**David Zev Smith**
Reed Smith LLP
10 South Wacker Drive
40th Floor
Chicago, IL 60606
(312) 207-1000
Email: dzsmith@reedsmith.com
*ATTORNEY TO BE NOTICED*

**Mark S. Melodia**
Reed Smith LLP
136 MainStreet
Suite 250
Princeton, NJ 08540
609 520 6015
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul J. Bond**
Reed Smith LLP
136 Main Street
Suite 250
Princeton, NJ 08540
609 520 6393
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/04/2009 | 1 | COMPLAINT filed by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham; Jury Demand. Filing fee $ 350, receipt number 07520000000003983529.(Barnow, Ben) (Entered: 08/04/2009) |
| 08/04/2009 | 2 | CIVIL Cover Sheet (Barnow, Ben) (Entered: 08/04/2009) |
| 08/04/2009 | 3 | ATTORNEY Appearance for Plaintiffs Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham by Ben Barnow (Barnow, Ben) (Entered: 08/04/2009) |
| 08/04/2009 | 4 | ATTORNEY Appearance for Plaintiffs Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham by Blake Anthony Strautins (Strautins, Blake) (Entered: 08/04/2009) |

| 08/04/2009 | 5 | ATTORNEY Appearance for Plaintiffs Lisa M. Graczyk, Matthew M. Jorge by Aron David Robinson (Robinson, Aron) (Entered: 08/04/2009) |
| 08/04/2009 | 6 | ATTORNEY Appearance for Plaintiff Brian Willingham by Aron David Robinson (Robinson, Aron) (Entered: 08/04/2009) |
| 08/05/2009 | | CASE ASSIGNED to the Honorable Robert W. Gettleman. Designated as Magistrate Judge the Honorable Nan R. Nolan. (li, ) (Entered: 08/05/2009) |
| 08/05/2009 | 7 | SUMMONS Issued as to Defendant West Publishing Corp. (ep, ) (Entered: 08/06/2009) |
| 08/20/2009 | 8 | SUMMONS Returned Executed by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham as to West Publishing Corp. on 8/12/2009, answer due 9/1/2009. (Strautins, Blake) (Entered: 08/20/2009) |
| 08/28/2009 | 9 | REQUEST for Clerk of Court to refund filing fee in the amount of 700.00, receipt no. 3983488; 3983515, regarding complaint 1 (Attachments: # 1 Exhibit)(Strautins, Blake) (Entered: 08/28/2009) |
| 09/30/2009 | 10 | ATTORNEY Appearance for Defendant West Publishing Corp. by David Zev Smith (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 11 | Corporate Disclosure Statement by West Publishing Corp. (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 12 | MOTION by Defendant West Publishing Corp. to dismiss *Plaintiffs' Complaint* (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 13 | MEMORANDUM by West Publishing Corp. in support of motion to dismiss 12 *Plaintiffs' Complaint* (Attachments: # 1 Exhibit Index A & B, # 2 Exhibit C part 1, # 3 Exhibit C part 2, # 4 Exhibit D, E, F, G)(Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 14 | NOTICE of Motion by David Zev Smith for presentment of motion to dismiss 12 before Honorable Robert W. Gettleman on 10/7/2009 at 09:15 AM. (Smith, David) (Entered: 09/30/2009) |
| 09/30/2009 | 15 | ATTORNEY Appearance for Defendant West Publishing Corp. by Diane Green-Kelly (Green-Kelly, Diane) (Entered: 09/30/2009) |
| 10/08/2009 | 16 | MINUTE entry before the Honorable Robert W. Gettleman: Motion hearing held on 10/8/2009 regarding motion to dismiss 12 . Response is due by 10/29/2009. Reply is due by 11/6/2009. Status hearing set for 1/14/2010 at 9:00 a.m. Mailed notice (gds, ) |

| | | (Entered: 10/09/2009) |
|---|---|---|
| 10/29/2009 | 17 | RESPONSE by Lisa M. Graczyk, Matthew M. Jorge, Brian Willinghamin Opposition to MOTION by Defendant West Publishing Corp. to dismiss *Plaintiffs' Complaint* 12 (Barnow, Ben) (Entered: 10/29/2009) |
| 11/03/2009 | 18 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000004245315. *on behalf of Defendant West Publishing Corporation* (Melodia, Mark) (Entered: 11/03/2009) |
| 11/03/2009 | 19 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000004245801. *on behalf of Defendant West Publishing Corporation* (Bond, Paul) (Entered: 11/03/2009) |
| 11/06/2009 | 20 | MOTION by Defendant West Publishing Corp. for extension of time to file response/reply as to motion to dismiss 12 *(Unopposed Motion for Extension of Time to File Reply Brief in Support of Its Motion to Dismiss)* (Smith, David) (Entered: 11/06/2009) |
| 11/06/2009 | 21 | NOTICE of Motion by David Zev Smith for presentment of motion for extension of time to file response/reply, motion for relief 20 before Honorable Robert W. Gettleman on 11/12/2009 at 09:15 AM. (Smith, David) (Entered: 11/06/2009) |
| 11/13/2009 | 22 | MEMORANDUM by West Publishing Corp. in support of motion to dismiss 12 *(Reply Memorandum of Law in Further Support of the Motion to Dismiss Plaintiffs' Complaint)* (Attachments: # 1 Exhibit Index and Exs. A to D)(Smith, David) (Entered: 11/13/2009) |
| 11/13/2009 | 23 | MINUTE entry before the Honorable Robert W. Gettleman: Motion for extension of time to 11/13/2009 to file reply regarding motion by defendant West Publishing Corp. to dismiss *Plaintiffs' Complaint* 12 20 is granted. Replies due by 11/13/2009. Telephone notice (gds, ) (Entered: 11/16/2009) |
| 12/04/2009 | 24 | REPORT of Rule 26(f) Planning Meeting (Strautins, Blake) (Entered: 12/04/2009) |
| 12/10/2009 | 25 | MINUTE entry before the Honorable Robert W. Gettleman: Motion 18 of Mark S. Melodia for leave to appear pro hac vice is granted. Motion 19 of Paul J. Bond for leave to appear pro hac vice is granted. Mailed notice (tc, ) (Entered: 12/11/2009) |
| 12/23/2009 | 26 | MEMORANDUM Opinion and Order. Signed by the Honorable |

| | | |
|---|---|---|
| | | Robert W. Gettleman on 12/23/2009. (ep, ) (Entered: 12/28/2009) |
| 12/23/2009 | 27 | MINUTE entry before Honorable Robert W. Gettleman: Memorandum opinion and order entered. Accordingly, defendant's motion 12 to dismiss the entire complaint is granted. Status hearing date of 1/14/2010 is stricken. Civil case terminated. (For further detail see separate order.) Mailed notice (ep, ) (Entered: 12/28/2009) |
| 01/22/2010 | 28 | PAYMENT by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham of Filing fee $ 455, receipt number 0752-4460505. (Barnow, Ben) (Entered: 01/22/2010) |
| 01/22/2010 | 29 | NOTICE of appeal by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham regarding orders 27 , 26 , Filing fee $ 455, receipt number 0752-4460505 (Barnow, Ben) Modified on 1/22/2010 (td, ). (Entered: 01/22/2010) |
| 01/22/2010 | 30 | DOCKETING Statement by Lisa M. Graczyk, Matthew M. Jorge, Brian Willingham regarding notice of appeal 29 (Barnow, Ben) (Entered: 01/22/2010) |
| 01/25/2010 | 31 | NOTICE of Appeal Due letter sent to counsel of record. (gej, ) (Entered: 01/25/2010) |

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF DOCKETING - Short Form

January 25, 2010

**To:**    Michael W. Dobbins
          District/Bankruptcy Clerk

The below captioned appeal has been docketed in the United States Court of Appeals for the Seventh Circuit:

---

Appellate Case No: 10-1193

Caption:
LISA M. GRACZYK, et al.,
Plaintiffs - Appellants

v.

WEST PUBLISHING COMPANY,
Defendant - Appellee

---

District Court No: 1:09-cv-04760
Court Reporter Jennifer Costales
Clerk/Agency Rep Michael Dobbins
District Judge Robert Gettleman

Date NOA filed in District Court: 01/22/2010

---

If you have any questions regarding this appeal, please call this office.

form name: **c7_Docket_Notice_short_form** (form ID: **188**)



## SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET

**PART I** – Must be completed by party or party's attorney pursuant to Rule 10(b) of the Federal Rules of Appellate Procedure and Rule 11(a) of the Circuit Rules. The appellant must file this form with the court reporter within 10 days of filing the notice of appeal, whether transcript is being ordered or not. (FRAP 10(b)(1)) Satisfactory arrangements with the court reporter for payment of the costs of the transcripts must also be made at that time. (FRAP 10(b)(4)) (Note: Appellees as well as appellants are expected to use this form when ordering transcripts.)

09 cv 4760

| Short Title | District<br>Northern | D.C. Docket No.<br>1:09-cv-04760 |
|---|---|---|
| Graczyk, et al. v. West Publishing Co. | District Judge<br>Robert W. Gettleman | Court Reporter<br>Jennifer Costales |

☐ I am ordering transcript.
☑ I am not ordering transcript, because: there was no hearing on the motion to dismiss.
☐ The transcript has been prepared.

Sign below and return original and one copy to court reporter. Distribute remaining copies to the Clerk of the District Court and opposing party, retaining one copy for yourself.

Indicate proceedings for which transcript is required. Dates must be provided:  Date(s)

☐ Pretrial proceedings. *Specify:* _____
☐ Voir Dire

Trial or Hearing. *Specify:* _____

☐ Opening statement
☐ Instruction conference
☐ Closing statements
☐ Court instructions
☐ Post-trial proceedings. *Specify:* _____
☐ Sentencing
☐ Other proceedings. *Specify:* _____

**FILED**
FEB - 5 2010
Feb 5, 2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

U.S. 7th Circuit
RECEIVED LMB
FEB 05 2010
GINO J. AGNELLO
CLERK

Method of Payment: ☐ Cash  ☐ Check or Money Order  ☐ C.J.A. Voucher
Status of Payment: ☐ Full Payment  ☐ Partial Payment  ☐ No Payment Yet

Signature: _____
Address: Barnow and Associates, P.C., One North LaSalle, Suite 4600, Chicago, IL 60602.

Telephone No. 312-621-2000
Date: 2/5/2010

**PART II** – Must be completed by Court Reporter pursuant to Rule 11(b) of the Federal Rules of Appellate Procedure. By signing this Part II, the Court Reporter certifies that *satisfactory arrangements for payment* have been made.

| U.S.C.A. Docket No. | Date Order Received | Estimated Completion Date | Estimated Length |
|---|---|---|---|

Signature of Court Reporter: _____  Date: _____

**NOTICE:** The Judicial Conference of the United States, by its resolution of March 11, 1982, has provided that a penalty of 10 percent must apply, unless a waiver is granted by the Court of Appeals' Clerk, when a "transcript of a case on appeal is not delivered within 30 days of the date ordered and payment received therefor." The penalty is 20 percent for transcript not delivered within 60 days.

*Original* to Court Reporter. *Copies to:* ● U.S.C.A. Clerk ● Service Copy ● District Court Clerk and to ● Party / Counsel Ordering Transcript.